# EXHIBIT B

# DEPOSITION EXCERPTS OF MICAHLYN POWERS, MD.

000008

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF WASHINGTON

3

4    DEMETRIOS VORGIAS,                    )
                                           )
5          Plaintiff,                      )
                                           )   NO. 1:21-CV-03013-SAB
6          v.                              )
                                           )
7    COMMUNITY HEALTH OF CENTRAL           )
     WASHINGTON,                           )
8                                          )
           Defendant.                      )
9

10

11        VIDEOTAPED VIDEOCONFERENCE DEPOSITION UPON ORAL

12        EXAMINATION OF MICHAHLYN POWERS, M.D.

13

                      November 4, 2021
14                        9:04 a.m.
                     Via Videoconference
15

16

17

18

19        TAKEN AT THE INSTANCE OF THE PLAINTIFF

20

21

22                    CERTIFIED COPY

23

24
     REPORTED REMOTELY BY:
25   DANI WHITE, CCR NO. 3352



Central Court Reporting    800.442.3376

Vorgias vs Community Health of Central Washington      Michahlyn Powers, M.D. 11/04/2021

```
 1    APPEARANCES VIA VIDEOCONFERENCE:

 2       FOR THE PLAINTIFF:

 3            MR. WILLIAM D. PICKETT
              Law Office of William D. Pickett
 4            Attorneys at Law
              917 Triple Crown Way, Suite 100
 5            Yakima, Washington  98908
              509.972.1825    509.972.1826 FAX
 6            bill@wdpickett-law.com

 7            MR. LUAN T. LE
              Law Offices of Luan T. Le
 8            Attorney at Law
              1190 South Bascom Avenue, Suite 213
 9            San Jose, California  95128
              408.247.4715
10            ledowningllp@gmail.com

11       FOR THE DEFENDANT:

12            MS. CATHARINE M. MORISSET
              Fisher & Phillips LLP
13            Attorneys at Law
              1201 3rd Avenue, Suite 2750
14            Seattle, Washington  98101
              206.682.2308    206.405.4450 FAX
15            cmorisset@fisherphillips.com

16       ALSO PRESENT:

17            MR. DEMETRIOS VORGIAS
              MS. SARAH MATHENY
18

19

20

21

22

23

24

25
```

Central Court Reporting    800.442.3376

000010

1                    I N D E X

2    VORGIAS v. COMMUNITY HEALTH OF CENTRAL WASHINGTON
     NO. 1:21-CV-03013-SAB
3    November 4, 2021

4

5                  T E S T I M O N Y

6    MICHAHLYN POWERS, M.D.                        PAGE NO.

7         Examination by Mr. Pickett                  5

8         Examination by Ms. Morisset               175

9         Further Examination by Mr. Pickett        184

10

11

12                 E X H I B I T S

13   Exhibit No. 2, NPE Report                        97

     Exhibit No. 4, CWFM Residency Verification of   107
14        Graduate Medical Education & Training

15   Exhibit No. 7, 5/8/19 Email from Dr. Powers to  144
          Demetrios re: Request to Meet
16
     Exhibit No. 8, 10/23/18 CARED Meeting Notes      73
17
     Exhibit No. 10, Email from Katina Rue re:        78
18        Requesting Neuropsych Eval

19   Exhibit No. 11, WPHP Letter with Summary of       54
          Medical Testing Events
20
     Exhibit No. 12, 5/8/19 Email from Powers to     161
21        Faculty re: Letter of Rec. for Vorgias

22   Exhibit No. 14, 2/15/19 WPHP Letter to Dr.      147
          Powers
23
     Exhibit A, Pre-reading for CARED Committee      177
24        Meeting 2/13/19

25   Exhibit B, 4/19/19 Email String                 179

000011

```
 1        A. Physician.

 2        Q. Okay.

 3        A. So faculty physician, which I became the interim

 4    residency program director from January through May of

 5    2019, I believe.

 6        Q. Okay.

 7        A. As well as clinical site director at the

 8    Ellensburg clinic.

 9        Q. Okay.  And when you -- we'll focus in, I think,

10    most of our discussion today will center around the time

11    period where, as I understand it, you were the interim

12    director at the Community Health of Central Washington.

13    And, again, that timeframe was -- was it January 2019 to

14    May 2019 or longer than that?  Because I know I've seen

15    records where it's longer than May of 2019.

16        A. I think it was until the end of May 2019.

17    Uh-huh.  And we had selected my -- my successor during

18    the month of -- maybe the late part of April, perhaps,

19    or the early part of May, and I transitioned out of that

20    role at the end of May 2019 after onboarding my

21    successor.

22        Q. And who was -- did you -- was your successor

23    Dr. Isaacs?

24        A. Correct.  Yes.  Although, he was not involved

25    really in any of the prior proceedings with Demetrios.
```



000012

Vorgias vs Community Health of Central Washington    Michahlyn Powers, M.D. 11/04/2021

1    Q. Okay.  You just -- okay.  Is there anything that

2    you're looking at or referring to?  I just need to --

3    because I can't see, I want to make sure that you're

4    testifying from your knowledge or from your memories.

5    You're not -- you don't have any notes in the room with

6    you?

7    A. Yeah, I have -- I have some electronic devices

8    that are turned off.

9    Q. Okay.

10   A. Otherwise, it's a pretty empty office.

11   Q. Thank you.  I appreciate that.

12       Okay.  Let me try to clarify a couple of things

13   on the record.  It's my understanding from talking

14   with -- and I'll try to get the name in the right order

15   here -- from talking with Dr. Isaacs that you,

16   Dr. Powers, were the final decision maker with regard to

17   Demetrios Vorgias's termination from the program; is

18   that true?

19       A. That's correct.  The residency program director

20   is always the final decision-maker for the termination

21   of a resident.

22       Q. And I understand during the process there was

23   also -- you, at some point during this process,

24   were I'll use the word reliant to a certain degree on

25   what's referred to as a CARED Committee; is that --



000013

1    is because his medical school prepared him poorly.  We

2    don't know, but we can't continue to spend the time and

3    the resources of the program on trying to get him to

4    learn information that he is not able to learn.

5        Q. And -- and part of that extending the grace that

6    you spoke about, in part, I take it, includes if you

7    receive recommendations for a resident and/or

8    specifically for Dr. Vorgias to receive accommodations,

9    to assist him to succeed, part of your extension of

10   grace includes waiting to get those recommendations and

11   evaluating them to see if they can actually be put into

12   place, true?

13       MS. MORISSET:  Object as to form.

14       A. Yes.  If we would have been given accommodation

15   or recommendations, we would have reviewed them and seen

16   if they could have been reasonably performed within the

17   program.

18       Q. (By Mr. Pickett)  Okay.  I'm going to try to see

19   if I can go to some records now.  Bear with me while I

20   try to share some things.

21       A. Are you going to share your screen or within --

22       Q. I will, yeah.  Okay.  Can you see what I've put

23   up here?

24       A. Yes.

25       Q. All right.  And it says, "WPHP Letter with



Vorgias vs Community Health of Central Washington    Michahlyn Powers, M.D. 11/04/2021

1   clean record here, okay?

2       A. And no accommodations were sent between April 19

3   and May 2, 2019, when -- when Demetrios was terminated.

4       Q. Right.  And I understand your previous testimony

5   to be that you never, ever received requests for

6   accommodation for Demetrios, true?

7       A. Correct.

8       Q. Okay.  And we've covered that, and I want to go

9   slowly through this, though.  You dispute -- you are --

10  you absolutely dispute that you were informed that

11  recommendations for accommodations for Demetrios would

12  be communicated to you at a later date, true?

13      A. True.

14      Q. Let me ask.  It also says that "we" -- I'm

15  assuming that's WPHP -- "were recommending that you

16  enroll in a monitoring agreement for an underlying

17  medical condition..."

18       Were you informed by Ms. Morales on April 19,

19  2019, that there was a recommendation for an enrollment

20  into a monitoring agreement for an underlying medical

21  condition?

22       A. Yes.

23      Q. Okay.

24      A. And not what that condition was, because that

25  was considered confidential information.  But we were



Vorgias vs Community Health of Central Washington    Michahlyn Powers, M.D. 11/04/2021

1  whether, in fact, Dr. Vorgias should have been enrolled

2  in a monitoring program?

3        MS. MORISSET:  Object as to form.

4        A. I don't understand that question.  Could you

5  clarify?

6        Q. (By Mr. Pickett)  As of April 19, 2019, did you

7  have any reason to dispute whether Dr. Vorgias should

8  have been enrolled in a monitoring program?

9        A. Could you rephrase that question?

10       Q. Did you have any reason to dispute, as of

11  April 19, 2019, whether Dr. Vorgias should have been

12  enrolled in a monitoring agreement?

13        MS. MORISSET:  Object as to form.

14       A. I'm sorry.  You're just repeating the same

15  question over and over.  Could you rephrase that --

16       Q. (By Mr. Pickett)  I can.

17       A. -- in a way that's more understandable?

18       Q. Sure.  You were told on April -- by email on

19  April 19, 2019 that Dr. Vorgias would be enrolled in a

20  monitoring agreement, true?

21       A. Yes.

22       Q. And that would be to monitor his underlying

23  medical condition, true?

24        MS. MORISSET:  Object as to form.

25       A. Yes.



Vorgias vs Community Health of Central Washington    Michahlyn Powers, M.D. 11/04/2021

1      Q. (By Mr. Pickett)  Okay.  And that was to monitor

2    his underlying medical condition, that's what you were

3    specifically informed of, true?

4          MS. MORISSET:  Object as to form.

5      A. Yes.  Uh-huh.

6      Q. (By Mr. Pickett)  Okay.  And did you have any

7    reason to dispute whether he should, in fact, have been

8    enrolled in a monitoring agreement for an underlying

9    medical condition?

10     A. Did I have reason to dispute that he should be?

11   Meaning, did I think he didn't have an underlying

12   medical condition?

13     Q. Did you have any reason to disagree -- let's do

14   it that way -- to disagree with him being enrolled in a

15   monitoring agreement for an underlying medical

16   condition?

17         MS. MORISSET:  Object as to form.

18     A. No.  The program would have been supportive of

19   him being enrolled in this monitoring agreement for his

20   unknown underlying medical condition.  We sent him to

21   the WPHP for help, and if that's how they thought it was

22   appropriate to help him, then we had no reason to

23   dispute or block that enrollment.

24     Q. (By Mr. Pickett)  And earlier you testified, I

25   think, in agreement with Dr. Isaacs when he said, Look,


000017

Vorgias vs Community Health of Central Washington    Michahlyn Powers, M.D. 11/04/2021

1    we send somebody to WPHP and we ask for a

2    recommendation, we follow it.  You were in agreement

3    with that, did I state that correctly?

4            MS. MORISSET:  Object as to form.

5        A. We follow recommendations to the extent that's

6    reasonable.

7        Q. (By Mr. Pickett)  Okay.

8        A. Accommodations are different.  Accommodations,

9    as you know, is a word that's tied to the language of

10   disabilities, and we were not aware that there was a --

11   a disability.

12       Q. Well, if accommodation is tied to the language

13   of disability, that's how you understand it, true?

14       A. In the HR world, yes.  Accommodations -- the

15   word "accommodation" is often tied to a formal diagnosis

16   or a disability, yes.

17       Q. And here, as of April 19, at least according to

18   this letter, Ms. Morales informed you that

19   recommendations for accommodations would be communicated

20   to you.  You read that, true?

21           MS. MORISSET:  Object as to form.

22       A. I do.  I read that and I dispute it.

23       Q. (By Mr. Pickett)  Okay.  And -- but if you had

24   received -- let me ask you this:  If you had been told

25   that, hey, recommendations for accommodations will be



000018

Vorgias vs Community Health of Central Washington    Michahlyn Powers, M.D. 11/04/2021

1    forthcoming, and you understand accommodations to be

2    related to disability in this world of HR and this --

3    this process, you would have at least, at a minimum,

4    wanted to read the recommendations for accommodations

5    before terminating Dr. Vorgias, true?

6        A. True.

7            MS. MORISSET:  I need to object as to form.

8    Thanks.

9        A. True.

10       Q. (By Mr. Pickett)  You do agree, Dr. Powers, that

11   you did receive an email from Ms. Morales on the 19th of

12   2019?

13       A. I agree.

14       Q. Okay.  Do you remember speaking to her on the

15   phone?

16       A. I do.

17       Q. Okay.  Do you remember -- did she tell you,

18   during a phone conversation that there was a

19   recommendation -- that there'd been an evaluation,

20   completed?

21       A. Yes.

22       Q. Do you remember her telling you on the phone

23   that part of that evaluation was going to result in the

24   recommendation of Dr. Vorgias enrolling in a monitoring

25   agreement?



Vorgias vs Community Health of Central Washington    Michahlyn Powers, M.D. 11/04/2021

1       Q. Did you ask her about any condition that could
2   impair his ability to learn as a resident?
3       A. No.  Not specifically.  We were looking for
4   conditions that would make him unsafe to practice.  And
5   it seemed that he didn't have an underlying substance
6   abuse disorder, which we were very happy to hear.
7   Although, I'm not sure if they would have told us that
8   because of confidentially, but they said simply that
9   he's safe.
10      Q. So the WPHP concluded, at least they told you,
11  either -- was it by the phone -- during the phone
12  conversation that he was safe to practice?
13      A. Right.  Yep.
14      Q. Okay.  And then they did also express that in
15  the email, that Dr. Vorgias was safe?  He was safe in
16  terms of, I'm assuming, patient safety?  He was safe to
17  practice?
18      A. He was safe to --
19      MS. MORISSET:  Object as to form.  Go ahead.
20  Object to form.
21      A. He was safe in the sense that there was not an
22  impairing diagnosis.  For example, bipolar disorder
23  with, you know, mania or delusions or paranoia or
24  substance use, something that would make him, you know,
25  gravely impaired and unsafe to practice.  That's all



Vorgias vs Community Health of Central Washington     Michahlyn Powers, M.D. 11/04/2021

1  that that statement told us.

2      Q. (By Mr. Pickett)  Okay.  So you could at least

3  alleviate your concerns with regard to Dr. Vorgias based

4  on this examination with regard to patient safety; is

5  that fair?

6      MS. MORISSET:  Object as to form.

7      A. No.

8      Q. (By Mr. Pickett)  Okay.

9      A. Patient safety is -- is impacted by a variety of

10  things.  And so we were reassured that he didn't have

11  something that was making him wildly unfit for duty.

12  But it did not alleviate our concerns about his

13  on-the-ground performance, which was making decisions,

14  evaluating patients, counseling them, making a plan,

15  presenting that information to his supervisor so they

16  could be confident in his medical knowledge.

17      Q. Okay.  Did you ask Ms. Morales during your

18  conversation and/or emails with her whether there was --

19  the underlying medical condition that Dr. Vorgias was

20  suffering from, whether that would impair his ability to

21  express his medical knowledge?

22      A. No.

23      MS. MORISSET:  Object as to form.

24      A. I did not ask her that.  And even if I had, she

25  would not have told me.



Vorgias vs Community Health of Central Washington     Michahlyn Powers, M.D. 11/04/2021

1    Q. (By Mr. Pickett)  She would not --

2    A. So that sort of information is -- would have

3  been written and well-documented from the WPHP.  She

4  would not have been at liberty to share his -- his

5  private information with me.

6    Q. Okay.  You were -- the paragraph above here, it

7  says -- it indicates -- and I'm looking back at the

8  documents, it says, Dr. Kelly Cornett administered

9  neuropsychological testing to you" -- this is to

10  Dr. Vorgias -- "on April 3.  We were notified of the

11  findings and recommendations subsequent to the

12  evaluation on April 18, 2019, during a telephone call

13  with Dr. Cornett."

14      First question is did you know that Dr. Vorgias

15  had been -- when you had sent him to WPHP that he was

16  going to have a neuropsych?

17    A. They had made that recommendation.  I was not

18  aware that it had -- the date of the evaluation.  WPHP

19  informed us that it had been completed, though.

20    Q. When did they inform you and who?

21    A. Cynthia Morales let me know that a

22  neuropsychological test had been performed, but those

23  results were not sent to us at that time.  And I never

24  received them.

25      Q. When did she do that?  When did she inform you.



1    that a neuropsychological evaluation had been conducted

2    with Dr. Vorgias?

3        A. I believe on April 19, in that email.

4        Q. Okay.  And did she also tell you during that

5    conversation and/or email that that neuropsychological

6    evaluation was part of their evaluation of these -- of

7    what she referred to as "underlying medical conditions"?

8        MS. MORISSET:  Object as to form.

9        A. No.

10       Q. (By Mr. Pickett)  Okay.  Did you ask at all, at

11   all in any way, shape, or form, when you talked to

12   Ms. Morales if that -- if there was any way that these

13   underlying medical conditions were affecting Demetrios's

14   performance in the residency program?

15       A. I asked her if there were any conditions that we

16   should be aware of that were impairing his performance.

17   And she said, No, he is able to work.  There are no

18   impairments.

19       Q. Did you ask specifically whether the underlying

20   medical conditions that she told you about were

21   impairing his performance in any way?

22       MS. MORISSET:  Object as to form.

23       A. No, I did not ask her that specifically.

24       Q. (By Mr. Pickett)  Why not?

25       A. If I had --



000023

1          MS. MORISSET:  Object -- hold on.  Object as to

2     form.

3          A. If I had asked her that specifically, she would

4     not have answered that over the phone.  She would have

5     put that in writing, and we would have received that in

6     an official capacity.  She answered the questions that I

7     asked her.

8          Q. (By Mr. Pickett)  All right.  But with regard to

9     the underlying medical conditions and whether they were

10    impacting Dr. Vorgias's performance in the residency

11    program, you simply did not ask Ms. Morales that

12    question, true?

13         MS. MORISSET:  Object as to form.

14         A. No, I did not ask her that question.

15         Q. (By Mr. Pickett)  Okay.  Is it fair to say that

16    if there was an underlying medical condition affecting

17    Dr. Vorgias's performance in the program, you as the

18    director would have wanted to know that; is that fair?

19         A. That is the reason why he was sent to WPHP, yes.

20    And she -- she assured me that there were no

21    impairments.  So her -- she answered my question.

22         Q. And when she spoke about impairments, she was

23    specifically, if you know, referring to his ability to

24    practice safely, true?

25         MS. MORISSET:  Object as to form.



Vorgias vs Community Health of Central Washington    Michahlyn Powers, M.D. 11/04/2021

1          MS. MORISSET:  Object as to form.

2          Q. (By Mr. Pickett)  Go ahead.

3          A. I'm going to say yes, we were aware he had an

4     underlying medical condition for which he was being

5     enrolled in a monitoring program with WPHP.

6          Q. And for our purposes here today, you were aware

7     of that underlying medical condition well before he --

8     you chose to terminate him from the program, true?

9          MS. MORISSET:  Object as to form.

10         A. Yes.  We were informed ten days prior to his

11    termination.

12         Q. (By Mr. Pickett)  And being informed -- having

13    been informed ten days before his termination, what

14    steps did you take as the program director, if any, to

15    consult with Dr. Vorgias about that?

16         A. None.

17         Q. What steps did human resources do or take prior

18    to Dr. -- Dr. Vorgias's termination from the program to

19    consult with him regarding his underlying medical

20    conditions?

21         MS. MORISSET:  Object as to form.

22         A. No outreach to Dr. Vorgias was deemed necessary

23    by the program or the HR department, and he did not come

24    forward to discuss or reveal any of his health

25    information to us.  And he had several opportunities to

000025

Vorgias vs Community Health of Central Washington    Michahlyn Powers, M.D. 11/04/2021

1    at 12:30.  Thank you.

2          MS. MORISSET:  All right.  Thanks, Bill.

3          THE VIDEOGRAPHER:  Okay.  This is going to end

4    Media No. 2, and we're off the record at 11:55.

5          (A lunch break was held from 11:55 to 12:35 p.m.)

6          THE VIDEOGRAPHER:  Okay.  This will begin Media

7    No. 3 in the deposition of Micahlyn Powers, M.D.  Back

8    on the record at approximately 12:35.

9          Q. (By Mr. Pickett)  Okay.  Dr. Powers, we're back

10    from our break.  Can you hear me okay?

11          A. Yes.

12          Q. All right.  Perfect.  Let me see if I can get a

13    document up here.  Let me know if that comes through on

14    your screen.  It's what's titled "Verification of

15    Graduate Medical Education and Training."

16          A. Yes.

17          MR. PICKETT:  And this has previously been

18    marked and we'll mark it in your deposition as

19    Exhibit 4.  And, again, we're taking these out of order

20    as they come up.

21          (Exhibit No. 4 marked for identification.)

22          Q. Can you tell me -- and I'll scroll through this

23    if you need me to -- do you recognize this document?

24          A. I did.  I created this document as a summary at

25    the end of his training.



Vorgias vs Community Health of Central Washington    Michahlyn Powers, M.D. 11/04/2021

1    your signature?

2        A. Yes.

3        Q. It was signed June 6, 2019, correct?

4        A. Correct.

5        Q. And I know, at least by June 6, 2019, from your

6    prior testimony, you were all -- already out of the role

7    of program director, true?

8        A. Yes.  And I signed that document as the

9    residency program director at the time of Demetrios's, I

10   guess, training.  So it was appropriate for me to sign

11   that as a summary.  It would not have been appropriate

12   for Dr. Isaacs to complete that or sign that because he

13   really had no -- very little knowledge of what had

14   happened prior.

15       Q. Right.  Understood.  And just so I'm clear, even

16   though you're signing it on June 6, 2019, as the

17   residency program director, as of that date, you were no

18   longer the program director, true?

19       A. Correct.

20       Q. Okay.  And sort of you're signing it in that

21   capacity -- in that capacity even though Dr. Isaacs had

22   already assumed that position, that role, true?

23       A. Yep.

24       Q. Okay.  And I -- and I -- he had no -- I'm going

25   to guess, he had no concerns with you signing as the



1  director even though he was in that role, in part,

2  because he did not participate in the decision to

3  terminate Dr. Vorgias, true?

4      A. Yes.

5      Q. All right.  One of things -- and I'm going to

6  scroll back up here.  It talks about -- you've got

7  little -- these are check-the-box comments.  And it

8  talks about -- starts with patient care.  See where I'm

9  at there?

10     A. Yes.

11     Q. And if we go down, it talks about clinical

12 competence overall, you rated him as fair?

13     A. Yes.

14     Q. True?  Okay.  And then I'm going to talk -- when

15 it comes to -- this is in the patient care section --

16 preventative medicine, you rated Dr. Vorgias as fair?

17     A. Where is that?  Oh, it's the second line.

18     Q. Yeah.

19     A. Yes.  I rated him fair for most of his patient

20 care.

21     Q. And you also rated -- for inpatient competence,

22 you rated him as fair?

23     A. Uh-huh.

24     Q. Yes?

25     A. Yes.



000028

Vorgias vs Community Health of Central Washington     Michahlyn Powers, M.D. 11/04/2021

1     Q. And for his outpatient competence, you rated him

2   as fair?

3     A. Yes.

4     Q. For you said procedural competence, you said,

5   "Not observed, unknown."  That was the rating you gave

6   him?

7     A. Yes.

8     Q. And then with regard to quality of medical

9   records, you rated him as good?

10    A. Yes.

11    Q. On his medical knowledge, you had a category of

12  general medical knowledge, and you rated Dr. Vorgias at

13  the time of his -- or in summarizing his performance,

14  you rated it as fair?

15    A. Yes.

16    Q. With regard to clinical knowledge -- and this is

17  in parentheses -- outpatient, you also rated him in that

18  category as being fair?

19    A. Yes.

20    Q. Clinical knowledge, parenthesis, inpatient, you

21  also rated him as being fair?

22    A. Yes.

23    Q. And then clinical knowledge in -- with

24  parenthesis, obstetrics, you also rated him as fair?

25    A. Yes.



Vorgias vs Community Health of Central Washington    Michahlyn Powers, M.D. 11/04/2021

1      Q. With regard to systems-based practices and the

2   subheading, it says, "Ability to work with

3   interdisciplinary team," you rated him as fair?

4      A. Yes.

5      Q. With regard to awareness of larger context and

6   system -- and the system of health care, you rated him

7   as fair there as well?

8      A. Yes.

9      Q. With regard to ability to effectively call on

10   resources to provide care, you rated him as fair?

11      A. Yes.

12      Q. And then on practice-based learning and

13   improvement, it says -- the question was, "Initiates

14   self-directed learning," you rated him as fair?

15      A. Yes.

16      Q. On the ability to improve the system/the

17   practice you rated him as fair?

18      A. Yes.

19      Q. With regard to the professionalism category,

20   professional judgment and attitude, you rated him under

21   the -- as a -- the standard was good?

22      A. Yes.

23      Q. Punctuality and attendance, you rated as

24   excellent?

25      A. Yes.



000030

Vorgias vs Community Health of Central Washington    Michahlyn Powers, M.D. 11/04/2021

1      Q. Timeliness completion of medical records

2    administrative duties you rated him as good?

3      A. Yes.

4      Q. With regard to ethics and a sense of

5    responsibility and honesty, you also rated Dr. Vorgias

6    as good?

7      A. Uh-huh.

8      Q. Yes?

9      A. Yes.

10      Q. In terms of interpersonal communication skills,

11    the category that's labeled "General Ability to

12    Understand/Speak/Write Fluently in English," you rated

13    that as excellent?

14      A. Yes.

15      Q. With regard to interaction with clinical team

16    members, you rated that in the category of good?

17      A. Yes.

18      Q. In osteopathic principles, there was -- it

19    starts with "patient care," you did not give any rating

20    because he's not in -- he's not an osteopath; is that

21    fair?

22      A. Yes.

23      Q. And is that with regard to all of the

24    osteopathic principles because he's an M.D., not a D.O.?

25      A. Yes.



000031

Vorgias vs Community Health of Central Washington    Michahlyn Powers, M.D. 11/04/2021

```
1        Q. You did not rate him; is that true?
2        A. Correct.
3        Q. Okay.  You asked if -- you were asked if the
4   training -- was the training subsequent to any of the
5   following during training, and you marked a "yes" with
6   regard to conditions or restrictions beyond those
7   generally associated with the training regimen at your
8   facility, you marked yes?
9        A. Yes.
10       Q. What were the conditions or restrictions beyond
11  those generally associated with the training regimen at
12  your facility?
13       A. You're asking what were those conditions or
14  restrictions?
15       Q. Yes.  Beyond those generally associated with the
16  training regimen at your facility.
17       A. Uh-huh.  So that refers to his progression
18  through the corrective action process.  And so those
19  conditions were that, you know, he was given a
20  constructive citation, he was given the -- the second
21  citation, and then was moved to probation.  And all
22  those conditions and restrictions were just the
23  different parts of those plans as it went along.  So,
24  you know, those are documented in his citation forms.
25       Q. Okay.  And the conditions and restrictions
```



```
 1                    C E R T I F I C A T E

 2     STATE OF WASHINGTON )
                           )
 3     COUNTY OF YAKIMA    )

 4

 5          This is to certify that I, Dani White, Certified

 6     Court Reporter in and for the State of Washington,

 7     residing in Yakima, reported the within and foregoing

 8     deposition; said deposition being taken before me on the

 9     date herein set forth; that pursuant to RCW 5.28.010 the

10     witness was first by me duly sworn; that said

11     examination was taken by me in shorthand and thereafter

12     under my supervision transcribed; and that same is a

13     full, true, and correct record of the testimony of said

14     witness, including all questions, answers, and

15     objections, if any, of counsel.

16          I further certify that I am not a relative or

17     employee or attorney or counsel of any of the parties,

18     nor am I financially interested in the outcome of the

19     cause.

20          IN WITNESS WHEREOF I have set my hand this 17th

21     day of November, 2021.

22

23                        DANI WHITE
                          CCR NO. 3352
24

25
```

**Central Washington**
**Family Medicine**
**Residency Program**

 a Service of
Community Health
of Central Washington

## CENTRAL WASHINGTON FAMILY MEDICINE RESIDENCY
## VERIFICATION OF GRADUATE MEDICAL EDUCATION & TRAINING

**Section I: Verification of training and performance during training**

Trainee's Name:   Demetrios Vorgias

Trainee's NPI:   1356833750

Trainee's DOB:   03/07/1975

Dates of training: PGY 1: Date From 06/25/2018 To: 05/01/2019

PGY 2: Date From None To: None

 PGY 3: Date From None To: None

Training Program Accreditation:   ✔ ACGME W/Osteopathic Recognition

Did the above-named trainee successfully complete the training program?

☐ Yes   ✔ No

If NO, please provide an explanation here: Dr. Vorgias successfully completed 4 weeks each of orientation, surgery, obstetrics, ambulatory pediatrics, musculoskeletal medicine, emergency medicine, Elective: EKG and behavioral medicine.

| | Excellent | Good | Fair | Poor | Not Observed/Unknown |
|---|---|---|---|---|---|
| **Patient Care** | | | | | |
| Overall clinical competence | | | X | | |
| Preventative medicine | | | X | | |
| Inpatient competence | | | X | | |
| Outpatient competence | | | X | | |
| Procedural competence | | | | | X |
| Quality of medical records | | X | | | |
| **Medical Knowledge** | | | | | |
| General medical knowledge | | | X | | |
| Clinical knowledge (outpatient) | | | X | | |
| Clinical knowledge (inpatient) | | | X | | |
| Clinical knowledge (obstetrics) | | | X | | |
| **Systems Based Practice** | | | | | |
| Ability to Work with Interdisciplinary Team | | | X | | |
| Awareness of the larger context and system of healthcare | | | X | | |
| Ability to effectively call on resources to provide care | | | X | | |
| **Practice Based Learning and Improvement** | | | | | |
| Initiates self-directed learning | | | X | | |
| Ability to improve the system/practice | | | X | | |

P:\Program Admin\Evaluation-Advisor Forms
Created: 04-2019 HJM



EXHIBIT    4
Witness: M. Powers, M.D.
Date: 11-4-21
Stenographer: DW

Ex . 4

VORGIAS 000124

| | Excellent | Good | Fair | Poor | Not Observed/Unknown |
|---|---|---|---|---|---|
| **Professionalism** | | | | | |
| Professional judgment and attitude | | X | | | |
| Punctuality and attendance | X | | | | |
| Timeliness completion of medical records/administrative duties | | X | | | |
| Ethics, sense of responsibility and honesty | | X | | | |
| **Interpersonal Communication Skills** | | | | | |
| General ability to understand/speak/write fluently in English | X | | | | |
| Interaction with clinical team members | | X | | | |
| **Osteopathic Principles** | | | | | |
| Patient Care | | | | | |
| Examination, Diagnosis, & Treatment | | | | | |
| Medical Knowledge | | | | | |
| Practice Based Learning & Improvement | | | | | |
| Interpersonal & Communication Skills | | | | | |
| Systems Based Practice | | | | | |
| Professionalism | | | | | |

| | | Yes | No |
|---|---|---|---|
| Was the trainee subject to any of the following during training? | | Yes | No |
| Conditions or restrictions beyond those generally associated with the training regimen at your facility? | | X | |
| Leave of absence | | | X |
| Corrective or disciplinary action | | X | |
| | Non-promotion/non-renewal | | |
| | Extension of training year (s) | | |
| | Probationary Action | X | |
| | Dismissal | X | |
| Investigated by a Government/Legal | | | X |
| Malpractice Suits | | | X |
| Disciplinary action for attending patients while apparently under the influence of drugs, alcohol or controlled substances | | | X |
| Medical problems or mental disorders that affected the capacity to practice medicine | | | X |
| Ever attempt procedures beyond his/her competence or granted privileges | | | X |

Please provide explanation to any "yes" answer above : Dr. Vorgias came under scrutiny due to medical knowledge and professionalism concerns during Jan. 2019 of his R1 year, was placed on constructive citation, which was advanced to probation and subsequently, dismissal. He made improvements in his professionalism and administrative task completion. Number of patients per half day in clinic was initially

restricted in January 2019 due to difficulty with medical knowledge, efficiency, and time management. He progressed to the normal number of patients per half day of clinic after a short period of restriction. He was required to pre-precept before seeing clinic patients as well as have the attending physician repeat the history and exam for each patient he saw in clinic. This lasted from January 2019 to his dismissal in May 2019 for medical knowledge deficits despite attempts at remediation.

## Section II: Recommendation

Upon completion of the training program, the individual was deemed to have demonstrated sufficient competence in the specialty/subspecialty to enter autonomous practice.  ☐ Yes   ✓ No ☐ N/A

This individual demonstrated sufficient competence to apply osteopathic principles to patient care, upon entry to practice, without direct supervision.                                    ☐ Yes   ☐ No ✓ N/A

This trainee is:
☐ Recommended highly without reservation
☐ Recommended as qualified and competent
✓ Recommended with limitations described as direct supervision needed in the outpatient and inpatient setting. Would benefit from repeating the R1 year in family medicine.
☐ Not recommended for the following reason(s): Click here to enter text.

Did the program endorse this trainee as meeting the qualifications necessary for respective board certification in family medicine?    ☐ Yes   X No ☐ N/A
If NO or N/A, indicate the reason(s): Demetrios was dismissed before he was eligible to sit for ABFM Board exam.

## Section III: Additional Comments

Please utilize this comment area to provide additional information regarding this trainee's performance, notable strengths or weaknesses:

Dr. Vorgias is enthusiastic, caring, and team oriented. He consistently was checking in with his co-residents and nurses in clinic on how they were doing and if he could help with any tasks. He was motivated to be a productive and helpful member of the medical team. He is dedicated to medicine driven to improve his medical knowledge. He loves patient care, and the relationships he can build with his patients. He gets significant joy from his work with the pediatrics population- watching kids grow and develop new skills and teaching them that the doctor's office is not a place to fear. He was noted to have given two very well received presentations. One was to his colleagues on a pediatrics topic which he worked diligently on preparing, and another was on a Pain class topic to the patients enrolled in the class. His preceptor for the pain class noted that it was one of the better presentations that had been given in pain class despite Dr. Vorgias being very nervous prior to the presentation. Dr. Vorgias does like to teach, which was reflected in his topic presentations, but due to some struggles with performance anxiety he would lose sleep due to his desire to impress classmates and attendings. Dr. Vorgias is very motivated to succeed in medicine, but he did struggle on hospital inpatient rotations, both medicine and obstetrics. He required more supervision and direction than what was expected for an intern and needed repeated review of medicine topics and patent care tasks each rotation and between rotations, which led to concern about his synthesis of medical knowledge. He is highly critical of himself, and this significantly impaired his ability to absorb and respond to feedback, make corrections, and continue to show progress. Frequently, we would discuss how he had the basic idea for a topic but got sidetracked on either his self-criticism or concern about improving that it impeded his growth. He is now addressing these concerns personally so that moving forward he can be successful in his career.

VORGIAS 000126

**Section IV: Attestation**

The information provided on this form is based on review of available training records, evaluations and direct information provided by supervising faculty.

_M. powers MD._

Residency Program Director

_6/6/19_

Date

Micahlyn Powers, MD
Phone: 509-452-4946
Fax: 509-457-3989
Email: cwfmr@chcw.org

VORGIAS 000127

000037

# WPHP Letter with Summary of Medical Testing Events

EXHIBIT    11
Witness: M. Powers, M.D.
Date: 11-4-21
Stenographer: DW

**EXHIBIT 11**

**000038**



WASHINGTON PHYSICIANS HEALTH PROGRAM

December 11, 2019

Demetrios Vorgias, MD
1126 Radis Place
Jacksonville, FL 32225

PERSONAL & CONFIDENTIAL

Dear Dr. Vorgias:

This letter is in follow up to your request for a chronology of services provided to you since your referral to Washington Physicians Health Program (WPHP), initiated on January 23, 2019 by Dr. Micahlyn Powers, MD, former interim residency training director at Central Washington Family Medicine Residency Program.

We met with you for an initial assessment on January 30, 2019. Cynthia Morales, your clinical coordinator, contacted Dr. Powers on this date to confirm your attendance at the scheduled appointment. Ms. Morales also stated that the WPHP team recommended that you could be returned to practice while we completed the evaluation, due to no observed current impairment.

We subsequently met with you for a follow up appointment on March 1, 2019, to review and discuss our recommendation for additional evaluation from an outpatient provider. During this appointment, we specifically recommended completion of a neuropsychological evaluation.

Dr. Kelly Cornett, PsyD, administered neuropsychological testing to you on April 3, 2019. We were notified of the findings and recommendations subsequent to the evaluation on April 18, 2019, during a telephone call with Dr. Cornett.

On April 19, 2019, Cynthia Morales received an email correspondence from Dr. Micahlyn Powers. In this email, Dr. Powers requested an update regarding your evaluation with WPHP. Ms. Morales responded via email by informing her that your evaluation with WPHP was complete, we were recommending that you enroll in a monitoring agreement for an underlying medical condition, and there were recommendations for accommodations that would later be communicated to Dr. Powers.

On May 2, 2019, you spoke with Ms. Morales via telephone and notified her of your termination from your residency program, which was effective May 1, 2019, per your report during this conversation.

On May 20, 2019, you met with Ms. Morales and Laura Moss, MD, Associate Medical Director, for an in-person appointment. We reviewed and discussed Dr. Cornett's findings and recommendations subsequent to your neurocognitive evaluation. You shared with us your intention to complete your residency training in a new program, and we recommended enrollment in behavioral health monitoring to provide documented advocacy.

On August 9, 2019, you enrolled in a behavioral health monitoring agreement for WPHP monitoring of your underlying mental health conditions and provision of advocacy.

720 Olive Way, Suite 1010
Seattle, WA 98101-1819

Tel: 800.552.7236
206.583.0127

Fax: 206.583.0418
www.wphp.org

**EXHIBIT 11**

000039

Please do not hesitate to contact us directly at any time with your questions or concerns regarding this matter.

If we may be of further assistance, kindly so advise.

Sincerely,

Laura Moss, MD
**Associate Medical Director**

Cynthia Morales, MA, LMHC
**Clinical Coordinator**

LM/AC
1040

**EXHIBIT 11**

000040