# EXHIBIT C
# DEPOSITION EXCERPTS OF KATINA RUE, DO.

000041

```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF WASHINGTON

 3

 4   DEMETRIOS VORGIAS,                )
                                       )
 5         Plaintiff,                  )
                                       )   NO. 1:21-CV-03013-SAB
 6   v.                                )
                                       )
 7   COMMUNITY HEALTH OF CENTRAL       )
     WASHINGTON,                       )
 8                                     )
           Defendant.                  )
 9

10
         VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION OF
11
                           KATINA RUE, D.O.
12

13
                         November 10, 2021
14                          9:05 a.m.
                        Via Videoconference
15

16

17

18

19       TAKEN AT THE INSTANCE OF THE PLAINTIFF

20

21

22
                        CERTIFIED COPY
23

24
     REPORTED REMOTELY BY:
25   DANI WHITE, CCR NO. 3352
```



```
 1    APPEARANCES VIA VIDEOCONFERENCE:

 2       FOR THE PLAINTIFF:

 3           MR. WILLIAM D. PICKETT
             Law Office of William D. Pickett
 4           Attorneys at Law
             917 Triple Crown Way, Suite 100
 5           Yakima, Washington  98908
             509.972.1825    509.972.1826 FAX
 6           bill@wdpickett-law.com

 7           MR. LUAN T. LE
             Law Offices of Luan T. Le
 8           Attorney at Law
             1190 South Bascom Avenue, Suite 213
 9           San Jose, California  95128
             408.247.4715
10           ledowningllp@gmail.com

11           MR. SETH W. WIENER
             Law Offices of Seth W. Wiener
12           Attorney at Law
             609 Karina Court
13           San Ramon, California  95128
             925.487.5607
14           seth@sethwienerlaw.com

15       FOR THE DEFENDANT:

16           MR. NATE BAILEY
             Fisher & Phillips LLP
17           Attorneys at Law
             1201 3rd Avenue, Suite 2750
18           Seattle, Washington  98101
             206.682.2308    206.682.7908 FAX
19           nbailey@fisherphillips.com

20       ALSO PRESENT:

21           MR. DEMETRIOS VORGIAS
             MS. SARAH MATHENY
22

23

24

25
```

```
 1                         I N D E X

 2   VORGIAS v. COMMUNITY HEALTH OF CENTRAL WASHINGTON
     NO. 1:21-CV-03013-SAB
 3   November 10, 2021

 4

 5

 6
                         T E S T I M O N Y
 7
     KATINA RUE, D.O.                                  PAGE NO.
 8
            Examination by Mr. Pickett                    4
 9

10

11

12

13

14

15                        E X H I B I T S

16   Exhibit No. 10, Email for Pre-reading for CARED      73
           Committee Meeting 2/13/19 RE: Dr. Rue
17         request for neuropsych eval.

18   Exhibit No. 13, CARED Meeting Notes 4/17/19          81

19   Exhibit No. 15, Email 4/23/19                        41

20

21

22

23

24

25
```

```
 1        Q. Okay.  And so when you said you were, are you
 2   still the associate program director?
 3        A. I left Community Health of Central Washington in
 4   February of this year as a full-time faculty.
 5        Q. Okay.  And I apologize, that broke up on my
 6   transmission.  Could you restate that answer again?
 7        A. I left Community Health of Central Washington on
 8   February 1st as a full-time faculty.
 9        Q. Okay.  You said you "left," you mean you no
10   longer are with Community Health of Central Washington;
11   is that true?
12        A. That is true.
13        Q. Okay.  And can you just tell me a little bit why
14   you left or decided to leave?
15        A. There were some family issues I had going on,
16   and it was in the best interest of my family to no
17   longer maintain my employment at Central Washington
18   Family Medicine.
19        Q. Okay.  And you were -- I take it you resigned or
20   quit or how did you depart?  How did you separate from
21   them?
22        A. I departed after discussion with the CEO
23   regarding my option for further employment there.  And I
24   was able to depart the job with a six-month severance
25   pay.
```



```
 1   employment due to the family stressors I was having at
 2   the time.
 3        Q. Okay.  And who proposed the separation, was it
 4   you or was it Community Health of Central Washington?
 5   The separation of employment, who proposed it?
 6        A. Community Health of Central Washington after
 7   discussion previously.
 8        Q. Okay.  And can you tell me what -- why they
 9   proposed the separation for you from their employment?
10            MR. BAILEY:  Calls for speculation.
11        A. I'm not exactly clear why they proposed a
12   separation.  There was considerable stress within the
13   department at the time and that may have led to the
14   proposal.
15        Q. (By Mr. Pickett)  Can you identify, Dr. Rue,
16   what was the considerable stress in the department at
17   the time that may have led Community Health of Central
18   Washington to propose a separation agreement to you?
19        A. There was significant stress between myself and
20   Dr. Isaacs and other faculty and leadership members and
21   Dr. Isaacs that was unable to be resolved through
22   discussions.
23        Q. And can you identify a little more specifically,
24   what was the considerable stress between you and
25   Dr. Isaacs?
```



Vorgias vs Community Health of Central Washington                Katina Rue, D.O. 11/10/2021

```
 1         A. Lack of communication.
 2         Q. And expand on that a little, if you will.  What
 3   do you mean when you say "lack of communication"?
 4         A. Dr. Isaacs had not spoken to me for four months
 5   despite reaching out to HR and the chief experience
 6   officer to assist with improved communication between
 7   the program director and the associate program director.
 8         Q. Okay.  So at the time, Dr. Isaacs was serving as
 9   the program director and you were still serving as the
10   associate program director, true?
11         A. That is true.
12         Q. And he hadn't spoken to you for four months.
13   Can you give us the time frame, that four-months gap in
14   time where you indicated Dr. Isaacs had not communicated
15   with you?
16         A. October 20th was the last time of 2020.
17              MR. BAILEY:  Hey, Bill.  I'm sorry, I need a
18   quick break.  If we could just have a couple of minutes
19   here.  I apologize.  I can be back in -- probably at
20   9:20.
21              MR. PICKETT:  Dr. Rue, we're going to --
22   Mr. Bailey has left the room so we're going to pause for
23   a moment.
24              (Mr. Bailey took a break at 9:15 a.m.)
25              THE WITNESS:  Okay.  Should I turn off my camera
```



```
 1   during the break?
 2           MR. PICKETT:  We're going to -- we're all going
 3   to stay here.  He said something came up.  He's taking a
 4   five-minute break so we're going to pause and just stay
 5   right here.  Thank you.
 6           THE WITNESS:  Okay.
 7           MR. PICKETT:  So we'll stay on the record, Dani.
 8   And we will note the time of his departure, Dani, and
 9   the time of his return, please.
10           MR. VORGIAS:  Good to see you, Bill.
11           MR. PICKETT:  Good to see you, Demetrios.
12   You're looking well.
13           MR. VORGIAS:  I'm trying to grow this out.
14           MR. PICKETT:  I know.  I see that.
15           MR. BAILEY:  All right.  I'm ready.
16           (Mr. Bailey returned from break at 9:20 a.m.)
17           MR. PICKET:  Okay.  Dani, will you just note
18   Mr. Bailey's back online again?  Thank you.
19       Q.  (By Mr. Pickett)  Dr. Rue, we were discussing
20   your last testimony was October 20, 2020, and I'm trying
21   to decipher what that date means in terms of the
22   four-month time period where there was a lack of
23   communication between you and Dr. Isaacs.
24       A.  There was a considerable disconnect in our
25   communication prior to that time, and October 20 was the
```



```
 1   last date that he had any direct communication with me.
 2       Q. Okay.  And what did he say -- what was his
 3   communication on October 20, 2020?
 4       A. I don't recall the details of that communication
 5   that we had.
 6       Q. Okay.  Can you generally tell me what was the
 7   nature of the discussion?
 8       A. I don't recall the nature of our discussion on
 9   that day.
10       Q. Okay.  On -- let me ask you:  Is there -- I
11   should have asked you this -- and I apologize -- at the
12   beginning, where are you today for your deposition?
13       A. I'm in my home.
14       Q. Okay.  And is -- I know other than your dog that
15   we had heard earlier, who's there being very quiet now,
16   is anyone else with you?
17       A. No.  There's no one else here.
18       Q. Okay.  Is there anyone communicating with you
19   while you're doing -- giving this deposition?
20       A. No, there's no one communicating with me while
21   I'm giving this deposition.
22       Q. Okay.  Did anyone communicate with you during --
23   during the break that we just took?
24       A. I did communicate with Nate during the break.
25       Q. Okay.  And how -- and how did that communication
```



```
 1   with Nate -- with Mr. Bailey during the break, how did
 2   that occur?
 3        A. Via my cell phone.
 4        Q. Meaning did you communicate by text or by a --
 5   by a phone call, how did that happen during the break?
 6        A. During the break, I received a text from a
 7   number that appeared to be Nate's number so I responded
 8   to the text since we were on the break and we had
 9   discussed that we could communicate during breaks.
10        Q. So how long after Mr. Bailey took the break and
11   took himself off the screen, how long after that did you
12   start communicating with him during the break?
13        A. I didn't --
14        MR. BAILEY:  So I'm going to object to this line
15   of questioning.  It's not relevant at all to the
16   proceeding today.
17        Q. (By Mr. Pickett)  Go ahead, Doctor.
18        A. I did not note the time that the text came
19   through.
20        Q. Okay.  How long was the communication and was it
21   all in text?  Let me strike that.
22        How long was the communication?
23        A. The communication was under 30 seconds.
24        Q. Okay.  And was it all by text or otherwise?
25        A. Via text and phone call.
```



```
 1        Q. Okay.  So there was a text message from
 2   Mr. Bailey during -- when he took himself out on the
 3   break, true?
 4        A. True.
 5        Q. And then there was a phone call from Mr. Bailey
 6   when he took himself out on the break?
 7        A. True.
 8        Q. And you responded to both of those, both his
 9   text and his phone call, during the time in which he
10   took himself off screen and took a break?
11        A. Yes.
12        Q. Okay.  The four-month period of time that you
13   described as a lack of communication between you and
14   Dr. Isaacs, would that have been roughly July of 2020 to
15   October of 2020?
16        A. Yes.
17        Q. Okay.  Why -- and I need to know your best --
18   best thoughts or recollection as to why there was a lack
19   of communication between you and Program Director Isaacs
20   at that period of time.
21           MR. BAILEY:  Objection.  Calls for speculations.
22        Q. (By Mr. Pickett)  Go ahead.
23        A. I'm not really sure why there was a lack of
24   communication between myself and Dr. Isaacs.
25        Q. Okay.  I know during his deposition Dr. Isaacs
```



```
 1    highlighted is it says, "Can we get a neuropsych eval
 2    asap?"  Do you see that?
 3         A.  Yes, I see that.
 4         Q.  Okay.
 5             MR. BAILEY:  Bill, I'm just going to object
 6    because this was part of a larger document and it looks
 7    like it's taking one page out of that larger document.
 8         Q.  (By Mr. Pickett)  Okay.  Doctor, do you see
 9    where -- and it says -- it's signed off, I've
10    highlighted "Katina," that's you, true?
11         A.  True.
12         Q.  Okay.  Let me -- I'm -- what prompted you or do
13    you recall asking for a neuropsych ASAP for Dr. Vorgias
14    during any of your CARED Committee meetings?
15         A.  I don't recall asking for a neuropsych eval
16    specifically at one of the CARED Committee meetings.
17         Q.  Do you recall asking for a neuropsych eval of
18    Dr. Vorgias?
19         A.  I don't recall asking for a neuropsych
20    evaluation other than in this email.  It is one of the
21    tools that we have potentially for, as I stated earlier,
22    assisting us with delineating problems within
23    potential -- you know, sources of problems with
24    residents experiencing difficulty in taking care of
25    patients.
```



```
 1        Q. Right.  And did you ask for a neuropsych of
 2   Dr. Vorgias out of concern specifically for his taking
 3   care of patients?
 4        A. I asked in this email for an evaluation because
 5   I was concerned about patient safety and the risk that
 6   Dr. Vorgias had upon our patients, specifically in the
 7   hospital setting at this time.
 8        Q. And I understand patient safety is always a --
 9   is a very significant concern for all residency
10   programs, true?
11        A. Yes, patient safety is our No. 1 -- one of our
12   No. 1 top concerns.
13        Q. And my understanding is that one of the reasons
14   the program -- and specifically, let's talk about, you
15   know, Community Health of Central Washington or Central
16   Washington Family Medicine, when I use those terms,
17   they're all one in the same.  One of the reasons there's
18   a concern for patient safety is, in fact, because, to a
19   certain degree, residents are learning, and as they
20   learn, they do present some level of risk or danger to
21   patients, true?
22            MR. BAILEY:  Object to the form.
23        A. I don't actually agree with all of that
24   statement.  I agree that residents are learning, but I
25   don't think that is inherently a risk to patient
```



```
 1   safety --
 2       Q. (By Mr. Pickett)  Okay.
 3       A. -- as a blanket statement.
 4       Q. Yeah, and I wasn't trying to make a blanket
 5   statement or say it was inherent.  But patient safety,
 6   as a general principle, is always a concern when you're
 7   training a new doctor, true?
 8       A. True.
 9       Q. And it's a concern because the reality is
10   doctors are in the residency program because they don't
11   know everything, they're actually learning to be
12   hopefully good, competent, capable doctors, true?
13           MR. BAILEY:  Objection.  Argumentative.
14       Q. (By Mr. Pickett)  Go ahead.
15       A. Residents are involved in residency programs in
16   order to get board certifications, in order to provide
17   high-quality, sympathetic, qualified patient care.
18       Q. Right.  And you don't just turn residents loose
19   on patients, right?  True?
20       A. True.  Residents are highly supervised.
21       Q. Highly supervised because -- because they're in
22   the learning stage, you want to -- you want to be -- you
23   want to protect patients from potential mistakes or
24   errors that the residents may make while they're
25   learning, true?
```

```
 1    CARED Committee brainstorming -- I guess what you call a
 2    brainstorming manner, "Can we get a neuropsych eval
 3    asap?"  And what did you mean by ASAP?
 4         A.  What I mean by ASAP is in the neuropsych world
 5    is not actually ASAP, as we discussed in the CARED
 6    Committee that that isn't really even a thing.
 7         Q.  Okay.
 8         A.  It takes greater than six months to get that
 9    sort of evaluation.
10         Q.  Okay.  It takes greater than roughly -- and this
11    is your experience, based on your experience, it takes
12    greater than six months to get a neuropsych evaluation
13    completed; is that true?
14         A.  Yes, in my very, very limited experience.
15         Q.  Okay.  So when you said ASAP -- and I know what
16    it means, you know, I'm assuming it means as soon as
17    possible -- but what you're trying to communicate there
18    is let's get this done because it's going to --
19    essentially, people who are in the know like yourself,
20    if you know what I mean, know this is going to take some
21    time; is that fair?
22         A.  Actually, at this time, I don't believe that I
23    knew it took six months to get the evaluation.  I knew
24    that this was one of the things I had heard discussed in
25    the past and that this might be a tool that we could use
```



1  to help us or not with the difficulties we were
2  experiencing with Dr. Vorgias. At that time, I did not
3  know that it took six months because that wouldn't have
4  been as urgent as what was necessary at the time for
5  patient safety.
6      Q. Okay. And is there anything that prompted you
7  to go from I think it takes -- your testimony earlier
8  that it could take up to six months to now your
9  testimony says I'm not sure, what prompted you?
10         MR. BAILEY: Objection. Confusing question.
11     Q. (By Mr. Pickett) Go ahead, Doctor.
12     A. Yes, will you state that question again? I
13 think I know what you're asking but I'm not entirely
14 sure.
15     Q. I'm just wondering if something prompted you to
16 change your answer, right, or clarify your answer?
17     A. I believe I was clarifying my answer in that at
18 the time of this email, I misunderstood that this was
19 something that could happen quickly, there was another
20 resident going through a process that I later found out
21 it took six months. So now I know, as I'm giving the
22 testimony today, that this actually wasn't a viable
23 option at the time that I suggested this. Does that
24 clarify what I was saying?
25     Q. So to be -- so let me see if I can clarify.



```
 1   resident, can you tell me why the neuropsych was done on
 2   that particular resident?
 3              MR. BAILEY:  Objection.  Lack of foundation.
 4   Calls for speculation.
 5         A.  With that particular resident, there were also
 6   some concerns about medical knowledge and being able to
 7   build upon previously-learned information, and the
 8   neuropsych eval was done to help us get any insight into
 9   that question that we had.
10         Q.  (By Mr. Pickett)  Okay.  And is it fair to say
11   that when the neuropsych eval is received, specifically
12   in this instance on a resident where there appeared to
13   be sort of a lack of medical knowledge, that you then,
14   as the CARED Committee, utilize that information to see
15   if there's some way to assist the resident in
16   successfully performing in the program; is that fair?
17              MR. BAILEY:  Objection.  Assumes facts not in
18   evidence.
19         A.  The CARED Committee reviewed the document from
20   the neuropsych and that was again one piece of
21   information to help build an individualized learning
22   plan for that particular resident.
23         Q.  (By Mr. Pickett)  And again, that's to assist
24   the student identify, one, any impairments that could be
25   affecting performance and then, two, try to do your best
```



```
 1                    C E R T I F I C A T E

 2   STATE OF WASHINGTON )
                         )
 3   COUNTY OF YAKIMA    )

 4

 5        This is to certify that I, Dani White, Certified

 6   Court Reporter in and for the State of Washington,

 7   residing in Yakima, reported the within and foregoing

 8   deposition; said deposition being taken before me on the

 9   date herein set forth; that pursuant to RCW 5.28.010 the

10   witness was first by me duly sworn; that said

11   examination was taken by me in shorthand and thereafter

12   under my supervision transcribed; and that same is a

13   full, true, and correct record of the testimony of said

14   witness, including all questions, answers, and

15   objections, if any, of counsel.

16        I further certify that I am not a relative or

17   employee or attorney or counsel of any of the parties,

18   nor am I financially interested in the outcome of the

19   cause.

20        IN WITNESS WHEREOF I have set my hand this 17

21   day of November, 2021.

22                       _____
                              Dani White
23                            DANI WHITE
                              CCR NO. 3352
24

25
```



# Email for Pre-reading for CARED Committee Meeting 2/13/19
# RE: Dr. Rue request for neuropsych eval.



EXHIBIT 10

000059

**Email in Response from Katina Rue:**

I was on this week with him. Dom did in fact stay all day with him at least twice. He did not improve.

He took 2.5 hours to discharge a patient, after we discussed the patient. This was a total of 5 hours for a patient who he admitted the evening before. The care of multiple other patients was affected.

I agree with Carlin that he is a detriment to the team and is a risk as far as patient safety. I do not feel comfortable with him communicating accurate information to me, to consultants, nursing staff or families. This potentially effects patient care in a negative way. I would urge u to remove him from the service. Dom is not an ongoing solution and he is missing out on his own educational opportunities.

I really hoped he would have had some improvement this week, but I didn't see any. He is not meeting the requirements of the ILP. He has not been proactive in any sense...although he told me he was practicing his one liners at home. This was not evident. We literally took 15 minutes to present a one liner on one of his patients on Friday. He doesn't seem to incorporate realtime feedback in any meaningful way.

**Can we get a neuropsych eval asap?**

Again, I would favor removing him from the service and getting an evaluation. Currently, I just don't think he can do this.

-Katina

**EXHIBIT 10**

000060