# EXHIBIT 1

**Declaration of Demetrios Vorgias in
Opposition to Defendants Summary
Judgment**

**Heidi Martinez**

| | |
|---|---|
| From: | Micahlyn Powers |
| Sent: | Tuesday, April 23, 2019 4:06 PM |
| To: | Heidi Martinez |
| Subject: | FW: Vorgias FMS evaluations |

Please print for binder.

*Micahlyn Powers MD*

Interim Program Director- Central WA Family Medicine Residency
Site Director- CHCW Ellensburg

**From:** Caitlin Hill
**Sent:** Tuesday, April 23, 2019 3:43 PM
**To:** Micahlyn Powers <Micahlyn.Powers@chcw.org>
**Subject:** Fwd: Vorgias FMS evaluations

Get Outlook for iOS

**From:** Joel Pearson
**Sent:** Tuesday, April 23, 2019 3:39:14 PM
**To:** Caitlin Hill
**Subject:** Re: Vorgias FMS evaluations

I've been on FMS 2 days so far, with only a couple patients with him, 1 being an admit.

The admit was pretty complex, a transfer out of the ICU to tele. He took a long time to prepare. There was a lot of data to sift through, from ER, ICU, cardiology. In general, he was able to convey pretty well that patient's progress and current status. He didn't need to really develop much of a fresh A/P, since the patient had been managed by other providers already. His resultant note was pretty good, hit the important points and was clear.

Overall, that experience was below what would be expected for his level of training. Looking ahead, seems he would not be ready for nights. All that said, I feel like I need more of a sample size to really confidently say much.

JP

1

CONFIDENTIAL                    CHCW 000083

# EXHIBIT 2

**Declaration of Demetrios Vorgias in
Opposition to Defendants Summary
Judgment**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON


DEMETRIOS VORGIAS,                   )
                                     )
        Plaintiff,                   )
                                     )   NO. 1:21-CV-03013-SAB
        v.                           )
                                     )
COMMUNITY HEALTH OF CENTRAL          )
WASHINGTON,                          )
                                     )
        Defendant.                   )


VIDEOTAPED VIDEOCONFERENCE DEPOSITION UPON ORAL

EXAMINATION OF MICHAHLYN POWERS, M.D.


November 4, 2021
9:04 a.m.
Via Videoconference


TAKEN AT THE INSTANCE OF THE PLAINTIFF


REPORTED REMOTELY BY:
DANI WHITE, CCR NO. 3352

1    Q. Did you ask her about any condition that could

2    impair his ability to learn as a resident?

3    A. No.  Not specifically.  We were looking for

4    conditions that would make him unsafe to practice.  And

5    it seemed that he didn't have an underlying substance

6    abuse disorder, which we were very happy to hear.

7    Although, I'm not sure if they would have told us that

8    because of confidentially, but they said simply that

9    he's safe.

10    Q. So the WPHP concluded, at least they told you,

11    either -- was it by the phone -- during the phone

12    conversation that he was safe to practice?

13    A. Right.  Yep.

14    Q. Okay.  And then they did also express that in

15    the email, that Dr. Vorgias was safe?  He was safe in

16    terms of, I'm assuming, patient safety?  He was safe to

17    practice?

18    A. He was safe to --

19    MS. MORISSET:  Object as to form.  Go ahead.

20    Object to form.

21    A. He was safe in the sense that there was not an

22    impairing diagnosis.  For example, bipolar disorder

23    with, you know, mania or delusions or paranoia or

24    substance use, something that would make him, you know,

25    gravely impaired and unsafe to practice.  That's all

Page 66

1            C E R T I F I C A T E

2    STATE OF WASHINGTON )
                         )
3    COUNTY OF YAKIMA    )

4

5        This is to certify that I, Dani White, Certified

6    Court Reporter in and for the State of Washington,

7    residing in Yakima, reported the within and foregoing

8    deposition; said deposition being taken before me on the

9    date herein set forth; that pursuant to RCW 5.28.010 the

10   witness was first by me duly sworn; that said

11   examination was taken by me in shorthand and thereafter

12   under my supervision transcribed; and that same is a

13   full, true, and correct record of the testimony of said

14   witness, including all questions, answers, and

15   objections, if any, of counsel.

16       I further certify that I am not a relative or

17   employee or attorney or counsel of any of the parties,

18   nor am I financially interested in the outcome of the

19   cause.

20       IN WITNESS WHEREOF I have set my hand this 17th

21   day of November, 2021.

22

23                        DANI WHITE
                          CCR NO. 3352

24

25

# EXHIBIT 3

**Declaration of Demetrios Vorgias in Opposition to Defendants Summary Judgment**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON


DEMETRIOS VORGIAS,                )
                                  )
          Plaintiff,              )
                                  )   NO. 1:21-CV-03013-SAB
          v.                      )
                                  )
COMMUNITY HEALTH OF CENTRAL       )
WASHINGTON,                       )
                                  )
          Defendant.              )


VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION OF

KATINA RUE, D.O.


November 10, 2021
9:05 a.m.
Via Videoconference


TAKEN AT THE INSTANCE OF THE PLAINTIFF


REPORTED REMOTELY BY:
DANI WHITE, CCR NO. 3352

Page 1

Vorgias vs Community Health of Central Washington                                   Katina Rue, D.O. 11/10/2021

```
 1          MR. BAILEY:  Objection.  It's a leading

 2    question.

 3          A. Residents are supervised for several reasons.

 4    One, including patient safety; two, including evaluation

 5    of their progress in their medical education and their

 6    residency training and curriculum.

 7          Q. (By Mr. Pickett)  And when you requested a

 8    neuropsych eval ASAP for Dr. Vorgias, it sounds like you

 9    did that, at least in part, for patient safety; is that

10    fair?

11          MR. BAILEY:  Object.  Mischaracterizes the

12    email.

13          Q. (By Mr. Pickett)  Go ahead.  You can answer.

14          A. I was concerned at the time that Dr. Vorgias

15    posed a risk over and above the typical R1 resident for

16    his level of training to patients under his care, and

17    that's what prompted this question in the email, "Can we

18    get a neuropsych eval asap?"

19          Q. And who were you asking that specifically to?

20    Was it the CARED Committee or someone else?

21          A. I was not asking it specifically to anyone

22    rather than a brainstorming mechanism.

23          Q. A brainstorming mechanism?

24          A. With the CARED Committee.

25          Q. All right.  So you were specifically asking the
```

Page  77

Vorgias vs Community Health of Central Washington          Katina Rue, D.O. 11/10/2021

```
 1                 C E R T I F I C A T E

 2    STATE OF WASHINGTON )
                          )
 3    COUNTY OF YAKIMA    )

 4

 5          This is to certify that I, Dani White, Certified

 6    Court Reporter in and for the State of Washington,

 7    residing in Yakima, reported the within and foregoing

 8    deposition; said deposition being taken before me on the

 9    date herein set forth; that pursuant to RCW 5.28.010 the

10    witness was first by me duly sworn; that said

11    examination was taken by me in shorthand and thereafter

12    under my supervision transcribed; and that same is a

13    full, true, and correct record of the testimony of said

14    witness, including all questions, answers, and

15    objections, if any, of counsel.

16          I further certify that I am not a relative or

17    employee or attorney or counsel of any of the parties,

18    nor am I financially interested in the outcome of the

19    cause.

20          IN WITNESS WHEREOF I have set my hand this 17

21    day of November, 2021.

22

23                        DANI WHITE
                          CCR NO. 3352
24

25
```

# EXHIBIT 4

**Declaration of Demetrios Vorgias in
Opposition to Defendants Summary
Judgment**

7. You will receive an evaluation by Washington Physician Health Program, in person, in Seattle, to determine your fitness to practice in residency. You will be released from clinical duties to attend this evaluation and any follow up appts.

8. You have failed your second FMS rotation after your 2nd week in Feb 2019, as well your first FMS month in Nov 2018 and will be required to make up both rotations (8 weeks) prior to graduating from CWFM and this will extend your training by 2 blocks (unless you choose to use your elective time to re-do one of these rotation).

9. You will inform your preceptors that you must have them see all of your patients during your family medicine clinic, as well as precept all patients at the time of the visit. You need to articulate workup for presenting problem (chart prep), give 3 differential diagnoses for new or acute problems, and state guideline and source used to formulate a treatment plan. Confirm plan with attending- ie. Repeat back plan to attending to confirm both parties are on the same page. If unclear, ask questions.

10. You will seek help with the stress of residency by contacting the EAP program for counseling appts, which are free. You must make an appointment with EAP by 2/21/19, and should have your first counseling appointment completed by 2/27/19. You will be excused from clinical duties if needed, in order to attend these appointments, with prior arrangements through the residency coordinator Leticia Fernandez and scheduler Cindi Grunewald.

11. You were offered additional trainings on Cerner EMR at VMM & Astria prior to your next FMS rotation, which you refused.

12.   Clinic Learning Plan:

Pick 1 clinical question to answer EVERY night regarding a clinic patient you have seen or are going to see, and read your chosen resource. Examples of resources include UpToDate,

*yes M-F ; weekends no*

Write a 1 paragraph email to your advisor and the PD (Caitlin.hill@chcw.org and micahlyn.powers@chcw.org) EVERY NIGHT to tell them your clinical question, and then summarize what you have learned, and cite your source.

13.   I understand that probation becomes a permanent and reportable part of my academic record and may interfere with my ability to obtain

**EXHIBIT 9**

# EXHIBIT 5

**Declaration of Demetrios Vorgias in
Opposition to Defendants Summary
Judgment**



WASHINGTON PHYSICIANS HEALTH PROGRAM

February 15, 2019

Micahlyn Powers, MD
Interim Residency Director
Central Washington Family Medicine Residency Program
1806 West Lincoln Ave.
Yakima, WA 98902

PERSONAL & CONFIDENTIAL

Re: Demetrios Vorgias, MD

Dear Dr. Powers:

I have the above client's consent to disclose to you that he attended his scheduled appointment with the Washington Physicians Health Program (WPHP) on January 30, 2019. Based on this meeting with Dr. Vorgias there was no evidence of current impairment.

Per our recommendation, he will be undergoing additional evaluation from an outside provider to rule out an underlying medical condition that could affect his ability to practice with reasonable safety to patients. Once the evaluation has been completed, we will notify you with any further recommendations.

Please note the prohibition of redisclosure of this information. Please do not respond to any third party inquiries about this information without speaking to us first.

If I may be of further assistance, kindly so advise.

Sincerely,

Laura Moss, MD
Associate Medical Director

LM/AC
1040

720 Olive Way, Suite 1010        Tel: 800.552.7236        Fax: 206.583.0418
Seattle, WA 98101-1819           206.583.0127              www.wphp.org

CHCW 000077
Exhibit 2

# EXHIBIT 6

**Declaration of Demetrios Vorgias in
Opposition to Defendants Summary
Judgment**

Vorgias vs Community Health of Central Washington                Michahlyn Powers, M.D. 11/04/2021

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON


DEMETRIOS VORGIAS,                    )
                                      )
          Plaintiff,                  )
                                      )   NO. 1:21-CV-03013-SAB
          v.                          )
                                      )
COMMUNITY HEALTH OF CENTRAL           )
WASHINGTON,                           )
                                      )
          Defendant.                  )


VIDEOTAPED VIDEOCONFERENCE DEPOSITION UPON ORAL

EXAMINATION OF MICHAHLYN POWERS, M.D.


November 4, 2021
9:04 a.m.
Via Videoconference


TAKEN AT THE INSTANCE OF THE PLAINTIFF


REPORTED REMOTELY BY:
DANI WHITE, CCR NO. 3352

Vorglas vs Community Health of Central Washington                    Michahlyn Powers, M.D. 11/04/2021

1    actually going into the room with him towards the end of

2    his visit to observe him examining and putting together

3    the plan and counseling the patient.  So that's the

4    setting.

5         And then in terms of his performance --

6         Q. (By Mr. Pickett)  Yes.  Please.

7         A. Okay.

8         Q. You read my mind.  You're ahead of me, so I

9    appreciate it.  Thank you.

10        A. In terms of his performance, what I noticed was

11   that he -- he appeared scattered.  He didn't appear

12   particularly nervous to me, but he was always quite

13   talkative and jumping from -- from idea to idea as he

14   was looking through the chart.  He had difficulty

15   navigating the electronic medical record, which is vital

16   for being able to find information in a timely way and

17   enter information as well.

18        And in the room with the patient, again, he --

19   he seemed poorly organized, abrupt with patients, he did

20   not really have a bedside manner that -- that put

21   patients at ease.  I never saw him be inappropriate with

22   a patient myself.  He was -- he was appropriate and

23   pleasant.  His physical exam skills were basic.  I would

24   say adequate, but not good and not sophisticated.  And

25   his ability to counsel patients and make a plan was the

Vorgias vs Community Health of Central Washington                    Michahlyn Powers, M.D. 11/04/2021

1     Q. (By Mr. Pickett)   She would not --

2     A. So that sort of information is -- would have

3  been written and well-documented from the WPHP.   She

4  would not have been at liberty to share his -- his

5  private information with me.

6     Q. Okay.   You were -- the paragraph above here, it

7  says -- it indicates -- and I'm looking back at the

8  documents, it says, Dr. Kelly Cornett administered

9  neuropsychological testing to you" -- this is to

10 Dr. Vorgias -- "on April 3.   We were notified of the

11 findings and recommendations subsequent to the

12 evaluation on April 18, 2019, during a telephone call

13 with Dr. Cornett."

14       First question is did you know that Dr. Vorgias

15 had been -- when you had sent him to WPHP that he was

16 going to have a neuropsych?

17     A. They had made that recommendation.   I was not

18 aware that it had -- the date of the evaluation.   WPHP

19 informed us that it had been completed, though.

20     Q. When did they inform you and who?

21     A. Cynthia Morales let me know that a

22 neuropsychological test had been performed, but those

23 results were not sent to us at that time.   And I never

24 received them.

25     Q. When did she do that?   When did she inform you

Page 68

1    that a neuropsychological evaluation had been conducted

2    with Dr. Vorgias?

3         A. I believe on April 19, in that email.

4         Q. Okay.  And did she also tell you during that

5    conversation and/or email that that neuropsychological

6    evaluation was part of their evaluation of these -- of

7    what she referred to as "underlying medical conditions"?

8              MS. MORISSET:  Object as to form.

9         A. No.

10        Q. (By Mr. Pickett)  Okay.  Did you ask at all, at

11   all in any way, shape, or form, when you talked to

12   Ms. Morales if that -- if there was any way that these

13   underlying medical conditions were affecting Demetrios's

14   performance in the residency program?

15        A. I asked her if there were any conditions that we

16   should be aware of that were impairing his performance.

17   And she said, No, he is able to work.  There are no

18   impairments.

19        Q. Did you ask specifically whether the underlying

20   medical conditions that she told you about were

21   impairing his performance in any way?

22             MS. MORISSET:  Object as to form.

23        A. No, I did not ask her that specifically.

24        Q. (By Mr. Pickett)  Why not?

25        A. If I had --

Page 69

Vorgias vs Community Health of Central Washington                     Michahlyn Powers, M.D. 11/04/2021

```
 1                  C E R T I F I C A T E

 2    STATE OF WASHINGTON )
                          )
 3    COUNTY OF YAKIMA    )

 4

 5         This is to certify that I, Dani White, Certified

 6    Court Reporter in and for the State of Washington,

 7    residing in Yakima, reported the within and foregoing

 8    deposition; said deposition being taken before me on the

 9    date herein set forth; that pursuant to RCW 5.28.010 the

10    witness was first by me duly sworn; that said

11    examination was taken by me in shorthand and thereafter

12    under my supervision transcribed; and that same is a

13    full, true, and correct record of the testimony of said

14    witness, including all questions, answers, and

15    objections, if any, of counsel.

16         I further certify that I am not a relative or

17    employee or attorney or counsel of any of the parties,

18    nor am I financially interested in the outcome of the

19    cause.

20         IN WITNESS WHEREOF I have set my hand this 17th

21    day of November, 2021.

22

23                        DANI WHITE
                          CCR NO. 3352
24

25
```

Central Court Reporting   800.442.3376

# EXHIBIT 7

**Declaration of Demetrios Vorgias in
Opposition to Defendants Summary
Judgment**

Demetrios Vorgias

CARED Committee Meeting 4/17/19 Progress Report:

1. Initially started doing inpatient cases instead of outpatient cases (despite his probation document stating that he needed to do outpatient cases based on his clinic patients), but after being corrected he began to do outpatient cases, until we allowed him to do inpatient cases in preparation for his current FMS month. Cases were detailed and well prepared, but with limited resources used (mostly UpToDate) and when he had the opportunity to use some of the information he had prepared and apply it patient cases during rounds, he struggled with application. He did come in an pre-rounds the patients with the attendings.

2. Attempted to cancel and reschedule the EKG final exam but was not allowed to do so by Dr. Katina Rue, as he had plenty of opportunity to study ahead of time.

3. Cancelled and rescheduled his WPHP evaluation appointment in order to study for his pre-scheduled EKG final exam, despite having that evaluation pre-planned, less clinics than other residents on the EKG elective. He rescheduled his WPHP evaluation from during his EKG elective to during his 1st week of a busy FMS rotation, which was a hardship on his teammates.

4. FMS block 4/1/19 feedback: Patient presentations continue to be scattered, disorganized. Sometimes able to answer attending questions, but seems to lack common sense in ability to approach a patient case. Currently low census on FMS (10 pts), and despite having 2-3 patients, notes are not done by 2pm on a regular basis. H&P completion often takes 6 hours, which is far too long. Easily distracted and side tracked from task completion such as discharge summaries. Difficult to keep on task. Misses critical information in H&P, differential diagnoses are shallow, and despite writing 2 cases about sepsis criteria he could not identify that a COPD patient met criteria for sepsis. Resident is not reviewing at least 1 evidence based article related to his patient's condition despite being reminded to do so at the beginning of the FMS rotation by his advisor Dr. Hill and again on Sunday at the end of the 1st week of the rotation. He is not providing this with Dr. Carlin Miller. Focus on dirty urine. He wasn't able to interpret a basic lab urine dip. Not able to let the lab test go, brought up 4 times. Sarah Ortner noted that he seems to be more professional and nursing staff seem to be more positive. Nursing staff provided feedback from Virginia Mason Hospital from Ellwood – regarding a patient transitioning to hospice in the morning without labs, etc being an extensive care plan. HE still put in orders for blood draw, after this was already discussed and the plans were to not do any lab draws. This upset the family and nursing staff. Nora Kirschner his level of knowledge is below that of a medical student. Doesn't know acid base disorders or where to look up about them.

5. Inbox Progress: 2 docs, 4 pt messages, 1 lab, 0 open encounters

6. Need to communicate to the faculty that this FMS eval needs to clearly document whether or not he is meeting expectations of an FMS R1. His probation document states that IF he does not pass the rotation, his probation states that he will be discharged.

Conclusion:

Ongoing grave concerns about decision making, organizational skills, comprehension, and ability to complete tasks on time and follow a plan. Clinic performance has improved overall, and largest area of concern is his inpatient care. If he does not pass his FMS rotation, he will be discharged from the program. If he passes his FMS rotation, he will also need to pass his upcoming FMS rotation on 4/29-5/27. He will be ineligible for promotion to the R2 year and would need to continue as an off cycle R1 and re-do his failed FMS rotations and pass them in order to continue. Based on his prior OB rotation

CONFIDENTIAL

evaluations, he needed direct supervision and there were nursing concerns and attending concerns regarding his ability to perform at a basic level.

CONFIDENTIAL

CHCW 000079

# EXHIBIT 8

**Declaration of Demetrios Vorgias in
Opposition to Defendants Summary
Judgment**

**Heidi Martinez**

| | |
|---|---|
| **From:** | Micahlyn Powers |
| **Sent:** | Friday, April 19, 2019 11:55 AM |
| **To:** | Leticia Fernandez; Heidi Martinez |
| **Subject:** | Fwd: D.V. |

Please print for his binder.

Get Outlook for iOS

**From:** Cynthia Morales <cmorales@wphp.org>
**Sent:** Friday, April 19, 2019 11:52 AM
**To:** Micahlyn Powers
**Subject:** RE: D.V.

Hi Dr. Powers,

Thank you for taking my call. To summarize, D.V. has completed the evaluation process recommended by our organization. Based on this evaluation, there was no current identified impairment due to an underlying medical condition.

We are recommending to him enrollment in monitoring with our organization in order to monitor underlying medical conditions. We want to monitor these conditions in order to prevent future impairment. We hope that the recommendations provided to him will impact his performance. We believe it may take some time before these recommendations produce results.

We emphasize to all residency programs and employers that they may continue their own disciplinary processes in tandem with our own processes.

I will send to you a letter confirming completion of our evaluation process and our recommendation for monitoring, per your instructions.

Thank you for collaborating with us. I will be in touch again to discuss in more detail specific aspects of his monitoring with our program.

1

CHCW 000093

Kindly,

( ˙ ˙nthia Morales, M.A., LMHC

Clinical Coordinator

Washington Physicians Health Program

**From:** Micahlyn Powers <Micahlyn.Powers@chcw.org>
**Sent:** Thursday, April 18, 2019 4:41 PM
**To:** Cynthia Morales <cmorales@wphp.org>
**Subject:** Demetrios Vorgias

Cynthia,

I'd love to have an update on how Dr. Vorgias is doing based on his last evaluation performed a few weeks ago.

The "CARED" Committee ( Committee about residents experiencing difficulty ) met yesterday to discuss his progress, and there are ongoing great concerns, and we suspect he will not pass his current inpatient family medicine rotation. This will lead to his termination from the residency program. Concerns regarding professionalism have improved, but medical knowledge lags far behind his peers and he is in no way able to be promoted to the second year of residency.

Any information on his progress would be welcome before Wednesday, April 24, which is His next formal evaluation.

Micahlyn Powers MD

Interim Program Director Central WA Family Medicine Residency

Yakima, WA

CHCW-Ellensburg Site Director

CHCW 000094



WASHINGTON PHYSICIANS HEALTH PROGRAM

December 11, 2019

Demetrios Vorgias, MD
1126 Radis Place
Jacksonville, FL 32225

PERSONAL & CONFIDENTIAL

Dear Dr. Vorgias:

This letter is in follow up to your request for a chronology of services provided to you since your referral to Washington Physicians Health Program (WPHP), initiated on January 23, 2019 by Dr. Micahlyn Powers, MD, former interim residency training director at Central Washington Family Medicine Residency Program.

We met with you for an initial assessment on January 30, 2019. Cynthia Morales, your clinical coordinator, contacted Dr. Powers on this date to confirm your attendance at the scheduled appointment. Ms. Morales also stated that the WPHP team recommended that you could be returned to practice while we completed the evaluation, due to no observed current impairment.

We subsequently met with you for a follow up appointment on March 1, 2019, to review and discuss our recommendation for additional evaluation from an outpatient provider. During this appointment, we specifically recommended completion of a neuropsychological evaluation.

Dr. Kelly Cornett, PsyD, administered neuropsychological testing to you on April 3, 2019. We were notified of the findings and recommendations subsequent to the evaluation on April 18, 2019, during a telephone call with Dr. Cornett.

On April 19, 2019, Cynthia Morales received an email correspondence from Dr. Micahlyn Powers. In this email, Dr. Powers requested an update regarding your evaluation with WPHP. Ms. Morales responded via email by informing her that your evaluation with WPHP was complete, we were recommending that you enroll in a monitoring agreement for an underlying medical condition, and there were recommendations for accommodations that would later be communicated to Dr. Powers.

On May 2, 2019, you spoke with Ms. Morales via telephone and notified her of your termination from your residency program, which was effective May 1, 2019, per your report during this conversation.

On May 20, 2019, you met with Ms. Morales and Laura Moss, MD, Associate Medical Director, for an in-person appointment. We reviewed and discussed Dr. Cornett's findings and recommendations subsequent to your neurocognitive evaluation. You shared with us your intention to complete your residency training in a new program, and we recommended enrollment in behavioral health monitoring to provide documented advocacy.

On August 9, 2019, you enrolled in a behavioral health monitoring agreement for WPHP monitoring of your underlying mental health conditions and provision of advocacy.

Please do not hesitate to contact us directly at any time with your questions or concerns regarding this matter.

If we may be of further assistance, kindly so advise.

Sincerely,

Laura **Moss**, MD
Associate Medical Director

Cynthia Morales, MA, LMHC
Clinical Coordinator

LM/AC
1040

# EXHIBIT 9

**Declaration of Demetrios Vorgias in
Opposition to Defendants Summary
Judgment**

1  career.  Residents are often nervous in these circumstances, and it is important

2  for residents to be able to learn how to manage their nerves and treat patients

3  safely despite feeling nervous or anxious.

4      7.    At the October meeting, CARED placed Dr. Vorgias on a

5  constructive citation, which is the first step in our performance remediation

6  program.  As part of the constructive citation, CARED developed a list of

7  recommendations for Dr. Vorgias that we felt would help him overcome the

8  difficulties I and other faculty had observed.  For example, I began checking in

9  with Dr. Vorgias more frequently to provide him with additional support and

10  give him the opportunity to seek help on any issues he was facing.

11      8.    One of our CARED recommendations was to have Dr. David

12  Bauman, a psychologist and the Director of the Behavioral Health Education

13  department and a member of the Behavioral Health Consultant (BHC) group,

14  shadow Dr. Vorgias to help Dr. Vorgias with his interactions with both staff

15  and patients and possibly improve efficiency and organization of visits.  There

16  had been concern about Dr. Vorgias's interactions with patients, including

17  calling them "dear" or "love."  Dr. Bauman reported that he shadowed Dr.

18  Vorgias for more than two hours and had several concerns about Dr. Vorgias's

19  performance. Attached as **Exhibit 4** is a true and correct copy of Dr. Bauman's

20  email to me, which I shared with the CARED committee.

21      9.    In or around October 2018, Dr. Vorgias told me he had ADHD and

22  that he was struggling with the Cerner EMR system.  It is essential that a doctor

23  understand how to use an EMR as virtually all health systems (i.e., employers

DECLARATION OF CAITLIN HILL IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT
1:21-cv-03013-SAB - 4

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
Tel: (206) 682-2308 | Fax: (206) 682-7908

1  of doctors) store patient records in an EMR.  I arranged to get him extra help,

2  including teaching him how to use the system myself, helping him find

3  trainings, and pairing him with senior residents to help him learn the system.

4  Dr. Vorgias also shared that he did not have a medical provider to treat his

5  ADHD, and I encouraged him to find a provider and seek any needed treatment.

6  I also encouraged him to find an organizational system that would work for him

7  given his ADHD.  Several doctors, including Dom Nguyen (a senior resident),

8  Tess Ish-Shalom (a senior resident), and Dr. Mark tried to help Dr. Vorgias use

9  the EMR system more efficiently and find an organization/workflow system

10  that would work for him.  I also offered additional training to Dr. Vorgias on

11  the specific EMR system used by CHCW, but Dr. Vorgias declined saying he

12  did not feel it would be helpful.  With the additional support provided to Dr.

13  Vorgias, his organization and use of the EMR system did show incremental

14  improvement.  At the time of his termination, Dr. Vorgias was still not fully

15  proficient with the EMR, but because he was still showing improvement in this

16  area, his use of the EMR system did not factor into my decision to recommend

17  and support his termination.  Further, after we provided this ongoing support

18  for Dr. Vorgias, he never indicated to me that he needed more or different

19  support for the EMR system or related to his ADHD.

20      10.    On November 14, 2018, Dr. Carlin Miller, an attending, reported

21  that he had worked with Dr. Vorgias and had serious concerns about Dr.

22  Vorgias's performance.  I shared Dr. Miller's feedback with CARED.  Attached

23  as **Exhibit 5** is a true and correct copy of Dr. Miller's email to me.

DECLARATION OF CAITLIN HILL IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT
1:21-cv-03013-SAB - 5

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
Tel: (206) 682-2308 | Fax: (206) 682-7908

# EXHIBIT 10

**Declaration of Demetrios Vorgias in
Opposition to Defendants Summary
Judgment**

errors. Dr. Lancaster may have some feedback on that. Medical knowledge is still a big problem that is a concern for patient's safety as he tends to be very superficial and if you begin to ask him "why" questions he has no idea what to say. A history and physical presentation could easily take 30-45 minutes. This also presents significantly more work for attendings in particular as you have to oversee essentially everything he does. It was very helpful to have Dom they are helping out with that. Efficiency also remains a huge problem, I will give you 1 example from the final day that was not particularly unique. He got assigned the admission approximately 10:00 a.m.. Patient was stable, I saw the patient, Dom saw the patient, we put in holding orders and made sure things were taking care and necessary medications in place. He had a somewhat urgent discharge at the other hospital which he went and did with the expectation he would come back and do the admission. In most cases we expect residents to see admissions 1st but we did allow for this and made sure patient was taken care of. I decided to wait and see how long it would take for him to see the patient and present to me. On a 10 a.m. admission, he staffed it with me at 8:00 p.m. even more concerning was that he did not even seem to comprehend that this was a huge problem. He superficially apologized for calling me late and that was it. There are more examples from the week but all leave it at that for now. My personal opinion is that it is not viable to keep him on service, and that even if there was some movement in a positive direction he would still be so far below minimum expectations that it is still not a good idea. I acknowledge that I may be especially frustrated and biased after spending a busy week on service watching this happen and I am interested in other people's perspectives. I will support whatever we collectively decided to do.

-Carlin Miller

**Email in response from Caitlin Hill:**

Thank you. I noticed the same on Thursday and the admit he got at 4 pm was not staffed until I said he had no more tome at 10:30 pm, note was not in until after midnight. Two other admission came in at the same time or after his and they were staffed prior to sign out. His note although "done" required addendums from him before I could sign off on them so although it looked like notes were in around rounds they were not completed until 5 pm. On Thursday we set goals at rounds and his was reading-which is thoughtful based on his citation. Knowing he had not yet presented a topic to me I suggested he do abone minute pearl session at rounds to support him and his colleagues learning as reading was his goal- he. Did not like that as he would "need a beta blocker" no matter how informal.

I sat in on his admission on Thursday, and although he is trying to use a checklist to get important info he is not listening to his patient so frequently has to reask the question multiple times- sometimes appearing as if he did not remeber asking the first or third time. He struggles synthesizing the important parts of a history and exam into a plan. He has asked that we have dom with him again so he can build on the lessons- hoping some time this week. Maybe a whole day as a half day does not get us full info as well as managing a admit + rounding.
Caitlin

**Email in Response from Katina Rue:**

I was on this week with him. Dom did in fact stay all day with him at least twice. He did not improve.

He took 2.5 hours to discharge a patient, after we discussed the patient. This was a total of 5 hours for a patient who he admitted the evening before. The care of multiple other patients was affected.

CONFIDENTIAL

# EXHIBIT 11

**Declaration of Demetrios Vorgias in
Opposition to Defendants Summary
Judgment**



# United States Medical Licensing Examination®

## Step 3 Score Report

FOR EXAMINEE USE ONLY. THIRD-PARTY USERS OF USMLE SCORES
SHOULD RELY SOLELY ON OFFICIAL TRANSCRIPTS RECEIVED DIRECTLY
FROM THE EXAMINEE'S USMLE REGISTRATION ENTITY.

**NAME:** Vorgias, Demetrios
**USMLE ID:** 0-884-961-4

**TEST DATE:** December 18, 2019

## Your Performance

**Test Result**
# PASS

**Test Score**
# 208

### Your Performance Compared to Other Examinees

The chart below represents the distribution of scores for examinees from US and Canadian medical schools taking Step 3 for the first time between January 1, 2018 and December 31, 2018. Reported scores range from 1-300 with a mean of 226 and a standard deviation of 15.



If you tested repeatedly under the same conditions on a different set of items covering the same content, without learning or forgetting, your score would fall within one standard error of the estimate (SEE) of your current score two-thirds of the time. The SEE on this exam is 8 points.

*Your score +/- SEE: 200 – 216*

# United States Medical Licensing Examination

# Step 3 Score Report

**FOR EXAMINEE USE ONLY. THIRD-PARTY USERS OF USMLE SCORES SHOULD RELY SOLELY ON OFFICIAL TRANSCRIPTS RECEIVED DIRECTLY FROM THE EXAMINEE'S USMLE REGISTRATION ENTITY.**

**NAME:** Vorgias, Demetrios
**USMLE ID:** 0-884-961-4

**TEST DATE:** December 18, 2019

## Your Relative Strengths and Weaknesses

The boxes below indicate areas of relatively lower or higher performance in each content area within the Step 3 examination. A box in the "Higher" column indicates that your performance in that area was higher than your overall Step 3 performance shown on page 1. A box in the "Same" column indicates that your performance in that area was similar to or the same as your overall Step 3 performance. A box in the "Lower" column indicates that your performance in that area was lower than your overall Step 3 performance. The percentage range of items from each content area on the Step 3 examination is indicated below.

This information can be used to identify areas of strength and weakness to guide future study. Because the exam is highly integrative, USMLE recommends reviewing all content areas if retaking the test.

## Performance by Physician Task Relative to Your Overall Step 3 Performance

| | (% Items Per Test) | Lower | Same | Higher |
|---|---|---|---|---|
| **PC: Diagnosis** | (30 - 40%) | | ▪ | |
| **PC: Health Maint & Disease Prevent/Pharmacotherapy** | (14 - 22%) | | ▪ | |
| **PC: Clinical Interventions/Mixed Mgmt** | (12 - 20%) | | ▪ | |
| **MK: Applying Foundational Science Concepts** | (10 - 15%) | | ▪ | |
| **Systems-based Practice/Patient Safety & PBLI** | (10 - 15%) | | ▪ | |

Abbreviations: MK, Medical Knowledge; PC, Patient Care; PBLI, Practice-based Learning and Improvement.

## Performance on Computer-based Case Simulations Relative to Your Overall Step 3 Performance

| | (# Cases Per Test) | Lower | Same | Higher |
|---|---|---|---|---|
| **Advanced Clinical Medicine: Computer-based Case Simulations** | (13) | | ▪ | |

# United States Medical Licensing Examination

## Step 3 Score Report

FOR EXAMINEE USE ONLY. THIRD-PARTY USERS OF USMLE SCORES SHOULD RELY SOLELY
ON OFFICIAL TRANSCRIPTS RECEIVED DIRECTLY FROM THE EXAMINEE'S USMLE REGISTRATION ENTITY.

**NAME:** Vorgias, Demetrios

**USMLE ID:** 0-884-961-4

**TEST DATE:** December 18, 2019

## Performance by System Relative to Your Overall Step 3 Performance

| | (% Items Per Test) | Lower | Same | Higher |
|---|---|---|---|---|
| Renal/Urinary & Male/Female Sys & Pregnancy | (12 - 16%) | | ▮ | |
| Bhv Health & Soc Sci: Comm Skills/Ethics/Pt Safety | (11 - 15%) | | ▮ | |
| Immune/Blood & Lymph/Endocrine/Multisystem | (11 - 15%) | | ▮ | |
| Biostatistics & Epidemiology/Population Health | (10 - 14%) | | ▮ | |
| Musculoskeletal Sys/Skin & Subcutaneous Tissue | (10 - 14%) | | ▮ | |
| Cardiovascular System | (8 - 12%) | | ▮ | |
| Nervous System & Special Senses | (7 - 11%) | | ▮ | |
| Respiratory System | (7 - 11%) | | ▮ | |
| Gastrointestinal System | (5 - 9%) | | ▮ | |

# United States Medical Licensing Examination
# Step 3 Score Report

## Supplemental Information: Understanding the Content Areas

The information below is a visual representation of the content weighting on this examination that may be informative in guiding remediation. Descriptions of the topics covered in these content areas, as well as other topics covered on USMLE Step 3, can be found in the information materials on the USMLE website (https://www.usmle.org). Please use the contact form on the USMLE website (https://www.usmle.org/contact/) if you have additional questions.

| Physician Task | (% Items Per Test) |
|---|---|
| PC: Diagnosis | (30 - 40%) |
| PC: Health Maint & Disease Prevent/Pharmacotherapy | (14 - 22%) |
| PC: Clinical Interventions/Mixed Mgmt | (12 - 20%) |
| MK: Applying Foundational Science Concepts | (10 - 15%) |
| Systems-based Practice/Patient Safety & PBLI | (10 - 15%) |

Abbreviations: MK, Medical Knowledge; PC, Patient Care; PBLI, Practice-based Learning and Improvement.

| System | (% Items Per Test) |
|---|---|
| Renal/Urinary & Male/Female Sys & Pregnancy | (12 - 16%) |
| Bhv Health & Soc Sci: Comm Skills/Ethics/Pt Safety | (11 - 15%) |
| Immune/Blood & Lymph/Endocrine/Multisystem | (11 - 15%) |
| Biostatistics & Epidemiology/Population Health | (10 - 14%) |
| Musculoskeletal Sys/Skin & Subcutaneous Tissue | (10 - 14%) |
| Cardiovascular System | (8 - 12%) |
| Nervous System & Special Senses | (7 - 11%) |
| Respiratory System | (7 - 11%) |
| Gastrointestinal System | (5 - 9%) |

# EXHIBIT 12

**Declaration of Demetrios Vorgias in
Opposition to Defendants Summary
Judgment**

**Judith Harvey MD**
902 S 31st Avenue
Yakima WA 98902
judykharvey62@gmail.com

July 3, 2019

To Whom it May Concern:

I was employed as core faculty at Central Washington Family Medicine Residency in Yakima, Washington. I practiced full spectrum family medicine, including inpatient medicine and obstetrics, for nineteen years before deciding to retire.

I first met Dr. Demetrios Vorgias when he interviewed for a residency slot for the class of 2021 and I was impressed with his passion for connecting with others. He matched with our residency and joined our program in June 2018. I supervised him for a year while practicing  outpatient, OB, and hospital medicine.

It was fairly obvious from the get-go that Dr. Vorgias had been out of the clinical setting for a while and that his skills and medical knowledge were rusty. However, he recognized his deficits and worked quite hard at building his medical knowledge and efficiency. During my time supervising him, it was also clear to me that he would get anxious during his patient presentations. When we worked one-on-one, I was able to put him at ease and he was then able to give appropriate and thorough presentations and demonstrate an appropriate fund of medical knowledge.

Dr. Vorgias would consistently work to improve his gaps in medical knowledge. He took feedback from me well and has an obvious desire to improve his skills. By the end of his first year, he was performing at the level expected for an intern. Unfortunately, because of his nervousness, some of the faculty had "already made up their minds" about Dr. Vorgias and were unable to see the progress that he made.

As part of his probation, Dr. Vorgias was sent to the Washington Physicians Health Program for evaluation. He was eventually diagnosed with generalized anxiety disorder. Unfortunately, he was discharged from our program before he had an opportunity to address his anxiety. Given the opportunity to address it, I likely would not have needed to write this letter.

One quality that Dr. Vorgias does possess – a quality that cannot be taught – is a great big heart. He is very protective of his patients and is first and foremost a patient advocate. He is acutely aware that medicine is about more than just treating disease, but rather it is about treating the whole person. Demetrios was always cognizant of potential barriers to patient care

– whether it be financial, cultural, or otherwise – and went the extra mile to work with our care coordinators to ensure that his patients could receive the best care he could offer.

After the meeting in which he was notified of his termination, Demetrios returned to the hospital and gave sign-out on his patients, even as he was breaking down in front of me. That is the kind of dedication and professionalism that medicine needs. Given the opportunity, this dedication will continue to serve his patients, his team, and his career very well.

Dr. Vorgias is a warm, motivated, enthusiastic, hard-working, passionate, and dedicated resident. He is a team-player who is well-loved by his colleagues, staff, and patients. He has the capacity to become an excellent physician who I believe any program would benefit from having him on their team. I highly recommend Dr. Vorgias for your residency program.

Please feel free to contact me with any further questions,


Judith Harvey MD

# EXHIBIT 13

**Declaration of Demetrios Vorgias in Opposition to Defendants Summary Judgment**

**Heidi Martinez**

*Vorgias* 10/2/18

From:         Leticia Fernandez
Sent:         Friday, October 19, 2018 7:48 AM
**To:**         Heidi Martinez
**Subject:**     FW: DV on OB

---

**From:** Russell Maier
**Sent:** Thursday, October 18, 2018 1:12 PM
**To:** Leticia Fernandez
**Subject:** FW: DV on OB

---

**From:** Caitlin Hill
**Sent:** Tuesday, October 02, 2018 10:15 AM
**To:** Russell Maier; Patrick Moran
**Subject:** Fwd: DV on OB

I will be forwarding a few of these and will be working to sit down with him soon. On fms this week.
Caitlin

t Outlook for iOS

---------- Forwarded message ----------
From: "Tiffany Mark" <Tiffany.Mark@chcw.org>
Date: Mon, Oct 1, 2018 at 2:15 PM -0700
Subject: DV on OB
To: "Caitlin Hill" <Caitlin.Hill@chcw.org>

Hello,

This is the email about the resident we spoke about in person. I wanted to address my concerns after working with this resident on OB. My concern is that it is early into residency for him, and I don't want to see him fall further behind. I worked with him for hours on work flow, proper documentation, and time management. He even came on a day off to learn more about the work flow. A few specific concerns are as follows:

#Time management: Repeatedly, I had to remind him to be dressed in hospital scrubs and at nursing rounds at 7am. Often, there are 7:45 sections that residents need to assist on and that means being ready in a timely manner. The students that rotated through understood and were changed and at nursing rounds by 7am. Not once did I see him ready and changed by 7am. It was the consistency in not being ready that was frustrating.
#Work flow: I spent hours working with him on making sure he understood the work flows. He wrote it all down. He continued to struggle on when to write the notes and what type of note to write. There were many mornings the notes were not completed as he had started them in the middle of the night and then not seen the patient. One sign out in rticular stands out, in that he was presenting to the attending and it didn't seem like he had seen the patient. He cused on the labs and vitals, without mention of a newborn exam. I pulled up the note and no physical exam was done. I asked him about it and he said he started it and then never rounded because the mom and baby were

1

CHCW 000045

sleeping.  I told him he needed to wake them in order to get the notes done.  I examined the newborn myself and added a note.  This is incredibly concerning, and I never saw it repeated.

Overall, I do trust his medical knowledge, but I worry about him getting documentation done in a timely and complete manner.  This is difficult, especially on OB, as it puts more work on his fellow residents.  I don't think he is prepared for FMS without close guidance.

Please let me know if I can clarify or explain further on any points.  Thank you.

Tiffany Mark

2

# EXHIBIT 14

**Declaration of Demetrios Vorgias in
Opposition to Defendants Summary
Judgment**

Dr. Vorgias FMS feedback for this past week.

I thought it was important to provide some feedback while it was fresh on my mind, also I have some questions regarding the wisdom of keeping him on the FMS service. As you are aware Dom spent 3 half days on the service with him this past week shadowing and trying to assist with efficiency issues. I expect some direct feedback from him also. My approach to the week, particularly since he had a senior resident already assigned to help him out, was to basically sit back and see what would happen. Looking back I am not sure if that was the right approach or not but I decided the expectations had been clearly laid out to him, he was an adult and needed to take initiative to make these things happen. I can summarized the week by saying there was little to no evident forward movement on any of the problem areas. As laid out in the formal citation the expectations for FMS are as below:

1. You will receive shadowing and mentorship on your next FMS rotation on 2/4, 2/7 and 2/8 in the morning, in order to improve your efficiency, workflows, etc.  Dom was there for these 3 half days, and while I think he tried to provide direction he did not do the work for Vorgias and from my perspective there did not seem to be any increase in efficiency over the week, more details below. Dom may be able to speak more directly to some areas where he may have improved.

2. On FMS, you are expected to:

Review plans for care with attending prior to rounds.  I do not think this happened once, again I could have pushed him more but it was a relatively busy service which meant limited time, and I thought it was important for him to take the initiative.
Review at least 1 evidence based article related your patient's condition with attending once daily. While I think he did review evidence base material a couple of times there was no clear plan on his part to pick out specific conditions and present that information to me. About halfway through the week at morning rounds I gave him a couple clinical questions to look up throughout the day related to one of his patients. He answered 1 of the questions later in the day and several times told me he was going to spend time on the 2nd but never did. The following day after morning rounds I suggested to him that he maybe should review the citation specifics and start doing them, he told me he had a copy of the citation with him and would do so. There was absolutely no change. On one hand I do not think he is deliberately ignoring these things but his resident duties and patient responsibilities for the day consumed so much of his time I think it rarely registered with him that he needed to be doing things related to his citation status. At the pace he works for him to meet the citation standard and do his resident duties I do not think he could see more than 1 at the most 2 patients a day. To keep him at this level in reality makes him more of a liability to the team than an asset. While I know that sounds harsh I think it is already having a demoralizing effect on the team. We needed to call in extra help all week mostly because of this issue.
Review evidence for treatment of each patient's primary condition and include in verbal presentations.  I do not think this ever really happened, maybe a couple of times
Provide attending with your personal study plan for the next day and ask the attending for feedback. This never happened
For the majority of the week he took 3 at the very most four patient's a day, I will say his notes were usually done by the time I left in the evening, 1 or 2 of them might be done earlier in the day. Accuracy of notes was variable, if he was going off of a note from a patient that had been there for a while and there was an existing progress note he could copy, they remained relatively accurate. If he had to produce an H&P from scratch there was frequently not only medical knowledge concern, but accuracy problems with the story, physical exam, assessment and plan, and just general glaring grammatical

CHCW 000069

errors. Dr. Lancaster may have some feedback on that. Medical knowledge is still a big problem that is a concern for patient's safety as he tends to be very superficial and if you begin to ask him "why" questions he has no idea what to say. A history and physical presentation could easily take 30-45 minutes. This also presents significantly more work for attendings in particular as you have to oversee essentially everything he does. It was very helpful to have Dom they are helping out with that. Efficiency also remains a huge problem, I will give you 1 example from the final day that was not particularly unique. He got assigned the admission approximately 10:00 a.m.. Patient was stable, I saw the patient, Dom saw the patient, we put in holding orders and made sure things were taking care and necessary medications in place. He had a somewhat urgent discharge at the other hospital which he went and did with the expectation he would come back and do the admission. In most cases we expect residents to see admissions 1st but we did allow for this and made sure patient was taken care of. I decided to wait and see how long it would take for him to see the patient and present to me. On a 10 a.m. admission, he staffed it with me at 8:00 p.m. even more concerning was that he did not even seem to comprehend that this was a huge problem. He superficially apologized for calling me late and that was it. There are more examples from the week but all leave it at that for now. My personal opinion is that it is not viable to keep him on service, and that even if there was some movement in a positive direction he would still be so far below minimum expectations that it is still not a good idea. I acknowledge that I may be especially frustrated and biased after spending a busy week on service watching this happen and I am interested in other people's perspectives. I will support whatever we collectively decided to do.

-Carlin Miller

**Email in response from Caitlin Hill:**

Thank you. I noticed the same on Thursday and the admit he got at 4 pm was not staffed until I said he had no more tome at 10:30 pm, note was not in until after midnight. Two other admission came in at the same time or after he did and they were staffed prior to sign out. His note although "done" required addendums from him before I could sign off on them so although it looked like notes were in around rounds they were not completed until 5 pm. On Thursday we set goals at rounds and his was reading- which is thoughtful based on his citation. Knowing he had not yet presented a topic to me I suggested he do abone minute pearl session at rounds to support him and his colleagues learning as reading was his goal- he. Did not like that as he would "need a beta blocker" no matter how informal.

I sat in on his admission on Thursday, and although he is trying to use a checklist to get important info he is not listening to his patient so frequently has to reask the question multiple times- sometimes appearing as if he did not even remeber asking the first or third time. He struggles synthesizing the important parts of a history and exam into a plan. He has asked that we have dom with him again so he can build on the lessons- hoping some time this week. Maybe a whole day as a half day does not get us full info as well as managing a admit + rounding.
Caitlin

**Email in Response from Katina Rue:**

I was on this week with him. Dom did in fact stay all day with him at least twice. He did not improve.

He took 2.5 hours to discharge a patient, after we discussed the patient. This was a total of 5 hours for a patient who he admitted the evening before. The care of multiple other patients was affected.

I agree with Carlin that he is a detriment to the team and is a risk as far as patient safety. I do not feel comfortable with him communicating accurate information to me, to consultants, nursing staff or families. This potentially effects patient care in a negative way. I would urge u to remove him from the service. Dom is not an ongoing solution and he is missing out on his own educational opportunities.

I really hoped he would have had some improvement this week, but I didn't see any. He is not meeting the requirements of the ILP. He has not been proactive in any sense...although he told me he was practicing his one liners at home. This was not evident. We literally took 15 minutes to present a one liner on one of his patients on Friday. He doesn't seem to incorporate realtime feedback in any meaningful way.

Can we get a neuropsych eval asap?

Again, I would favor removing him from the service and getting an evaluation. Currently, I just don't think he can do this.

-Katina

CONFIDENTIAL

# EXHIBIT 15

**Declaration of Demetrios Vorgias in
Opposition to Defendants Summary
Judgment**

*11/2018 Vorgias*

**Heidi Martinez**

From:  Leticia Fernandez
Sent:  Tuesday, November 06, 2018 9:05 AM
**To:**  Heidi Martinez
**Subject:**  FW: Observations from FMS shadowing of Dr. Vorgias

For his file

**From:** David Bauman
**Sent:** Sunday, November 04, 2018 6:03 PM
**To:** Caitlin Hill; Leticia Fernandez; Russell Maier
**Subject:** Observations from FMS shadowing of Dr. Vorgias

Hey all, please see my observations of Dr. Vorgias. Please let me know any thoughts, questions, and/or concerns.

Observations from 10.31.2018 shadowing of Demetrios Vorgias, MD.
I was able to observe Dr. Vorgias from 12:30 PM until 2:45 PM. Shadowing started immediately after 11 AM rounds. Talking with Dr. Vorgias it appeared he was aware of his current struggles, stating "I am a type A personality, and I feel like I am letting the team down." He said this to indicate how his struggles have been "weighing on him." Below are the general themes from the day:

- EHR → Dr. Vorgias commented as we were walking to the physician lounge that he is still struggling with the computer system at the hospital. This was evident, as I observed him repeatedly search for something (e.g., recent lab, etc.) within the EHR and having a difficult time locating it (often pulling up windows/tabs that he had just exited). At one point he mentioned, "Where is it? I know it was here this morning!" This lead to him at one point phoning the lab at the hospital and inquiring specifically what the last lab result was.
- Multi-tasking → I must admit observing residents on service always provides perspective, as it is truly impressive to see how much they have to manage, organize, and coordinate. Thus, it is difficult for me to know what is appropriate and expected of a resident, and it would behoove us to have a medical provider shadow him to provide a more representative perspective. In any case, I observed Dr. Vorgias striving to organize the four patients that he was managing at two hospitals. He routinely answered phone calls, consulted, and staffed components of his patients' care. He did appear to be "overwhelmed" at times; however, I am not sure if this is atypical for a first year resident on his first FMS rotation nor a reflection of how Dr. Vorgias handles stressful situations (i.e., while he may seem like he is overwhelmed to an observer, he may feel quite in control himself).
  - I was able to observe Dr. Vorgias regularly reach and seek out support and help from his attendings and fellow residents. It is difficult to know if this was beyond what is expected and appropriate. It did appear, on a few occasions, that the response from the individual he reached out to conveyed the individual felt that Dr. Vorgias should know the information; however, this is an assumption and we should request comments from his fellow residents and attendings.
    - Further, Dr. Vorgias was encouraged to find an appropriate dosing of a medication using UpToDate by his attending. I observed him search for this on UpToDate but was unable to find the medication dosing information. He then asked me if I had a point of care resource (I believe epocrates) on my phone. I informed him I did not. He then proceeded to ask a fellow resident if they did, in which the resident responded UpToDate is the best source. Dr. Vorgias then requested the resident show him how to look this up because he was unable to find the information, which the resident did.

1

- o  Another relevant observation that falls under multi-tasking was my observation of him interacting with a patient that was just recently admitted. This was a Spanish speaking elderly male who had a difficult time communicating with Dr. Vorgias. There appeared to be a cognitive deficit, either some cognitive impairment or decline. Again, not being familiar with what is expected of residents during the first interaction with a patient admitted, I am not sure if my feedback is relevant. However, Dr. Vorgias asked very few questions to the patient, other than, "how are you feeling; it seems that you are feeling better?" He did also ask a few orienting questions, which demonstrated some cognitive concerns. In total, Dr. Vorgias spent 5-10 minutes during this initial interaction and after leaving the room stated, "okay, I am ready to present this patient with Dr. Moran." I, unfortunately, was not able to observe this presentation.
  - ▪ My mind wonders if the interaction was brief due to Dr. Vorgias managing three other patients, two of which were having a number of care coordination issues that Dr. Vorgias was simultaneously overseeing.  Again, with being unfamiliar to know what is expected during these interactions, I am unsure if this was even an aberrant behavior.
- o  By the time I left at 2:45 PM, it appeared that Dr. Vorgias was going to struggle to be at sign-out on time, as he had to present to Dr. Moran, as well as complete a discharge summary and see a patient at Regional.

Overall, I felt like Dr. Vorgias was definitely aware that he was falling behind his other residents. He also appeared to be very hard working. There were moments where his lack of comfortability and competence with the EHR was impacting his efficiency, as well as being unsure of how to locate relevant information in point-of-care resources. As stated previously, I am unable to assess how his behavior matches up to his peers, due to having minimal perspective on expectations of residents on FMS. Thus, I would highly suggest combining my observations with attendings and fellow residents' feedback.

Please let me know if you all have any other questions or concerns!

David Bauman, PsyD
Behavioral Health Education Director
Licensed Psychologist, State of Washington
Behavioral Health Consultant, Faculty
Central Washington Family Medicine Residency Program

2

# EXHIBIT 16

**Declaration of Demetrios Vorgias in
Opposition to Defendants Summary
Judgment**

**CARED meeting**

**10/23/18**

**Demetrios Vorgias, MD**

Tiffany has spent several hours working with and mentoring Demetrios. Tess and Sheri also spent time working with him.

Demetrios is currently on the FMS rotation-this is his 1st FMS rotation

Medical Knowledge is lacking, per Dr.Rue. She will continue to work with and observe Demetrios during her time on FMS.

All evaluations that are available in NI and in binder were reviewed for this meeting.

Preceptor shift card from Dr. MacLeod express concerns about medical knowledge and concerns about managing increasing caseloads.

What seems to be anxiety is affecting his confidence, per Dr. Bauman.

Dr. Hill, his advisor, has spent time meeting with him.

He's a visual and needs an example of notes and what must in the notes.

There is verbal and documented positive and negative feedback regarding his performance.

Per Dr. Rue, he lost three notes in Cerner @ Regional. H&P took 3 hours to complete and didn't sign out the case out. Diagnosis was not very specific so Katina edited his H&P. Still gets nervous presenting to the group so asked Katina if he could delay reporting out today, 10/23/18.

Difficulty prioritizing--jumps around with SOAP notes even with what he calls an easy case.

Demetrios runs behind in clinic and doesn't seem to chart prep.

**CARED committee recommendations:**

- Placing Demetrios at the first stage of the citation process-which is called a constructive citation. This is an internal process and only remains in his program file. Please see resident handbook for list of citations and their processes.
- For organizational assistance-mandate that he contact the EAP and WPHP. The EAP specific number for physicians to call. Although, this will be mandated, we would allow Demetrios to choose who to contact for resources and assistance.

# EXHIBIT 17

**Declaration of Demetrios Vorgias in
Opposition to Defendants Summary
Judgment**

# On The Fly Resident Evaluation

**Instructions:**
*Please provide feedback on either of the below questions.*

**1  What this resident did well?**


**2  What does this resident need to improve?**

Feedback on Behalf of Dr. Kirschner: First is a knowledge deficit combined with the difficulty with understanding pertinent nuances and synthesizing information. Sadly for Dr Vorgias, on the one hand, but thankfully for most (as we would all become bored of medicine within a few years)textbook medicine is largely a myth. There are rarely textbook cases. Without fundamental knowledge with which one is relatively facile, it is difficult to pick up pertinent nuances much less synthesize co morbid conditions that most patients present with. Perhaps the fundamental knowledge is there but masked by anxiety. I saw little picking up of nuances without getting lost in the Forest nor did I see much synthesis of information. I had 1 case that I precepted directly but attended morning and noon rounds daily. The second issue is attitude. I have compassion and can understand how difficult this must be for Dr. Vorgias and how their must be a strong desire to save face. It is the attempt at saving face that gets in the way of feeling like what you have attempted to communicate to Dr. Vorgias has actually reached him. The patient that I precepted with Dr. Vorgias pointed out to me that she did not feel as though "he heard her or got her concerns"

---

## Signatures

**Heidi Martinez**
4/26/2019 7:19 PM

# EXHIBIT 18

**Declaration of Demetrios Vorgias in
Opposition to Defendants Summary
Judgment**

## FMS Attdg Eval of 1st Year Resident

**Instructions:**
*Please highlight resident's strengths and areas of improvement in the comment box with references to specific competency item(s) you have checkmarked.*

### GENERAL

*The Family Medicine Service has in-patients of high complexity of all ages and both sexes.*

### I. PATIENT CARE

**1  Resident:**
> **Managed appropriate patient load for level of training.**
> **Demonstrated sound clinical judgment.**
> **Gathered data completely appropriate to the case (history, labs, tests, consultations)**
> **Performed physical exams accurately and appropriately, thorough or directed**

Dr. Vorgias is significantly below his co-residents in number of patients he can manage on the service. His clinical judgement is not where I would expect it to be. For example, on a patient NPO due to swallowing, his first thought was to place a PEG tube (took several tries before I suggested we give IVFs). Allscripts was usually not reviewed prior to being asked to review by the Attending. It was not thoroughly reviewed. This caused some delay in care and some potential duplication of work which had already been done. Exams were lacking in completeness. He did try to document findings that he did not perform.

**2  SCORING**

| Performance not acceptable | Performance needs improvement | Performance at or above level | N/A |
|:---:|:---:|:---:|:---:|
| ⦿ | ◯ | ◯ | ◯ |

### II. MEDICAL KNOWLEDGE

**3  Resident:**
> **Demonstrated knowledge that is extensive and well-integrated for level of training.**
> **Recognized limits of knowledge and sought help as needed.**

Medical knowledge is below his peers. Had to be pressed to come up with appropriate differential diagnosis for potential CVA (weakness, leaning to the side, difficulty swallowing). He did not come up with CVA on the differential.

**4  SCORING**

| Performance not acceptable | Performance needs improvement | Performance at or above level | N/A |
|:---:|:---:|:---:|:---:|
| ⦿ | ◯ | ◯ | ◯ |

### III. PRACTICE-BASED LEARNING & IMPROVEMENT (Focus is on physician's own medical practice)

5

**Resident:**
> **Analyzed and improved own practice.**
> **Managed time well.**
> **Used technology to access information.**

Struggles with time management, which affects patient care. He took about 4 hours in total for an observation discharge. 1.5 prep/examine/talk with senior mentor, .5 hr presenting to me, then another 2.5 h to do the discharge. This delayed him seeing an admission and performing another discharge and delay in a 3rd patients' care.

**6** **SCORING**

| Performance not acceptable | Performance needs improvement | Performance at or above level | N/A |
|---|---|---|---|
| ◉ | ○ | ○ | ○ |

## IV. INTERPERSONAL AND COMMUNICATION SKILLS

**7** **Resident:**
> **Arrived at a treatment plan which met patient and provider needs.**
> **Established trust and rapport with patients.**
> **Functioned as an effective and supportive member of the health care team.**

Significant difficulty in verbal presentations. Difficulty in communication with nursing and therapy staff. This was brought to my attention by ACU nurse and ST. Ineffective member of the team, due to not being able to take more than 4 patients.

**8** **SCORING**

| Performance not acceptable | Performance needs improvement | Performance at or above level | N/A |
|---|---|---|---|
| ◉ | ○ | ○ | ○ |

## V. PROFESSIONALISM (Focus is on personal qualities, attitudes, behavior)

**9** **Resident:**
> **Demonstrated integrity, respect, and compassion.**
> **Directed staff appropriately.**
> **Completed patient records in a timely and legible manner.**

Chart notes frequently took a long time to be available for the attending to review. There were many revisions which occurred prior to being finalized. He was very anxious and this inhibited his ability to be effective.

**10** **SCORING**

| Performance not acceptable | Performance needs improvement | Performance at or above level | N/A |
|---|---|---|---|
| ○ | ◉ | ○ | ○ |

## VI. SYSTEMS-BASED PRACTICE (Focus is on health care systems)

**11 Resident:**
> Advocated for patients in the health care system.
> Practiced cost-effective medicine in context of quality care.
> Used evidence-based medicine in treatment plans.

He did not bring any evidence for me to review with him, as is part of his treatment plan. He hesitated to look stuff up at the time unless he was pressed to do so. He hesitated to accept input from team members (nursing staff reported difficulty with patients ability to eat, but Dr. Vorgias said the patient was fine because he saw him eating in the ER....then, the patient failed a swallow study X3 days in a row, with <50% clearance from the velicula and severe dysphagia). He originally doubted the need for NPO or to get speech therapy evaluation.

**12 SCORING**

| Performance not acceptable | Performance needs improvement | Performance at or above level | N/A |
|---|---|---|---|
| ◉ | ○ | ○ | ○ |

## VII. OSTEOPATHIC PHILOSOPHY AND MANIPULATIVE MEDICINE

**13 Resident:**
>Documents Osteopathic Findings

| Performance not acceptable | Performance needs improvement | Performance at or above level | N/A |
|---|---|---|---|
| ○ | ○ | ○ | ◉ |

**14 Resident:**
>Integrates Palpatory Findings

| Performance not acceptable | Performance needs improvement | Performance at or above level | N/A |
|---|---|---|---|
| ○ | ○ | ○ | ◉ |

**15 Resident:**
>Applies Manipulation

| Performance not acceptable | Performance needs improvement | Performance at or above level | N/A |
|---|---|---|---|
| ○ | ○ | ○ | ◉ |

## VIII. SUMMARY - OVERALL CLINICAL COMPETENCE

**16 This rating represents your assessment of the degree to which the resident possesses the knowledge, skills and attitudes essential to the provision of excellent care. Please specify reasons for your rating.**

Dr. Vorgias has been unable to get up to the expected level of patient care. He is struggling in obtaining the history and relaying the information accurately. This results in an insufficient differential diagnosis and inaccurate assessment. He continues to struggle with developing an appropriate plan of care. He is not timely in delivering patient care. He is not able to perform at the level where I would expect him to be. I have seen little growth.

**17\*  SCORING**

| Doesn't meet requirements | Frequently doesn't meet requirements | Meets requirements | Frequently exceeds requirements | Consistently exceeds requirements |
|---|---|---|---|---|
| ⦿ | ◯ | ◯ | ◯ | ◯ |

## Signatures

**Katina Rue**
2/10/2019 5:00 PM

# EXHIBIT 19

**Declaration of Demetrios Vorgias in
Opposition to Defendants Summary
Judgment**



**Accreditation Council for
Graduate Medical Education**

# ACGME

# Institutional Requirements

ACGME approved focused revision: February 4, 2018; effective July 1, 2018

III.B.7.b) The Sponsoring Institution, in partnership with its ACGME-accredited program(s), must educate faculty members and residents/fellows in identification of the symptoms of burnout, depression, and substance abuse, including means to assist those who experience these conditions. This responsibility includes educating residents/fellows and faculty members in how to recognize those symptoms in themselves, and how to seek appropriate care. (Core)

III.B.7.c) The Sponsoring Institution, in partnership with its ACGME-accredited program(s), must: (Core)

III.B.7.c).(1) encourage residents/fellows and faculty members to alert their program director, DIO, or other designated personnel or programs when they are concerned that another resident/fellow or faculty member may be displaying signs of burnout, depression, substance abuse, suicidal ideation, or potential for violence; (Core)

III.B.7.c).(2) provide access to appropriate tools for self screening; and, (Core)

III.B.7.c).(3) provide access to confidential, affordable mental health assessment, counseling, and treatment, including access to urgent and emergent care 24 hours a day, seven days a week. (Core)

III.B.7.d) The Sponsoring Institution must ensure a healthy and safe clinical and educational environment that provides for: (Core)

III.B.7.d).(1) access to food during clinical and educational assignments; and, (Core)

III.B.7.d).(2) safety and security measures for residents/fellows appropriate to the participating site. (Core)

IV. Institutional GME Policies and Procedures

IV.A. Resident/Fellow Recruitment

IV.A.1. Eligibility and Selection of Residents/Fellows: The Sponsoring Institution must have written policies and procedures for resident/fellow recruitment and appointment, and must monitor each of its ACGME-accredited programs for compliance. (Core)

IV.A.2. An applicant must meet one of the following qualifications to be eligible for appointment to an ACGME-accredited program: (Core)

IV.A.2.a) graduation from a medical school in the United States or Canada, accredited by the Liaison Committee on Medical Education (LCME); or, (Core)

# EXHIBIT 20

**Declaration of Demetrios Vorgias in
Opposition to Defendants Summary
Judgment**

## Micahlyn Powers

| | |
|---|---|
| ( ˈm: | Micahlyn Powers |
| ᵼent: | Wednesday, May 08, 2019 11:03 AM |
| To: | Demetrios Vorgias |
| Subject: | Re: Request to meet |

You can retake the EKG test on Monday and will be proctored by Tosha Durand. You will be given the standard 1 hour for the exam. Tosha is available all day on Monday and you can arrive anytime but need to come by 3pm. If you need to contact Tosha you can email her or call her @ 509-930-8343. This will be your last chance to retake this exam.

Good luck!

Get Outlook for iOS

From: Micahlyn Powers <micahlyn.powers@chcw.org>
Sent: Wednesday, May 8, 2019 9:57 AM
To: Demetrios Vorgias
Subject: Re: Request to meet

Demetrios,

I appreciate your struggle and your thoughtful requests, thank you for sharing your progress with me.

( answer your questions:

1. No, resignation is not an option in your case, due to the rotation failures. The EKG elective was not part of your probation, and therefore not part of the reasons for your termination. There are programs who will be willing to take a chance on you, even knowing that you need to repeat the R1 year and all of those rotations, despite the termination (vs. resignation).

2. If you would like to retake the EKG exam, I am open to that. We could arrange for that to happen early next week. Let me know.

3. I'm in Ellensburg the rest of the week, but will be in Yakima again next Wed and have some time from 4-4:30pm. I'd be happy to meet with you if that works for you.

Micahlyn Powers MD
Interim Program Director Central WA Family Medicine Residency
Yakima, WA
CHCW-Ellensburg Site Director

From: Demetrios Vorgias <dvorgias@gmail.com>
Sent: Wednesday, May 8, 2019 9:31 AM
To: Micahlyn Powers
Subject: Request to meet

Dear Dr. Powers,
(

It has been a struggle to put this email together. I understand that it must have been a very difficult decision for you to make. I know you and this program invested a lot of time, energy, and effort into me and I feel that I let everyone down.

1

I loved every day that I was a resident here, and I feel that I learned and grew a lot. It has been an excellent educational experience.

Following that my time here has ended, I have three of requests:

1. I would like the opportunity to resign, instead of being dismissed. After speaking with Ms. McClintock, it is my understanding that I was terminated instead of being given the opportunity to resign was so that I would be eligible for unemployment benefits. I will not be needing these benefits. Being able to resign will help me more in my future endeavors as I plan to continue in my residency training.

Yesterday (Tuesday 5/7/2019), I spoke with the neuropsychiatrist that evaluated me as part of my meetings with WPHP. She informed me that I have generalized anxiety disorder (GAD) and recommended that I receive CBT to address it. That is something that I plan on doing. She made it very clear that the GAD made it seem that I did not have confidence and my presentations and gave the impression that I lacked medical knowledge and that I was difficult to train.

I understand that I had perceived academic difficulties. I also understand that if that was my only difficulty, I would have been offered a leave of absence or remediation. I understand that my time here is over. I would simply like this program's support moving forward.

2. I would like the opportunity to retake the EKG exam. When we spoke last month, you made it sound as if it was not uncommon for residents to retake the exam if they do not pass it the first time. Retaking and passing that exam will give me a chance to remove a fail from my transcripts and further strengthen my application when I begin to apply to other residency programs.

3. Lastly, would you be willing to meet later on this week or early next week? I would really appreciate any advice from you, especially as a program director, as I take my next steps.


Thank you,

Demetrios Vorgias

# NPE report

Kelly Cornett <kcornett@rehabwashington.com>

Tue 5/7/2019 9:47 AM

To:dvorgias@gmail.com <dvorgias@gmail.com>;

📎 1 attachments (330 KB)
Vorgias Demetrios NPE 04.03.2019.pdf;

Kelly A. Cornett, Psy. D., CBIS
Clinical Neuropsychologist
Program Director – Brain Injury Rehabilitation Program
Part-Time Faculty – University of Washington
Rehabilitation Institute of Washington, PLLC
415 1st Avenue N, Suite 200
Seattle, WA 98109
206-859-5030
206-859-5031 Fax
www.rehabwashington.com

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended individual(s) named above and may contain confidential, privileged, and/or protected information. Any unauthorized review, use, disclosure, copying, or distribution of its contents is prohibited. If you are not the intended recipient, you have received this email in error. If so, please notify the sender immediately by reply email and delete/destroy the original and all copies of this communication. Also know that Internet e-mail is not secure. In choosing to communicate with the Rehabilitation Institute of Washington by email you will assume these confidentiality risks. Internet messages may become corrupted, incomplete, or may incorrectly identify the sender.

EX. 2

# Rehabilitation Institute of Washington, PLLC
Phone: (206) 859-5030    Fax: (206) 859-5031

## REPORT OF NEUROPSYCHOLOGICAL ASSESSMENT
This is a Confidential Evaluation. It is intended for use by professionals only, and it is not to be released without the consent of the client.

**Name:** Demetrios Vorgias   **Date of Birth:** 03/07/1975
**Date of Evaluation:** 04/03/2019   **Age at Evaluation:** 44-years-old
**Report Date:** 04/10/2019   **Date of Test Feedback**: 04/30/2019
**Referral Source:** Laura Moss, MD & Charles Bulfinch, DO

**Evaluated By:** Kelly Cornett, PsyD, CBIS

## REASON FOR REFERRAL
Demetrios Vorgias is a 44-year-old, right-handed, Greek male resident physician referred by the Washington Physician Health Program's Dr. Moss and his primary care physician, Dr. Charles Bulfinch in order to assess patterns of cognitive strengths and weaknesses, to examine neurobehavioral contributors to the presenting concerns, and to make recommendations as appropriate.

## EVALUATION PROCEDURES
Diagnostic Interview with Dr. Vorgias
Review of Records
Neuropsychological Testing
       Advanced Clinical Solutions: Test of Premorbid Functioning (ACS)
       Boston Naming Test 60 item (BNT)
       Conners' Adult ADHD Rating Scale: Long Version (CAARS-L)
       California Verbal Learning Test, Third Edition (CVLT-3)
       Continuous Performance Test, Third Edition (CPT-3)
       Controlled Oral Word Association Test/Word Fluency (COWAT)
       Grooved Pegboard (GPT)
       Millon Clinical Multiaxial Inventory-IV (MCMI-IV)
       Neuropsychological Assessment Battery (NAB) Judgment subtest
       Paced Auditory Serial Attention Test (PASAT)
       Rey Complex Figure Test (RCFT)
       Stroop Interference Test (Stroop)
       Tower of London Drexel University, Second Edition (TOL-DX)
       Trail Making Test A&B (TMT)
       Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV)
       Wechsler Memory Scale, Fourth Edition (WMS-IV), *Selected Subtests*
       Wisconsin Card Sorting Test (WCST)
       Woodcock Johnson III (WJ-III)

## HISTORY OF THE INJURY
Dr. Vorgias reported that he has struggled with attentional issues since childhood. He reported that this first became apparent to him in the fourth grade. His family had recently moved him from public to private school, and he found that he was not able to keep up with his peers but "I knew that I was smart." He identified problems with being able to attend in class and absorb information as quickly as his classmates could. In graduate school, he found these attentional issues, including problems with alternating attention and prioritization, impacting him. A friend then encouraged him to seek evaluation of this.

Neuropsychological Evaluation                               Client's Name: Demetrios Vorgias
DOE: 04/03/2019                                             Clinic #: 1006228

He was seen for a psychological assessment by David Goodman, PhD, supervised by Carol
Wintermeyer, PhD.   His performance yielded the following: verbal and nonverbal reasoning
in the above average range (SS125 and SS118, respectively).   Additionally, his performance
on measures of working memory and processing speed were also significantly above age
expectation (SS115 and SS114).   His response inhibition fell below age expectation (T32).
Alternating attention (T50), figural memory (Delayed=T56), and problem-solving all tested
within normal limits for his age.   His obtained score on the TOVA indicated an ADHD score
of 16.51.   Diagnoses from this evaluation included Attention-Deficit/Hyperactivity Disorder,
Combined Presentation as well as notes of academic difficulties, relational discord, and
"cumbersome schedule." Recommendations included evaluation for psychopharmacological
assistance and additional strategies through the Office of Student Disabilities at his school.

He was then prescribed by his primary care physician methylphenidate, 15mg. He stated that
he takes this consistently when is working. He reported that he had some difficulty acquiring
this medication when he attended medical school outside of the United States.  He would
have his friend help fulfill this medication but noticed that, when he did not have access to
his Adderall, his work productivity suffered.

At present, he reported that he takes this medication twice, daily when he is working. He
reported that this regimen helps address the majority of his attentional concerns.  However,
he reported that, beginning in November or December of 2018, he experienced difficulty
with adapting to the electronic medical record system at his hospital.  He stated that, as a
result of this time needed to learn this system, he was unable to devote as much time to his
studies.   He also reported that he had difficulty with hyperfocus resulting in difficulty in him
transitioning to another task as needed.  He stated that prioritization continues to be an area
of challenge for him. He denied any other concerns with his cognitive functioning.

With respect to psychological functioning, Dr. Vorgias reported that he experiences anxiety
with respect to the recent disciplinary action he has received.  Specifically, he described
experiencing persisting worry about the outcome of the investigation, difficulty controlling
this worry, and feeling on edge. He stated that he copes with this by discussing what is
upsetting him with his mother, his best friend, as well as with his wife. He endorsed
experiencing depressed mood, which he described as contingent with his stress level.  He
stated that when stressors arise, he will experience down mood, anhedonia, amotivation, and
sleep dysregulation.   He endorsed experiencing mild symptoms of this currently.  He denied
suicidal ideation and panic attack. However, he reported that, in the past, when significant
stress had arisen, he experienced suicidal thoughts albeit with no plan or intent.  He said that
he has not had any such thoughts currently (within the past 30 days).

Regarding physical functioning, he described his sleep as "ordinary, good."  He denied any
problems with falling or staying asleep. He stated that he has been told he snores but denied
concern for sleep apnea.  He reported that his appetite is generally good. He denied any
recent weight loss and reported mild weight gain.  He denied experiencing any pain at
today's visit.  He also denied concern with vision, audition, and with balance or coordination.

## ADDITIONAL HISTORY
*Social/Developmental History:*
Dr. Vorgias was born in Redwood City, California.  He was raised by his biological parents.
He denied any known problems with his mother's pregnancy, his birth or development.  He

Neuropsychological Evaluation
DOE: 04/03/2019

Client's Name: Demetrios Vorgias
Clinic #: 1006228

denied a history of physical, emotional, or sexual abuse. He stated that his family moved back to Greece when he was six months of age. He was raised there until age five. He stated that his mother worked as an attorney and his father was an engineer. He described having a generally good relationship with his parents growing up apart from some strain with his father.

*Family Medical/Psychiatric History:*
Family medical history was reported to be significant for depression (mother; suspected in his paternal grandmother), unspecified alcohol use (father), Central Auditory Processing Disorder (brother), attention deficit hyperactivity disorder- suspected (uncle and three cousins).

*Medical History:*
Medical history, outside of what is indicated above, is reportedly unremarkable. He denied any history of seizures, brain infections, stroke, diabetes, thyroid disorder, cardiac abnormalities, hospitalizations, or surgeries aside from what was related to the injury, and exposure to toxins. He denied any prior history of head injury with loss of consciousness.

*Medications:*
Dr. Vorgias reported taking methylphenidate (20mg, BID).

*Psychiatric History:*
Dr. Vorgias reported that, outside of what is indicated above, his psychiatric history is otherwise unremarkable. He denied psychiatric hospitalization. He denied prior suicidal ideation. There is no history of symptoms that would be suggestive of a hypomania or mania. There are also no symptoms consistent with psychosis (i.e., auditory or visual hallucinations, delusions, paranoia).

*Substance Use Status and History:*
Dr. Vorgias denied consumption of alcohol or tobacco. He also denied a history of problematic use of substances. He denied use of recreational substances including marijuana, cocaine, amphetamines, hallucinogens, laboratory drugs, or the abuse of prescription medications.

*Educational and Vocational Background:*
Dr. Vorgias initiated his Bachelor of Art degree in molecular and cell biology in 1993 and graduated in 2000 from University of California, Berkeley. Following this, he started a Master of Art degree in Medical Science in 2005. He completed this degree in 2009 from Boston University School of Medicine. Following this, he began his Doctor of Medicine degree from St. George's University School of Medicine in Grenada, West Indies in 2011 and completed this in 2016. He initiated a Master of Business Administration degree in Multi-Sector Health Management from St. George's University Grenada, West Indies. He is still in progress with this degree.

He is currently a resident physician and has worked in this capacity for the past nine months. Prior to that, he worked as a medical scribe for one year. Before that, he worked as a teacher's assistant for three years. Previous to that, he worked as a laboratory assistant for two years.

Neuropsychological Evaluation
DOE: 04/03/2019

Client's Name: Demetrios Vorgias
Clinic #: 1006228

*Military History:*
Dr. Vorgias denied any military service.

*Legal History:*
Dr. Vorgias denied a history of arrests or convictions.

*Marital Status, Current Living Situation:*
Dr. Vorgias reported that he is currently married.  His wife currently resides in Florida for work.  He has no dependents.  He currently resides alone in Yakima, Washington.

*Recreation:*
Dr. Vorgias reported that he enjoys cooking, spending time with family and friends, and playing games on his computer.

*Cultural/linguistic background:*
Dr. Vorgias identified as Greek and stated that his native language is English.

*Activities of Daily Living:*
Dr. Vorgias denied any problems with his basic or instrumental activities of daily living.

**BEHAVIORAL OBSERVATIONS**
Dr. Vorgias is a 44-year-old male who appeared to be of the stated age.  He was appropriately groomed and casually dressed on the day of testing. Routine gait, body and facial features are grossly within normal limits.  He ambulated to the testing room adequately and without assistance. There were no observed ticks or dyskinesias.  He stayed in a hotel nearby the clinic; however, he arrived at his appointment approximately 15 minutes late.  He did not wear any corrective lens. Upon introduction, he reciprocated interactions with the examiner and made adequate eye contact.  Speech was pressured and at times, circumstantial. There were also neologisms present (i.e., "fit hit the shan").  He cursed often, although he later apologized for doing so.  He reported his mood to be "okay."  Affectively, he appeared mildly anxious. Testing took place over the course of one visit to this clinic. He denied experiencing excessive fatigue or pain.  Testing was conducted while the patient was on his usual medication regimen (i.e., twice daily methylphenidate).  During testing, Dr. Vorgias reported that he understood test instructions. He appeared to be engaged and attending to the test material.

**TEST RESULTS**
Please refer to the Appendix for the scores. For consistency purposes, a uniform system of qualitive descriptors has been applied (see appendix for ranges).  Qualitative observations and percentiles are included as appropriate.  Results from the tests are reported in comparison to other adults Dr.Vorgias's age and, where available, to his level of education as a range of functioning and as standardized scores.

**DISCUSSION**
*Validity*
Effort was assessed using embedded indicators of test effort (LM II Recognition, VRII Recognition, RDS).  His performance fell within the range considered as valid on the

Neuropsychological Evaluation
DOE: 04/03/2019

Client's Name: Demetrios Vorgias
Clinic #: 1006228

measures of test effort. Therefore, the results of the testing can be considered a reliable estimate of his current neuropsychological functioning.

*Estimated Premorbid Functioning*
Dr. Vorgias's premorbid functioning was estimated using a measure of irregular word reading (TOPF). He tested in the superior range (87th percentile).

*General Intellectual Functioning*
Dr. Vorgias underwent a comprehensive assessment of his intellectual functioning (WAIS-IV). His performance varied significantly across the domains assessed such that his intellectual functioning is not best represented by a unitary factor. He showed personal strength on tests of verbal reasoning (VCI=98th percentile) and was weaker, although within normal limits, on tests of processing speed (PSI=70th percentile). Dr. Vorgias's performance on this battery of tests and others is discussed further below.

*Language Functions:*
Confrontation naming fell in the average range, 48th percentile (BNT). Likewise, phonemic or letter fluency fell in the average range, 34th percentile (FAS) and semantic or categorical fluency fell in the high average range, 79th percentile (AN).

Dr. Vorgias's performance on measures of verbal reasoning fell generally in the very superior range (98th percentile). More specifically, he was in the superior range, 95th percentile on a measure in which he was to use prior knowledge to answer questions about everyday situations and cultural norms (WAIS- Information). Dr. Vorgias performed in the superior range, 84th percentile when he was to identify how two words were related (WAIS-Similarities). Lastly, he performed in the very superior range, 99.6 percentile when he was to define words (WAIS- Vocabulary).

*Attention/concentration, Processing Speed, and Working Memory:*
Dr. Vorgias's performance on measures of processing speed tested generally within the average to above average range. This encompasses tasks that require quickly and automatically copying, scanning, and/or comparing both meaningful and non-meaningful stimuli. Auditory processing speed and mental summation tested in the average range, 64th percentile for the first rate and, likewise, at the average range, 64th percentile for the second, faster rate (PASAT). Sequential processing of unidimensional automatized information was in the superior range, 88th percentile (TMT A). He tested at the average range, 50th percentile on a graphic symbol-substitution task (WAIS- Symbol Search). Likewise, he fell at the superior range, 84th percentile when he was to rapidly indicate the correct code that corresponds to a particular number (WAIS-Coding).

Dr. Vorgias' performance varied on tasks of working memory. This term refers to the ability to hold information or instructions in mind in order to use them or manipulate them in some manner. He tested at the average range, 50th percentile when he was to repeat an orally presented series of numbers and fell at the very superior range, 98th percentile when he was to reverse the order of numbers he heard and at the average range, 63rd percentile when he was to seriate them (WAIS-Digit Span). Lastly, he tested at the superior range, 91st percentile on a measure of mental manipulation and numerical reasoning (WAIS-Arithmetic).

Neuropsychological Evaluation
DOE: 04/03/2019

Client's Name: Demetrios Vorgias
Clinic #: 1006228

He was also administered a measure of visual sustained attention (CPT-3). His performance on this measure fell generally within expectation for age on measures of both accuracy and reaction time.

Lastly, Dr. Vorgias was administered a self-report questionnaire of symptoms of inattention and overactivity (CAARS-S:L). His response style was considered valid. He did not obtain any significant elevations on this measure.

*Executive Control:*
Executive control encompasses the ability to self-regulate, maintain sets, selectively inhibit responses, solve problems, be cognitively flexible, plan, and organize.

He performed in the average range, 27th percentile on a measure of set shifting in which he was to alternate between a pattern of numbers and letters (Trail Making Part B).

Rapid word reading tested at the average range, 50th percentile and rapid color naming tested at the average range, 58th percentile. Dr. Vorgias tested in the average range, 66th percentile on a measure of response inhibition, selective attention, and cognitive flexibility in which he was to inhibit a prepotent response and provide the alternative response (Stroop).

Dr. Vorgias was also administered a measure of spatial planning, inhibition of impulsive responding, and rule learning in which he was to problem-solve using beads on a peg board (TOL-DX). His performance on this suggested superior-range accuracy and move efficiency (86th and 88th percentile, respectively). He was also able to adhere to the rule set. Lastly, his ability to initiate his response fell in the high average range, 79th percentile for his age.

He was administered a measure of his ability to think flexibly without making excessive errors in the face of changing schedules of reinforcement (WCST). He achieved six of the six possible categories. This included intact initial learning and ability to adhere to a successful response set.

Lastly, he performed in the superior range, 95th percentile, on a measure of basic safety judgment (NAB-JDG).

*Visuoperceptual, Visuospatial, and Visuoconstructional:*
He generally performed within to above normal limits on measures of nonverbal reasoning skills; such skills involve little or no language demands (PRI). This included average range (63rd percentile) performance on a task of visuoconstructive ability (WAIS-Block Design). He fell at the average range, 50th percentile when he was to reconstruct pieces to form puzzle (WAIS- Visual Puzzles). Lastly, he tested at the very superior range, 99.6 percentile on a task of novel problem solving and spatial ability in which he was to complete a matrix or series (WAIS-Matrix Reasoning).

Dr. Vorgias's performance was within normal limits on a measure of conceptual/gestalt organization by graphic (drawing) constructional development (RCFT Copy).

*Memory and Learning*
Dr. Vorgias's performance on measures of verbal learning and memory was somewhat variable. Immediate free recall of structured, orally-presented paragraphed information was

Neuropsychological Evaluation
DOE: 04/03/2019

Client's Name: Demetrios Vorgias
Clinic #: 1006228

in the superior range, 95th percentile (WMS-IV Logical Memory). He was able to recall what he initially learned well over a 20-30 minute delay (91st percentile). Additionally, he was administered a measure of his ability to acquire a supraspan list of words given multiple learning trials and, on this measure, performance was more variable (CVLT-3). His initial attention to the list was in the 50th percentile, average range for his age. His performance on subsequent learning trials remained in this average range (6-8-11-11-13). He did not evidence significant retroactive or proactive interference. However, his ability to recall this information after a 20-minute delay fell at the 37th percentile. His performance, when provided recognition cueing, fell to the below average range, 9th percentile and suggests some difficulty with response discriminability.

New-learning/encoding and subsequent recall/memory of visual-spatial information was first assessed via a task that involved copying, and then later recalling, a complex geometric design (RCFT). His ability to immediately recall the figure fell in the 62nd percentile, average range. He again fell in the average range when he was asked to recall this information after a long delay (i.e., 30minutes), where he fell at the 50th percentile. His performance when provided structured (recognition) cueing fell at the 98th percentile. Another measure of visual learning and memory was administered that involved Dr. Vorgias viewing a series of designs and then copying the design from memory (WMS VR). He was able to recall this information to within the 95th percentile when asked immediately for this. His long-term declarative recall fell at the 50th percentile. He performed in the high average range (>75th percentile) when provided with recognition-oriented cueing.

*Academic Functions:*
Dr. Vorgias was administered a comprehensive measure of academic achievement (WJ-III).

He tested at the high average range, 77th percentile for his age on a measure of his word-identification ability. He tested at the average range, 47th percentile on a measure of his speed of reading.

He tested at the average range, 73rd percentile on a measure of his ability to follow orally-presented, multiple-step instruction.

He tested at the average range, 73rd percentile on a measure of his ability to perform various mathematics computations. He tested at the high average range, 75th percentile on a measure of his ability to perform simple mathematics, quickly. His ability to solve applied, mathematic computations tested at the superior range, 90th percentile.

He tested at the average range, 70th percentile on a measure of his ability to write orally-presented words, accurately. He tested at the superior range, 92nd percentile on a measure of his ability to formulate sentences, rapidly. He tested at the superior range, 84th percentile on a measure of his ability to comprehend what he reads. He tested at the superior range, 96th percentile on a measure of his ability to formulate sentences with a verbal and picture cue.

*Sensorimotor/Praxis:*
Fine motor dexterity tested in the average range, 54th percentile for the dominant hand (right hand) and at the average range, 69th percentile for the nondominant hand (GPT).

*Emotional, Social, Behavioral Functioning:*

Page 7

Neuropsychological Evaluation
DOE: 04/03/2019

Client's Name: Demetrios Vorgias
Clinic #: 1006228

An assessment of emotional functioning was obtained through a combination of clinical interview and self-report questionnaires. Dr. Vorgias was administered a comprehensive, self-report measure of psychiatric symptoms and personality (MCMI-IV). Validity indicators of his profile were indicative of a tendency to portray himself in an overly favorable light (Scale Y=BR85). Given this pattern, his response set may not be an accurate reflection of his current psychiatric state. His Personality Pattern profile is suggestive of a strong desire to pursue challenging endeavors and that, when feelings of inefficacy result, this is generally suppressed. Individuals with similar profiles tend to have high energy, which can become, at times, constraining to others. If faced with rejection, these individuals' tendency towards exuberance may trend toward edgy irritability. Individuals with similar profiles also tend to experience difficulty examining their own role in distressing situations, which may also lead to challenges with limit setting. High-Point Code: 4B – 4A– 6B. Analysis of Clinical Syndrome scale elevations is indicative of generalized anxiety, characterized by endorsement of feeling tense and agitated, , ill-at-ease, as well as physiological symptoms of such (muscular pain, headache, unexplained perspiration).

## SUMMARY AND CONCLUSIONS

Demetrios Vorgias is a 44-year-old, right-handed, Greek male resident physician referred by Washington Physician Health Program's Dr. Moss and primary care physician, Dr. Charles Bulfinch given ongoing concerns regarding his attentional and interpersonal functioning, and how that may be impacting him, vocationally. His medical history is significant for Attention-Deficit/Hyperactivity Disorder, Combined presentation managed with methylphenidate. He reported having taken his typical dosage of the methylphenidate over the course of this evaluation.

Findings from today's evaluation suggest strength in his verbal reasoning ability (VCI=98th percentile, superior range). He also evidenced strength above average performance on measures of his ability to learn and remember highly structured information (story vs list), visual memory and learning, writing, as well as problem-solving. In contrast, his performance was relatively weaker (i.e., average range) on aspects of attentional functioning (processing speed, working memory, alternating attention, response inhibition), visual reasoning, list learning, reading (fluency and comprehension), mathematics (fluency and calculation), and fine motor dexterity. Relative weakness in attentional control is likely a function of his attentional disorder. However, in the remaining cognitive domains, his average-range performance while, not a deficit per se, is likely representative of relative weakness in these areas. This may be particularly salient in his very cognitively-demanding position where otherwise, these mild personal weaknesses would not be as pronounced. These deficits, however, do not satisfy criteria for a cognitive disorder. Evaluation of his psychosocial functioning was somewhat hampered by his reduced willingness to disclose information on self-report questionnaire both of attentional concerns (where his responses included a denial of any problems with this) as well as other aspects of his psychiatric functioning. This is, however, not unusual in the context of this type of evaluation. Of additional salience, there was endorsement of symptoms indicative of significant anxiety alongside characterological tendencies toward excitability and turbulence.

## ICD-10 Diagnostic Impression:
F41.1  Generalized Anxiety Disorder
F90.2  Attention-Deficit/Hyperactivity Disorder, Combined Presentation (per history)

Neuropsychological Evaluation
DOE: 04/03/2019

Client's Name: Demetrios Vorgias
Clinic #: 1006228

The following recommendations may be of some benefit to Dr. Vorgias:

## IMPLICATIONS/RECOMMENDATIONS

1. Findings from psychosocial assessment suggest that Cognitive Behavior Therapy is warranted, including cognitive restructuring to manage anxiety, enhance interpersonal sensitivity, and to learn ways to avoid being rebuffed and misunderstood. It is recommended that he be afforded time to attend this once, weekly therapy.

2. Additional supervision during his residency is also recommended to address the concerns regarding relative weakness in the domains of attention and executive control.

3. With respect to attentional concerns, I have included some recommendations below that he may find helpful. He may also find it helpful to work with a cognitive speech therapist to help with implementation of these strategies.

    a. Use of the Situation-Behavior-Impact and Assessment (SBIA) Model can be helpful in effective communication. Additional information about this model can be found here: https://www.ccl.org/articles/leading-effectively-articles/hr-pipeline-a-quick-win-to-improve-your-talent-development-process/.

    b. A self-monitoring checklist can assist in keeping the patient on task. This would include goal setting, using the S.M.A.R.T. goal format: http://www.hr.virginia.edu/uploads/documents/media/Writing_SMART_Goals.pdf)

    c. Scheduling in time to engage in physical activity outside of work can also help manage both anxiety and inattention.

    d. To support planning and prioritization, using Post-It notes to write down the tasks to do and rearrange the notes until the order appears accurate. Using a visual aid like this can be helpful in bringing the patient's awareness to the upcoming tasks and ways in which they should be performed. For longer-term projects, use of Gantt charts can aid in the planning process. A planning template is also available here: www.guilford.com/dawson7-forms

    e. To address time management, use of the ABC Method (Alan Lakein) may be also be of help. In this approach, the patient is to assign a priority status of "A," "B," or "C" which is as follows:

| | |
|---|---|
| "A" Status Items – "Must Do" | High priority, very important, critical items, with close deadlines or high level of importance to them. |
| "B" Status Items – "Should Do" | Medium priority, quite important over time, not as critical as "A" items, but still important to spend time doing. |
| "C" Status Items – "Nice to Do" | Low priority at this time, low consequences if left undone at this moment. |

    f. Other strategies for time management can be found here: https://success.oregonstate.edu/learning/manage-my-time

Page 9

Neuropsychological Evaluation
DOE: 04/03/2019

Client's Name: Demetrios Vorgias
Clinic #: 1006228

4. Further follow-up with a psychiatric provider is warranted given both his prominent anxiety and ADHD-C.

Thank you for allowing me to participate in the care of this patient and please do not hesitate to contact me if I can be of any further assistance.

Kelly Cornett, PsyD, CBIS
Evaluating Neuropsychologist

**CC List:** Charles Bulfinch, DO; Laura Moss, MD
**Time Spent:** A total of 11 hours was spent in evaluation of this patient. 5 hours were spent in clinical interview, interpretation of results, review of medical records, report feedback, and report generation by Dr. Cornett. 6 hours were spent in the administration of tests by psychometrician, Kate Donaldson and neuropsychologist, Dr. Cornett.
**Informed Consent:** The potential risks and benefits, limits of confidentiality, and test procedures were discussed with the patient and the patient agreed to the evaluation.

### Appendix: Test Scores



| **Key to scores:** | Standard and I.Q. Scores | --- average is 100, ranging from 85 to 15 |
| | T-Scores | --- average is 50, ranging from 40 to 60 |
| | Scaled Score | --- average is 10, ranging from 7 to 13 |
| | Percentile Ratings | --- average is 50th, ranging from 16th to 84th |

*Standard Vorgias IQ Scores:* 70   85   100   115   130

*T-Scores* 30   40   50   60   70

*Scaled Scores* 4   7   10   13   16

*Percentile (%ile) Ratings:* 2nd   16th   50th   84t   98th

Qualitative Descriptions: Extremely Low | Below Average | Low Average | Average | High Average | Superior | Very Superior

### ACS:

| Measure | Standard Score | Percentile Rank | Qualitative Descriptor |
|---|---|---|---|
| | | | |

Neuropsychological Evaluation
DOE: 04/03/2019

Client's Name: Demetrios Vorgias
Clinic #: 1006228

| Test of Premorbid Functioning | | | |
|---|---|---|---|
| Total Correct | 117 | 87 | Superior |
| Predicted Score | 120 | 91 | Superior |

| BNT: | | | |
|---|---|---|---|
| *Measure* | *Z-Score* | *Percentile* | *Qualitative Descriptor* |
| Total Correct | -0.26 | 48 | Average |

| CAARS: | Self-Report | |
|---|---|---|
| *Measure* | *T-Score* | *Percentile* |
| Inattention/Memory Problems | 49 | 46 |
| Hyperactivity/Restlessness | 55 | 69 |
| Impulsivity/Emotional Lability | 45 | 31 |
| Problems with Self-Concept | 50 | 50 |
| DSM-IV Inattention Symptoms | 53 | 62 |
| DSM-IV Hyperactivity-Impulsive Symptoms | 62 | 88 |
| DSM-IV ADHD Symptoms Total | 64 | 92 |
| ADHD Index | 52 | 62 |

| COWAT: | | | |
|---|---|---|---|
| *Measure* | *T Score* | *Percentile Rank* | *Qualitative Descriptor* |
| FAS: | 46 | 34 | Average |
| Animals | 58 | 79 | High Average |

| CPT 3: | | |
|---|---|---|
| *Measure* | *T Score* | *Conners' Guideline* |
| Detectability | 45 | Average |
| Omissions | 45 | Average |
| Commissions | 50 | Average |
| Perseverations | 45 | Average |
| Hit Reaction Time | 50 | Average |
| HRT SD | 46 | Average |
| Variability | 41 | Low |
| HRT Block Change | 52 | Average |
| HRT ISI Change | 52 | Average |

| CVLT-3: | | | |
|---|---|---|---|
| *Measure* | *Scaled Score* | *Percentile Rank* | *Qualitative Descriptor* |

Neuropsychological Evaluation
DOE: 04/03/2019

Client's Name: Demetrios Vorgias
Clinic #: 1006228

| Trial 1 | 10 | 50 | Average |
|---|---|---|---|
| Trial 5 | 10 | 50 | Average |
| Trials 1-5 (Index-Score) | 98 | 45 | Average |
| Trial B | 10 | 50 | Average |
| Short Delay Free Recall | 9 | 37 | Average |
| Short Delay Cued Recall | 10 | 50 | Average |
| Long Delay Free Recall | 9 | 37 | Average |
| Long Delay Cued Recall | 9 | 37 | Average |
| Delayed Recognition Total Hits | 6 | 9 | Below Average |

**Grooved Pegboard:**

| Hand | T Score | Percentile Rank | Qualitative Descriptor |
|---|---|---|---|
| Dominant (Right) | 51 | 54 | Average |
| Non-dominant (Left) | 55 | 69 | Average |

**NAB:**

| Measure | T Score | Percentile Rank | Qualitative Descriptor |
|---|---|---|---|
| **Judgment** | | | |
| Total Score | 67 | 95 | Superior |

**PASAT:**

| Measure: | Z Score | Percentile Rank | Qualitative Descriptor |
|---|---|---|---|
| Rate #1 (3") | 0.37 | 64 | Average |
| Rate #2 (2") | 0.35 | 64 | Average |

**RCFT:**

| Measure | T Score | Percentile Rank | Qualitative Descriptor |
|---|---|---|---|
| Copy | -- | >16 | Within Normal Limits |
| Immediate | 53 | 62 | Average |
| Delayed | 50 | 50 | Average |
| Recognition | 70 | 98 | Very Superior |

**Stroop:**

| Measure | T-Score | Percentile Rank | Qualitative Description |
|---|---|---|---|
| Word Page | 50 | 50 | Average |
| Color Page | 52 | 58 | Average |
| Color/Word Page | 54 | 66 | Average |

**TOL-DX:**

Neuropsychological Evaluation
DOE: 04/03/2019

Client's Name: Demetrios Vorgias
Clinic #: 1006228

| Measure | Standard Score | Percentile Rank | Qualitative Descriptor |
|---|---|---|---|
| Total Move Score | 116 | 86 | Superior |
| Total Correct Score | 118 | 88 | Superior |
| Total Rule Violation Score | 104 | 61 | Average |
| Total Time Violation Score | 108 | 70 | Average |
| Total Initiation Time | 112 | 79 | High Average |
| Total Problem-Solving Time | 108 | 70 | Average |

**TMT:**

| Measure | T Score | Percentile Rank | Qualitative Descriptor |
|---|---|---|---|
| Trail A | 62 | 88 | Superior |
| Trail B | 44 | 27 | Average |

**WAIS-IV:**

| Scale | Composite Score | Percentile Rank | Qualitative Description |
|---|---|---|---|
| Verbal Comprehension (VCI) | 132 | 98 | Very Superior |
| Perceptual Reasoning (PRI) | 115 | 84 | Superior |
| Working Memory (WMI) | 122 | 93 | Superior |
| Processing Speed (PSI) | 108 | 70 | Average |
| Full Scale (FSIQ) | 125 | 95 | Superior |
| General Ability (GAI) | 126 | 96 | Superior |
| Subtest | Scaled Scores | Percentile Rank | Qualitative Description |
| **Verbal Comprehension** | | | |
| Similarities | 13 | 84 | Superior |
| Vocabulary | 18 | 99.6 | Very Superior |
| Information | 15 | 95 | Superior |
| **Perceptual Reasoning** | | | |
| Block Design | 11 | 63 | Average |
| Matrix Reasoning | 17 | 99 | Very Superior |
| Visual Puzzles | 10 | 50 | Average |
| **Working Memory** | | | |
| Digit Span | 14 | 91 | Superior |
| Arithmetic | 14 | 91 | Superior |
| **Processing Speed** | | | |
| Symbol Search | 10 | 50 | Average |
| Coding | 13 | 84 | Superior |
| **Working Memory Process Score Summary** | | | |
| Measure | Scaled Score | Percentile Rank | Qualitative Description |

Neuropsychological Evaluation
DOE: 04/03/2019

Client's Name: Demetrios Vorgias
Clinic #: 1006228

| Digit Span Forward | 10 | 50 | Average |
| Digit Span Backward | 16 | 98 | Very Superior |
| Digit Span Sequencing | 11 | 63 | Average |

**WMS-IV:**

| Measure | Scaled Score | Percentile Rank/Cumulative Percentage | Qualitative Descriptor |
|---|---|---|---|
| Logical Memory I | 15 | 95 | Superior |
| Logical Memory II | 14 | 91 | Superior |
| Visual Reproduction I | 15 | 95 | Superior |
| Visual Reproduction II | 10 | 50 | Average |
| Logical Memory Recognition (Cumulative Percentage) | -- | >75 | High Average |
| Visual Reproduction Recognition (Cumulative Percentage) | -- | >75 | High Average |

**WCST:**

| Measure | T Score | Percentile Score |
|---|---|---|
| Total Errors | 48 | 42 |
| Perseverative Responses | 49 | 45 |
| Perseverative Errors | 49 | 45 |
| Non perseverative Errors | 47 | 37 |
| Conceptual Level Responses | 49 | 47 |
| Categories Completed (raw) | 6 | >16 |

**WJ-III:**

| Measure | Standard Score | Percentile Rank |
|---|---|---|
| Brief Achievement | 115 | 84 |
| Broad Reading | 111 | 77 |
| Broad Math | 117 | 87 |
| Broad Written Language | 120 | 91 |
| Brief Reading | 115 | 84 |
| Brief Math | 119 | 90 |
| Math Calculation Skills | 112 | 79 |
| Brief Writing | 117 | 87 |
| Written Expression | 128 | 97 |
| Academic Skills | 113 | 81 |
| Academic Fluency | 110 | 75 |
| Academic Apps | 128 | 97 |
| Letter-Word Identification | 111 | 77 |

Neuropsychological Evaluation
DOE: 04/03/2019

Client's Name: Demetrios Vorgias
Clinic #: 1006228

| Reading Fluency | 99 | 47 |
|---|---|---|
| Understanding Directions | 109 | 73 |
| Calculation | 109 | 73 |
| Math Fluency | 110 | 75 |
| Spelling | 108 | 70 |
| Writing Fluency | 121 | 92 |
| Passage Comprehension | 115 | 84 |
| Applied Problems | 119 | 90 |
| Writing Samples | 126 | 96 |