# Exhibit A

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

DEMETRIOS VORGIAS,    )
                )
        Plaintiff,   )
                )
  vs.             )   No. 1:21-cv-03013-SAB
                )
COMMUNITY HEALTH OF  )
CENTRAL WASHINGTON,  )
                )
        Defendant.

VIDEOTAPED VIDEOCONFERENCE
DEPOSITION UPON ORAL EXAMINATION
OF
DEMETRIOS VORGIAS, M.D.

Taken at Yakima, Washington
(All parties appearing via Zoom)

DATE TAKEN: OCTOBER 15, 2021

REPORTED BY: KIM DORE-HACKBARTH, RPR, CCR 2072

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

Page 33

1    It does.

2    Do candidates ever have an opportunity to find

3    out where they ranked on non, their non-match folks?

4    A.    No, ma'am.  I think that's against the rules.

5    I don't know -- if you are applying, you don't

6    know where anyone's ranked you anywhere on the list.

7    And I don't know how programs -- I don't think programs

8    are allowed to tell you where they are going to rank

9    you.

10    It's, ACGME is very strict about that.  I am not

11    sure about all the guidelines, but they won't tell

12    you -- they might say.  We are going to rank you high,

13    but they could be lying, you know, so -- but you don't

14    know where your number two ranking, you don't know where

15    your number three ranking, you don't know any of that.

16    You as the applicant don't know that.

17    Q.    I'm sorry that I interrupted you.

18    MR. PICKETT:  Let me know, Catharine, when

19    you get to a point where we can do a short restroom

20    break.

21    MS. MORISSET:  Yeah, a couple more questions

22    and then I will save my exhibit and we will take a break

23    before that.

24    MR. PICKETT:  Thank you.

25    BY MS. MORISSET:

Page 28

1    tell me, the first time you went through this process

2    was in 2016; is that correct?

3        A.    Yes, ma'am.

4        Q.    And that would have been as you were finishing

5    up your last year at St. George, correct?

6        A.    Yes, ma'am.

7        Q.    And you didn't match with anybody that year?

8        A.    No, ma'am.

9        Q.    Did you go through the SOAP process as well?

10       A.    Yes, ma'am.

11       Q.    Do you have any idea why you didn't match with

12   anybody in 2016?

13       A.    Yes, ma'am.

14       Q.    What is that?

15       A.    I applied, I guess, late would be the way to put

16   it.  My -- for the 2016 match, we, you send your

17   applications in in mid-September of 2015.

18            And in 2015 my father-in-law and my -- passed

19   away in February.  My wife had a -- my future wife had a

20   very difficult time with that.  We had to take a leave

21   of absence, and I took care of the administrative stuff

22   for school.

23            My father passed away in June of 2015.  And I

24   had to spend the month of August that we had set time

25   aside to take step two to help my mother and my brother.

Vorgias v. Community Health of Central Washington                    Demetrios Vorgias, M.D.

Page 58

1    A.    I am not sure, ma'am.

2    Q.    What is it that you are not sure about?

3    A.    If I remember correctly, I know CARED met to

4    discuss me, but I don't know if they met to discuss my

5    employment.   I just know that they met to discuss me.   I

6    don't know what the topics of conversation were.   They

7    might have.   I just don't know.

8    Q.    And have you come to have any understanding

9    about whether CARED met to discuss you and the topic

10   since your departure from Community Health?

11   A.    I am sorry, say again?

12   Q.    Well, I assume that you were talking about your

13   knowledge of the CARED meeting during your employment

14   while you were employed, prior to your separation; is

15   that correct?

16   A.    Yes, ma'am.

17   Q.    Have you learned anything since your departure

18   from Community Health about what CARED discussed when

19   they met about you?

20   A.    I don't think so, ma'am.

21   Q.    Have you ever reviewed the materials that

22   Community Health submitted to the Equal Employment

23   Opportunity Commission regarding your charge?

24   A.    I believe so, ma'am.

25   Q.    But you don't have a recollection of reviewing

cd20613f-2f45-479d-a511-9e24979a41ba

Vorgias v. Community Health of Central Washington                    Demetrios Vorgias, M.D.

Page 65

1    shock and a bit of an emotional and psychological just

2    shock.

3            After they said they are letting me go, I kind

4    of didn't hear anything else they said.  It was kind of

5    like Charlie Brown school teacher.  You know, I was

6    under water and all I heard was, wau-wau-wau-wau, you

7    know, I just didn't hear anything.  And I wasn't in a

8    place to really understand what's happening to me.  It

9    was kind of sleepwalking through the whole, the whole

10   process.

11           I had a medical evaluation pending that I knew

12   they knew.  I had a -- you know, I was tired from FMS

13   service.  I came right over that day from rounding on my

14   patients.  I just, I wasn't in a place to think clearly

15   or rationally.  I just wasn't there, ma'am, I am sorry.

16   That's the best answer I can give you.

17       Q.    Do you recall having a conversation with

18   Ms. Morales at -- I am going to get the acronym wrong --

19   the Washington Physicians Health, WPHP, the next day?

20       A.    Excuse me, can you repeat the date?

21       Q.    Yeah, let me back up and ask the question -- let

22   me ask a foundational question because I'm not intending

23   to confuse you.

24           You said you had a medical evaluation pending.

25   Was that with somebody you saw through WPHP?

cd20613f-2f45-479d-a511-9e24979a41ba

Vorgias v. Community Health of Central Washington                    Demetrios Vorgias, M.D.

Page 83

1          Did you ever ask Dr. Hill to provide any

2    accommodations for you or modifications for you related

3    to your residency because of your ADHD?

4       A.    Sorry, I am sorry, could you repeat the

5    question, please?  I am sorry.

6       Q.    Did you ever ask Dr. Hill to provide any

7    accommodations or modifications for you in the program

8    because of your ADHD?

9       A.    Yes, ma'am.

10       Q.    What were those?

11       A.    Nothing specific.  I told her I was struggling

12    at times with the EMR.  And someone who is familiar with

13    ADHD knows that just a lot of, a lot of buttons, a lot

14    of clicking, it can be extra intimidating.  And I was

15    having difficulty juggling the EMR and make it do what I

16    wanted it to do and was asking for help.

17          I asked for help with that, and that's when I

18    told her I have ADHD and this can make it a little more

19    difficult.  She saw me come in the night before my

20    first -- two nights before my first OB rotation.  My

21    first OB, 24-hour OB shift, she saw me come in.  She

22    came in and saw me there.  I came in for a couple of

23    hours to do extra work with a senior resident to just

24    get a handle on the EMR and I still had trouble with it

25    and making it do what I wanted it to do.

cd20613f-2f45-479d-a511-9e24979a41ba

Page 84

1        And so I told her that in the context of I need

2    help just making things do what I needed it to do.  And

3    areas that other people may have an easier time with, I

4    learn differently basically, and areas that other people

5    have easier time with I might struggle and vice versa,

6    and so that's it.

7        Q.    Did you get the help that you asked her for with

8    the EMR?

9        A.    Clearly not, ma'am.

10       Q.    Well, what did you ask for that you weren't

11   provided?

12       A.    Well, I told her I was having difficulty with

13   the EMR, and I -- they attributed my difficulties to

14   lack of medical knowledge rather than difficulty

15   managing the system.

16       Q.    My question was more narrow.

17             Was there some sort of help or assistance you

18   asked Dr. Hill for and related to the EMR that you were

19   not provided?

20             MR. PICKETT:  Objection just to the extent

21   that's been asked and answered, but go ahead.

22             THE WITNESS:  I told her I was having

23   difficulty with the EMR.  I couldn't pinpoint exactly

24   what it was.  And there was no real extra help provided.

25   I sought out senior residents and figured it out on my

Vorgias v. Community Health of Central Washington                    Demetrios Vorgias, M.D.

Page 85

1    own, but this was after they had put me on citation.

2              So I had asked for help before, and if you

3    look at my citation, one of the things is clearing out

4    my inbox and other, and other things, which on a, on the

5    EMR, which I was having a hard time doing.  And I had

6    asked for help before they put me on citation.

7              But when they put me on citation, I figured

8    it out and took care of it, if that makes sense.  They

9    didn't give me any extra help or guidance.  I figured it

10   out on my own, and took care of it.

11   BY MS. MORISSET:

12   Q.    Who did you ask for help other than Dr. Hill?

13   A.    Regarding what, ma'am?

14   Q.    Your struggles with EMR.

15   A.    I don't remember the specifics.  I know it was

16   other residents, but I don't remember the specifics.  I

17   don't remember who it was.  I know I asked other

18   residents, just how do I do this; might have been my

19   nursing team, but I'm not sure who it was.

20   Q.    EMR is an electronic medical record; is that

21   right, Dr. Vorgias?

22   A.    Yes, ma'am.

23   Q.    Do you recall having any conversations with any

24   other members of the faculty about EMR being difficult

25   for you because of your ADHD?

cd20613f-2f45-479d-a511-9e24979a41ba

Vorgias v. Community Health of Central Washington                    Demetrios Vorgias, M.D.

Page 86

1    A.    I am not sure, ma'am.  I want to say yes.  I
2  think I told Dr. Miller.  I might have told Dr. Pearson.
3  Yung Pearson not pediatrics Pearson.  Those are the two
4  that I am the most -- I think I told, but I don't
5  remember the rest.  I might have.  But I don't remember
6  the rest.  I might have told Dr. McCloud.
7         But this is a small program.  Everyone knew that
8  I had ADHD.  And there were other residents that had
9  ADHD that the program had helped, so I didn't think I
10 was in uncharted territory.
11        These were senior residents that had clearly
12 gotten help, so they clearly knew; the program clearly
13 knew how to help them.
14    Q.    Is there something that you believe a senior
15 resident that has ADHD was given that you were not?
16    A.    Say it again.
17    Q.    Was there something that you believe a senior
18 resident who had ADHD was provided that you were not
19 provided?
20    A.    Yes, ma'am.
21    Q.    What is that?
22    A.    Their employment.  They failed their step three,
23 and, which demonstrates definite lack of medical
24 knowledge, and they were allowed to stay on and take it
25 again and pass it and keep going and they have a life

cd20613f-2f45-479d-a511-9e24979a41ba

Vorgias v. Community Health of Central Washington

Demetrios Vorgias, M.D.

Page 88

1   who they were and I didn't ask.

2       Q.   Do you recall the context in which you stated

3   that you believed you told Dr. Miller you had ADHD?

4       A.   No, ma'am.

5       Q.   Do you have any recollection as to when it was

6   that you talked to Dr. Miller about your ADHD?

7       A.   It was early in my residency in 2018, but it

8   might have been during my OB rotation, but I couldn't

9   give you a specific time frame.

10      Q.   And the same questions for Dr. Pearson, do you

11  recall the context in which she discussed your ADHD

12  diagnosis with Dr. Pearson?

13      A.   It was around that same time, maybe the next

14  block, but I couldn't give you the specific dates.

15      Q.   Did you ask Dr. Pearson for any job modification

16  related to your ADHD?

17      A.   No, ma'am, he wouldn't be the person to ask for

18  that.

19      Q.   And did you ask Dr. Miller for any modifications

20  to your job related to your ADHD?

21      A.   No, ma'am.

22      Q.   And how about Dr. McCloud, did you ever ask

23  Dr. McCloud for any modifications to your job related to

24  ADHD?

25      A.   No, ma'am.

cd20613f-2f45-479d-a511-9e24979a41ba

Vorgias v. Community Health of Central Washington                    Demetrios Vorgias, M.D.

Page 89

1    Q.    Do you have any recollection of the context in

2    which you said you might have had a conversation with

3    Dr. McCloud about your ADHD?

4    A.    No, ma'am.  Like I said, these were early in my

5    residency in 2018, towards the end of 2018, but I can't

6    give you the exact moment, you know, the exact

7    conversation.

8    Q.    I think you said, it's not to trip you up, I

9    think you said that Dr. Pearson would not have been the

10   person to ask about job modifications related to your

11   ADHD?

12   A.    Yes, ma'am.

13   Q.    Who would have been the person to ask?

14   A.    I am not sure.  I would assume my advisor or the

15   program director, or just the program director directly.

16   But somebody up the chain of command.

17   Q.    Did you ever talk to Dr. Mayer about a request

18   for job modifications related to your ADHD?

19   A.    No, ma'am.

20   Q.    Did you ever talk to Dr. Mayer about you having

21   been diagnosed with ADHD?

22   A.    I believe I made him aware of that at some

23   point, ma'am.  I can't tell you when it was.

24   Q.    Do you recall the context and how that came up?

25   A.    No, I would like to, but I am sorry, I can't.

Page 90

1    Q.    By context, I mean, you might not necessarily

2  remember the date, but you might remember, for example,

3  that we had a meeting about X and I brought up the

4  topic.

5    A.    I think it was in the context of patient care

6  and how, I think because I have it, you know, try to

7  empathize a little more with my patients.  I think that

8  was the general context when I was speaking to him about

9  something.  I believe that was the backdrop of it.

10    Q.    Do you recall any communications with Dr. Powers

11  about your diagnosis of ADHD?

12    A.    No, ma'am.

13    Q.    Did you ever ask Dr. Powers for any job

14  modifications related to your ADHD?

15    A.    No, ma'am.

16    Q.    Okay, I would like to ask you some questions

17  about what has been marked as Exhibit 5 in the chat.

18                (Exhibit No. 5 was marked.)

19    Q.    And once we finish through these, we will be

20  headed towards another break, I think.

21    A.    Okay, ma'am.  Let me adjust the font.

22          Okay.

23    Q.    I should have said to you at the beginning that

24  if at any point you need a break, just let me know.  The

25  one thing I do ask is that if a question is pending, you

Vorgias v. Community Health of Central Washington                    Demetrios Vorgias, M.D.

Page 123

1              MR. PICKETT:  You can answer, if you can

2      answer.

3              THE WITNESS:  Okay, I don't want to go

4      around and around.  Can you be very clear about your

5      question, please.

6      BY MS. MORISSET:

7        Q.   You were issued a constructive citation in

8      November of 2018; are we in agreement on that?

9        A.   Yes, ma'am.

10       Q.   That constructive citation set out several areas

11     needed for improvement; would you agree with that?

12       A.   Yes, ma'am.

13       Q.   Is it your testimony that all of those areas for

14     improvement are attributable to an undiagnosed

15     condition?

16             MR. PICKETT:  Objection as to form.  Go

17     ahead, if you can answer.

18             THE WITNESS:  In part, yes, ma'am.

19     BY MS. MORISSET:

20       Q.   You received a consequential citation on

21     January 23rd, 2019, correct?

22       A.   Are you sure it was a citation and not placed on

23     probation?

24       Q.   My understanding is that there's three steps:

25     The constructive citation, consequential citation and

BUELL REALTIME REPORTING, LLC
206.287.9066 l 800.846.6989

cd20613f-2f45-479d-a511-9e24979a41ba

Page 138

1    Q.    Were you aware that the patient complained about

2    you?

3    A.    Eventually.

4    Q.    So there was a patient complaint about you while

5    you were at Community Health, correct?

6    A.    I was made aware of it a lot later.  It wasn't

7    like I read about it in my evaluation at some point, but

8    no one sat down with me and said a patient complained

9    about me.

10         I think like I said, that Dr. Moran knew I

11   wasn't trying to be disrespectful.  I was trying to be

12   helpful in him doing a procedure.  And I inadvertently

13   did something that made the patient uncomfortable and

14   when I was a made aware, I stopped.  And I wouldn't do

15   it again.  It was a learning experience.  It was a

16   teaching moment.

17         I wasn't purposely trying to make the patient

18   uncomfortable or anything like that, and I didn't make

19   that mistake again.

20   Q.    Okay.

21         And it ended up in one of your evaluations, did

22   I catch that?

23   A.    I believe so, yes.

24         I believe the MA was also in the room and she

25   didn't document that at all in her evaluation of the

Vorgias v. Community Health of Central Washington

Demetrios Vorgias, M.D.

Page 153

1   cruel not to feed him incident that we have been

2   discussing.  You said several times it has nothing to do

3   with medical knowledge.

4       A.   Yes, ma'am.

5       Q.   And I want to know why you think that that was,

6   that somehow it's a criticism related to that, or maybe

7   I'm misunderstanding.

8       A.   It's a criticism because they terminated me

9   under the assumption, under the pretense that I don't

10  have -- I lack medical knowledge.  And this created,

11  this incident created a log, a record, an incident, not

12  an incident, a pattern that people, that attendings

13  would think I don't know my medical knowledge and I

14  don't know how to triage, I don't know how to do stuff.

15      And I want to be clear when I told Dr. Hill

16  this, this had nothing to do with medical knowledge, I

17  understood all of the procedures and why we do them.

18  This was about managing the social aspects of medicine

19  and, you know, this isn't a patient, this isn't a

20  question, a multiple-choice question on an exam, this is

21  an actual patient, and I have got people telling me

22  different things and there's a law involved.  This is

23  something that, again, they are supposed to teach you

24  this.

25      Q.   It wasn't your role to come up with a treatment

cd20613f-2f45-479d-a511-9e24979a41ba

Page 156

1          VIDEOGRAPHER:  We are back on the record at

2     2:26.

3               EXAMINATION (CONTINUED)

4     BY MS. MORISSET:

5          Q.   Did you work -- hi, Dr. Vorgias.

6               Did you work with somebody named Dr. Nguyen?

7          A.   Yes.

8          Q.   I think his first name was Dom?

9          A.   Yes, ma'am.

10         Q.   What was your working relationship with

11    Dr. Nguyen?

12         A.   He was senior resident.  He was assigned to me.

13    He had a reputation for being very good at inpatient

14    medicine.  And during my second FMS, he was assigned to

15    me to in theory, excuse me, help me identify where I was

16    struggling and how to get better.  And we worked --

17    yeah, that's it.

18         Q.   And it sounds like -- well, did you have a good

19    working relationship with him or not so good working

20    relationship with him?

21         A.   Not so good would be very charitable, ma'am.

22         Q.   How would you describe it?

23         A.   Absolutely awful.  He was, not only was he not

24    helpful, but he, he acted like he made up his mind about

25    me already after the first day and was just not very

Vorgias v. Community Health of Central Washington

Demetrios Vorgias, M.D.

Page 157

1  helpful.  I just started avoiding him and told him, you

2  are not helping me.

3      Q.   And what was his reaction when you told him he

4  wasn't being helpful?

5      A.   At first he tried to work with me, but I found

6  out after the fact he accused me of being argumentative

7  and unteachable.

8      Q.   He didn't say that to you at the time?  He

9  didn't -- give me a second.

10         He didn't call you argumentative and unteachable

11  at that time while you were working with him, correct?

12     A.   No, ma'am, he didn't say it to my face.  He

13  wrote it to an email behind my back to the program

14  director and I don't remember who else.

15     Q.   And is that something you saw only after your

16  separation?

17     A.   Yes, ma'am.

18     Q.   All right.

19         I may have an internet problem, but let's keep

20  going until you tell me you can't hear me, okay?

21     A.   (Indicating).

22     Q.   Okay.

23         MR. PICKETT:  Catharine, where are you?

24         MS. MORISSET:  I am at home.  It shouldn't

25  be a problem, but I got kicked off the one.

cd20613f-2f45-479d-a511-9e24979a41ba

Vorgias v. Community Health of Central Washington                    Demetrios Vorgias, M.D.

Page 175

1    and it was because I was nervous and I was struggling.

2          And twice in the last month that Dr. Hill

3    specifically noticed that and wrote down one example

4    that, something's going on with me that I am not

5    performing, that I am not performing at my best because

6    of something going on, but I actually know my stuff when

7    you get me in the right circumstances.

8       Q.    Were you given other opportunities to present

9    one-on-one or outside of the group after these two

10   incidents?

11      A.    No, ma'am.  By the way, just to be clear, there

12   was only one incident that I presented one-on-one to

13   Dr. Hill about a presentation.  This second one was in

14   front of a group and it was better than the first one in

15   front of a group, but it really wasn't as good -- like I

16   said, I was nervous.

17      Q.    Okay.

18          Did you have to do any other group presentations

19   after these two incidents you described?

20      A.    No, ma'am.  Not after that, that was in April

21   and they let me go on May 1st.

22          And I would like to be clear.  I wanted to do

23   more, I wanted to get better.  I wanted to keep -- I

24   asked Dr. Hill for another bite at the apple, for

25   another presentation.  And she was very calming and she

cd20613f-2f45-479d-a511-9e24979a41ba

Vorgias v. Community Health of Central Washington                    Demetrios Vorgias, M.D.

Page 176

1    said you will get another opportunity, just do better,

2    calm down.  But she knew I made it clear to her that I

3    was nervous and struggling with that.

4        Q.    One of the items on No. 2 under "Lack of Medical

5    Knowledge," Dr. Vorgias, talks about, it's lacks basic

6    knowledge regarding several things and one of the things

7    listed was cardiology.  Do you know what that one was

8    referring to?

9        A.    Not really, no.  No.

10       Q.    Was there ever an occasion where you presented

11   regarding a patient, but you hadn't examined the

12   patient?

13       A.    Say again.

14       Q.    Was there ever an occasion where you presented

15   like to the next resident coming on shift when you

16   actually hadn't examined the patient?

17       A.    Yes and no.  I would tell the other resident I

18   haven't examined them yet, but this is where I am right

19   now, this is where we are.  But I was very clear that I

20   haven't examined this patient.

21       Q.    On the next page, CHCW 92.

22       A.    One second.

23             Yes, ma'am.

24       Q.    Under item No. 3, the last sentence of that

25   paragraph says, "on FMS 11 2018 evaluation concern for

cd20613f-2f45-479d-a511-9e24979a41ba

Vorgias v. Community Health of Central Washington                    Demetrios Vorgias, M.D.

Page 186

1    evaluation and didn't wait for the results to come back

2    and upended my life over a mistake for reasons that I

3    don't understand.

4         You know, they sent me out for an evaluation,

5    they knew it was pending.  This is a common condition

6    that I have that affects 30% of us.  These are trained

7    medical educators who would know about it and they

8    decided not my problem, go away.

9         And I worked my whole life to get to this point,

10   and to have it, have this be treated so casually, so

11   cruelly, sorry, bye, I don't know what other words I can

12   use to describe somebody like that.

13        I mean, this program, excuse my language, but

14   this program, I was suicidal for four months because,

15   five months, because of what they did to me.

16        And when I told Dr. Powers on the 7th or when I

17   sent her an email and said this is why I am struggling,

18   she said I don't want to hear it.  What kind of teacher

19   are you, what kind of medical doctor are you, what kind

20   of professional are you, what kind of human being are

21   you?  You have gone through this.  You know how hard it

22   is.  You know what the sacrifices are to get to this

23   point.  And they know how hard it is to get in to a

24   residency.  And for them to casually say good-bye, go

25   with God, not my problem anymore.  Medicine sucks up

cd20613f-2f45-479d-a511-9e24979a41ba

Vorgias v. Community Health of Central Washington                    Demetrios Vorgias, M.D.

Page 187

1  your entire life.  I couldn't attend my graduation.  My

2  father died, I had to -- I took time off and it's a red

3  flag on my applications because we had to take a leave

4  of absence because my father-in-law died.

5          And it's, you know, they punish you for being

6  human.  You sacrifice everything for this career, this

7  is who you are.  And for them to just casually say,

8  well, we sent you for the evaluation, but, you know,

9  sorry, too bad.  And all it would require for them is a

10 little extra supervision.  This is an easy condition to

11 fix.  And I am working now as proof.  I passed my step

12 three, I have proof that I know my medical knowledge,

13 and they got me wrong.

14         And we are still here, three years later I'm

15 talking to you to show you, them, that they got it

16 wrong.  And rather than for them to admit, yeah, we made

17 a mistake, let's fix this and make it right, I have to

18 go through the ringer and hire lawyers and go into a

19 world I know nothing about, the laws, which I don't want

20 to know anything about, just to get my life back, just

21 because they don't want to admit they made a mistake.

22 And your client is putting me through this.

23         What word would you want me to use?  If

24 malicious and cruel doesn't count, the English language

25 has no meaning.

cd20613f-2f45-479d-a511-9e24979a41ba

Vorgias v. Community Health of Central Washington

Demetrios Vorgias, M.D.

Page 207

```
1                      C E R T I F I C A T E

2

   STATE OF WASHINGTON    )
3                          ) ss.
   COUNTY OF KING          )

4

5        I, KIM M. DORE-HACKBARTH, a Certified Shorthand

6   Reporter in and for the State of Washington, do hereby

7   certify that the foregoing transcript is true and

8   accurate to the best of my knowledge, skill and ability.

9        IN WITNESS WHEREOF, I have hereunto set my hand

10  and seal this 25th day of October, 2021.

11

12

13

14  _____

15        KIM M. DORE-HACKBARTH, RPR, CCR
          Certified Court Reporter No. 2072
16        (Certification expires 5/27/22.)

17

18

19

20

21

22

23

24

25
```

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

cd20613f-2f45-479d-a511-9e24979a41ba

**Central Washington Family Medicine Residency Program**
A Service of Community Health of Central Washington
1806 W. Lincoln, Yakima, WA 98902
(509) 452-4946

10.15.2021
Vorgias
**1**
Buell Realtime Reporting

## RESIDENT CONTRACT IN FAMILY MEDICINE

The Central Washington Family Medicine Residency Program (CWFMR), an accredited residency for training family physicians, hereby enters into a contract of residency with **Demetrios Vorgias, MD** subject to the following terms which supersede the terms of any previous contract:

## AGREEMENT BY RESIDENCY:

The Central Washington Family Medicine Residency Program agrees:

1. To accept **Demetrios Vorgias, MD** as a resident physician in Family Medicine for the period beginning June 25, 2018 and ending June 24, 2019. It is agreed that intention to terminate this contract by either party be accompanied by a 30 day written notice.

2. To maintain an approved Family Medicine residency program in keeping with the standards established by the Accreditation Council for Graduate Medical Education (ACGME), the Residency Review Committee for Family Medicine (RC), the American Board of Family Medicine (ABFM), and the American College of Osteopathic Family Physicians (ACOFP). CWFM-R has received the ACGME Osteopathic Recognition accreditation.

3. To provide an annual salary as recommended by the Graduate Medical Education Committee and approved by the Community Health of Central Washington Board of Directors.

4. To comply with the guidelines of the ACGME with regard to resident workload and duty hours.

5. To provide 20 days of Paid Time Off (PTO) per year that may be used for vacation, illness or the provision of care for an ill spouse or immediate household dependent. PTO must be requested three months in advance. PTO may only be taken during unrestricted residency time as specified in the *Resident Handbook*. Any unused PTO from the R-1 contract year may not be carried forth into the R-2 year.

6. To provide a lump sum of $1,500 in professional development funds to be used during the R-1 through the R-3 year in accordance with professional development policies. Professional development funds not spent by the conclusion of the R-3 year remain the property of CWFMR and are not paid to the resident.

7. To extend the date of completion of training commensurately in accordance with the American Board of Family Medicine and the American College of Osteopathic Family Physicians continuity requirements for leaves of absence from the residency in excess of

Paid Time Off (PTO) granted in each year of training. Extended personal leave is granted at the discretion of the Program Director for *compelling* personal reasons.

8. To grant leaves of absence of the type below **without pay** *as accorded by law*. Benefits do not accrue during extended unpaid leaves of absence.

   Family and Medical Leave Act (FMLA)

   Eligible residents have a right under FMLA for up to 12 weeks of leave in a 12-month period for the reasons listed below:

   - Birth of a child, or the placement of a child for adoption or foster care
   - A serious health condition that renders the resident unable to perform the essential functions of his/her job
   - A serious health condition affecting the resident's spouse, child, or parent, for which the resident must provide care.

   During FMLA, PTO must be used prior to utilizing unpaid leave.

9. To assure that the participating hospitals furnish meals when the resident is on call in their institutions.

10. To provide health insurance (medical, dental, and vision) for the resident via a paid premium for the CHCW Preferred Provider Premium Plan <u>or</u> a contribution to the CHCW High Deductible Health Plan/Health Saving Account. Any co-payments/deductibles will be the responsibility of the resident.

11. To pay 50% of the health insurance (medical, dental, and vision) Preferred Provider Premium Plan premium for resident dependents <u>or</u> a contribution to the CHCW High Deductible Health Plan/Health Saving Account.

12. To pay the State of Washington physician license fees (MD/DO) and the Drug Enforcement Administration registration fees.

13. To provide Professional Liability Insurance that applies to any professional acts performed by residents <u>within the approved educational program.</u>

14. To pay necessary dues and assessments for the American Academy of Family Physicians, the Washington Academy of Family Physicians, the American College of Osteopathic Family Physicians, the Washington Osteopathic Medical Association, and the Yakima County Medical Society.

15. To maintain a Flexible Spending Account (IRC Section 125) for the benefit of the resident.

16. To provide disability insurance for residents at the expense of CWFMR.

17. To subscribe to an Employee Assistance Program for the use of the resident and his/her family.

18. To pay taxes for Workmen's Compensation and Unemployment on behalf of the resident, and to deduct Social Security from the resident's salary, and match the deduction.

19. To issue a Certificate of Advancement upon satisfactory completion of all program requirements for the R-1 level of training.

20. To follow due process as described by the grievance procedure detailed in the *Resident Handbook* provided to the resident in printed and/or electronic format.

## DUTIES OF THE RESIDENT:

**I, Demetrios Vorgias, MD,** agree:

1. To withdraw from the NRMP match systems, if applicable.

2. To fulfill the duties of a Family Medicine resident during the entire period agreed upon as specified in this contract. I agree to participate in all areas of that curriculum. This may include additional assignments in areas of medicine deemed necessary or appropriate by the faculty for completeness of experience and education in Family Medicine.

3. To observe all policies, rules and regulations of this residency and the sponsoring and participating institutions; and to consider that any infraction thereof will be full justification for discipline up to and including dismissal from the program.

4. To consider the salary, as well as the experience and instruction received, as sole compensation, and not to engage in any employment outside the auspices of CWFMR.

5. To assume responsibility for all acts performed outside the course and scope of the training provided by CWFMR, and to indemnify and hold harmless CWFMR regarding such acts.

6. To participate in educational duties and conferences, including required and elective hospital, non-hospital and community based rotations and didactics, and to meet the training requirements of the residency as defined by the approved curriculum. Failure to meet this requirement may result in disciplinary action.

7. To obtain and maintain licensure in accordance with the laws of the State of Washington while a member of this residency. In the event that I do not obtain such license for any reason whatsoever, this contract shall be canceled.

8. To charge fees as established and agreed to by Community Health of Central Washington and to agree that all fees that are obtained from such services shall be the property of Community Health of Central Washington, free from any claim or interest by me.

9. To abide by the by-laws, rules, and regulations of the sponsoring and participating institutions of this residency. Suspension from any hospital for delinquent records or for any other reason may result in disciplinary action.

10. To have reliable transportation for travel to and from the hospitals, the clinic, and assigned rotation sites.

## ESSENTIAL FUNCTIONS:

The following list includes abilities that are representative of those required of a resident in Family Medicine at CWFMR. The list is not meant to be all-inclusive, nor does it constitute all academic performance measures or graduation standards. It does not prevent the residency from temporarily restructuring resident duties as it deems appropriate for residents with acute illness, injury, or other circumstances of a temporary nature.

1. The resident must be able to read, write, and speak English well enough to communicate effectively with hospital and clinic staff, colleagues and patients.

2. The resident must be able to work extended hours in accordance with ACGME and AOA guidelines.

3. The resident must have the ability to make competent assessments and judgments about patient illnesses and care and communicate that adequately in a written and spoken form.

4. The resident must have basic computer and keyboarding skills to use email, electronic medical records and internet-based medical data bases.

5. The resident must be free from drug or alcohol use or physical or mental impairment that could adversely affect judgment or patient safety.

## TERM AND SALARY:

This agreement for the R-1 year is for the period from June 25, 2018 to June 24, 2019.  Annual salary for this year of residency is $53,326.


_____
Date

_____
**Demetrios Vorgias, MD, MA, MBA**
Resident Physician


_3|27|18_____
Date

_____
Russell Maier, M.D.
Designated Institutional Official/Program Director


Revised 3.2018 lf


R-1 Contract, page 4

## ESSENTIAL FUNCTIONS:

The following list includes abilities that are representative of those required of a resident in Family Medicine at CWFMR. The list is not meant to be all-inclusive, nor does it constitute all academic performance measures or graduation standards. It does not prevent the residency from temporarily restructuring resident duties as it deems appropriate for residents with acute illness, injury, or other circumstances of a temporary nature.

1. The resident must be able to read, write, and speak English well enough to communicate effectively with hospital and clinic staff, colleagues and patients.

2. The resident must be able to work extended hours in accordance with ACGME and AOA guidelines.

3. The resident must have the ability to make competent assessments and judgments about patient illnesses and care and communicate that adequately in a written and spoken form.

4. The resident must have basic computer and keyboarding skills to use email, electronic medical records and internet-based medical data bases.

5. The resident must be free from drug or alcohol use or physical or mental impairment that could adversely affect judgment or patient safety.

## TERM AND SALARY:

This agreement for the R-1 year is for the period from June 25, 2018 to June 24, 2019. Annual salary for this year of residency is $53,326.

3/29/18
Date

**Demetrios Vorgias, MD, ~~MA, MBA~~**
Resident Physician

3/27/18
Date

Russell Maier, M.D.
Designated Institutional Official/Program Director

Revised 3.2018 lf

R-1 Contract, page 4

# Central Washington Family Medicine Residency Program



a Service of
**Community Health**
of Central Washington

# RESIDENT HANDBOOK

10.15.2021
Vorgias
**5**
Buell Realtime Reporting

6/2016

CH_000001

CHCW 000002

# EMPLOYMENT POLICIES

### Definitions

1. **Residents.** Full time, salaried physician trainees.
2. **R-1.** Physician in the first year of residency training.
3. **R-2.** Physician in the second year of residency training.
4. **R-3.** Physician in the third year of residency training.
5. **Term of Training.** The normal term of residency training in family medicine is three years (36 months). The Resident's training may be extended beyond three years, at the discretion of the Program Director/DIO, due to the Resident's time away from the program or to address academic deficiencies.
6. **Year.** For the purpose of these policies "year" refers to the CWFMR academic year.
7. **Orientation Period.** The first rotation of the first year of residency training.

### Equal Opportunity

The Central Washington Family Medicine Residency Program (CWFMR) maintains a policy of nondiscrimination with applicants and Residents. No aspect of the application process or residency training will be influenced in any manner by race, color, religion, sex, age, national origin, physical or mental disability, or any other basis prohibited by statute. Further, CWFMR will reasonably accommodate persons with mental or physical disabilities as long as the accommodation doesn't cause the Program undue hardship or negatively impact the provision of comprehensive patient care.

### Orientation

All new R-1 residents will have an orientation month that introduces a comprehensive approach to health care and promotes resident identity as a family physician. The orientation will include an introduction to CHCW, the residency program, the clinic, and the hospitals. An assessment of the resident's level of proficiency in the ACGME core competencies will be completed. The orientation is a required educational experience and included as part of the Resident's 36 months of training.

CHCW 000003

responsibilities of the solicitors or the donors. Information may be disseminated via company mailboxes or email but is not to be presented as a CHCW sponsored event. Advertisement for these events such as fliers, posters, etc. should not be published utilizing CHCW supplies or equipment.

2. Charity Support

   CHCW conducts an annual United Way campaign and may sponsor other CHCW Leadership Group approved fundraisers. All Residents are given an opportunity to participate as part of our corporate commitment to community service. Solicitation of money, time, or goods for these events is not intended to interfere with the job responsibilities of the solicitors or the donors. Resident solicitations for money, time, or goods for non-CHCW sponsored charity fundraisers are allowed, but must not interfere with the job responsibilities of the solicitor or the donors. Advertisement for non-CHCW sponsored charity fundraisers such as fliers, posters, etc. should not be published utilizing CHCW supplies or equipment.

3. Community Events

   Residents may provide information regarding community events to co-workers and other CHCW employees via the employee bulletin board(s) and employee break-room(s). Postings in patient waiting areas must be approved by site leadership.

4. Commercial

   Solicitation by Residents of personal goods and services is allowed, but must not interfere with the job responsibilities of the solicitor or those being solicited. Advertisement for these goods and services should not utilize CHCW supplies or equipment.

5. Outside Solicitors

   Non-employees are prohibited from soliciting on CHCW premises.


**Policy Against Harassment**

Harassment is illegal and will not be tolerated. Harassment may include:

1. Making unwelcome sexual advances or requests for sexual favors.
2. Making verbal or physical conduct of a sexual nature a condition of a Resident's or employee's continued employment.
3. Making submission to or rejections of such conduct the basis for decisions affecting the Resident or employee.
4. Creating an intimidating, hostile or offensive work environment by such conduct.
5. Retaliating against any person, because he/she has made or filed a complaint of sexual harassment or opposed such conduct.

A Resident who feels he/she has been sexually or otherwise harassed should tell the offender to stop and report the incident to the Program Director/DIO. Confidentiality will be maintained to the extent dictated by the circumstances.

CHCW 000004

11. Conduct which adversely reflects on the Resident or Community Health of Central Washington.
12. Work performance that does not meet the requirements of the position.
13. Engaging in practices inconsistent with the ordinary and reasonable rules of conduct necessary for the welfare of Community Health of Central Washington, its employees, patients, or visitors.
14. Any acts, conduct or omission deemed of a serious nature by Community Health of Central Washington.

# RESIDENT SUPERVISION, EVALUATION, ADVISING, AND ADVANCEMENT

**Supervision of Residents**

Residents are supervised by program faculty and community attending physicians with documented qualifications, expertise and diversified interests sufficient to meet the various training responsibilities of the program. Please see resident supervision policy for details.

**Performance Appraisals**

Residents are subject to continuous performance evaluation, with regard to the seven core competencies: patient care, medical knowledge, practice-based learning and improvement, interpersonal and communication skills, professionalism, systems-based practice, and osteopathic philosophy and osteopathic manipulative medicine. Such evaluation is an integral part of the education process, and each Resident is responsible for participating in the evaluation process as requested and as delineated in the "Evaluation Strategy" of each curriculum and rotation, and as described in the "Resident Evaluation and Advising" sections of the Resident Handbook. Residents are evaluated by the Program faculty and staff, including nursing and other staff within the FMC, and by community physicians and health care workers with whom the Resident has contact throughout their period of training.

The goals of the CWFMR Resident evaluation system are:

1. Assure the safety of patients.
2. Provide relevant, fair, useful, and accurate feedback about Resident progress from appropriate sources including CWFMR faculty and community preceptors, encounter/billing form data, inpatient and outpatient supervisors, and results of national Resident In-Training Examinations.
3. Measure Resident and residency program outcomes to determine if educational objectives are met.

CHCW 000005

4. Assess Resident involvement and investment in establishing personal learning goals, self-assessment of educational progress, and attainment of goals.
5. Document progress and competence for purposes of advancement and graduation, compliance with residency program requirements for accreditation, references for future work applications and determination of privileges.
6. Obtain information that will contribute to the maintenance and continuous improvement of educational opportunities and rotations.
7. Utilize the NAS (Next Accreditation System) Milestone evaluations to measure resident performance and progression.

Resident competence will be evaluated in a variety of ways including direct observation, outcomes assessment, patient feedback and written examination.
Upon evaluating residents, if remediation is identified, advisor will follow Remediation policy. Please see Remediation policy for details.

**Advancement and Graduation**

Resident advancement is determined by the Program Director/DIO in consultation with the faculty of the program.

There are three advancement steps:

1. R1 to R2
2. R2 to R3
3. R3 to graduation

For advancement to the next level, acceptable progress meeting milestones in the seven core competencies needs to be documented. Additionally, the Resident must be judged competent to supervise others (R1's and students), and to act with limited independence. In the R3 to graduation step, the Resident must be judged with sufficient ability and appropriate clinical and procedural skills to demonstrate sufficient competence to enter practice without direct supervision. Upon the Resident's successful completion of the program, the Program Director/DIO will issue a certificate so stating. Please see Promotion, Graduation and Dismissal policies for details. Below is the link to the ACGME-FM Milestones.
P:\Program Admin\CWFM-R Policies and Procedures

**Advisor/Advisee Relationship**

At the beginning of the R1 year, each Resident is assigned a Faculty Advisor. An Advisor/Advisee relationship is, by nature, personal and confidential. Information will be shared outside the relationship only as permitted by either party. Unless the Resident specifies otherwise, the advisor is permitted to share information with other members of

the faculty as may be necessary.   Confidentiality may be broken if harm or threats of harm to self or others is revealed.

The Resident and the advisor may request a change of advisor/advisee once a year if there are conflicts or discomfort with the relationship.  The proposed change must be discussed with the Program Director/DIO.  The Program Director/DIO retains the right to make an assignment if an equitable solution cannot be worked out.

## Advisor/Advisee Meetings

Residents and advisors should meet quarterly.  Meetings should take place:

1. R-1s: end of Orientation, October, January, and April.
2. R-2s: end of August, November, February, and May.
3. R-3s: end of September, December, March, and June.

Informal advisor/advisee meetings will be Resident driven. Quarterly advisor/advisee meetings will be initiated by the advisor, as will meetings to discuss urgent issues that require review. The advisor will write a summary report for all quarterly and formal evaluation sessions, to include resident Individual Learning Plans (ILP).

The Resident or his/her advisor should discuss significant general problems with an area of the curriculum, a rotation, an educational setting, or an educator, with the faculty member responsible for that curricular area.

## Advisor Responsibilities

The advisor reviews information from all areas evaluated, and develops a coherent summary of formative and evaluative comments for discussion with the Resident. The advisor prepares a summary of the evaluation meeting for the Resident's file.

## Advisee Responsibilities

The Resident should review curriculum objectives before each rotation and after rotation completion to gauge progress toward educational goals. He/she will present an open/creative self-assessment during each formal advisor/advisee meeting and a detailed ILP. Self-assessment forms are located in New Innovations.

CHCW 000007

## Documentation of Skills and Abilities

The granting of privileges for care and procedures is a legal and financial issue that continues to escalate for all physicians. Future privileging and credentialing for hospital care and some clinic settings will depend upon accurate documentation during residency to capture the content and scope of the patient care experience. Residents are required to carefully document their procedures and participation in the care of high risk or complicated patients. The ACGME and AOA also require Residents to document the care of nursing home patients and home visits on continuity patients.

Residents are required to document all procedures performed in New Innovations. These include procedures done in the clinic (including OMT), at rotation sites and in the hospitals. Residents should pay particular attention to including appropriate information, as prescribed, to capture experience.

## Core Competency Development

The criteria for advancement shall be based upon appropriate development of the following seven core competencies. The Resident must be judged as competent in these for each level of advancement.

1. Patient Care & Patient Safety:
   Residents must be able to provide patient care that is compassionate, appropriate, and effective for the treatment of health problems and the promotion of health. Residents are expected to:
   - communicate effectively and demonstrate caring and respectful behaviors when interacting with patients and their families, gather essential and accurate information about their patients, make informed decisions about diagnostic and therapeutic interventions based on patient information and preferences, up-to-date scientific evidence, and clinical judgment.
   - develop and carry out patient management plans.
   - counsel and educate patients and their families.
   - use information technology to support patient care decisions and patient education.
   - perform competently all medical and invasive procedures considered essential for the area of practice.
   - provide health care services aimed at preventing health problems or maintaining health.
   - work with health care professionals, including those from other disciplines, to provide patient-focused care.

- Please refer to CHCW policy regarding patient safety and risk management program. Policy is available via intranet.

2. Medical Knowledge:

Residents must demonstrate knowledge about established and evolving biomedical, clinical, and cognate (e.g., epidemiological and social-behavioral) sciences and the application of this knowledge to patient care. Residents are expected to:
   - demonstrate an investigatory and analytic thinking approach to clinical situations.
   - know and apply the basic clinically supportive sciences which are appropriate to their discipline.

3. Practice-Based Learning and Improvement:

Residents must be able to investigate and evaluate their patient care practices, appraise and assimilate scientific evidence, and improve their patient care practices. Residents are expected to:
   - analyze practice experience and perform practice-based improvement activities using a systematic methodology.
   - locate, appraise, and assimilate evidence from scientific studies related to their patients' health problems.

4. Interpersonal and Communication Skills:

Residents must be able to demonstrate interpersonal and communication skills that result in effective information exchange and teaming with patients, their patients' families, and professional associates. Residents are expected to:
   - create and sustain a therapeutic and ethically sound relationship with patients.
   - use effective listening skills and elicit and provide information using effective nonverbal, explanatory, questioning, and writing skills.
   - work effectively with others as a member or leader of a health care team or other professional group.

5. Professionalism

Residents must demonstrate a commitment to carrying out professional responsibilities, adherence to ethical principles, and sensitivity to a diverse patient population. Residents are expected to:
   - demonstrate respect, compassion, and integrity; a responsiveness to the needs of patients and society that supercedes self-interest; accountability to patients, society, and the profession; and a commitment to excellence and on-going professional development.
   - demonstrate a commitment to ethical principles pertaining to provision or withholding of clinical care, confidentiality of patient information, informed consent, and business practices.
   - demonstrate sensitivity and responsiveness to patients' culture, age, gender, and disabilities.

CHCW 000009

6. Systems-Based Practice

Residents must demonstrate an awareness of and responsiveness to the larger context and system of health care and the ability to effectively call on system resources to provide care that is of optimal value. Residents are expected to:

- understand how their patient care and other professional practices affect other health care professionals, the health care organization, and the larger society and how these elements of the system affect their own practice.
- know how types of medical practice and delivery systems differ from one another, including methods of controlling health care costs and allocating resources.
- practice cost-effective health care and assist patients in dealing with system complexities.
- know how to partner with health care managers and health care providers to assess, coordinate, and improve health care and know how these activities can affect system performance.

7. Osteopathic Philosophy and Osteopathic Manipulative Medicine: (DO residents)

Residents must demonstrate knowledge of accepted standards in Osteopathic Manipulative Treatment (OMT) appropriate to Family Medicine. Residents are expected to:

- demonstrate competency in understanding and application of OMT in Family Medicine.
- integrate osteopathic concepts and OMT in the medical care provided to patients.
- understand and integrate Osteopathic Principles and Philosophy into all clinical and patient care activities.

**Successful Completion of Rotations and Educational Experiences**

The decision whether a Resident passes a rotation or other educational element of the required curriculum is determined by the Program Director/DIO, in consultation with other faculty and teachers, and using all objective and subjective information that is appropriate to the assessment of the Resident's performance in the setting. Evaluation by attendings and others is *advisory* to the Program Director/DIO. Failure may result from deficiencies in cognition, clinical performance, technical skills, attendance, and/or attitudinal objectives. If remediation is required, the resident will be provided with the remediation policy and will have a formal meeting with his/her advisor to develop a plan. Please see Remediation policy for details.

**Steps for Improvement**

The quarterly evaluation, which summarizes the input from the rotation and clinical evaluations, will outline formative comments and the significance of these comments to the

Resident's advancement. Any significant deficiencies or concerns about Resident achievement of the core competencies will be addressed. A plan for working on the areas identified will be developed.

1. Constructive Citations
   Constructive Citations are areas of concern on which the Resident should focus his/her study, but are not serious enough to cause concern about advancement.
2. Consequential Citations
   Consequential Citations are areas of concern significant enough to require the Resident and faculty to develop a formal plan of corrective action. Failure to correct these areas within a specified time frame could result in required remediation and probation. Elective time is used for required remediation, but no more than four weeks of elective time may be used for remediation in any year of the academic program.
3. Probation
   If a Resident fails a rotation or does not correct a consequential citation within the specified time, he/she will be placed on probation. Further testing, evaluation by professionals, tutorials or outside therapy/treatment may be required. Expectations for achievement and the timeline for reevaluation will be determined. All failed rotations must be repeated and the Resident's advancement to the next level of training delayed a commensurate amount. Likewise, the period of training will be extended to meet the completion of training requirements.
4. Termination
   The intention to terminate training may be initiated by the Resident or the Program Director/DIO with a 30 day written notice. Termination by the Program Director/DIO may be for Standards of Conduct violations or academic reasons. If the termination is for lack of academic progress, the Resident will have progressed through several stages of remediation and termination will be a last resort after those steps have failed. Standards of Conduct violations may result in immediate termination depending on the nature/severity of the violation.

**Grievance Procedure**
If the dismissed Resident does not agree with the Program Director/DIO's decision, the Resident may submit a grievance in writing to the Program Director/DIO within five (5) days to be sure that due process was followed. If satisfactory resolution is not reached, the Resident may within five (5) days submit a written request for review of the due process to the CHCW Chief Executive Officer. The CEO's decision will be final and binding. Please refer to Grievance and Due Process policy for details.

CHCW 000011



10.15.2021
Vorgias
**8**
Buell Realtime Reporting

Resident Name: Dr. Demetrios Vorgias

The CARED (Committee Addressing Residents Experiencing Difficulty) met on 1/23/19 to discuss your recent progress and form this plan for consequential citation.

As a result, this meeting is to place you on consequential citation, per the resident handbook:

Consequential Citation :

If a resident fails a rotation or does not correct a consequential citation within the specified time, he/she will be placed on probation. Further testing, evaluation by professionals, tutorials or outside therapy/treatment may be required. Expectations for achievement and the timeline for reevaluation will be determined.

All failed rotations must be repeated and the resident's advancement to the next level of training delayed a commensurate amount. Likewise, the period of training will be extended to meet the completion of training requirements.

**Primary Reason for Consequential Citation:**

1. Professionalism Concerns: Based on New Innovations evaluations from faculty and discussion at R1 evaluations on 1/23/19, the primary professionalism concerns are
   - Failure to complete required administrative tasks such as logging didactic attendance, procedure logging and CKSAs.
   - Failure to notify BHC of lateness to shadowing opportunity (Sarah Ortner).
   - Lack of preparation for clinic and knowledge of patient's medical conditions prior to visit.
   - Great difficulty running on time in clinic, and not communicating with your preceptors, patients, & nursing team, and not precepting within a reasonable time.
2. Lack of medical knowledge for stage of training:
   - Failure to consistently take accurate history, perform physical exam, and develop a basis differential diagnosis and plan for outpatients and inpatients in multiple settings (CWFM clinic, Hospitals).
   - Failure to ask for supervision by appropriate attendings when needed, and instead asking for nursing supervision (OB rotation email).
3. Concerns for patient safety & decision making:
   - Concern about documentation of after hours call for patient with chest pain, SOB, & palpitations who wanted to drive herself to the ER. Documentation should have included advising her to call 911, rather than drive herself.
   - On FMS 11/2018 evaluation, concern for documenting a physical exam without examining the patient, which is fraudulent.

4. Lack of awareness of inappropriate social interactions with female faculty, staff, & peers:

- Multiple concerns about being overly familiar with attendings, calling females "love" and making comments about females physical appearance. Your intention is to be friendly but is perceived to be inappropriate due to lack of personal relationship with those you are addressing as well as the professional setting.

**ACTION PLAN:**

1. I must review and respond to messages, refill requests, labs within 3 business days and documents within 7 business days (PTO excluded). I will sign off all my documents & patient messages (as well as paper inbox) that are currently in my inbox as of 1/24/19 by 1/31/19.

2. I must arrive on time for clinic, shadowing experiences, required clinic meetings, as well as shifts at hospitals and rotations.

3. I must complete didactic attendance logging, CKSA completion, and procedure logging by 2/21/19 and require no more than 1 reminder from advisor or program administrative staff in the future.

4. I understand that in order to ascertain adherence to this action plan, residency staff will provide Dr. Hill with a status report of my Allscripts inbox, charts, outstanding documents/refills/labs, timely arrival to rotation duties, as well as rotation performance on 2/6/19 and 2/21/19.

5. You are expected to arrive to your family medicine clinic at 8am, chart prep the night before clinic, and consistently huddle with your purple team MA. Feedback will be obtained on 2/6/19 and 2/21/19.

6. You will be shadowed in your family medicine clinic by a faculty member in the next 1 mo, with special attention paid to EMR efficiency, time management, & history and physical exam performance.

7. You will receive an evaluation by Washington Physician Health Program, in person, in Seattle, to determine your fitness to practice in residency. You will be released from clinical duties to attend this evaluation and any follow up appts. You are scheduled Wednesday, January 30 at 10 AM in Seattle for a WPHP intake. It will likely take several hours. The program will contact you in the next few days to confirm that appointment, and under no circumstances should you miss that appointment.

8. You have failed your first FMS rotation in Nov 2018 and will be required to make up this rotation prior to graduating from CWFM. This will extend your training by 1 block (unless you choose to use your elective time to re-do this rotation).

9. You will inform your preceptors that you must have them see all of your patients during your family medicine clinic, as well as precept all patients at the time of the visit. You

need to articulate workup for presenting problem (chart prep), give 3 differential diagnoses for new or acute problems, and state guideline and source used to formulate a treatment plan. Confirm plan with attending- ie. Repeat back plan to attending to confirm both parties are on the same page. If unclear, ask questions.

10. You will seek help with the stress of residency by contacting the EAP program for counseling appts, which are free within the next 2 weeks. You will be excused from clinical duties in order to attend these appointments, with prior arrangements through the residency coordinator Leticia Fernandez and scheduler Cindi Grunewald.

11. You will receive additional trainings on Cerner EMR at VMM & Astria prior to your next FMS rotation, to improve your efficiency. You will be released from clinical duties to do this training.

12. You will receive shadowing and mentorship on your next FMS rotation on 2/4, 2/7 and 2/8 in the morning, in order to improve your efficiency, workflows, etc.

13. On FMS, you are expected to review plans for care with attending prior to rounds, review at least 1 evidence based article related to your patient's condition with attending once daily, and review evidence for treatment of each patient's primary condition and include in verbal presentations. Provide attending with your personal study plan for the next day and ask the attending for feedback.

14. I understand that failure to uphold the action plan will be grounds for being escalated to probation. I understand probation becomes a permanent and reportable part of my academic record and may interfere with my ability to obtain future employment. Probation may proceed to termination.

15. I understand that if I meet the requirements of this citation and maintain consistent performance that I may be removed from citation within 6 months.

Resident Acknowledgement: I have received this citation.    Date: 1/24/19

Resident Signature: _____
Advisory and Residency Site Director Signature: Cecilee D Hill MD
Faculty Witness: _____
Program Director: M. Powers MD

# Exhibit B

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

DEMETRIOS VORGIAS,                     )
                                       )
            Plaintiff,                 )
                                       )   NO. 1:21-CV-03013-SAB
       v.                              )
                                       )
COMMUNITY HEALTH OF CENTRAL            )
WASHINGTON,                            )
                                       )
            Defendant.                 )


    VIDEOTAPED VIDEOCONFERENCE DEPOSITION UPON ORAL

       EXAMINATION OF MICHAHLYN POWERS, M.D.



                 November 4, 2021
                    9:04 a.m.
                 Via Videoconference




          TAKEN AT THE INSTANCE OF THE PLAINTIFF




REPORTED REMOTELY BY:
DANI WHITE, CCR NO. 3352

Vorgias vs Community Health of Central Washington

Michahlyn Powers, M.D. 11/04/2021

Page 41

1      A. I referred him to the WPHP, and we knew that he
2   was being evaluated.  I think we were let known
3   officially by email that he had no impairment that would
4   prevent him from practicing medicine.  So he was
5   enrolled in some kind of monitoring program, but, of
6   course, no information was shared with us or what
7   reason.  It said "monitoring" -- not treatment, not
8   therapy -- but monitoring for some unnamed medical --
9   underlying medical condition.'
10      Q. So you were -- and was this before he was
11   terminated that you received this information?
12      A. Correct.  Yes, just before.  And that allowed
13   the program to know that there was no underlying
14   impairment that should be affecting his performance;
15   and, therefore, his medical knowledge which had been
16   problematic all along and was not improving, that we
17   could follow that to its natural conclusion.
18      Q. Okay.  Well, let me -- I'm going to follow --
19   I'm going to continue to follow up on this.  At this
20   point, though, I'm going to need about a five-minute
21   break, if that works for you, Dr. Powers and Catharine?
22   Five minutes?
23      A. Great.
24      MS. MORISSET:  Fine with me.
25      MR. PICKETT:  Five minutes.  Thank you.  We'll

00105650-b3db-4ca8-b5d8-5fb1d36cd98d

Vorgias vs Community Health of Central Washington

Michahlyn Powers, M.D. 11/04/2021

```
 1          MS. MORRISET:  Hold on.  Object to form.  Go
 2    ahead.
 3          A. That information is largely confidential, so the
 4    reports that we receive from WPHP are -- are very, I
 5    would say, short.  But, yes, we always review them.  We
 6    would never refer without reviewing their -- their
 7    conclusions.
 8          Q. (By Mr. Pickett)  Okay.  And I know when I
 9    talked to Dr. Isaacs at his deposition, I asked him
10    about referrals to the WPHP.  And, specifically, I asked
11    him, If you receive a recommendation from WPHP, do you
12    typically follow the recommendation or do you ignore it?
13    And he indicated to me that, We follow it, otherwise we
14    wouldn't ask for it in the first place.  You're smiling.
15    Does that sound like Dr. Isaacs?
16          A. Yes.
17          MS. MORRISET:  Object as to form.
18          A. Yes, I agree.  They are -- they are
19    professionals, and they work only with physicians.  And
20    we really -- we do trust their -- their evaluations, and
21    we follow their recommendations if it's reasonable
22    within the resources of the program to do that.
23          Q. (By Mr. Pickett)  Did the WPHP provide you with
24    a recommendation for Dr. -- regarding Dr. Vorgias after
25    he went to see them?
```

Central Court Reporting   800.442.3376

Vorgias vs Community Health of Central Washington

Michahlyn Powers, M.D. 11/04/2021

Page 45

1       A. No.

2       Q. Have you ever received any report with regards

3   to Dr. Vorgias and a neuropsych eval that he had?

4       A. No.  I never received or saw the results of the

5   neuropsych eval.

6       Q. Do you know if there was a neuropsych eval?

7       A. I was informed by the WPHP that he received a

8   neuropsych eval, but those reports were not forwarded to

9   me.  And if that had happened, it would have been after

10  his termination for academic reasons.

11      Q. And were you -- did you ever -- were you ever

12  informed by WPHP that they were going to send

13  recommendations for accommodations for Dr. Vorgias?

14      A. No.

15      Q. Do you know who you spoke with at WPHP?

16      A. Yes.  Cynthia Morales.

17      Q. Did you speak with anyone else?

18      A. No.

19      Q. If -- if Ms. Morales had indicated to you -- and

20  this is a hypothetical -- that there had been a

21  diagnosis of Dr. Vorgias and that accommo --

22  recommendations for accommodations would be forthcoming,

23  would you have reviewed anything like that if it -- if

24  it were, in fact, sent to you?

25          MS. MORISSET:  Object as to form.

Central Court Reporting  800.442.3376

00105650-b3db-4ca8-b5d8-5fb1d36cd98d

Vorgias vs Community Health of Central Washington                    Michahlyn Powers, M.D. 11/04/2021

Page 52

1   you sought the expertise of the WPHP -- is because you

2   were trying to determine, in part, if there was some

3   underlying condition, like generalized anxiety disorder

4   and/or ADHD, that was causing him to struggle in the

5   program; is that fair?

6          MS. MORISSET:   Object as to form.

7          A. We were wondering if there was an underlying

8   condition.  We did not have any ideas as to what that

9   might be.  We were -- we were open to hearing about

10  anything that might have come up in that evaluation,

11  including was there a substance use disorder?  Was there

12  extra stress occurring in his life?  Did he need

13  counseling?  Did he have a mental health or a more

14  medical condition?  But we were told he had no

15  impairments.

16         Q. (By Mr. Pickett)  And you -- you were wondering

17  if there were any mental health impairments or any

18  underlying conditions, in part, because you're trying to

19  do everything you can to help, in this case, Dr. Vorgias

20  succeed in the program, true?

21         A. Yes.  That's part of that giving grace.  Like,

22  let's find out why.  And when we are told there are no

23  impairments, we have no choice but to say his medical

24  knowledge is not adequate.  Maybe that is because he had

25  several years off before starting residency.  Maybe that

Central Court Reporting   800.442.3376

00105650-b3db-4ca8-b5d8-5fb1d36cd98d

Vorgias vs Community Health of Central Washington

Michahlyn Powers, M.D. 11/04/2021

Page 53

1   is because his medical school prepared him poorly.  We

2   don't know, but we can't continue to spend the time and

3   the resources of the program on trying to get him to

4   learn information that he is not able to learn.

5       Q. And -- and part of that extending the grace that

6   you spoke about, in part, I take it, includes if you

7   receive recommendations for a resident and/or

8   specifically for Dr. Vorgias to receive accommodations

9   to assist him to succeed, part of your extension of

10   grace includes waiting to get those recommendations and

11   evaluating them to see if they can actually be put into

12   place, true?

13       MS. MORISSET:  Object as to form.

14       A. Yes.  If we would have been given accommodation

15   or recommendations, we would have reviewed them and seen

16   if they could have been reasonably performed within the

17   program.

18       Q. (By Mr. Pickett)  Okay.  I'm going to try to see

19   if I can go to some records now.  Bear with me while I

20   try to share some things.

21       A. Are you going to share your screen or within --

22       Q. I will, yeah.  Okay.  Can you see what I've put

23   up here?

24       A. Yes.

25       Q. All right.  And it says, "WPHP Letter with

00105650-b3db-4ca8-b5d8-5fb1d36cd98d

Vorgias vs Community Health of Central Washington

Michahlyn Powers, M.D. 11/04/2021

Page 58

1   clean record here, okay?

2        A. And no accommodations were sent between April 19

3   and May 2, 2019, when -- when Demetrios was terminated.

4        Q. Right.  And I understand your previous testimony

5   to be that you never, ever received requests for

6   accommodation for Demetrios, true?

7        A. Correct.

8        Q. Okay.  And we've covered that, and I want to go

9   slowly through this, though.  You dispute -- you are --

10  you absolutely dispute that you were informed that

11  recommendations for accommodations for Demetrios would

12  be communicated to you at a later date, true?

13       A. True.

14       Q. Let me ask.  It also says that "we" -- I'm

15  assuming that's WPHP -- "were recommending that you

16  enroll in a monitoring agreement for an underlying

17  medical condition..."

18       Were you informed by Ms. Morales on April 19,

19  2019, that there was a recommendation for an enrollment

20  into a monitoring agreement for an underlying medical

21  condition?

22       A. Yes.

23       Q. Okay.

24       A. And not what that condition was, because that

25  was considered confidential information.  But we were

00105650-b3db-4ca8-b5d8-5fb1d36cd98d

Page 68

1    Q. (By Mr. Pickett)  She would not --

2    A. So that sort of information is -- would have

3  been written and well-documented from the WPHP.  She

4  would not have been at liberty to share his -- his

5  private information with me.

6    Q. Okay.  You were -- the paragraph above here, it

7  says -- it indicates -- and I'm looking back at the

8  documents, it says, Dr. Kelly Cornett administered

9  neuropsychological testing to you" -- this is to

10  Dr. Vorgias -- "on April 3.  We were notified of the

11  findings and recommendations subsequent to the

12  evaluation on April 18, 2019, during a telephone call

13  with Dr. Cornett."

14    First question is did you know that Dr. Vorgias

15  had been -- when you had sent him to WPHP that he was

16  going to have a neuropsych?

17    A. They had made that recommendation.  I was not

18  aware that it had -- the date of the evaluation.  WPHP

19  informed us that it had been completed, though.

20    Q. When did they inform you and who?

21    A. Cynthia Morales let me know that a

22  neuropsychological test had been performed, but those

23  results were not sent to us at that time.  And I never

24  received them.

25    Q. When did she do that?  When did she inform you

00105650-b3db-4ca8-b5d8-5fb1d36cd98d

Vorgias vs Community Health of Central Washington                    Michahlyn Powers, M.D. 11/04/2021

Page 69

1    that a neuropsychological evaluation had been conducted

2    with Dr. Vorgias?

3         A. I believe on April 19, in that email.

4         Q. Okay.  And did she also tell you during that

5    conversation and/or email that that neuropsychological

6    evaluation was part of their evaluation of these -- of

7    what she referred to as "underlying medical conditions"?

8         MS. MORISSET:  Object as to form.

9         A. No.

10        Q. (By Mr. Pickett)  Okay.  Did you ask at all, at

11   all in any way, shape, or form, when you talked to

12   Ms. Morales if that -- if there was any way that these

13   underlying medical conditions were affecting Demetrios's

14   performance in the residency program?

15        A. I asked her if there were any conditions that we

16   should be aware of that were impairing his performance.

17   And she said, No, he is able to work.  There are no

18   impairments.

19        Q. Did you ask specifically whether the underlying

20   medical conditions that she told you about were

21   impairing his performance in any way?

22        MS. MORISSET:  Object as to form.

23        A. No, I did not ask her that specifically.

24        Q. (By Mr. Pickett)  Why not?

25        A. If I had --

Central Court Reporting  800.442.3376

Vorgias vs Community Health of Central Washington

Michahlyn Powers, M.D. 11/04/2021

Page 70

1    MS. MORISSET:  Object -- hold on.  Object as to

2  form.

3    A. If I had asked her that specifically, she would

4  not have answered that over the phone.  She would have

5  put that in writing, and we would have received that in

6  an official capacity.  She answered the questions that I

7  asked her.

8    Q. (By Mr. Pickett)  All right.  But with regard to

9  the underlying medical conditions and whether they were

10  impacting Dr. Vorgias's performance in the residency

11  program, you simply did not ask Ms. Morales that

12  question, true?

13    MS. MORISSET:  Object as to form.

14    A. No, I did not ask her that question.

15    Q. (By Mr. Pickett)  Okay.  Is it fair to say that

16  if there was an underlying medical condition affecting

17  Dr. Vorgias's performance in the program, you as the

18  director would have wanted to know that; is that fair?

19    A. That is the reason why he was sent to WPHP, yes.

20  And she -- she assured me that there were no

21  impairments.  So her -- she answered my question.

22    Q. And when she spoke about impairments, she was

23  specifically, if you know, referring to his ability to

24  practice safely, true?

25    MS. MORISSET:  Object as to form.

Central Court Reporting   800.442.3376

Vorgias vs Community Health of Central Washington

Michahlyn Powers, M.D. 11/04/2021

```
 1          MS. MORISSET:  Object as to form.
 2      Q. (By Mr. Pickett)  Go ahead.
 3      A. I'm going to say yes, we were aware he had an
 4  underlying medical condition for which he was being
 5  enrolled in a monitoring program with WPHP.
 6      Q. And for our purposes here today, you were aware
 7  of that underlying medical condition well before he --
 8  you chose to terminate him from the program, true?
 9          MS. MORISSET:  Object as to form.
10      A. Yes.  We were informed ten days prior to his
11  termination.
12      Q. (By Mr. Pickett)  And being informed -- having
13  been informed ten days before his termination, what
14  steps did you take as the program director, if any, to
15  consult with Dr. Vorgias about that?
16      A. None.
17      Q. What steps did human resources do or take prior
18  to Dr. -- Dr. Vorgias's termination from the program to
19  consult with him regarding his underlying medical
20  conditions?
21          MS. MORISSET:  Object as to form.
22      A. No outreach to Dr. Vorgias was deemed necessary
23  by the program or the HR department, and he did not come
24  forward to discuss or reveal any of his health
25  information to us.  And he had several opportunities to
```

Page 89

1  do so, including at his meeting with his advisor and at

2  his final termination meeting.

3        Q. (By Mr. Pickett)  Okay.  And so it's -- is it

4  your position, Dr. Powers, that if Dr. Vorgias -- it's

5  his responsibility to come forward and tell you that he

6  has an underlying medical condition and what it is

7  before the program will take any action to accommodate?

8  Is that your position?

9        MS. MORISSET:  Object as to form.

10       A. As an adult, yes.  And if WPHP had informed us

11 of a specific condition that was impairing his

12 performance, then we would have acted on that, but we

13 were not told by either WPHP or Demetrios himself.

14       Q. (By Mr. Pickett)  Right.  I understand you

15 weren't told -- you -- the converse to that, Dr. Powers,

16 is you specifically didn't ask if the underlying medical

17 conditions were impairing Dr. Vorgias's performance in

18 the program, true?

19       MS. MORISSET:  Object as to form.

20       A. Correct.

21       Q. (By Mr. Pickett)  And, in fact, no -- it's your

22 testimony, I believe, that no one in the program,

23 whether it be HR, human resources, Laura McClintock, I

24 believe is her name, or anyone else ever tried to get to

25 the bottom of whether these underlying medical

00105650-b3db-4ca8-b5d8-5fb1d36cd98d

Vorgias vs Community Health of Central Washington                Michahlyn Powers, M.D. 11/04/2021

Page 90

1    conditions were, in fact, impairing Dr. Vorgias's

2    ability to succeed and perform in the program, true?

3            MS. MORISSET:  Object as to form.

4        A. Correct.  Because that's not the role of the

5    residency program.

6        Q. (By Mr. Pickett)  Okay.  But you would agree

7    that it is the role of the residency program -- if you

8    have information of an underlying medical condition that

9    could be impacting a resident's ability to successfully

10   perform, you would agree that is the role of the program

11   to actually try and assist the residency, to accommodate

12   him, true?

13           MS. MORISSET:  Object as to form.

14       A. Yes, if possible.

15       Q. (By Mr. Pickett)  Okay.

16       A. Our goal is to keep residents in residency.  Our

17   goal is not to terminate.  It's an incredible waste of

18   finances and time to terminate a resident, and we never

19   do that without a great deal of thought and due process.

20       Q. Right.  And it's an incredible waste of

21   resources and time.  That was what you testified to.

22   That's your -- that is, at least in part, your thinking

23   in having to terminate a resident.  It's an incredible

24   waste of resources and time for the program, true?

25           MS. MORISSET:  Object as to form.

00105650-b3db-4ca8-b5d8-5fb1d36cd98d

Vorgias vs Community Health of Central Washington

Michahlyn Powers, M.D. 11/04/2021

Page 108

1      Q. And is this the -- I talked a little bit about
2    this with Dr. Isaacs, and I think he -- he referred to
3    it -- and if I'm wrong, I apologize -- but I think he
4    referred to it as "Demetrios's last evaluation"; is that
5    accurate?
6      A. It's a summary of his prior evaluations.  It's
7    not an evaluation, because we're not giving it to him
8    with the hope that he's going to improve at this point.
9    It's a summary of his training in a couple page sheet so
10   that future programs, who might agree to have him join,
11   will have that from us.
12     Q. Let me ask you just as an aside, do you still
13   have that light on?  It was helpful.
14     A. It is still on.
15     Q. Okay.
16     A. Yeah.
17     Q. You just -- it seemed like it's dark again, so
18   that's why I was asking.
19     A. Yeah, it does.
20     Q. Okay.  All right.
21     A. I'll see if I can move that a little bit.  Oh,
22   there we go.  That did it.
23     Q. Much better.  Thank you.
24       I'm going to scroll down to the end, and then
25   I'll come back on this.  But at the very end, is that

Central Court Reporting   800.442.3376

Page 109

1    your signature?

2        A. Yes.

3        Q. It was signed June 6, 2019, correct?

4        A. Correct.

5        Q. And I know, at least by June 6, 2019, from your

6    prior testimony, you were all -- already out of the role

7    of program director, true?

8        A. Yes.  And I signed that document as the

9    residency program director at the time of Demetrios's, I

10   guess, training.  So it was appropriate for me to sign

11   that as a summary.  It would not have been appropriate

12   for Dr. Isaacs to complete that or sign that because he

13   really had no -- very little knowledge of what had

14   happened prior.

15       Q. Right.  Understood.  And just so I'm clear, even

16   though you're signing it on June 6, 2019, as the

17   residency program director, as of that date, you were no

18   longer the program director, true?

19       A. Correct.

20       Q. Okay.  And sort of you're signing it in that

21   capacity -- in that capacity even though Dr. Isaacs had

22   already assumed that position, that role, true?

23       A. Yep.

24       Q. Okay.  And I -- and I -- he had no -- I'm going

25   to guess, he had no concerns with you signing as the

Page 110

1  director even though he was in that role, in part,

2  because he did not participate in the decision to

3  terminate Dr. Vorgias, true?

4      A. Yes.

5      Q. All right.  One of things -- and I'm going to

6  scroll back up here.  It talks about -- you've got

7  little -- these are check-the-box comments.  And it

8  talks about -- starts with patient care.  See where I'm

9  at there?

10     A. Yes.

11     Q. And if we go down, it talks about clinical

12 competence overall, you rated him as fair?

13     A. Yes.

14     Q. True?  Okay.  And then I'm going to talk -- when

15 it comes to -- this is in the patient care section --

16 preventative medicine, you rated Dr. Vorgias as fair?

17     A. Where is that?  Oh, it's the second line.

18     Q. Yeah.

19     A. Yes.  I rated him fair for most of his patient

20 care.

21     Q. And you also rated -- for inpatient competence,

22 you rated him as fair?

23     A. Uh-huh.

24     Q. Yes?

25     A. Yes.

00105650-b3db-4ca8-b5d8-5fb1d36cd98d

Vorgias vs Community Health of Central Washington

Michahlyn Powers, M.D. 11/04/2021

Page 111

1    Q. And for his outpatient competence, you rated him

2  as fair?

3    A. Yes.

4    Q. For you said procedural competence, you said,

5  "Not observed, unknown."  That was the rating you gave

6  him?

7    A. Yes.

8    Q. And then with regard to quality of medical

9  records, you rated him as good?

10    A. Yes.

11    Q. On his medical knowledge, you had a category of

12  general medical knowledge, and you rated Dr. Vorgias at

13  the time of his -- or in summarizing his performance,

14  you rated it as fair?

15    A. Yes.

16    Q. With regard to clinical knowledge -- and this is

17  in parentheses -- outpatient, you also rated him in that

18  category as being fair?

19    A. Yes.

20    Q. Clinical knowledge, parenthesis, inpatient, you

21  also rated him as being fair?

22    A. Yes.

23    Q. And then clinical knowledge in -- with

24  parenthesis, obstetrics, you also rated him as fair?

25    A. Yes.

00105650-b3db-4ca8-b5d8-5fb1d36cd98d

Vorgias vs Community Health of Central Washington

Michahlyn Powers, M.D. 11/04/2021

Page 112

1    Q. With regard to systems-based practices and the
2    subheading, it says, "Ability to work with
3    interdisciplinary team," you rated him as fair?
4    A. Yes.
5    Q. With regard to awareness of larger context and
6    system -- and the system of health care, you rated him
7    as fair there as well?
8    A. Yes.
9    Q. With regard to ability to effectively call on
10   resources to provide care, you rated him as fair?
11   A. Yes.
12   Q. And then on practice-based learning and
13   improvement, it says -- the question was, "Initiates
14   self-directed learning," you rated him as fair?
15   A. Yes.
16   Q. On the ability to improve the system/the
17   practice you rated him as fair?
18   A. Yes.
19   Q. With regard to the professionalism category,
20   professional judgment and attitude, you rated him under
21   the -- as a -- the standard was good?
22   A. Yes.
23   Q. Punctuality and attendance, you rated as
24   excellent?
25   A. Yes.

00105650-b3db-4ca8-b5d8-5fb1d36cd98d

Page 113

1       Q. Timeliness completion of medical records

2   administrative duties you rated him as good?

3       A. Yes.

4       Q. With regard to ethics and a sense of

5   responsibility and honesty, you also rated Dr. Vorgias

6   as good?

7       A. Uh-huh.

8       Q. Yes?

9       A. Yes.

10      Q. In terms of interpersonal communication skills,

11  the category that's labeled "General Ability to

12  Understand/Speak/Write Fluently in English," you rated

13  that as excellent?

14      A. Yes.

15      Q. With regard to interaction with clinical team

16  members, you rated that in the category of good?

17      A. Yes.

18      Q. In osteopathic principles, there was -- it

19  starts with "patient care," you did not give any rating

20  because he's not in -- he's not an osteopath; is that

21  fair?

22      A. Yes.

23      Q. And is that with regard to all of the

24  osteopathic principles because he's an M.D., not a D.O.?

25      A. Yes.

Vorgias vs Community Health of Central Washington

Michahlyn Powers, M.D. 11/04/2021

Page 146

1    email informing you -- confirming that he had

2    generalized anxiety disorder as it had been relayed to

3    him during his WPHP evaluation, and you said to him, "I

4    appreciate your struggle and your thoughtful request.

5    Thank you for sharing your progress with me."  Did I

6    read that correctly?

7        A. Yes, you did.

8        Q. Okay.  And that's -- you sent that to Demetrios

9    on May 8 of 2019?

10       A. Yes.  I believe these two emails are probably

11   the only communication he and I had personally about

12   this issue other than Demetrios sending me different

13   assignments that he had for clinical questions that he

14   had to answer.

15       Q. And as of May 8, you agreed to let him retake

16   the EKG exam, true?

17       A. Yes, I did.

18       Q. And you arranged for that to happen early the

19   next week?

20       A. I did.

21       Q. And, although, is it -- it's your position, I

22   take it, that he was terminated when you arranged for

23   him to take the E -- to retake the EKG exam?

24       A. Yes.  He was -- he was asking for that chance to

25   retake that.  I think he wanted to just increase the

00105650-b3db-4ca8-b5d8-5fb1d36cd98d

Vorgias vs Community Health of Central Washington

Michahlyn Powers, M.D. 11/04/2021

Page 178

1      Q. Okay.

2      A. So this email went to Dr. Rue, myself, and

3   Leticia Fernandez, who was, like, an administrative

4   director of the residency at that time.  And Dom Nguyen

5   was a third-year resident at that time.  Okay.  Go ahead

6   and scroll down.

7      Q. Oh.  It looks like this first entry is Dom's

8   feedback after shadowing Dr. Vorgias for a week, right?

9      A. Yeah.  So three half days of the extra

10  supervision, and so he detailed his observations.

11     Q. Then...

12     A. Then Dr. Miller -- so this is a faculty member

13  giving his feedback about Demetrios's performance on his

14  first week back on the FMS rotation.  Okay.

15     Q. And that's family medical services you said?

16     A. Correct.  This must have been his second

17  rotation.  And then from Dr. Hill about feedback.

18  Dr. Rue with more feedback.  Okay.

19     Q. Okay.  So you would agree this one from Dr. Rue

20  was part of this whole --

21     A. Yeah.

22     Q. -- set of --

23     A. And it looks like the timing here is he -- he'd

24  been referred to WPHP already, and then he got his

25  neuropsych evaluation later.  May.  No.

Central Court Reporting  800.442.3376

Page 188

1    recommendations for accommodations that would later be

2    communicated to Dr. Powers.  And I understand you

3    dispute that ever being said to you, that under -- that

4    recommended accommodations would be relayed to you.  I

5    got that right, true?  Correct?

6              MS. MORISSET:  Object as to form.

7         A.  I do dispute that --

8         Q.  (By Mr. Pickett)  Okay.

9         A.  -- because that is not what happened.  In the

10   letter --

11        Q.  Okay.

12        A.  -- there are no medical conditions listed, and

13   there are no recommendations for accommodations that

14   were --

15        Q.  Okay.

16        A.  -- ever sent to the program.

17        Q.  And I understand that's your position.  I do.  I

18   get it.  My question, though, was with regard -- and I

19   asked about the recommendations -- with regard to the

20   enrolling in the monitoring agreement for an underlying

21   medical condition, my question was really more detailed.

22   Did anybody on the CARED Committee ever express a desire

23   or a request to understand what the underlying medical

24   conditions were?

25              MS. MORISSET:  Object as to form.

00105650-b3db-4ca8-b5d8-5fb1d36cd98d

Vorgias vs Community Health of Central Washington

Michahlyn Powers, M.D. 11/04/2021

**Page 194**

1                          C E R T I F I C A T E

2     STATE OF WASHINGTON )
                          )
3     COUNTY OF YAKIMA    )

4

5          This is to certify that I, Dani White, Certified

6     Court Reporter in and for the State of Washington,

7     residing in Yakima, reported the within and foregoing

8     deposition; said deposition being taken before me on the

9     date herein set forth; that pursuant to RCW 5.28.010 the

10    witness was first by me duly sworn; that said

11    examination was taken by me in shorthand and thereafter

12    under my supervision transcribed; and that same is a

13    full, true, and correct record of the testimony of said

14    witness, including all questions, answers, and

15    objections, if any, of counsel.

16         I further certify that I am not a relative or

17    employee or attorney or counsel of any of the parties,

18    nor am I financially interested in the outcome of the

19    cause.

20         IN WITNESS WHEREOF I have set my hand this 17th

21    day of November, 2021.

22

23                         DANI WHITE
                           CCR NO. 3352
24

25

Central Court Reporting   800.442.3376

00105650-b3db-4ca8-b5d8-5fb1d36cd98d

**Central Washington Family Medicine Residency Program**  a Service of Community Health of Central Washington

## CENTRAL WASHINGTON FAMILY MEDICINE RESIDENCY
## VERIFICATION OF GRADUATE MEDICAL EDUCATION & TRAINING

**Section I: Verification of training and performance during training**

Trainee's Name:  Demetrios Vorgias

Trainee's NPI:  1356833750

Trainee's DOB:  03/07/1975

Dates of training: PGY 1: Date From 06/25/2018 To: 05/01/2019

PGY 2: Date From None To: None

PGY 3: Date From None To: None

Training Program Accreditation:  ✔ ACGME W/Osteopathic Recognition

Did the above-named trainee successfully complete the training program?

☐ Yes   ✔ No

If NO, please provide an explanation here: Dr. Vorgias successfully completed 4 weeks each of orientation, surgery, obstetrics, ambulatory pediatrics, musculoskeletal medicine, emergency medicine, Elective: EKG and behavioral medicine.

| | Excellent | Good | Fair | Poor | Not Observed/Unknown |
|---|---|---|---|---|---|
| **Patient Care** | | | | | |
| Overall clinical competence | | | X | | |
| Preventative medicine | | | X | | |
| Inpatient competence | | | X | | |
| Outpatient competence | | | X | | |
| Procedural competence | | | | | X |
| Quality of medical records | | X | | | |
| **Medical Knowledge** | | | | | |
| General medical knowledge | | | X | | |
| Clinical knowledge (outpatient) | | | X | | |
| Clinical knowledge (inpatient) | | | X | | |
| Clinical knowledge (obstetrics) | | | X | | |
| **Systems Based Practice** | | | | | |
| Ability to Work with interdisciplinary Team | | | X | | |
| Awareness of the larger context and system of healthcare | | | X | | |
| Ability to effectively call on resources to provide care | | | X | | |
| **Practice Based Learning and Improvement** | | | | | |
| Initiates self-directed learning | | | X | | |
| Ability to improve the system/practice | | | X | | |

P:\Program Admin\Evaluation-Advisor Forms

Created: 04-2019 HJM

**EXHIBIT    4**
Witness: M. Powers, M.D.
Date: 11-4-21
Stenographer: DW

VORGIAS 000124

Ex. 4

| | Excellent | Good | Fair | Poor | Not Observed/Unknown |
|---|---|---|---|---|---|
| **Professionalism** | | | | | |
| **Professional judgment and attitude** | | X | | | |
| Punctuality and attendance | X | | | | |
| Timeliness completion of medical records/administrative duties | | X | | | |
| Ethics, sense of responsibility and honesty | | X | | | |
| **Interpersonal Communication Skills** | | | | | |
| General ability to understand/speak/write fluently in English | X | | | | |
| Interaction with clinical team members | | X | | | |
| **Osteopathic Principles** | | | | | |
| Patient Care | | | | | |
| Examination, Diagnosis, & Treatment | | | | | |
| Medical Knowledge | | | | | |
| Practice Based Learning & Improvement | | | | | |
| Interpersonal & Communication Skills | | | | | |
| Systems Based Practice | | | | | |
| Professionalism | | | | | |

| Was the trainee subject to any of the following during training? | Yes | No |
|---|---|---|
| Conditions or restrictions beyond those generally associated with the training regimen at your facility? | X | |
| Leave of absence | | X |
| Corrective or disciplinary action | X | |
|     Non-promotion/non-renewal | | |
|     Extension of training year (s) | | |
|     Probationary Action | X | |
|     Dismissal | X | |
| Investigated by a Government/Legal | | X |
| Malpractice Suits | | X |
| Disciplinary action for attending patients while apparently under the influence of drugs, alcohol or controlled substances | | X |
| Medical problems or mental disorders that affected the capacity to practice medicine | | X |
| Ever attempt procedures beyond his/her competence or granted privileges | | X |

Please provide explanation to any "yes" answer above : Dr. Vorgias came under scrutiny due to medical knowledge and professionalism concerns during Jan. 2019 of his R1 year, was placed on constructive citation, which was advanced to probation and subsequently, dismissal. He made improvements in his professionalism and administrative task completion. Number of patients per half day in clinic was initially

VORGIAS 000125

restricted in January 2019 due to difficulty with medical knowledge, efficiency, and time management. He progressed to the normal number of patients per half day of clinic after a short period of restriction. He was required to pre-precept before seeing clinic patients as well as have the attending physician repeat the history and exam for each patient he saw in clinic. This lasted from January 2019 to his dismissal in May 2019 for medical knowledge deficits despite attempts at remediation.

## Section II: Recommendation

Upon completion of the training program, the individual was deemed to have demonstrated sufficient competence in the specialty/subspecialty to enter autonomous practice. ☐ Yes  ✓No ☐ N/A

This individual demonstrated sufficient competence to apply osteopathic principles to patient care, upon entry to practice, without direct supervision.                              ☐ Yes   ☐ No ✓ N/A

This trainee is:
☐ Recommended highly without reservation
☐ Recommended as qualified and competent
✓ Recommended with limitations described as direct supervision needed in the outpatient and inpatient setting. Would benefit from repeating the R1 year in family medicine.
☐ Not recommended for the following reason(s): Click here to enter text.

Did the program endorse this trainee as meeting the qualifications necessary for respective board certification in family medicine?   ☐ Yes   X No ☐ N/A
If NO or N/A, indicate the reason(s): Demetrios was dismissed before he was eligible to sit for ABFM Board exam.

## Section III: Additional Comments

Please utilize this comment area to provide additional information regarding this trainee's performance, notable strengths or weaknesses:
Dr. Vorgias is enthusiastic, caring, and team oriented. He consistently was checking in with his co-residents and nurses in clinic on how they were doing and if he could help with any tasks. He was motivated to be a productive and helpful member of the medical team. He is dedicated to medicine driven to improve his medical knowledge. He loves patient care, and the relationships he can build with his patients. He gets significant joy from his work with the pediatrics population- watching kids grow and develop new skills and teaching them that the doctor's office is not a place to fear. He was noted to have given two very well received presentations. One was to his colleagues on a pediatrics topic which he worked diligently on preparing, and another was on a Pain class topic to the patients enrolled in the class. His preceptor for the pain class noted that it was one of the better presentations that had been given in pain class despite Dr. Vorgias being very nervous prior to the presentation. Dr. Vorgias does like to teach, which was reflected in his topic presentations, but due to some struggles with performance anxiety he would lose sleep due to his desire to impress classmates and attendings. Dr. Vorgias is very motivated to succeed in medicine, but he did struggle on hospital inpatient rotations, both medicine and obstetrics. He required more supervision and direction than what was expected for an intern and needed repeated review of medicine topics and patient care tasks each rotation and between rotations, which led to concern about his synthesis of medical knowledge. He is highly critical of himself, and this significantly impaired his ability to absorb and respond to feedback, make corrections, and continue to show progress. Frequently, we would discuss how he had the basic idea for a topic but got sidetracked on either his self-criticism or concern about improving that it impeded his growth. He is now addressing these concerns personally so that moving forward he can be successful in his career.

**Section IV: Attestation**

The information provided on this form is based on review of available training records, evaluations and direct information provided by supervising faculty.

_M. powers MD._          6/6/19
Residency Program Director          Date

Micahlyn Powers, MD
Phone: 509-452-4946
Fax: 509-457-3989
Email: cwfmr@chcw.org

VORGIAS 000127

# WPHP Letter with Summary of Medical Testing Events

**EXHIBIT   11**
Witness: M. Powers, M.D.
Date: 11-4-21
Stenographer: DW

**EXHIBIT 11**



WASHINGTON PHYSICIANS HEALTH PROGRAM

December 11, 2019

Demetrios Vorgias, MD
1126 Radis Place
Jacksonville, FL 32225

PERSONAL & CONFIDENTIAL

Dear Dr. Vorgias:

This letter is in follow up to your request for a chronology of services provided to you since your referral to Washington Physicians Health Program (WPHP), initiated on January 23, 2019 by Dr. Micahlyn Powers, MD, former interim residency training director at Central Washington Family Medicine Residency Program.

We met with you for an initial assessment on January 30, 2019. Cynthia Morales, your clinical coordinator, contacted Dr. Powers on this date to confirm your attendance at the scheduled appointment. Ms. Morales also stated that the WPHP team recommended that you could be returned to practice while we completed the evaluation, due to no observed current impairment.

We subsequently met with you for a follow up appointment on March 1, 2019, to review and discuss our recommendation for additional evaluation from an outpatient provider. During this appointment, we specifically recommended completion of a neuropsychological evaluation.

Dr. Kelly Cornett, PsyD, administered neuropsychological testing to you on April 3, 2019. We were notified of the findings and recommendations subsequent to the evaluation on April 18, 2019, during a telephone call with Dr. Cornett.

On April 19, 2019, Cynthia Morales received an email correspondence from Dr. Micahlyn Powers. In this email, Dr. Powers requested an update regarding your evaluation with WPHP. Ms. Morales responded via email by informing her that your evaluation with WPHP was complete, we were recommending that you enroll in a monitoring agreement for an underlying medical condition, and there were recommendations for accommodations that would later be communicated to Dr. Powers.

On May 2, 2019, you spoke with Ms. Morales via telephone and notified her of your termination from your residency program, which was effective May 1, 2019, per your report during this conversation.

On May 20, 2019, you met with Ms. Morales and Laura Moss, MD, Associate Medical Director, for an in-person appointment. We reviewed and discussed Dr. Cornett's findings and recommendations subsequent to your neurocognitive evaluation. You shared with us your intention to complete your residency training in a new program, and we recommended enrollment in behavioral health monitoring to provide documented advocacy.

On August 9, 2019, you enrolled in a behavioral health monitoring agreement for WPHP monitoring of your underlying mental health conditions and provision of advocacy.

720 Olive Way, Suite 1010
Seattle, WA 98101-1819

Tel: 800.552.7236
206.583.0127

Fax: 206.583.0418
www.wphp.org

**EXHIBIT 11**

Please do not hesitate to contact us directly at any time with your questions or concerns regarding this matter.

If we may be of further assistance, kindly so advise.

Sincerely,

Laura Moss, MD
**Associate Medical Director**

Cynthia Morales, MA, LMHC
**Clinical Coordinator**

LM/AC
1040

**EXHIBIT 11**

**Heidi Martinez**

| | |
|---|---|
| **From:** | Micahlyn Powers |
| **Sent:** | Friday, April 19, 2019 11:55 AM |
| **To:** | Leticia Fernandez; Heidi Martinez |
| **Subject:** | Fwd: D.V. |

Please print for his binder.

Get Outlook for iOS

**From:** Cynthia Morales <cmorales@wphp.org>
**Sent:** Friday, April 19, 2019 11:52 AM
**To:** Micahlyn Powers
**Subject:** RE: D.V.

Hi Dr. Powers,

Thank you for taking my call. To summarize, D.V. has completed the evaluation process recommended by our organization. Based on this evaluation, there was no current identified impairment due to an underlying medical condition.

We are recommending to him enrollment in monitoring with our organization in order to monitor underlying medical conditions. We want to monitor these conditions in order to prevent future impairment. We hope that the recommendations provided to him will impact his performance. We believe it may take some time before these recommendations produce results.

We emphasize to all residency programs and employers that they may continue their own disciplinary processes in tandem with our own processes.

I will send to you a letter confirming completion of our evaluation process and our recommendation for monitoring, per your instructions.

Thank you for collaborating with us. I will be in touch again to discuss in more detail specific aspects of his monitoring with our program.

1



EXHIBIT B
Witness: M. Powers, M.D.
Date: 11-4-21
Stenographer: DW

CHCW 000121

Kindly,

Cynthia Morales, M.A., LMHC

Clinical Coordinator

Washington Physicians Health Program

**From:** Micahlyn Powers <Micahlyn.Powers@chcw.org>

**Sent:** Thursday, April 18, 2019 4:41 PM

**To:** Cynthia Morales <cmorales@wphp.org>

**Subject:** Demetrios Vorgias

Cynthia,

I'd love to have an update on how Dr. Vorgias is doing based on his last evaluation performed a few weeks ago.

The "CARED" Committee ( Committee about residents experiencing difficulty ) met yesterday to discuss his progress, and there are ongoing great concerns, and we suspect he will not pass his current inpatient family medicine rotation. This will lead to his termination from the residency program. Concerns regarding professionalism have improved, but medical knowledge lags far behind his peers and he is in no way able to be promoted to the second year of residency.

Any information on his progress would be welcome before Wednesday, April 24, which is His next formal evaluation.

Micahlyn Powers MD

Interim Program Director Central WA Family Medicine Residency

Yakima, WA

CHCW-Ellensburg Site Director

CHCW 000122

# Exhibit C

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON


DEMETRIOS VORGIAS,                    )
                                      )
          Plaintiff,                  )
                                      )   NO. 1:21-CV-03013-SAB
          v.                          )
                                      )
COMMUNITY HEALTH OF CENTRAL           )
WASHINGTON,                           )
                                      )
          Defendant.                  )


VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION OF

KATINA RUE, D.O.


November 10, 2021
9:05 a.m.
Via Videoconference


TAKEN AT THE INSTANCE OF THE PLAINTIFF


REPORTED REMOTELY BY:
DANI WHITE, CCR NO. 3352

Vorgias vs Community Health of Central Washington                    Katina Rue, D.O. 11/10/2021

Page 22

1      A. True.

2      Q. Okay.  My question was a little different,

3   though, and I'll try to go back to it, if you'd ever

4   noted any mental health concerns with Dr. Vorgias.  And

5   I'm not asking if you diagnosed -- I understand you

6   don't make diagnoses when it comes to residents, but

7   wondering if you ever recall noting any mental health

8   concerns for him.

9      A. I don't recall noting a specific mental health

10  concern.

11     Q. Okay.  Did you ever have any concerns regarding

12  Dr. Vorgias's mental health during the time that you

13  supervised him?

14     A. I don't recall having concerns about

15  Dr. Vorgias's mental health during the time that I

16  supervised him.

17     Q. Do you recall at one point during your service

18  on the CARED Committee specifically with regard to

19  Dr. Vorgias recommending a neuropsych eval?

20     A. I don't recall that specifically in the CARED

21  Committee.

22     Q. Okay.  Do you recall at any other time?

23     A. I do recall that that was a possible option for

24  helping us determine a potential cause of Dr. Vorgias's

25  difficulty and struggle in performing his duties as a

Central Court Reporting   800.442.3376

6ff52665-c660-4125-83b4-76f0910425a0

Vorgias vs Community Health of Central Washington                    Katina Rue, D.O. 11/10/2021

Page 23

1    <mark>resident.</mark>

2         Q. And explain that in terms of how did that come

3    to your attention.

4         A. How did which come to my attention?

5         Q. The possibility of a neuropsych evaluation for

6    Dr. Vorgias.  Thank you.

7             MR. BAILEY:  Objection.  Assumes facts not in

8    evidence.

9         Q. (By Mr. Pickett)  Go ahead.

10        A. Sorry.  I'm still unclear on how -- I don't

11   understand your question.  I'm sorry.

12        Q. Yeah.  How did that come to your attention that

13   there may need to be a neuropsychological evaluation for

14   Dr. Vorgias?

15            MR. BAILEY:  Same objection.

16        A. I -- I think I answered this question.  I think

17   the question is that that is one of the tools that are

18   available for residency programs to assist us with

19   struggling residents.

20        Q. (By Mr. Pickett)  And do you know if Dr.

21   Vorgias -- and I will -- I'll go to CARED Committee

22   notes here in a little bit, would that help your

23   recollection at all to see CARED Committee notes, I'm

24   assuming?

25            MR. BAILEY:  Objection.  Calls for speculation.

6ff52665-c660-4125-83b4-76f0910425a0

Page 46

1  comment on that.

2      Q. It's really -- I know there's objections that

3  get in the middle of my questions but my question was

4  actually different.  I was asking about anxiousness or

5  anxiety that you observed during your supervision of

6  Dr. Vorgias.

7      MR. BAILEY:  Bill, what was your question?

8  Could you just repeat the question?  I'm sorry.

9      Q. (By Mr. Pickett)  Do you understand the

10  question, Doctor?

11      MR. BAILEY:  Bill, I need you to repeat it so I

12  can make an objection, if necessary.  Thank you.  I

13  appreciate that.

14      Q. (By Mr. Pickett)  Doctor, do you understand the

15  question?

16      A. I don't understand the question.

17      Q. Okay.  My question is:  Would you please explain

18  any observations you made during your supervision of

19  Dr. Vorgias regarding anxious behavior and/or anxiety?

20      A. So you're asking me to describe observations of

21  anxious behavior in Dr. Vorgias when I was supervising

22  him, that's the question?

23      Q. Any anxiety or anxious behavior that you

24  observed.

25      A. I observed difficulty in communicating --

Page 47

1   verbally communicating a history and physical exam in a

2   timely manner, in a linear process in the normal SOAP

3   format.  I observed many pauses and sighs in his

4   communication that I did not observe in other residents.

5   I observed a lot of words without a lot of content

6   during these verbal presentations that were difficult to

7   follow.  Those are some of the behaviors that I

8   observed.

9       Q. Any other examples of anxious -- anxious

10  behavior?

11      A. Those are the examples that come to mind.

12      Q. Okay.  Doctor, I'm going to scroll down, and

13  next sort of in this long chain of emails on Exhibit 15,

14  Doctor, there's an email from Nora --

15      A. Kirschner.

16      Q. -- Kirschner.  Do you know is it Dr. -- is that

17  Dr. Kirschner?

18      A. Yes, that's Dr. Kirschner.

19      Q. And how do you know Dr. Kirschner?

20      A. She is one of our community -- well, CHCW's

21  community preceptors and an internal medicine physician

22  that supervises residents in the inpatient setting.

23      Q. Do you get along with -- or I know you're not

24  there anymore -- did you get along with Dr. Kirschner?

25      A. I worked well with Dr. Kirschner.

Page 51

1      A. Yes.

2      Q. Okay.  And I know that Dr. -- that Dr. Kirschner

3  doesn't say medical knowledge deficit, but it's fair to

4  say you're assuming she's referring to his medical

5  knowledge, true?

6      A. I'm assuming that we're talking about medical

7  knowledge, yes.

8      Q. And you're assuming that Dr. Kirschner is

9  talking about medical knowledge?

10      A. Yes.

11      Q. Okay.  And then partway down -- and I

12  highlighted this -- Dr. Kirschner goes on to say,

13  "Perhaps the fundamental knowledge is there but masked

14  by anxiety."  Did I read that correctly?

15      A. That the fundamental knowledge is there but

16  masked by anxiety.  Yes, that's what I'm reading.

17      Q. Okay.  When you were -- what discussions, if

18  any, came from or were had on the CARED -- well, let me

19  strike that.

20          Let me ask you this:  Did you relay that

21  information to the CARED Committee, that perhaps

22  Dr. Vorgias's fundamental knowledge -- medical knowledge

23  was there but masked by anxiety?

24          A. I don't recall myself relaying that information

25  to the CARED Committee.

Vorgias vs Community Health of Central Washington

Katina Rue, D.O. 11/10/2021

Page 52

1    Q. Okay.  Did Dr. -- do you recall Dr. Powers ever

2    relaying this information to the CARED Committee that

3    perhaps with regard to Dr. Vorgias, the fundamental

4    medical knowledge was there but it was masked by

5    anxiety?

6        MR. BAILEY:  Objection.  Assumes facts not in

7    evidence.

8    A. I don't recall specifically Dr. Powers relaying

9    that information.

10    Q. (By Mr. Pickett)  Generally do you have any

11    recollection of Dr. Powers relaying that information to

12    the CARED Committee?

13    A. No, I don't have that specific recollection of

14    Dr. Powers relaying that -- this information.

15    Q. How about Dr. Hill, do you recall Dr. Hill

16    relaying the information to the CARED Committee that at

17    least Dr. Kirschner had indicated that perhaps with

18    regard to Dr. Vorgias, his medical knowledge,

19    fundamental medical knowledge is there but it's masked

20    by anxiety?

21    A. I do not specifically recall Dr. Hill relaying

22    this information to the CARED Committee.

23    Q. How about generally?  Do you generally recall

24    Dr. Hill relaying this information to the CARED

25    Committee that Dr. Vorgias perhaps fundamentally --

6ff52665-c660-4125-83b4-76f0910425a0

Vorgias vs Community Health of Central Washington                    Katina Rue, D.O. 11/10/2021

Page 53

1   fundamental medical knowledge is actually there but it's

2   masked by anxiety?

3        MR. BAILEY:   Object to the characterization of

4   "this information."

5        A. I don't recall her relaying that perhaps the

6   fundamental knowledge is there --

7        Q. (By Mr. Pickett)   Okay.

8        A. -- in a general sense.

9        Q. That's important information, is it not,

10  specific to Dr. Vorgias if, in fact, his medical

11  knowledge -- fundamental medical knowledge was there but

12  being masked by anxiety?   That would be important

13  information for the CARED Committee to know, true?

14       MR. BAILEY:   Objection.   Argumentative.

15       A. I believe that there are many direct

16  observations and evaluations of his medical knowledge in

17  clinical decision-making from a variety of faculty and

18  all of that information was forwarded to the CARED

19  Committee.

20       Q. (By Mr. Pickett)   My question was a little

21  different, and I'll rephrase -- I'll restate it, Doctor.

22       Do you agree that this information -- and I'm

23  talking about the email that you received from

24  Dr. Kirschner that states, Perhaps with regard to

25  Dr. Vorgias, his fundamental medical knowledge is there

6ff52665-c660-4125-83b4-76f0910425a0

Vorgias vs Community Health of Central Washington                    Katina Rue, D.O. 11/10/2021

Page 54

1  but it's masked by anxiety.  You agree, don't you, that

2  that would be important information for the CARED

3  Committee to have?

4          MR. BAILEY:  Objection.  Assumes facts not in

5  evidence and argumentative.

6          A.  I believe that the CARED Committee had access to

7  all of these emails as part of the process of CARED.

8          Q.  (By Mr. Pickett)  My question was whether you

9  believe it's im -- whether it was important for the

10  CARED Committee to have this information.

11         MR. BAILEY:  Objection.  I'm not sure what

12  information we're talking about.  Part of it assumes

13  evidence not in -- or assumes facts not in evidence.

14         Q.  (By Mr. Pickett)  Go ahead.  You can answer.

15         A.  It's -- yes, it's important for the CARED

16  Committee to have the emails.

17         Q.  Okay.  And specific -- specifically, it would be

18  important for the CARED Committee with regard to

19  Dr. Vorgias to have this email that says, Perhaps his

20  fundamental -- mental, excuse me, knowledge is masked by

21  anxiety, true?

22         MR. BAILEY:  Objection.  Argumentative.

23         A.  I believe it's important to have all the emails

24  and feedback available to the CARED Committee.

25         Q.  (By Mr. Pickett)  All right.

6ff52665-c660-4125-83b4-76f0910425a0

Vorgias vs Community Health of Central Washington

Katina Rue, D.O. 11/10/2021

Page 74

1    highlighted is it says, "Can we get a neuropsych eval

2    asap?"  Do you see that?

3        A. Yes, I see that.

4        Q. Okay.

5        MR. BAILEY:  Bill, I'm just going to object

6    because this was part of a larger document and it looks

7    like it's taking one page out of that larger document.

8        Q. (By Mr. Pickett)  Okay.  Doctor, do you see

9    where -- and it says -- it's signed off, I've

10   highlighted "Katina," that's you, true?

11       A. True.

12       Q. Okay.  Let me -- I'm -- what prompted you or do

13   you recall asking for a neuropsych ASAP for Dr. Vorgias

14   during any of your CARED Committee meetings?

15       A. I don't recall asking for a neuropsych eval

16   specifically at one of the CARED Committee meetings.

17       Q. Do you recall asking for a neuropsych eval of

18   Dr. Vorgias?

19       A. I don't recall asking for a neuropsych

20   evaluation other than in this email.  It is one of the

21   tools that we have potentially for, as I stated earlier,

22   assisting us with delineating problems within

23   potential -- you know, sources of problems with

24   residents experiencing difficulty in taking care of

25   patients.

Central Court Reporting   800.442.3376

6ff52665-c660-4125-83b4-76f0910425a0

Vorgias vs Community Health of Central Washington

Katina Rue, D.O. 11/10/2021

Page 76

1   safety --

2        Q. (By Mr. Pickett)  Okay.

3        A. -- as a blanket statement.

4        Q. Yeah, and I wasn't trying to make a blanket

5   statement or say it was inherent. But patient safety,

6   as a general principle, is always a concern when you're

7   training a new doctor, true?

8        A. True.

9        Q. And it's a concern because the reality is

10  doctors are in the residency program because they don't

11  know everything, they're actually learning to be

12  hopefully good, competent, capable doctors, true?

13       MR. BAILEY:  Objection.  Argumentative.

14       Q. (By Mr. Pickett)  Go ahead.

15       A. Residents are involved in residency programs in

16  order to get board certifications, in order to provide

17  high-quality, sympathetic, qualified patient care.

18       Q. Right.  And you don't just turn residents loose

19  on patients, right?  True?

20       A. True.  Residents are highly supervised.

21       Q. Highly supervised because -- because they're in

22  the learning stage, you want to -- you want to be -- you

23  want to protect patients from potential mistakes or

24  errors that the residents may make while they're

25  learning, true?

6ff52665-c660-4125-83b4-76f0910425a0

Page 78

1   CARED Committee brainstorming -- I guess what you call a

2   brainstorming manner, "Can we get a neuropsych eval

3   asap?"  And what did you mean by ASAP?

4       A. What I mean by ASAP is in the neuropsych world

5   is not actually ASAP, as we discussed in the CARED

6   Committee that that isn't really even a thing.

7       Q. Okay.

8       A. It takes greater than six months to get that

9   sort of evaluation.

10      Q. Okay.  It takes greater than roughly -- and this

11  is your experience, based on your experience, it takes

12  greater than six months to get a neuropsych evaluation

13  completed; is that true?

14      A. Yes, in my very, very limited experience.

15      Q. Okay.  So when you said ASAP -- and I know what

16  it means, you know, I'm assuming it means as soon as

17  possible -- but what you're trying to communicate there

18  is let's get this done because it's going to --

19  essentially, people who are in the know like yourself,

20  if you know what I mean, know this is going to take some

21  time; is that fair?

22      A. Actually, at this time, I don't believe that I

23  knew it took six months to get the evaluation.  I knew

24  that this was one of the things I had heard discussed in

25  the past and that this might be a tool that we could use.

6ff52665-c660-4125-83b4-76f0910425a0

Vorgias vs Community Health of Central Washington

Katina Rue, D.O. 11/10/2021

Page 79

1   to help us or not with the difficulties we were

2   experiencing with Dr. Vorgias.   At that time, I did not

3   know that it took six months because that wouldn't have

4   been as urgent as what was necessary at the time for

5   patient safety.

6        Q. Okay.  And is there anything that prompted you

7   to go from I think it takes -- your testimony earlier

8   that it could take up to six months to now your

9   testimony says I'm not sure, what prompted you?

10        MR. BAILEY:  Objection.  Confusing question.

11        Q. (By Mr. Pickett)  Go ahead, Doctor.

12        A. Yes, will you state that question again?  I

13   think I know what you're asking but I'm not entirely

14   sure.

15        Q. I'm just wondering if something prompted you to

16   change your answer, right, or clarify your answer?

17        A. I believe I was clarifying my answer in that at

18   the time of this email, I misunderstood that this was

19   something that could happen quickly, there was another

20   resident going through a process that I later found out

21   it took six months.  So now I know, as I'm giving the

22   testimony today, that this actually wasn't a viable

23   option at the time that I suggested this.  Does that

24   clarify what I was saying?

25        Q. So to be -- so let me see if I can clarify.

Central Court Reporting   800.442.3376

Vorgias vs Community Health of Central Washington          Katina Rue, D.O. 11/10/2021

Page 86

1   those providers, who they contract with.

2       Q. (By Mr. Pickett)   Okay.   Let me ask you did

3   anyone at -- during your time on the CARED Committee

4   supervising Dr. Vorgias, did anyone ever tell you that

5   he was, in fact, undergoing a neuropsych evaluation?

6       A. No.

7       Q. Never?

8       A. Never.

9       Q. If he -- assume for purposes of my questions

10  that he, in fact, did undergo a neuropsych evaluation,

11  would that be information that would be helpful -- would

12  have been helpful to the CARED Committee to have in

13  evaluating Dr. Vorgias's performance?

14      MR. BAILEY:   Objection.   Assumes facts not in

15  evidence.

16      A. As I stated before, I think any feedback and

17  data points are important for the CARED Committee to

18  evaluate and have access to.

19      Q. (By Mr. Pickett)   Okay.   And his neuropsych

20  evaluation, are you familiar -- have you ever received a

21  neuropsych evaluation on a student -- a resident, excuse

22  me?

23      A. I have received one evaluation -- neuropsych

24  evaluation on a former resident.

25      Q. Okay.   And without giving me the name of the

Central Court Reporting   800.442.3376

Vorgias vs Community Health of Central Washington                    Katina Rue, D.O. 11/10/2021

Page 87

1   resident, can you tell me why the neuropsych was done on

2   that particular resident?

3       MR. BAILEY:  Objection.  Lack of foundation.

4   Calls for speculation.

5       A. With that particular resident, there were also

6   some concerns about medical knowledge and being able to

7   build upon previously-learned information, and the

8   neuropsych eval was done to help us get any insight into

9   that question that we had.

10      Q. (By Mr. Pickett)  Okay.  And is it fair to say

11  that when the neuropsych eval is received, specifically

12  in this instance on a resident where there appeared to

13  be sort of a lack of medical knowledge, that you then,

14  as the CARED Committee, utilize that information to see

15  if there's some way to assist the resident in

16  successfully performing in the program; is that fair?

17      MR. BAILEY:  Objection.  Assumes facts not in

18  evidence.

19      A. The CARED Committee reviewed the document from

20  the neuropsych and that was again one piece of

21  information to help build an individualized learning

22  plan for that particular resident.

23      Q. (By Mr. Pickett)  And again, that's to assist

24  the student identify, one, any impairments that could be

25  affecting performance and then, two, try to do your best

Central Court Reporting   800.442.3376

Vorgias vs Community Health of Central Washington

Katina Rue, D.O. 11/10/2021

Page 106

C E R T I F I C A T E

1

2  STATE OF WASHINGTON )
                        )
3  COUNTY OF YAKIMA    )

4

5      This is to certify that I, Dani White, Certified

6  Court Reporter in and for the State of Washington,

7  residing in Yakima, reported the within and foregoing

8  deposition; said deposition being taken before me on the

9  date herein set forth; that pursuant to RCW 5.28.010 the

10  witness was first by me duly sworn; that said

11  examination was taken by me in shorthand and thereafter

12  under my supervision transcribed; and that same is a

13  full, true, and correct record of the testimony of said

14  witness, including all questions, answers, and

15  objections, if any, of counsel.

16      I further certify that I am not a relative or

17  employee or attorney or counsel of any of the parties,

18  nor am I financially interested in the outcome of the

19  cause.

20      IN WITNESS WHEREOF I have set my hand this 17

21  day of November, 2021.

22

23                  DANI WHITE
                    CCR NO. 3352
24

25

Central Court Reporting   800.442.3376

6ff52665-c660-4125-83b4-76f0910425a0

# Email for Pre-reading for CARED Committee Meeting 2/13/19

# RE: Dr. Rue request for neuropsych eval.



**EXHIBIT 10**
Witness: K. Rue, D.O.
Date: 11-10-21
Stenographer: DW

**EXHIBIT 10**

**Email in Response from Katina Rue:**

I was on this week with him. Dom did in fact stay all day with him at least twice. He did not improve.

He took 2.5 hours to discharge a patient, after we discussed the patient. This was a total of 5 hours for a patient who he admitted the evening before. The care of multiple other patients was affected.

I agree with Carlin that he is a detriment to the team and is a risk as far as patient safety. I do not feel comfortable with him communicating accurate information to me, to consultants, nursing staff or families. This potentially effects patient care in a negative way. I would urge u to remove him from the service. Dom is not an ongoing solution and he is missing out on his own educational opportunities.

I really hoped he would have had some improvement this week, but I didn't see any. He is not meeting the requirements of the ILP. He has not been proactive in any sense...although he told me he was practicing his one liners at home. This was not evident. We literally took 15 minutes to present a one liner on one of his patients on Friday. He doesn't seem to incorporate realtime feedback in any meaningful way.

Can we get a neuropsych eval asap?

Again, I would favor removing him from the service and getting an evaluation. Currently, I just don't think he can do this.

-Katina

**EXHIBIT 10**

# Email – 4/23/19



**EXHIBIT   15**
Witness: K. Rue, D.O.
Date: 11-10-21
Stenographer: DW

**Exhibit 15**

**Heidi Martinez**

| | |
|---|---|
| From: | Micahlyn Powers |
| Sent: | Wednesday, April 24, 2019 5:29 AM |
| To: | Heidi Martinez |
| Subject: | Fwd: Vorgias FMS evaluations |

Please print for binder n
Get Outlook for iOS

From: Midhuna Papazian <midhuna.papazian@chcw.org>
Sent: Tuesday, April 23, 2019 10:26 PM
To: Caitlin Hill
Cc: Micahlyn Powers
Subject: RE: Vorgias FMS evaluations

I did not have a new admission with Demetrios during my week with him but I rounded on a patient with him to assess how he was doing. Prior to my rounding with him, we sat down and talked about the things we would ask the patient and he kept missing the main points during the interview. I think he got really anxious that I was there (I think). I had him talk to me about a COPD exacerbation patient and it took him a long time to discuss the patient, while going over and over the same points in the subjective part and unable to really give me a good differential for why he was febrile.

I have rounded on patients after he has seen them and they seem confused about the information that he shares with him. I don't feel like it's the right thing for patient care for him to round on patients by himself.

A patient's lab test came back positive for Salmonella and he informed me about it. I asked him what he wanted to do and he took more than 2 hours to get back to me with an answer and he still couldn't commit to an answer easily (I think he finally did when I asked him to commit).

I know we all want Demetrios to succeed but I really don't see how he is going to practice medicine successfully. He is extremely anxious, my continual feedback during the week doesn't seem to be registering, he does not know basic bread and butter FM topics and does not know how to manage simple cases — and this is scary since it is the end of his first year.

I did ask him to talk about COPD dx and management at didactics and I think he did a fine job with it even though he was really nervous to do so

From: Nora Kirschner <nbkirschner@gmail.com>
Sent: Tuesday, April 23, 2019 2:17 PM
To: Caitlin Hill <Caitlin.Hill@chcw.org>
Cc: Micahlyn Powers <Micahlyn.Powers@chcw.org>; Joel Pearson <Joel.Pearson@chcw.org>; Katina Rue <Katina.Rue@chcw.org>; Stephanie Ellwood <Stephanie.Ellwood@chcw.org>; Midhuna Papazian <Midhuna.Papazian@chcw.org>; Heidi Martinez <Heidi.Martinez@chcw.org>; Ragina Lancaster <Ragina.Lancaster@chcw.org>
Subject: Re: Vorgias FMS evaluations

Hello all,

Sadly I think there are 2 fundamental issues.

1

CONFIDENTIAL

CHCW 000080

**Exhibit 15**

First is a knowledge deficit combined with the difficulty with understanding pertinent nuances and synthesizing information. Sadly for Dr Vorgias, on the one hand,  but thankfully for most (as we would all become bored of medicine 'thin a few years)textbook medicine is largely a myth. There are rarely textbook cases. Without fundamental ...owledge with which one is relatively facile, it is difficult to pick up pertinent nuances much less synthesize co morbid conditions that most patients present with. Perhaps the fundamental knowledge is there but masked by anxiety. I saw little picking up of nuances without getting lost in the Forest nor did I see much synthesis of information. I had 1 case that I precepted directly but attended morning and noon rounds daily.

The second issue is attitude. I have compassion and can understand how difficult this must be for Dr. Vorgias and how their must be a strong desire to save face. it is the attempt at saving face that gets in the way of feeling like what you have attempted to communicate to Dr. Vorgias has actually reached him. The patient that I precepted with  Dr. Vorgias pointed out to me that she did not feel as though "he heard her or got her concerns" If Dr. Vorgias has had testing, has there been any mention of him being on the Spectrum, high functioning of course?

Just my quick 2 cents. My perspective has to be put in context, as I am truly not one of you ie full time faculty. I only had 1 case with Dr Vorgias and only worked with him for 1 week.

I have compassion for all of you as well,  who have to make a very difficult decision.

Good karma and strength to all,

Nora

Sent from my iPhone

Apr 23, 2019, at 1:26 PM, Caitlin Hill <Caitlin.Hill@chcw.org> wrote:

>Any feedback for tomorrow's evaluation is greatly appreciated- no matter how small of a nugget.
>Thanks,
>Caitlin

>**From:** Micahlyn Powers
>**Sent:** Wednesday, April 17, 2019 12:07 PM
>**To:** Caitlin Hill <Caitlin.Hill@chcw.org>; Joel Pearson <Joel.Pearson@chcw.org>; Nora Kirschner <nbkirschner@gmail.com>; Katina Rue <Katina.Rue@chcw.org>; Stephanie Ellwood <Stephanie.Ellwood@chcw.org>; Midhuna Papazian <Midhuna.Papazian@chcw.org>; Heidi Martinez <Heidi.Martinez@chcw.org>
>**Subject:** Vorgias FMS evaluations

>FMS Attendings:

>I'm writing on behalf of the CARED Committee (Committee About Residents Experiencing Difficulty) to ask that when you work with R1 Demetrios Vorgias in the next few weeks on FMS, that you think very hard about whether he is meeting expectations or not, as compared to other R1 residents. His final evaluations are very important in assessing his progress.

>In addition, could you please complete his evaluations on 4/23, so that we can review his progress at R1 quarterly evals on 4/24? Thank you so much.

2

CONFIDENTIAL                    CHCW 000081

**Exhibit 15**

@Heidi Martinez could you check for these evals on the morning of 4/24 to see how many we have completed?

Micahlyn Powers MD
Interim Program Director Central WA Family Medicine Residency
Yakima, WA
CHCW-Ellensburg Site Director

3

CONFIDENTIAL

CHCW 000082

**Exhibit 15**

# Exhibit D

William D. Pickett, WSBA #27867
THE PICKETT LAW FIRM
917 Triple Crown Way, Ste. 100
Yakima, Washington 98908
Tel: 509-972-1825
bill@wpickett-law.com
*Attorney for Plaintiff*

Luan T. Le, *pro hac vice*
Law Offices of Luan T. Le
1190 S. Bascom Ave, Suite 213
San Jose, CA 95128
Tel: 408-247-4715
Email: ledowningllp@gmail.com
*Co-counsel for Plaintiff*

Seth W. Wiener, *pro hac vice*
Law Offices of Seth W. Wiener
609 Karina Court
San Ramon, CA 94582
Tel: 925-487-5607
Email: seth@sethwienerlaw.com
*Co-counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| DEMETRIOS VORGIAS,<br>                    Plaintiff,<br><br>v.<br><br>COMMUNITY HEALTH OF<br>CENTRAL WASHINGTON,<br>                    Defendant. | NO: 1:21-CV-03013-SAB<br><br>**PLAINTIFF DEMETRIOS VORGIAS' INITIAL DISCLOSURES** |

Plaintiff's Initial Disclosures

Page 1

Plaintiff Demetrios Vorgias ("Plaintiff" or "Vorgias") hereby provides the following Initial Disclosures pursuant to Federal Rule of Civil Procedure 26. Vorgias states that Vorgias has not completed an investigation of the facts relating to this case, has not fully completed discovery in this action, and has not completed preparation for trial. All disclosures contained herein are based only upon such information and documentation as are presently available and specifically known to Vorgias, and disclose only that information pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure which presently is available to and occurs to Vorgias.  The following disclosures are given without prejudice to Vorgias's right to produce documentation and evidence of any fact or facts, or information regarding any witness or witnesses that Vorgias may subsequently recall or discover. No disclosures contained herein shall be construed to be admissions of fact or law. Vorgias accordingly reserves the right to change any and all disclosures and/or production of documents as additional facts are ascertained, analyses are made, documents are discovered, witnesses are discovered, legal research is completed, and contentions are made. The disclosures contained herein are made in a good faith effort to supply as much documentation, information regarding witnesses, and factual information pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure as is presently known, but it should in no way be to the prejudice of Vorgias in relation to further discovery, research, or analysis. Accordingly, Vorgias provides his Initial Disclosures as follows:

*(i)      the name and, if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to supports it claims or defenses, unless the use would be solely for impeachment:*

Vorgias identifies the following individuals as likely to have discoverable information as to Vorgias' claims and the subjects of that information:

1. Demetrios Vorgias, c/o Luan T. Le, 1190 S. Bascom Ave, Suite 213, San Jose, CA 95128, Tel: (408) 247-4715. This person has discoverable information concerning: (a) Plaintiff's disabilities; (b) Plaintiff's residency at Community Health of Central Washington ("CHCW"); (c) CHCW's discriminatory treatment of Plaintiff; (d) Plaintiff's damages.

2. Russell Maier, M.D., CHCW's Designated Institutional Official/Program Director. This person has discoverable information concerning: (a) Plaintiff's residency at CHCW.

3. Kelly Cornett, PsyD, CBIS, Rehabilitation Institute of Washington, PLLC, 415 1st Avenue N., Suite 200, Seattle, WA 98109, Tel.: (206) 859-5036. This person has discoverable information concerning: (a) Plaintiff's disabilities.

4. Michalyn Powers, MD, CHCW's Residency Program Director, Tel.: (509) 452-4946. This person has discoverable information concerning: (a) Plaintiff's disabilities; (b) Plaintiff's residency at CHCW; (c) CHCW's discriminatory treatment of Plaintiff; (d) Plaintiff's damages.

5. Tess Ish-Shalom, DO MS, 5373 Main Street, Hillsboro, OR 97123. This person has discoverable information concerning: (a) Plaintiff's disabilities; (b) Plaintiff's residency at CHCW; (c) CHCW's discriminatory treatment of Plaintiff; (d) Plaintiff's damages.

6. Mark J. Bauer M.D., P.O. Box 580, Naches, WA 98937. This person has discoverable information concerning: (a) Plaintiff's disabilities; (b) Plaintiff's residency at CHCW; (c) CHCW's discriminatory treatment of Plaintiff; (d) Plaintiff's damages.

7. Ed Prasthofer MD, 108 C Street, Salt Lake City, Utah, 84103, Tel.: (303) 877-1922. This person has discoverable information concerning: (a)

Plaintiff's disabilities; (b) Plaintiff's residency at CHCW; (c) CHCW's discriminatory treatment of Plaintiff; (d) Plaintiff's damages.

8.    Douglas E. Coon, Regional Medical Director, West Division Envision Healthcare Inc., Tel.: (360) 420-3817. This person has discoverable information concerning: (a) Plaintiff's disabilities; (b) Plaintiff's residency at CHCW; (c) CHCW's discriminatory treatment of Plaintiff; (d) Plaintiff's damages.

9.    Judith Harvey MD, 902 S 31st Avenue, Yakima WA 98902. This person has discoverable information concerning: (a) Plaintiff's disabilities; (b) Plaintiff's residency at CHCW; (c) CHCW's discriminatory treatment of Plaintiff; (d) Plaintiff's damages.

10.    Brandon Isaacs, DO, Residency Program Director, CHCW, 1806 W. Lincoln Avenue, Yakima, WA 98902. This person has discoverable information concerning: (a) Plaintiff's disabilities; (b) Plaintiff's residency at CHCW; (c) CHCW's discriminatory treatment of Plaintiff; (d) Plaintiff's damages.

11.    Caitlin C.D. Hill, MD, CHCW Faculty, Tel: (218) 260-1380.  This person has discoverable information concerning: (a) Plaintiff's disabilities; (b) Plaintiff's residency at CHCW; (c) CHCW's discriminatory treatment of Plaintiff; (d) Plaintiff's damages.

*(ii)    a copy – or a description by category and location – of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment:*

Vorgias identifies the following categories of documents, electronically stored information, and tangible things in Vorgias possession, custody, or control that Vorgias may use to support Vorgias's claims and defenses:

Plaintiff's Initial Disclosures

Page 4

Documents bates-stamped VORGIAS 000001-000269 produced herewith.

*(iii)    a computation of each category of damages claimed by the disclosing party – who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered:*

1.    Compensatory damages in the minimum amount of $1,000,000;

2.    For punitive and exemplary damages according to proof;

3.    An order placing Plaintiff in the position that he would have been had there been no violation of his rights;

4.    An order enjoining/restraining Defendant from further acts of discrimination or retaliation;

5.    An award of interest, costs, and reasonable attorney's fees;

6.    Any and all other remedies provided pursuant to the ADA and WLAD;

7.    Any other appropriate nondiscriminatory measures to overcome the above-described discrimination; and.

8.    For such other and further relief as the Court deems just and proper.

*(iv)    for inspection and copying under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment:*

Vorgias states that he is not aware of any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

Dated: June 25, 2021

Seth W. Wiener, *pro hac vice*
Law Offices of Seth W. Wiener
609 Karina Court
San Ramon, CA 94582
Tel:  925-487-5607
Email:  seth@sethwienerlaw.com
*Co-counsel for Plaintiff*

Plaintiff's Initial Disclosures

Page 6

William D. Pickett, WSBA #27867
THE PICKETT LAW FIRM
917 Triple Crown Way, Ste. 100
Yakima, Washington  98908
Tel: 509-972-1825
bill@wpickett-law.com
*Attorney for Plaintiff*

Luan T. Le, *pro hac vice*
Law Offices of Luan T. Le
1190 S. Bascom Ave, Suite 213
San Jose, CA 95128
Tel:  408-247-4715
Email:  ledowningllp@gmail.com
*Co-counsel for Plaintiff*

Seth W. Wiener, *pro hac vice*
Law Offices of Seth W. Wiener
609 Karina Court
San Ramon, CA 94582
Tel:  925-487-5607
Email:  seth@sethwienerlaw.com
*Co-counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| DEMETRIOS VORGIAS,<br>                    Plaintiff,<br><br>v.<br><br>COMMUNITY HEALTH OF<br>CENTRAL WASHINGTON,<br>                    Defendant. | NO: 1:21-CV-03013-SAB<br><br>**PROOF OF SERVICE** |

Plaintiff's Initial Disclosures

Page 7

I, Seth W. Wiener, declare:

I am employed in Contra Costa County, California. I am over eighteen years of age and not a party to this action. My business address is 609 Karina Court, San Ramon, CA 94582. On June 25, 2021, I served a true and correct copy of the following document(s):

- **PLAINTIFF DEMETRIOS VORGIAS' INITIAL DISCLOSURES**
- **DOCUMENTS BATES-STAMPED VORGIAS 000001-000269**

On the parties in this action, through their attorneys of record, addressed for service on the persons below:

- Ms. Catharine Morisset, WSBA #29682, Fisher & Phillips, LLP, 1201 Third Avenue, Ste. 2750, Seattle, Washington 98101, Tel: 206-682-2308, Email:  cmorisset@fisherphillips.com
- Scott M. Prange, WSBA #53980, Fisher & Phillips, LLP, 1201 Third Avenue, Ste. 2750, Seattle, Washington 98101, Tel:  206-682-2308, Email:  sprange@fisherphillips.com

(By Electronic Mail) Based on the consent of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent to the person(s) listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Proof of Service was executed on June 25, 2021, at San Ramon, California.

By: _____

Seth W. Wiener

Plaintiff's Initial Disclosures

Page 8

**Central Washington Family Medicine Residency Program**



a Service of
**Community Health** of Central Washington

# RESIDENT HANDBOOK

**4/2019**

VORGIAS 000007

# CENTRAL WASHINGTON FAMILY MEDICINE RESIDENCY PROGRAM RESIDENT HANDBOOK

## TABLE OF CONTENTS

Section                                                                             Page

I.      AN INTRODUCTION ..................................................................................1
        Mission and Purpose.................................................................................1

II.     OWNERSHIP, GOVERNANCE, SPONSORSHIP AND FUNDING ............2
        Ownership, Governance and Sponsorship ..................................................2
        Program Funding ......................................................................................2

III.    ACCREDITATION, AFFILIATION, CURRICULUM AND COMMITTEES..........3
        Accreditation.............................................................................................3
        Affiliation .................................................................................................3
        American Board of Family Medicine and American College of Osteopathic
            Family Physicians Guidelines ...............................................................3
        Curriculum ............................................................................................. 3-4
        Committee Addressing Residents Experiencing Difficulty (CARED)...............4
        Clinical Competency Committee................................................................4

IV.     EMPLOYMENT AND RESIDENCY POLICIES.........................................5
        Definitions ................................................................................................5
        Equal Opportunity.....................................................................................5
        Orientation ...............................................................................................5
        Resident Records and Privacy ...................................................................6
        Hours of Work ..........................................................................................6
        Attendance................................................................................................6

V.      WAGE AND SALARY POLICIES..............................................................7
        General Wage and Salary Policy ...............................................................7
        Payroll Deductions ...................................................................................7
        Paydays ....................................................................................................7
        Pay Advances ...........................................................................................7
        Automatic Bank Deposit............................................................................7
        Moonlighting ......................................................................................... 7-8

VI.     BENEFITS AND SERVICES.....................................................................9
        Social Security ..........................................................................................9
        State Unemployment Insurance ..................................................................9
        Workers' Compensation.............................................................................9
        Malpractice Liability Insurance .................................................................9
        Holidays ............................................................................................... 9-10
        Paid Time Off .........................................................................................10
        Professional Development ........................................................................11
        Bereavement Leave...................................................................................12
        Jury Duty ................................................................................................12
        Extended Leave of Absence .....................................................................12
            Extended Independent Study Elective .............................................. 12-13
            Family and Medical Leave Act .........................................................13
            Pregnancy Disability .......................................................................13
            Maternity Leave ..............................................................................13
            Military Service ..............................................................................13
            Military Reserve Training .................................................................13
        Health Insurance .....................................................................................13

VORGIAS 000008

401(k) Plan...........................................................................13
Flexible Spending Account...................................................13
Life and Disability Insurance...............................................13
Employee Assistance Program.............................................14
    Meals...........................................................................14

VII.   ORGANIZATIONAL ASSETS.........................................15
Use of Supplies...................................................................15
Key and Entrance Code Policy.............................................15
Electronic Business Equipment Use and Security...............15
Electronic Mail....................................................................16
Internet................................................................................16
Postage................................................................................17
Mail.....................................................................................17
Printing and Copying..........................................................17
Telephones..........................................................................17

VIII.  EMPLOYEE SAFETY AND HEALTH...............................18
Smoke Free Environment....................................................18
Substance Abuse.............................................................18-19
Life-Threatening Illnesses..................................................19
Policy Against Violence......................................................19

IX.    STANDARDS OF CONDUCT..........................................20
Personal Appearance......................................................20-21
Confidentiality....................................................................21
Employee and Family Healthcare.......................................21
Media Relations..................................................................22
Use of Names and Logos....................................................22
Outside Activities...............................................................22
Solicitation and Distribution..............................................22
Policy Against Harassment.................................................23
Employee Inter-relationships.............................................23
Standards of Conduct Violation.....................................23-24

X.     RESIDENT SUPERVISION, EVALUATION AND ADVISING...........25
Supervision of Residents....................................................25
Performance Appraisals......................................................25
Advancement and Graduation........................................25-26
Advisor/Advisee Relationship............................................26
Advisor/Advisee Meetings.................................................26
Advisor Responsibilities....................................................26
Advisee Responsibilities....................................................26
Documentation of Skills and Abilities...............................27
Core Competency Development..........................................27
    Patient Care...............................................................27
    Medical Knowledge...................................................27
    Practice-Based Learning and Improvement...............27
    Interpersonal and Communication Skills...................28
    Professionalism..........................................................28
    Systems-Based Practice.............................................28
    Osteopathic Philosophy and Osteopathic Manipulative Medicine...........28
Successful Completion of Rotations and Educational Experiences........28

VORGIAS 000009

Steps for Improvement, may include referral to CARED .................................................... 29-34
    Constructive Citations ........................................................................................... 35
    Consequential Citations ........................................................................................ 35
    Probation ............................................................................................................... 35
    Termination ........................................................................................................... 35
Grievance Procedure .................................................................................................. 35

XI.

    Appendix D: Handbook Receipt and Acknowledgement (File Copy) ........................................ 36

# INTRODUCTION

## Mission and Purpose

The Central Washington Family Medicine Residency Program (CWFMR) is a funded Teaching Health Center. The program's sponsoring institution (SI) is Community Health of Central Washington (CHCW), a federally qualified health center (FQHC), whose mission is to provide quality health care through service and education. To this end, the residency program is committed to develop and train board certified family physicians for underserved and rural settings. We define our success by our Residents' eligibility for – and successful completion of – certification by the American Board of Family Medicine and the American Osteopathic Board of Family Physicians (only applies to osteopathic residents).

This manual contains statements of policies and procedures to be followed by all CWFMR Resident physicians. It is the responsibility of every Resident to adhere to these policies. All CWFMR policies and procedures can be found on the intranet and in the shared public drive, P:\CWFM-R Policies and Procedures. This handbook, however, does not constitute an employment contract, express, or implied, nor is it a curriculum manual.

Procedures and practices in the area of personnel management are subject to periodic modification and development in light of experience, changes in labor laws, funding, and accreditation requirements. Residents will be notified in writing of any changes in these policies and procedures, and this manual will be updated accordingly. The updated version will be posted in the shared public drive and in New Innovations (NI).

Please read this handbook carefully and keep it for future reference. It supersedes all previous Resident handbooks and memos that may have been issued on subjects covered herein. Note: All CWFM-R formal policies & procedures can be found in the shared drive: P:\CWFM-R Policies and Procedures and also on the intranet site.

Brandon Isaacs, DO
Program Director

Katina Rue, DO
Associate Program Director, Osteopathic Recognition

Maria Verduzco, MD
CWFM Clinical Site Director

Micahlyn Powers, MD
CHCW-E Clinical Site Director

John Asriel, MD
Ellensburg Residency Site Director

Leticia R. Fernandez, MBA
Residency Program Manager,
Yakima & Ellensburg,
Institutional Coordinator

VORGIAS 000011

# OWNERSHIP, GOVERNANCE, SPONSORSHIP AND FUNDING

## Ownership, Governance and Sponsorship

CWFMR is a service of Community Health of Central Washington. CHCW is governed by a Board of Directors made up of a majority of health center patients. The Board appoints a Graduate Medical Education Committee (GMEC) which monitors and advises on *all* aspects of the residency program. The residency Program Director, Designated Institutional Official (DIO), Associate Program Director of Osteopathic Recognition and Chief Residents are voting members of the GMEC.

CHCW is the sponsoring institution (SI) for allopathic accreditation (ACGME) and osteopathic accreditation (ACGME-Osteopathic Recognition).

## Program Funding

Virginia Mason Memorial Hospital (Memorial) is a financial sponsor of the program. The residency program is funded primarily by funding that Memorial receives for graduate medical education reimbursement from Medicare and Medicaid. Other sources of revenue include Washington State primary care training funds, occasional grant moneys and the Health Resources and Service Administration (HRSA) Teaching Health Center grant.

VORGIAS 000012

# ACCREDITATION, AFFILIATION, CURRICULUM & COMMITTEES

## Accreditation

Central Washington Family Medicine Residency Program is accredited by the Accreditation Council for Graduate Medical Education (ACGME) and has achieved ACGME Osteopathic Recognition. The ACGME *Program Requirements for Graduate Medical Education in Family Medicine* may be viewed at: P:\CWFM-R Policies and Procedures\ACGME

Single Accreditation System (SAS)-On February 26, 2014, the Accreditation Council for Graduate Medical Education (ACGME), American Osteopathic Association (AOA), and American Association of Colleges of Osteopathic Medicine (AACOM) announced their agreement to a Memorandum of Understanding (MOU) that outlines a single graduate medical education accreditation system for residency and fellowship programs in the United States. The SAS should be completely implemented by 2020.
https://www.acgme.org/What-We-Do/Accreditation/Single-GME-Accreditation-System/articleid/4716

## University Affiliations

The residency program is affiliated with the University of Washington Family Medicine Residency Network (UWFMRN), Washington, Wyoming, Alaska, Montana and Idaho (WWAMI Network) and Pacific Northwest University of Health Sciences (PNWU). Affiliation provides academic support including professional development courses for faculty, research opportunities for residents and faculty, and access to electronic resources.
https://depts.washington.edu/fammed/network/

## American Board of Family Medicine (ABFM) and American Osteopathic Board of Family Physicians (AOBFP) Guidelines

CWFMR follows the ABFM and ACOFP guidelines to prepare Residents for Board certification. The ABFM guidelines are available on the ABFM website at:
https://www.theabfm.org/become-certified/i-am-acgme-residency-program

Click on the *Initial Certification/Residency* tab at the top and then click on *Residency Guidelines*.
The AOBFP guidelines are available on the AOBFP website at:
https://certification.osteopathic.org/family-physicians/certification-process/family-medicine/

## Curriculum

Each academic year is divided into thirteen four-week blocks (also known as rotations). The master rotation schedule is carefully balanced to meet accreditation requirements, educational needs, service coverage, continuity clinic requirements, community attending availability, and resident work hour rules. Curriculum is located in the public shared file and in New Innovations (NI):
P:\Curriculum\Active Curricula

Goals, educational strategies for core competency development, and operational statements for all required and elective curricular areas can be accessed in New Innovations (also known as NI), the residency's web-based information system. New Innovations can be accessed from anywhere since it is a web-based program. Residents are expected to review the appropriate curriculum statements in preparation for each rotation.

VORGIAS 000013

Rotation contact, and schedule information is distributed prior to each rotation to facilitate communication between residents and rotation attendings. Residents evaluate each rotation. Residents are expected to complete rotation evaluations upon completion of each rotation.

## Committee Addressing Resident Experiencing Difficulty (CARED) was developed in 2017. Mission and Purpose of CARED

The residency program is committed to providing residents with the tools they need to become successful practicing family physicians that receive certification from the American Board of Family Medicine and/or the American Osteopathic Board of Family Physicians.

An essential component of assessing resident progress is through the Accreditation Council for Graduate Medical Education (ACGME) milestone attainment. While residents meet various milestones at different stages of training, residents falling behind their peers in milestone attainment may require remediation to meet expectations required for program advancement. Ultimately the remediation process is designed to ensure residents overcome deficits in ACGME core competencies to attain all ACGME Entrustable Professional Activities (EPAs) required for Family Medicine Physicians at the time of graduation.

This committee aims to provide early identification and intervention for residents in difficulty through data collection and development of personalized improvement plans. The overarching goal of this committee is to ensure residents meet accreditation goals without receiving formal citations and/or delayed time to graduation. Therefore, the committee seeks to prevent and/or correct progression of problems in residency. Please see full CARED description and workflow located in the shared drive.

## Clinical Competency Committee (CCC) is an ACGME required committee

Purpose-To monitor resident performance and adherence to educational, program, and clinical responsibilities; to measure progression of resident performance and skill acquisition along the milestones with recommendations to the Program Director for advancement or learning plans for identified areas of needed improvement

Policy-This policy defines the purpose and responsibilities for monitoring resident progression along the milestones

Please see CCC policy located in the shared drive for details. It can also be found by clicking on below link (click on Family Medicine Milestones):
https://www.acgme.org/What-We-Do/Accreditation/Milestones/Milestones-by-Specialty

Family Medicine Osteopathic Milestones can be found by clicking link below (clinic on Osteopathic Recognition under the Milestones header):
https://www.acgme.org/What-We-Do/Recognition/Osteopathic-Recognition

Both sets of Milestones can be found in shared drive:
P:\CWFM-R Policies and Procedures\CCC

VORGIAS 000014

# EMPLOYMENT & RESIDENCY POLICIES

## Definitions

1. **Residents.** Full time, salaried physician trainees.
2. **R-1.** Physician in the first year of residency training.
3. **R-2.** Physician in the second year of residency training.
4. **R-3.** Physician in the third year of residency training.
5. **Term of Training.** The normal term of residency training in family medicine is three years (36 months). The Resident's training may be extended beyond three years, at the discretion of the Program Director, due to the Resident's time away from the program or to address academic deficiencies.
6. **Year.** For the purpose of these policies "year" refers to the CWFMR academic year.
7. **Orientation Period.** The first rotation of the first year of residency training.

## Equal Opportunity

The Central Washington Family Medicine Residency Program (CWFMR) maintains a policy of nondiscrimination with applicants and Residents. No aspect of the application process or residency training will be influenced in any manner by race, color, religion, sex, age, national origin, physical or mental disability, or any other basis prohibited by statute. Further, CWFMR will reasonably accommodate persons with mental or physical disabilities as long as the accommodation doesn't cause the Program undue hardship or negatively impact the provision of comprehensive patient care.

## Orientation

All new R-1 residents will have an orientation month that introduces a comprehensive approach to health care and promotes resident identity as a family physician. The orientation will include an introduction to CHCW, the residency program (Yakima & Ellensburg-only Ellensburg residents), the residency clinics, and the hospital (Memorial). An assessment of the resident's level of proficiency in the ACGME core competencies will be completed through objective structured clinical examination (OSCE). The orientation is a required educational experience and included as part of the Resident's 36 months of training.

VORGIAS 000015

**Resident Records and Privacy**

Access to Resident files is restricted to authorized personnel. Authorized personnel include the faculty and administrative staff of the program. Residents have the right to review and request copies of their own Resident files. Access to Resident files is granted by the Program Administration staff.

The Resident file will remain with the program for an indefinite period. Former Residents may, by written request, obtain information from their files at any time.

**Learning and Work/Educational Hours (formally known as Work hours)**

The residency program complies with the guidelines of the Accreditation Council for Graduate Medical Education (ACGME) with regard to resident workload and educational hours. Please see Resident Work Hours policy for details. For detailed information please refer to work hour's policy in shared drive (public folder) and on intranet site.

**Attendance**

Residents must attend scheduled work events. Acceptable reasons for absence include PTO, illness and appropriate prioritization of other demands placed upon the Resident (e.g., attending to the delivery of the Resident's OB patient or patient care demands on the Family Medicine Service). A Resident, who has worked a night or 24-hour shift prior to Wednesday morning, is excused from the weekly Wednesday afternoon didactics in order to maintain compliance with work hour rules. All FMS Residents are excused from Perinatal Grand Rounds/Noon Lecture.

The Resident must document Didactic/conference attendance and excused absences from didactics in New Innovations. Completion of the didactic/conference surveys, via New Innovations, is required. Failure to complete the required surveys and attendance documentation may result in disciplinary action.

**All residency policies/procedures can be located in the shared drive:**

P:\CWFM-R Policies and Procedures\Residency Policies and Procedures

VORGIAS 000016

# Wage and Salary Policies

## General Wage and Salary Policy

Community Health of Central Washington strives to pay Resident salaries that are competitive within the industry. Resident salaries are evaluated annually. The salary paid by CHCW and the education received is considered to be full compensation.

## Payroll Deductions

Various payroll deductions are made each payday to comply with federal and state laws pertaining to taxes and insurance. Deductions are made for the following:

1. Federal Tax Withholding
2. Social Security (FICA)
3. Other Deductions Authorized by the Resident
4. Workers' Compensation
5. Others Required by Law

## Paydays

The payroll week runs from Saturday of one week through Friday of the following week. Paychecks are issued by direct deposit every other Friday for time worked through the preceding Friday.

## Pay Advances

Pay advances are discouraged. Requests are considered on a case-by-case basis and, if given, are limited to one per year per Resident.

## Automatic Bank Deposit

Resident paychecks are automatically deposited into the Resident's bank account. The process for direct deposit is detailed in the benefits portfolio provided by the Human Resources Manager.

## Moonlighting

The Resident is employed full time by Community Health of Central Washington. Gainful employment outside of CHCW by Residents is not required and is permitted only with the written permission of the Program Director. Moonlighting hours count toward work hours and must meet the work hour requirements. The Program Director recognizes that the Resident may face extenuating financial circumstances during his/her training and will review requests for permission to "moonlight" accordingly. In order to be permitted to moonlight, the Resident must: (**Note: R1s are not allowed to moonlight, per ACGME**)

1. Be and remain in good standing; (not on any form of citation/probation)
2. Submit to the Program Director a written request form (obtain moonlighting request form from Program Manager).
3. Have a passing equivalent on the annual In-Training Examinations and have passed USMLE or COMLEX Step 3.
4. Provide written documentation to the Program Director that he/she is covered for any liability action which could arise from the moonlighting activity (for offsite moonlighting).

VORGIAS 000017

5.  Maintain his/her level of performance in the residency program during the moonlighting period, including attendance at didactic conferences and rounds without demonstration of undue fatigue;
6.  Demonstrate licensure appropriate for the planned activity.

The written permission to moonlight will become part of the Resident's permanent file. The Program Director may, at any time, rescind the moonlighting privilege. Please see Moonlighting policy and form for details. Policy located in shared drive and via intranet.

VORGIAS 000018

# BENEFITS AND SERVICES

Community Health of Central Washington strives to provide a competitive benefits package for its Residents. Residents can refer to their individual contracts for detailed benefit information.

The existence of these employee benefits and plans, in and of themselves, does not signify that a Resident will be employed for the time necessary to qualify for these benefits and plans.

## Social Security

All Residents are covered by the Federal Social Security Act.  A required percentage of the Resident's salary is deducted from each paycheck to pay the Resident's portion of this protection, and CHCW matches the Resident's deduction dollar for dollar.  The plan is designed to provide for the Resident's future security and that of his/her dependents and provides for retirement, disability, death, survivor and Medicare benefits.

## State Unemployment Insurance

State Unemployment Insurance, funded entirely by employers in the state of Washington, provides weekly benefits for no fault unemployment due to circumstances described in Washington State law.

## Workers' Compensation

CHCW carries state insurance to cover the cost of an employee's work-incurred injury or illness. Benefits help pay for medical treatment and part of any income loss while recovering.  Specific benefits are prescribed by law, depending on the circumstances of each case. Work-related accidents must be reported immediately to the Human Resources Manager to ensure timely inspection and completion of forms.

## Malpractice Liability Insurance

Residents are covered by an indemnification plan with claims made type liability insurance for claims that arise directly related to an activity in which the Resident is/was engaged while acting within the scope of assigned duties.

## Holidays

There are eight holidays in each academic year (July 1 – June 30).

| Holiday | Date Usually Observed |
|---|---|
| Independence Day | July 4 |
| Labor Day | First Monday in September |
| Thanksgiving Day | Fourth Thursday in November |
| Day after Thanksgiving | Friday following Thanksgiving |
| Christmas Day | December 25 |
| New Year's Day | January 1 |
| Presidents Day | Third Monday in February |
| Memorial Day | Last Monday in May |

**Please contact CHCW HR department if you should have any questions about your benefits.**

VORGIAS 000019

When a holiday falls on Sunday, the following Monday will be observed as the holiday.  If a holiday falls on Saturday, the preceding Friday will be observed as the holiday.

Services requiring ongoing coverage or rotations where the attending physician works on the holiday will be covered by the Resident(s) assigned to that service or rotation at the time of the holiday. The Program Scheduler coordinates the schedule in a manner that assures fairness.

## Paid Time Off

For any clarification or questions regarding the schedule or time off, please contact Program Scheduler, Tosha Durand at tosha.durand@chcw.org or 509-574-6116.

Each Resident is allowed 20 days of Paid Time Off (PTO) for each contract year. PTO is a benefit designed to provide residents with the flexibility to use time off to meet personal needs, while recognizing individual responsibility to manage paid time off. PTO may be used for vacation, illness, caring for family, medical/dental appointments, leave, personal business, holidays not recognized by CHCW, or emergencies. **No PTO may be carried over from one contract year to another.**

PTO requests must be submitted and approved **three** months in advance to avoid impairment of clinic operations, rotation schedules, and clinic and jeopardy call. Requests should be submitted via UltiPro, CHCW's web-based payroll management system. PTO requests are granted on a first-come, first-served basis. There is no guarantee, however, that a request for specific dates will be granted and Residents should not make travel or other plans until the PTO has been approved. Please refer to PTO policy located in the shared drive or via intranet for details.

It is the Resident's responsibility to remind the rotation site contact and the rotation attending in advance of any approved PTO scheduled during a rotation.

**No PTO will be granted during the 1st rotation of the academic year, the Family Medicine service (FMS), Obstetrics (OB) service, Pediatric Hospital Service (PHS) rotations and during the ACOFP and ABFM in-training exams.**

**Rotations Restricted from using PTO-No more than 5 days of any type of time off are allowed during any four-week rotation. Exceptions will be approved only if the activity is required by the residency program.**

**Yakima Resident Process**-In the case of unscheduled PTO when the Resident is unable to work due to illness, the Resident must notify the Residency Program Scheduler via email at tosha.durand@chcw.org and the rotation site contact, who is listed on their rotation schedule. If the Resident is scheduled for clinic at CWFM, they must send an email to CWFM All within the organization's outlook email system and also contact his/her continuity clinic call center (CWFM/509-452-4520; or 509-574-6131) to discuss the disposition of clinic patient care with his/her nurse and or team. As with scheduled PTO requests, the Resident must submit all unscheduled PTO requests via UltiPro.

**Ellensburg Resident Process**- In the case of unscheduled PTO when the Resident is unable to work due to illness, the Resident must send an email to notify the Ellensburg Residency Coordinator via email at charlene.mize@chcw.org and call the rotation site contact. As with scheduled PTO requests, the Resident must submit all unscheduled PTO requests via UltiPro.

-If scheduled in clinic, the Resident must discuss the disposition of clinic patient care with the nursing team.

-If the resident is scheduled for Daytime Admissions at KVH they must notify the Jeopardy resident (even if there are no CHCW patients admitted).  If there is no Jeopardy resident, they must notify their attending.

-If the resident is scheduled for clinic call they must notify their attending.

VORGIAS 000020

**Professional Development**

All Professional Development leave requests must be submitted 3 months in advance and submitted to the CWFMR scheduler or Ellensburg Residency Coordinator. However, when R3's are using Professional Development leave for interviews there is some leniency. <u>No Professional Development leave is granted during the first year of training</u>. Professional Development leave is granted to R-2s (3 days) and R-3s (5 days) and may be used <u>only during unrestricted residency time</u> as specified above. Approved professional development leave may include leave for the purpose of: travel/time away for conferences, cultural/language training or international experiences and/or exploration of future employment opportunities. As Professional Development leave is a defined benefit, an unused Professional Development leave may not be carried forward from the R-2 year into the R-3 year and will not be paid out to the resident.

All requests for Professional Development leave must be **pre-approved by the Resident's advisor prior to final approval by the Program Director**. The Resident **must** explain in writing how the proposed educational activity fits with the Resident's overall educational needs.

Upon receipt of approval for Professional Development <u>leave</u>, the Resident **must** submit the approved leave request via email to the Program Scheduler. Remember to submit request in advance and follow up with the approval process. Residents **must not** make travel arrangements or register for the professional development activity until the leave is cleared by the Program Scheduler (Ellensburg and/or Yakima).

At the beginning of the R1 academic year, residents are granted $1,500, for the three years of residency. These professional development <u>funds</u> may be used for **approved** professional development purposes. Approved professional development purposes may include: purchase of medical textbooks, journal subscriptions, travel or tuition or registration fee for conferences, cultural/language training and/or international experiences. There is a $200 limit on use of Professional Development funds for computer hardware or other electronic equipment. As Professional Development funds are a defined benefit, any unused Professional Development funds after the residents third year will not be given to the resident, the funds will remain property of CWFM-R.

A Resident may petition the Program Director to use Professional Development funds for other educational purposes. All uses of Professional Development funds must be **pre-approved by the Resident's advisor prior to final approval by the Program Director**. Expenditures **<u>will not</u>** be reimbursed if prior approval has not been granted.

Upon receipt of approval for the use of Professional Development <u>funds</u>, the Resident will submit the request for funds/reimbursement to the Program Services Coordinator. Requests for funds/reimbursement **<u>must be</u> submitted within 30 days** of the expenditure. In order to insure timely processing of invoices and payments by academic year-end, reimbursement requests for Professional Development expenditures incurred near the end of the academic year must be submitted to the Program Services Coordinator no later than 15 days prior to the end of the academic year.

If you have any questions regarding use of funds and reimbursement processes, please contact verna.redbear@chcw.org

VORGIAS 000021

**Bereavement Leave**

In the event of a death in his/her immediate family, a Resident may be granted up to three working days of paid leave per contract year. The term "immediate family" is defined as the Resident's grand-parent, parent, spouse, partner, brother, sister, child, grandchild, mother-in-law, father-in-law, brother-in-law, sister-in-law, and any relative living in the Resident's household. Bereavement leave must be pre-approved by the Program Director/DIO. If extended time is needed, PTO or leave without pay may be granted at the discretion of the Program Director/DIO.

**Jury Duty**

Normal earnings are paid for jury service. Payments received for jury service must be signed over to Community Health of Central Washington. The Resident must notify the Residency Program Manager and the Program Scheduler upon receipt of a jury summons. A letter will be issued excusing resident from jury duty. This letter must be submitted to the court for final decision.

**Extended Leave of Absence**

Extended personal leave is granted at the discretion of the Program Director for *compelling* personal reasons.

In accordance with continuity requirements, leaves of absence from the residency in excess of PTO granted in each year of training must be made up prior to graduation. The date of completion of training will be extended commensurate with excess time taken.

1. Extended Independent Study Elective (AKA Away Elective)
   - A Resident may request an extended independent study elective in lieu of absence beyond PTO. Residents will be expected to provide proof of their learning during this away elective by filling out the required elective paperwork prior to beginning leave, and any required evaluations afterwards. Our program's policy on extended independent study is designed to comply with the policies of Community Health of Central Washington, the ACGME requirements for Family Medicine, and all federal employment laws. This extended study is an option for the Resident and is not required. The guidelines set forth here are general recommendations, and any Resident considering taking extended independent study is required to discuss this with the Program Director and Residency Manager and his/her advisor as soon as a need for extended independent study is identified. Following these meetings, and once the Program Director has approved the plan, the Resident will meet with the CHCW Human Resource manager to complete any required paperwork.
   - An away elective can be used if needed and is deemed necessary by the program director. The away elective is typically a third-year rotation. The Resident will not have a second away elective if he/she chooses this option. Residents will be expected to provide proof of their learning during this away elective by filling out the required elective paperwork prior to beginning leave, and any required evaluations afterwards. The Resident may then take a four-week reading elective following the extended independent study elective, during which time clinical responsibilities will be limited to CWFM clinic (up to 4 half-day sessions/week) and attendance at required didactics. This elective must be discussed with the Resident's advisor and approved by the Program Director.
   - PTO may be used adjacent to the extended independent study elective, but the Resident must discuss this extension with his/her advisor and have the plan approved by the Program Director.

VORGIAS 000022

- In lieu of an extended independent study elective, a Resident may request to take leave **without pay** when his/her PTO is depleted. This must be approved by the program director.

2. **Family and Medical Leave Act (FMLA)/ Military Family Leave Act (MFLA)**
   Eligible residents have a right under FMLA for up to 12 weeks of leave in a 12-month period for the reasons listed below:
   - Birth of a child, or the placement of a child for adoption or foster care
   - A serious health condition that renders the resident unable to perform the essential functions of his/her job
   - A serious heal condition affecting the resident's spouse, child, or parent, for which the resident must provide care.
   - Family member of military servicemembers for qualifying exigencies and for care of covered servicemembers, including certain veterans, with a serious injury or illness.
   - The Washington State Military Family Leave Act (MFLA) (app.leg.wa.gov) allows an employee whose spouse is a member of the United States armed forces, National Guard or reserves to take 15 days of leave when the spouse is notified of an impending call to active duty or when the spouse is on leave from an active duty deployment.
   - During FMLA or MFLA, PTO must be used prior to utilizing unpaid leave.

## Health Insurance

Medical, dental, and vision insurance is available for Residents, subject to specific plan eligibility rules and coverage. Residents are eligible for benefits on the first day of employment. Residents may choose to insure family members. Resident is responsible for paying 50% of the health insurance premium (medical, dental, vision) for the PPO plan or HDHP plan for resident dependents and a contribution to the CHCW Health Saving Account when enrolled in the HDHP plan.

CHCW provides health insurance (medical, dental, and vision) for the resident via a paid premium for the CHCW PPO plan or CHCW High Deductible Health Plan and a contribution to the Health Saving Account when enrolled in the HDHP plan. Any co-payments/deductibles will be the responsibility of the resident.

## 401(k) Plan

CHCW provides a 401(k)-profit sharing plan. Upon eligibility CHCW makes contributions on behalf of each enrolled Resident. Residents are also eligible to contribute their own dollars beginning 90 calendar days from start of residency.

## Flexible Spending Account

A Flexible Spending (IRC Section 125) account is available to Residents. Participation is voluntary but limited to the extent of the law and IRS regulations. The Resident is eligible on the first day of employment.

## Life and Disability Insurance

Group Term Life Insurance and Group Disability Insurance are provided for Residents effective the first day of employment.

VORGIAS 000023

**Employee Assistance Plan**

CHCW provides an Employee Assistance Program (EAP) for Residents and their dependents that include free assessment and counseling services. Please contact Program Manager or Human Resources for contact information.

**Meals**

The institution provides meals/nourishments for residents during their inpatient hospital shifts/rotations where the resident is required to remain on the floor to provide patient care. Meals are always available while on an inpatient service. The resident is not required to pay out of pocket for meals and the hospital should bill the residency program. Kittitas Valley Hospital has agreed to provide Ellensburg residents with meals while working on inpatient services.

VORGIAS 000024

# ORGANIZATIONAL ASSETS

## Use of Supplies

CHCW purchases office and miscellaneous supplies for business use only and these supplies should not be used for personal reasons.

## Key and Entrance Code Policy

CHCW Residents are issued building keys and individual entrance codes for after-hours entrance to the building. It is the Resident's responsibility to keep keys and entrance codes in a secure place and report key loss or theft immediately. Keys should not be loaned or duplicated, and entrance codes should not be shared.

CHCW will replace a key the first time it is missing for any reason. Keys that need to be replaced for the second or more times will be at the Resident's expense.

Upon completion or termination of training, Residents are required to turn in key(s) prior to final departure from the building.

## Electronic Business Equipment Use and Security

Electronic business equipment that is owned or cost reimbursed by CHCW is a valuable asset and intended primarily for business use. Electronic business equipment includes: computer hardware and software, and smart phones used in the provision of patient care. All computer files created, loaded, or maintained on CHCW business equipment are the property of Community Health of Central Washington. Purchased/leased software may not be copied or used contrary to the provisions of the contract. Residents **may not** load personal software on a company provided computer unless given permission by the Director of Information Systems. All CHCW provided computers and software remain the property of CHCW.

Residents are required to use smart phones with voicemail, texting and internet capabilities to aid in communication and provide access to on-line medical resources. Residents are required to record a business voicemail greeting for their cell phones. Prompt response is required for all calls, voicemail and text messages except when a Resident is on night float and the phone is off during the day while the Resident is sleeping. During business hours, personal calls and text messaging must be kept to a minimum and not disrupt the flow of patient care or other work responsibilities. Residents may download non-business applications for personal use on smart phones but must use discretion and good judgment in the choice of applications.

When not in use, all portable electronic business equipment must be left in a secured area. Portable electronic business equipment is not to be left in any open, shared, or unsecured area in or outside of the clinic. The Resident bears the responsibility for replacement of electronic business equipment that is lost, stolen or damaged due to negligence.

VORGIAS 000025

**Electronic Mail**

CHCW has established a policy for the use of email whereby employees must ensure that they:
- Comply with current legislation
- Use email in an acceptable way
- Do not create unnecessary business risk to the company by their misuse of the Internet

Unacceptable behavior is listed as but not limited to:
- Use of company communications systems to set up personal businesses or send chain letters
- Forwarding of company confidential messages to external locations non-related to business matters.
- Distributing, disseminating or storing images, text or materials that might be considered indecent, pornographic, obscene or illegal
- Distributing, disseminating or storing images, text or materials that might be considered offensive or abusive.
- Accessing copyrighted information in a way that violates the copyright
- Breaking into the system or unauthorized use of a password/mailbox.
- Broadcasting unsolicited personal views on social, political, religious or other non-business related matters.
- Transmitting unsolicited commercial or advertising material
- Undertaking deliberate activities that waste staff effort or networked resources
- Introducing any form of computer virus into the corporate network.

The use of email is a valuable business tool. However, misuse can have a negative impact upon employee productivity and reputation of the business.

In addition, all of CHCW's email resources are provided for business purposes. Therefore, the company maintains the right to examine any systems and inspect any data recorded in those systems.

In order to ensure compliance with this policy, the company reserves and intends to exercise the right to review, audit, intercept, access and disclose all messages created, received or sent over the electronic mail system for any purpose. The contents of electronic mail properly obtained for legitimate business purposes, may be disclosed with the company without the permission of the employee.

Failure to comply with these guidelines will result in sanctions ranging from disciplinary action through dismissal.

**Internet**

Access to the Internet at CHCW is a company resource and is provided as a business-communication tool. As such, personal access to the Internet must be limited to breaks and lunch periods and may not disrupt normal business use.

Access to the Internet is not to be used in a way that may be illegal, disruptive, or offensive to others. Residents are prohibited from transmitting, downloading, uploading, or printing information that contains offensive information. Residents do not have a personal privacy right in use of the Internet and are expected to use good judgment in the use of the internet, including social media access.

Violation of this policy will result in discipline up to and including discharge.

VORGIAS 000026

**Postage**

The CHCW postage machine is for outgoing business mail. The CHCW postage machine should not be used by Residents for personal use. Postage for personal mail may be purchased from the designated mail attendant.

**Mail**

Residents are provided mailboxes at CWFM and/or CHCW-E. Routine written communications and mail are placed in the mailboxes. Boxes should be emptied each day when in clinic or at least once a week unless on an away rotation.

CHCW receives and sends large quantities of mail daily. Incoming and outgoing personal mail should be limited.

**Printing, Copying and Faxing**

Printers, photocopiers and fax machines are intended for business use.

**Telephones**

CHCW telephones (desk & cellular) are to be used for business. Calls should be answered promptly and courteously. On occasion, personal calls may be necessary, but should be limited to emergencies or brief essential personal business.

VORGIAS 000027

# EMPLOYEE SAFETY AND HEALTH

CHCW strives to provide safe working conditions for Residents by observing the safety laws of the federal and state government within whose jurisdiction it operates. No one is knowingly required to work in any unsafe manner. Safety is every Resident's responsibility, and all Residents are expected to do everything reasonable and necessary to keep the program a safe place to work. Upon hire, new Residents participate in the Health and Safety Training. Safety rules are posted and Residents are responsible to become familiar with and observe these rules at all times.

## Smoke Free Environment

Community Health of Central Washington is a smoke free workplace. Residents **are not** permitted to smoke on Community Health of Central Washington premises.

## Substance Abuse

Community Health of Central Washington maintains a commitment to provide a safe and healthy work environment for its employees by eliminating the effects of drug and alcohol use in the workplace.

Unauthorized or unlawful manufacture, distribution, dispensation, possession, and use of drugs or alcohol on company premises, and/or engaging in such activity while conducting business on company time, whether on or off company premises, is prohibited and may result in immediate termination.

Employees **must not** report for work or perform work under the influence of or after having used or consumed controlled substances. For purposes of this policy, any employee testing positive for a controlled substance (or its metabolite) in his/her urine is conclusively presumed to be under the influence of such drugs.

Employees **must not** report for work or perform work with a blood alcohol content greater than 0.00 percent.

Employees **must not** report for work or perform work under the influence of, or be impaired by prescription drugs, medications, or other substances that may, in any way, adversely impair their alertness, coordination, reaction, response, safety, or ability to perform the essential functions of the position.

Due to the nature of CHCW business, medications exist on company premises which are accessible to employees. The misuse, or unauthorized use, of these medications is prohibited, and will be considered a violation of this policy.

1. Testing
   To ensure compliance with the guidelines set forth in this policy, CHCW will utilize pre-employment and reasonable suspicion drug and alcohol testing analysis.
   - Pre-Employment Testing - All applicants with a pending job offer for any position will be required to submit to a urine drug screen prior to employment. New hires will not be permitted to begin working until the test results are received.
   - Reasonable Suspicion Testing - If facts, circumstances, physical evidence, physical symptoms, or a pattern of performance or behavior causes a supervisor to reasonably conclude that an employee may have used, be under the influence of, or impaired by drugs or alcohol, the supervisor may request testing.

VORGIAS 000028

Refusal to submit a sample or tampering with the sample during testing shall result in immediate termination or the withdrawal of an offer of employment.

2. Confidentiality
Community Health of Central Washington requires that all personnel maintain confidentiality in all matters relating to alcohol/drug use and enforcement of CHCW policy. Violations of confidentiality will result in disciplinary action up to and including termination.

## Life Threatening Illnesses

CHCW is committed to providing equal opportunity to all Residents, including those who have a life-threatening illness (cancer, AIDS, cardio-pulmonary diseases, etc.). Consequently, a Resident who has a life-threatening illness will be treated like any other Resident as long as:

1. The work environment does not impede the Resident's health.
2. Performance standards are met.
3. The illness does not present a threat to the Resident's co-workers.
4. Prescription drugs or medications used for the treatment of the illness do not adversely affect the Resident's alertness, judgment, coordination, reaction, response, or safety.

Information regarding any Resident with a life-threatening illness will be kept confidential and the Resident will be treated with compassion and respect.

A Resident granted leave for a medical disability may return to work when his/her physician provides a written release stating that the Resident is able to resume normal duties.

## Policy Against Violence

Community Health of Central Washington has zero tolerance for violence. Violence includes but is not limited to physical harm, shoving, threats, harassment, intimidation, coercion, brandishing weapons, etc.

Perceived or observed violent incidents must be reported to the Program Director/DIO or his/her designee. Appropriate action may include the notification of law enforcement officials, the removal of the offender from the premises, and the obtaining of a restraining order.

If the perpetrator is a Resident, the Program Director/DIO reserves the right to use any of the following steps as is dictated by the severity and nature of the threat:

1. Oral Warning.
2. Written Warning.
3. Suspension Without Pay.
4. Immediate Dismissal

# STANDARDS OF CONDUCT

Community Health of Central Washington Residents are expected to conduct business according to the highest ethical standards and best interests of the program. As representatives of Community Health of Central Washington, Residents are required to maintain the following standards of conduct:
**Please note: CHCW has developed and implemented an organizational Standard of Behavior. This standard is located on the intranet**.

## Personal Appearance

Residents are expected to dress and groom themselves in a manner that promotes patient and community confidence and respect, enhances CHCW's reputation as a professional organization, and exhibits good health and safety practices.

If a Resident presents to work dressed inappropriately, the Resident may be asked to leave the workplace until he/she is properly attired. A Resident who violates the personal appearance standards may be subject to appropriate disciplinary action.

1. Definitions
   - Patient care area – any part of the clinic used frequently by patients. This includes exam rooms, radiology, laboratory, waiting areas, patient homes (when care is provided in the home), hospitals, and other facilities where patient related work assignments are being performed.
   - Jeans day-typically every Friday with a $5.00 donation (see jeans day policy for more info)
   - Flip-flops – flat, backless, sandal consisting of a flat sole held loosely on the foot by a Y-shaped strap that fits between the toes.
   - Tank top – sleeveless top that does not cover the entire top portion of the shoulder.
2. Clothing must
   - Be professional and appropriate to the department;
   - Be clean and in good repair;
   - Fit in such a manner that it does not expose the abdomen, chest or buttocks;
   - Be free of messages, graphic arts, or advertisements unrelated to CHCW.
   - Halter-tops, spaghetti strap tops, and tank tops (when worn alone), shorts, beachwear, workout attire, casual T-shirts, sweatshirts, or other distracting, offensive, or revealing clothes are unacceptable.
   - Jeans, skirts, and jackets made of denim, regardless of color, are inappropriate except on designated jeans days.
   - Dresses and skirts must be slightly above the knee or longer.
   - White coats are not required and may be worn in clinic at the discretion of the Resident.

VORGIAS 000030

3. Shoes
   - Must be clean, in good repair, and appropriate to the work area.
   - Flip-flops and slippers are not permitted.
   - Any Resident who performs work in patient care areas must wear close-toed shoes. Acceptable close-toed shoes include tennis shoes, clogs, and comfortable loafers.
4. Hair
   - Hair must be clean and styled.
   - Facial hair is permissible if clean and neatly trimmed.
5. Jewelry
   - Jewelry should not be loose or dangle in such a way that it creates a safety hazard.
   - Body piercing jewelry is allowed in the ear only. All other visible piercings must be removed or covered while at work.
   - Pins that promote religious, political or union related messages or information are unacceptable.
6. Other
   - Fingernails must be clean and filed short enough to avoid potential injury in patient care areas.
   - Name badges are required to be worn at all times.
   - Visible tattoos designs must be appropriate for children and families. Those that are not (e.g. skulls, monsters, vulgar language, violent, gang related, or sexual content) must be covered while at work.
   - Cologne, perfume, scented body lotion, and aftershave lotion should be used in moderation. Light fragrances are acceptable.

7. Jeans Day
   - On designated jeans charity fundraiser days, Residents may wear jeans if neat, not excessively faded, and free of holes, tears, etc.
   - Residents should use good judgment in selecting clothing for these days; if the Resident is working in a non-CHCW facility or attending a meeting, more professional attire may be appropriate.
   - Attire worn on jeans days must be in compliance with the rest of the personal appearance standards.

## Confidentiality

Community Health of Central Washington Residents are expected to maintain confidentiality at all times. No medical information or medical report may be released or discussed without written consent from the patient, parent or legal guardian, or as allowed under the Health Care Information Act.    Access to employee files is limited as required by law and general business information should be provided only to those with a legitimate business need to know. All CHCW Residents will be provided HIPAA training during the orientation month.

## Employee and Family Healthcare

CHCW employees are now allowed to receive care from any CHCW provider and request care for immediate family members at any CHCW work site. However, the policy retains the authority of providers to place limitations if they have privacy or ethical concerns. The policy is available on the intranet site, Employees as Patients.

CHCW providers, including Residents, are prohibited from providing medical care to their immediate family members while conducting business on behalf of CHCW.

VORGIAS 000031

**Media Relations**

Only the CEO or his/her designee is permitted to make any comment to the media regarding CHCW, its patients, employees, or clinic issues. Residents are encouraged to use good judgment when discussing issues of general interest with the media.

**Use of Names and Logos**

The CHCW and CWFMR names and logos are properties of CHCW and used for business purposes only. Use of the names and/or logos for sponsorships and/or advertising is at the discretion of the CHCW Leadership Group.

**Outside Activities**

Because Community Health of Central Washington provides a service to its customers, its image and appearance in the community is important.  Any activity outside working hours that creates the appearance of a conflict or may adversely affect CHCW is prohibited.

**Solicitation and Distribution**

CHCW has clear guidelines and expectations regarding fundraising, solicitation and/or distribution of materials on CHCW premises.

1. Celebrations
   On occasion, Residents may collect monies or resources from one another or other CHCW employees for employee related purposes such as birthday, baby, wedding, or retirement celebrations, expressions of sympathy, or support in times of employee hardship. Such solicitations must not interfere with the job responsibilities of the solicitors or the donors. Information may be disseminated via company mailboxes or email but is not to be presented as a CHCW sponsored event. Advertisement for these events such as fliers, posters, etc. should not be published utilizing CHCW supplies or equipment.
2. Charity Support
   CHCW conducts an annual United Way campaign and may sponsor other CHCW Leadership Group approved fundraisers. All Residents are given an opportunity to participate as part of our corporate commitment to community service. Solicitation of money, time, or goods for these events is not intended to interfere with the job responsibilities of the solicitors or the donors. Resident solicitations for money, time, or goods for non-CHCW sponsored charity fundraisers are allowed but must not interfere with the job responsibilities of the solicitor or the donors. Advertisement for non-CHCW sponsored charity fundraisers such as fliers, posters, etc. should not be published utilizing CHCW supplies or equipment.
3. Community Events
   Residents may provide information regarding community events to co-workers and other CHCW employees via the employee bulletin board(s) and employee break-room(s). Postings in patient waiting areas must be approved by site leadership.
4. Commercial
   Solicitation by Residents of personal goods and services is allowed but must not interfere with the job responsibilities of the solicitor or those being solicited. Advertisement for these goods and services should not utilize CHCW supplies or equipment.
5. Outside Solicitors
   Non-employees are prohibited from soliciting on CHCW premises.

VORGIAS 000032

**Policy Against Harassment**

Harassment is illegal and will not be tolerated.  Harassment may include:

1.  Making unwelcome sexual advances or requests for sexual favors.
2.  Making verbal or physical conduct of a sexual nature a condition of a Resident's or employee's continued employment.
3.  Making submission to or rejections of such conduct the basis for decisions affecting the Resident or employee.
4.  Creating an intimidating, hostile or offensive work environment by such conduct.
5.  Retaliating against any person, because he/she has made or filed a complaint of sexual harassment or opposed such conduct.

A Resident who feels he/she has been sexually or otherwise harassed should tell the offender to stop and report the incident to the Program Director.  Confidentiality will be maintained to the extent dictated by the circumstances.

**Employee Inter-relationships**

CHCW encourages its employees to foster strong **working** relationships in order to develop the collaborative team approach needed for excellent patient care. CHCW discourages **personal** relationships of an intimate or romantic nature between employees across all levels of the organization as such relationships can compromise the effectiveness of the work environment.

**Standards of Conduct Violation**

Violations of Community Health of Central Washington standards of conduct will result in the development of a corrective action plan.  Depending on the seriousness of the infraction, the past record of the Resident and the circumstances surrounding the matter, corrective action may include, but is not limited to:

1.  Oral warning
2.  Written warning
3.  Suspension
4.  Dismissal

The following list is representative of the types of activities which may result in disciplinary action. Since there is no way to identify every possible violation of standards of conduct, including harassment or discrimination, it is not intended to be comprehensive and does not alter the employment-at-will relationship between the Resident and the program.

1.  Falsifying or omitting of information in the Resident's application or personnel information.
2.  Unauthorized possession or use of CHCW materials, time, equipment or property.
3.  Gambling, violating criminal law, carrying weapons or explosives on Community Health of Central Washington premises.
4.  Fighting, throwing things, horseplay, practical jokes or other disorderly conduct which may endanger the well-being of any Resident, employee, patient or visitor.
5.  Engaging in acts of dishonesty, fraud, theft or sabotage.
6.  Threatening, intimidating, coercing, using abusive or vulgar language, or interfering with the performance of other Residents or employees.
7.  Insubordination or refusal to comply with instructions or failure to perform reasonable duties as assigned.

VORGIAS 000033

8. Damaging or destroying program property due to careless or willful acts.
9. Negligence in observing fire prevention and safety rules.
10. Irregular attendance or absence without notice.
11. Conduct which adversely reflects on the Resident or Community Health of Central Washington.
12. Work performance that does not meet the requirements of the position.
13. Engaging in practices inconsistent with the ordinary and reasonable rules of conduct necessary for the welfare of Community Health of Central Washington, its employees, patients, or visitors.
14. Any acts, conduct or omission deemed of a serious nature by Community Health of Central Washington.

VORGIAS 000034

# RESIDENT SUPERVISION, EVALUATION, ADVISING, AND ADVANCEMENT

## Supervision of Residents

Residents are supervised by program faculty and community attending physicians with documented qualifications, expertise and diversified interests sufficient to meet the various training responsibilities of the program. Please see resident supervision policy located in the shared drive for details.

## Performance Appraisals (Evaluations)

Residents are subject to continuous performance evaluation, with regard to the seven core competencies: **patient care, medical knowledge, practice-based learning and improvement, interpersonal and communication skills, professionalism, systems-based practice, and osteopathic philosophy and osteopathic manipulative medicine**. Such evaluation is an integral part of the education process, and each Resident is responsible for participating in the evaluation process as requested and as delineated in the "Evaluation Strategy" of each curriculum and rotation, and as described in the "Resident Evaluation and Advising" sections of the Resident Handbook. Residents are evaluated by the Program faculty and staff, including nursing and other staff within the FMC, and by community physicians and health care workers with whom the Resident has contact throughout their period of training.

The goals of the CWFMR Resident evaluation system are:

1. Assure the safety of patients.
2. Provide relevant, fair, useful, and accurate feedback about Resident progress from appropriate sources including CWFMR faculty and community preceptors, encounter/billing form data, inpatient and outpatient supervisors, and results of national Resident In-Training Examinations.
3. Measure Resident and residency program outcomes to determine if educational objectives are met.
4. Assess Resident involvement and investment in establishing personal learning goals, self-assessment of educational progress, and attainment of goals.
5. Document progress and competence for purposes of advancement and graduation, compliance with residency program requirements for accreditation, references for future work applications and determination of privileges.
6. Obtain information that will contribute to the maintenance and continuous improvement of educational opportunities and rotations.
7. Utilize the ACGME and ABFM Family Medicine Milestone Project. The milestones are developmentally-based family medicine-specific attributes that family medicine residents can be expected to demonstrate as they progress through their program.

Resident competence will be evaluated in a variety of ways including direct observation, outcomes assessment, patient feedback and written examination.
Upon evaluating residents, if remediation is identified, advisor will follow Remediation policy. Please see Remediation policy for details.

## Advancement and Graduation

Resident advancement is determined by the Program Director in consultation with the faculty of the program.

There are three advancement steps:
1. R1 to R2

VORGIAS 000035

2. R2 to R3
3. R3 to graduation

For advancement to the next level, acceptable progress meeting milestones in the seven core competencies needs to be documented. Additionally, the Resident must be judged competent to supervise others (R1's and students), and to act with limited independence. In the R3 to graduation step, the Resident must be judged with sufficient ability and appropriate clinical and procedural skills to demonstrate sufficient competence to enter practice without direct supervision. Upon the Resident's successful completion of the program, the Program Director will issue a certificate so stating. Please see Promotion, Graduation and Dismissal policies for details.

Below is the link to the ACGME-FM Milestones.

https://www.acgme.org/What-We-Do/Accreditation/Milestones/Milestones-by-Specialty

**Advisor/Advisee Relationship**

At the beginning of the R1 year, each Resident is assigned a Faculty Advisor. An Advisor/Advisee relationship is, by nature, personal and confidential. Unless the Resident specifies otherwise, the advisor is permitted to share information with other members of the faculty as may be necessary. Confidentiality may be broken if harm or threats of harm to self or others is revealed.

The Resident and the advisor may request a change of advisor/advisee once a year if there are conflicts or discomfort with the relationship. The proposed change must be discussed with the Program Director. The Program Director retains the right to make an assignment if an equitable solution cannot be worked out.

**Advisor/Advisee Meetings**

Residents and advisors should meet quarterly. Meetings should take place:

1. R-1s: end of Orientation, October, January, and April.
2. R-2s: end of August, November, February, and May.
3. R-3s: end of September, December, March, and June.

Informal advisor/advisee meetings will be Resident driven. Quarterly advisor/advisee meetings will be initiated by the advisor, as will meetings to discuss urgent issues that require review. The advisor will write a summary report for all quarterly and formal evaluation sessions, to include resident Individual Learning Plans (ILP).

The Resident or his/her advisor should discuss significant general problems with an area of the curriculum, a rotation, an educational setting, or an educator, with the faculty member responsible for that curricular area.

**Advisor Responsibilities**

The advisor reviews information from all areas evaluated and develops a coherent summary of formative and evaluative comments for discussion with the Resident. The advisor prepares a summary of the evaluation meeting for the Resident's file.

**Advisee Responsibilities**

The Resident should review curriculum objectives before each rotation and after rotation completion to gauge progress toward educational goals. He/she will present an open/creative self-assessment during each formal advisor/advisee meeting and a detailed ILP. Self-assessment forms are located in New Innovations.

VORGIAS 000036

**Documentation of Skills and Abilities**

The granting of privileges for care and procedures is a legal and financial issue that continues to escalate for all physicians. Future privileging and credentialing for hospital care and some clinic settings will depend upon accurate documentation during residency to capture the content and scope of the patient experience. Residents are required to carefully document their procedures and participation in the care of high risk or complicated patients. The ACGME and AOA also require Residents to document the care of nursing home patients and home visits on continuity patients.

Residents are <u>required</u> to document all procedures performed in New Innovations. These include procedures done in the clinic (including OMT), at rotation sites and in the hospitals. Residents should pay particular attention to including appropriate information, such as type of procedure, role in procedure and patient identifiers to capture the experience.

**Core Competency Development**

The criteria for advancement shall be based upon appropriate development of the following seven core competencies. The Resident must be judged as competent in these for each level of advancement.

1. <u>**Patient Care & Patient Safety:**</u>
   Residents must be able to provide patient care that is compassionate, appropriate, and effective for the treatment of health problems and the promotion of health. Residents are expected to:
   - communicate effectively and demonstrate caring and respectful behaviors when interacting with patients and their families, gather essential and accurate information about their patients, make informed decisions about diagnostic and therapeutic interventions based on patient information and preferences, up-to-date scientific evidence, and clinical judgment.
   - develop and carry out patient management plans.
   - counsel and educate patients and their families.
   - use information technology to support patient care decisions and patient education.
   - perform competently all medical and invasive procedures considered essential for the area of practice.
   - provide health care services aimed at preventing health problems or maintaining health.
   - work with health care professionals, including those from other disciplines, to provide patient-focused care.
   - Please refer to CHCW policy regarding patient safety and risk management program. Policy is available via intranet.
2. <u>**Medical Knowledge:**</u>
   Residents must demonstrate knowledge about established and evolving biomedical, clinical, and cognate (e.g., epidemiological and social-behavioral) sciences and the application of this knowledge to patient care. Residents are expected to:
   - demonstrate an investigatory and analytic thinking approach to clinical situations.
   - know and apply the basic clinically supportive sciences which are appropriate to their discipline.
3. <u>**Practice-Based Learning and Improvement**</u>:
   Residents must be able to investigate and evaluate their patient care practices, appraise and assimilate scientific evidence, and improve their patient care practices. Residents are expected to:
   - analyze practice experience and perform practice-based improvement activities using a systematic methodology.
   - locate, appraise, and assimilate evidence from scientific studies related to their patients' health problems.

VORGIAS 000037

4. **Interpersonal and Communication Skills:**

Residents must be able to demonstrate interpersonal and communication skills that result in effective information exchange and teaming with patients, their patients' families, and professional associates. Residents are expected to:

- create and sustain a therapeutic and ethically sound relationship with patients.
- use effective listening skills and elicit and provide information using effective nonverbal, explanatory, questioning, and writing skills.
- work effectively with others as a member or leader of a health care team or other professional group.

5. **Professionalism**

Residents must demonstrate a commitment to carrying out professional responsibilities, adherence to ethical principles, and sensitivity to a diverse patient population. Residents are expected to:

- demonstrate respect, compassion, and integrity; a responsiveness to the needs of patients and society that supercedes self-interest; accountability to patients, society, and the profession; and a commitment to excellence and on-going professional development.
- demonstrate a commitment to ethical principles pertaining to provision or withholding of clinical care, confidentiality of patient information, informed consent, and business practices.
- demonstrate sensitivity and responsiveness to patients' culture, age, gender, and disabilities.

6. **Systems-Based Practice**

Residents must demonstrate an awareness of and responsiveness to the larger context and system of health care and the ability to effectively call on system resources to provide care that is of optimal value. Residents are expected to:

- understand how their patient care and other professional practices affect other health care professionals, the health care organization, and the larger society and how these elements of the system affect their own practice.
- know how types of medical practice and delivery systems differ from one another, including methods of controlling health care costs and allocating resources.
- practice cost-effective health care and assist patients in dealing with system complexities.
- know how to partner with health care managers and health care providers to assess, coordinate, and improve health care and know how these activities can affect system performance.

7. **Osteopathic Philosophy and Osteopathic Manipulation Medicine**

- Residents must demonstrate competency in the understanding and application of OMT appropriate to family medicine
- Resident must appropriately integrate osteopathic concepts and OMT into the medical care provided to patients.
- Resident must understand and integrate osteopathic principles and philosophy into all clinical and patient care activities.

## Successful Completion of Rotations and Educational Experiences

The decision whether a Resident passes a rotation or other educational element of the required curriculum is determined by the Program Director, in consultation with the advisor, other faculty and educators, and using all objective and subjective information that is appropriate to the assessment of the Resident's performance in the setting. Evaluation by attendings and others is *advisory* to the Program Director. Failure may result from deficiencies in cognition, clinical performance, technical skills, attendance, and/or attitudinal objectives. If remediation is required, the resident will be provided with the remediation policy and will have a formal meeting with his/her advisor to develop a plan. Please see Remediation policy for details. The advisor also has the option of making a CARED referral. Please see below CARED committee description and workflow.

VORGIAS 000038

**CARED Committee Description:**

## <u>C</u>ommittee <u>A</u>ddressing <u>R</u>esidents <u>E</u>xperiencing <u>D</u>ifficulty (CARED)

### I. Mission and Purpose

The Central Washington Family Medicine Residency Program (CWFMR) is a funded Teaching Health Center. The program's institutional sponsor is Community Health of Central Washington (CHCW), a federally qualified health center (FQHC), whose mission is **to provide quality health care through service and education**. To this end, the residency program is committed to providing residents with the tools they need to become successful practicing family physicians that receive certification from the American Board of Family Medicine and/or the American Osteopathic Board of Family Physicians.

An essential component of assessing resident progress is through the Accreditation Council for Graduate Medical Education (ACGME) milestone attainment. While residents meet various milestones at different stages of training, residents falling behind their peers in milestone attainment may require remediation to meet expectations required for program advancement. Ultimately the remediation process is designed to ensure residents overcome deficits in ACGME core competencies to attain all ACGME Entrustable Professional Activities (EPAs) required for Family Medicine Physicians at the time of graduation.

This committee aims to provide early identification and intervention for residents in difficulty through data collection and development of personalized improvement plans. The overarching goal of this committee is to ensure residents meet accreditation goals without receiving formal citations and/or delayed time to graduation. Therefore, the committee seeks to prevent and/or correct progression of problems in residency.

### Due Process

#### A. Committee Structure

i. **<u>Quorum</u>**: A committee will consistent of: Program Manager and/or Residency Site Coordinator, Medical Educator, Human Resource Director, and the Program Director (PD). Additionally, a behavioral health specialist, physician faculty member, and/or residency site coordinator should be present. Any of these parties is considered to contribute to the quorum if present in person or by phone. If the physician faculty is the advisor of the resident in difficulty, another physician faculty member, in good standing, will be requested to participate to meet the quorum. The faculty advisor does not need to participate in the initial committee meeting where their resident is discussed, unless deemed necessary by the committee.

    a. **<u>Site-Based Participation</u>**: Committee members contributing to the quorum will be asked to participate based on congruency between their home site and the home site of the resident in difficulty. For example, if the resident in difficulty is an Ellensburg resident, Ellensburg faculty will be preferentially asked to participate in order to best contribute to resident oversight.

    b. **<u>Permanent members</u>**:
        i. Program Manager/Residency Site Coordinator
        ii. Program Director
        iii. Medical Educator (Chair)
        iv. HR Director
        v. BHC Director

VORGIAS 000039

vi. APD

c. **Rotating members**:
   i. BHC representative
   ii. Physician faculty member

d. **Site-Based Participation**:
   i. Faculty, staff and coordinators will be involved based on home site of resident in difficulty and relevance to the problem

e. **Optional Members:**
   i. Residents will be given the option to have the chief resident represent them.

f. **Committee Referral**: Residents may be referred to the committee by any one of the following sources: Any individual who supervises or works collaboratively with a resident, including: faculty members, nursing supervisor, and residency staff.
   i. All referrals should be sent via an email addressed to the Program Manager and advisor (as applicable), copying the Program Director

g. **Referral Follow-Up**: Following a referral, the Program Manager contacts involved parties to acquire additional information. They will then discuss the situation with additional parties to collect data relevant to the deficiency/area of concern (i.e. advisor, nursing, etc.). The Program Manager will then provide CARED members and the resident's advisor with a brief outline (via email) of the situation and possible recommendations, asking for input from the committee and advisor. After review of comments and suggestions, the Program Manager summarizes the feedback and schedules a CARED meeting for follow-up as deemed necessary (see below). In certain cases (requiring informal remediation), the issue may be addressed solely by the advisor upon initial identification and prior to escalation. Major problems requiring formal remediation (e.g. issues regarding patient safety and/or ethical lapses) or recurrent problems will likely result in CARED referral. However, the advisor may request assistance from CARED for issues requiring informal remediation if they feel they do not have the experience and/or resources to properly address the issue.

   i. **No Action Necessary:** No remediation is determined as necessary at the current time. Note, the referral to CARED and determination of "no action necessary" will be kept on file for program tracking and liability purposes.
   ii. **Follow-Up to Informal Remediation**: Informal remediation represents the first step in the process and is initiated when warning signs of problems exist, but problems are not so significant to warrant immediate formal remediation (Smith *et al.*, 2017). Therefore, these problems are primarily addressed by the resident and their advisor. Here, the resident will meet with their advisor to develop plan of action. This plan of action is submitted to the committee and program office. The advisor and resident are expected to follow-up and report progress to the committee as outlined in their individual improvement plan. Examples of informal remediation action plans include: apologizing to offended party, not leaving clinic until charting is complete, etc.
      1. **Exceptions:** *Per above, if the advisor feels they do not have the experience and/or resources to address a given area of concern, the steps to informal remediation will be addressed by CARED in conjunction with the resident advisor.*

iii. **<u>Follow-Up to Formal Remediation</u>**: Once it has been decided the resident requires formal remediation to address the problem, the committee will setup a meeting time to discuss the problem and follow-up according to remediation levels (1-5) as described below. This meeting will ideally occur within 7 days of the identified problem/referral.

B. **Issues Requiring Formal Remediation:** The following list is representative of the types of activities which may result in formal remediation per the resident handbook. Since there is no way to identify every possible violation of standards of conduct, including harassment or discrimination, the list is not intended to be comprehensive and does not alter the employment-at-will relationship between the resident and the program.
1. Falsifying or omitting of information in the Resident's application or personnel information.
2. Unauthorized possession or use of CHCW materials, time, equipment or property.
3. Gambling, violating criminal law, carrying weapons or explosives on Community Health of Central Washington premises.
4. Fighting, throwing things, horseplay, practical jokes or other disorderly conduct which may endanger the well-being of any Resident, employee, patient or visitor.
5. Engaging in acts of dishonesty, fraud, theft or sabotage.
6. Threatening, intimidating, coercing, using abusive or vulgar language, or interfering with the performance of other Residents or employees.
7. Insubordination or refusal to comply with instructions or failure to perform reasonable duties as assigned.
8. Damaging or destroying program property due to careless or willful acts.
9. Negligence in observing fire prevention and safety rules.
10. Irregular attendance or absence without notice.
11. Conduct which adversely reflects on the Resident or Community Health of Central Washington.
12. Work performance that does not meet the requirements of the position.
13. Engaging in practices inconsistent with the ordinary and reasonable rules of conduct necessary for the welfare of Community Health of Central Washington, its employees, patients, or visitors.
14. Any acts, conduct or omission deemed of a serious nature by Community Health of Central Washington.

C. **Formal Remediation Documentation:** Formal remediation is considered a problem that is significant enough to warrant immediate formal remediation (e.g. patient safety concerns; see list above) or a chronic deficiency that has not been corrected (e.g. late charting) (Smith *et al.*, 2017). Once referred to the committee for formal remediation, the committee will supply the resident, advisor and the program director with all of the following:

i. Written documentation of the problem containing data from all parties involved.
ii. Documentation of any prior attempts by the program to help the resident remediate the deficiency or deficiencies.
iii. Steps that the resident needs to complete to address the problem (i.e. learning plan).
iv. Description of further steps to be implemented if resident **fails** to improve; this will include a required timeline for follow-up and improvement.

VORGIAS 000041

**D. Remediation Levels:**

1. **Formal Remediation—Constructive Citations:** Constructive Citations are areas of concern on which the resident should focus his/her study, but are not serious enough to cause concern about advancement. These citations should receive at least **quarterly** follow-up by a clearly delineated person and process outlined in the formal remediation plan. Once the committee has convened, the resident and their advisor will be responsible for developing a formal action plan. If the resident has not achieved goals by the time specified in their remediation plan, they will escalate to a Level 2 remediation (*Consequential Citation*).

2. **Formal Remediation—Consequential Citations:** Consequential Citations are areas of concern significant enough to require the resident and faculty to develop a formal plan of corrective action. Failure to correct these areas within a specified time frame could result in required remediation and probation. Elective time is used for required remediation, but no more than four weeks of elective time may be used for remediation in any year of the academic program. These citations should receive **monthly** follow-up by the committee, program director, **and** advisor in person or by email.

   a. **Formal Remediation—Probation:** The committee may recommend a resident for probation to the PD. The committee and PD should reach consensus in the decision to put a resident on probation. Lack of consensus on probation will result in an additional meeting between the committee and the PD. Documentation of the probation plan is signed by the resident, faculty advisor and PD and placed in the resident file. This signed document is copied and given to the resident. The resident will then work closely with their advisor and the committee to overcome deficits contributing to probation. Probation should receive **weekly** follow-up with the committee **and/or,** advisor in person or by email.

      ***It is important for all parties to recognize that imposition of a probation period is reportable in the summative final evaluation of the PD and is reportable on licensing and credentialing documents.*

3. **Formal Remediation—Suspension:** If an identified resident is deemed not safe to continue the practice of family medicine at the present time and/or the program needs additional time to review a serious problem, a temporary suspension from clinical duties is an option for the program. The steps needed to suspend a resident are the same as Probation (see above). If the committee considers the resident unsafe to practice medicine and has failed remediation, then dismissal rather than remediation is recommended.

   ***It is important for all parties to recognize that imposition of a suspension/probation period is reportable in the summative final evaluation of the PD and is reportable on licensing and credentialing documents. In addition, it will add to the length of training.*

a. **Notice of Suspension must contain the following:**

   i. Documentation of any prior attempts by the program to help the resident remediate the deficiency.
   ii. Steps that the resident needs to complete to address the problem.
   iii. Description of how the program will evaluate progress in resident's response to the problem.

VORGIAS 000042

      iv. Description of further steps that could be implemented if the resident fails to improve; including termination.

      v. Documentation of the suspension should be signed by the resident, faculty advisor, and PD and placed in the resident's file. This signed document is then copied and given to the resident.

4. **Formal Remediation—Dismissal:** Dismissal is considered a final decision with permanent severing of the education and financial contract with the resident. Dismissal should follow failure to meet agreed upon goals/expectations while on probation. Dismissal can be considered as an initial step if the deficiency in ACGME competency was so egregious as to represent an immediate step to protect the public from the continued practice of medicine by the given resident.

A resident must be able to have credentials at the training institutions where patients are seen: Virginia Mason Memorial Hospital; Regional Medical Center; Kittitas Valley Healthcare. A resident also must also maintain their credentials at Community Health of Central Washington. Any action that terminates their privileges or their credentials can result in dismissal from the residency.

The steps that must be taken to dismiss a resident are the same as those listed for probation above. The committee and PD should discuss the reasons for dismissal with HR. Upon dismissal, further follow up with the resident should be via HR.

E. **Non-renewal of contract:** The committee can recommend that a resident's contract not be renewed for the following academic year. In this case, the resident completes the current year of training, but is not offered a contract for the ensuing year of training. The final decision to non-renew a contract is made by the PD. This step can be considered when steps to remediate a competency issue(s) are unsuccessful. Notification of non-renewal should occur at least 90 days before the end of the resident's academic year.

F. **Grievance Procedure:** If the resident does not agree with the Program Director/CARED's decision (including dismissal), the resident may submit a grievance in writing to the Program Director/CARED within five (5) days to be sure that due process was followed. If satisfactory resolution is not reached, the resident may within five (5) days submit a written request for review of the due process to the CHCW Chief Executive Officer. The CEO's decision will be final and binding. Please refer to the detailed Grievance and Due Process Policy located in the shared drive for details.

G. **Follow-Up:**

1. Once an action plan is agreed upon, the committee will draft a notification letter to the resident. This letter will be presented to the resident by their advisor ideally within 7 days following the CARED meeting. Should the advisor be unavailable, this letter may be presented to the resident by the PD or another committee member.

2. Should it be deemed necessary by the committee, the committee may schedule an in-person meeting with the resident and their advisor to discuss action items for follow-up. *The resident may choose to have the chief resident present to advocate for them, in addition to their advisor.*

VORGIAS 000043

    3. It is strongly suggested to incorporate a committee member in resident-advisor meetings when the resident is on formal citation. This will provide external perspective and help track progress towards citation removal.

**H. Conflicts with Advisor:** In some cases the resident may feel their advisor is not able to sufficiently mentor them; this may occur independently of remediation. In this situation, the resident may write a written request to the CARED to request another advisor. The resident may suggest a new advisor to the committee only after discussing with the specified new advisor.

**I. References:**

    1. Smith, J. L., Lypson, M., Silverberg, M., Weizberg, M., Murano, T., Lukela, M., & Santen, S. A. (2017). Defining Uniform Processes for Remediation, Probation and Termination in Residency Training. Western Journal of Emergency Medicine, 18(1), 110–113. http://doi.org/10.5811/westjem.2016.10.31483

**CARED Workflow-Resident may ask for resident representation at these meetings**
**Figure 1. CARED Workflow Review: From problem identification to citation.**



VORGIAS 000044

**Steps for Improvement**

The quarterly evaluation, which summarizes the input from the rotation and clinical evaluations, will outline formative comments and the significance of these comments to the Resident's advancement. Any significant deficiencies or concerns about Resident achievement of the core competencies will be addressed. A plan for working on the areas identified will be developed.

1. Constructive Citations
   Constructive Citations are areas of concern on which the Resident should focus his/her study, but are not serious enough to cause concern about advancement.
2. Consequential Citations
   Consequential Citations are areas of concern significant enough to require the Resident and faculty to develop a formal plan of corrective action. Failure to correct these areas within a specified time frame could result in continued remediation and probation. Elective time is used for required remediation, but no more than four weeks of elective time may be used for remediation in any year of the academic program.
3. Probation
   If a Resident fails a rotation or does not correct a consequential citation within the specified time, he/she will be placed on probation. Further testing, evaluation by professionals, tutorials or outside therapy/treatment may be required. Expectations for achievement and the timeline for reevaluation will be determined.
   All failed rotations must be repeated and the Resident's advancement to the next level of training delayed a commensurate amount. Likewise, the period of training will be extended to meet the completion of training requirements.
4. Termination
   The intention to terminate training may be initiated by the Resident or the Program Director/DIO with a 30-day written notice. Termination by the Program Director/DIO may be for Standards of Conduct violations or academic reasons. If the termination is for lack of academic progress, the Resident will have progressed through several stages of remediation and termination will be a last resort after those steps have failed. Standards of Conduct violations may result in immediate termination depending on the nature/severity of the violation.

**Grievance Procedure**

If the dismissed Resident does not agree with the Program Director decision, the Resident may submit a grievance in writing to the Designated Institutional Official (DIO) within five (5) days to be sure that due process was followed. If satisfactory resolution is not reached, the Resident may within five (5) days submit a written request for review of the due process to the CHCW Chief Executive Officer. The CEO's decision will be final and binding. Please refer to Grievance and Due Process policy located in the shared drive for details.

VORGIAS 000045

# HANDBOOK RECEIPT AND ACKNOWLEDGEMENT

I have received a copy of the Central Washington Family Medicine Residency Program Resident Handbook and have reviewed the ACGME *Institutional Requirements for Residency Training*, the ACGME *Common Program Requirements for Residency Education in Family Medicine and the* ACGME *Osteopathic Recognition Requirements (only applicable to osteopathic residents).*

The *Resident Handbook* contains policies/procedures and rules that apply to me. I agree to abide by the policies/procedures and rules during my three years of training at the Central Washington Family Medicine Residency Program/CHCW Ellensburg. I further understand this handbook may be amended at any time and that changes will be communicated to me. I understand and agree that my residency education by the Central Washington Family Medicine Residency Program, a service of Community Health of Central Washington, is at-will.


_____          _____
Resident Signature                                Date


_____
Resident Name (Printed)


_____          _____
Witness Signature                                 Date


*(This copy to be filed in Resident binder)*

VORGIAS 000046

# Exhibit E

*11/2018 Vorgias*

**Heidi Martinez**

From:        Leticia Fernandez
Sent:        Tuesday, November 06, 2018 9:05 AM
To:          Heidi Martinez
Subject:     FW: Observations from FMS shadowing of Dr. Vorgias

For his file

**From:** David Bauman
**Sent:** Sunday, November 04, 2018 6:03 PM
**To:** Caitlin Hill; Leticia Fernandez; Russell Maier
**Subject:** Observations from FMS shadowing of Dr. Vorgias

Hey all, please see my observations of Dr. Vorgias. Please let me know any thoughts, questions, and/or concerns.

Observations from 10.31.2018 shadowing of Demetrios Vorgias, MD.
I was able to observe Dr. Vorgias from 12:30 PM until 2:45 PM. Shadowing started immediately after 11 AM rounds. Talking with Dr. Vorgias it appeared he was aware of his current struggles, stating "I am a type A personality, and I feel like I am letting the team down." He said this to indicate how his struggles have been "weighing on him." Below are the general themes from the day:

- EHR → Dr. Vorgias commented as we were walking to the physician lounge that he is still struggling with the computer system at the hospital. This was evident, as I observed him repeatedly search for something (e.g., recent lab, etc.) within the EHR and having a difficult time locating it (often pulling up windows/tabs that he had just exited). At one point he mentioned, "Where is it? I know it was here this morning!" This lead to him at one point phoning the lab at the hospital and inquiring specifically what the last lab result was.
- Multi-tasking → I must admit observing residents on service always provides perspective, as it is truly impressive to see how much they have to manage, organize, and coordinate. Thus, it is difficult for me to know what is appropriate and expected of a resident, and it would behoove us to have a medical provider shadow him to provide a more representative perspective. In any case, I observed Dr. Vorgias striving to organize the four patients that he was managing at two hospitals. He routinely answered phone calls, consulted, and staffed components of his patients' care. He did appear to be "overwhelmed" at times, however, I am not sure if this is atypical for a first year resident on his first FMS rotation nor a reflection of how Dr. Vorgias handles stressful situations (i.e., while he may seem like he is overwhelmed to an observer, he may feel quite in control himself).
  - I was able to observe Dr. Vorgias regularly reach and seek out support and help from his attendings and fellow residents. It is difficult to know if this was beyond what is expected and appropriate. It did appear, on a few occasions, that the response from the individual he reached out to conveyed the individual felt that Dr. Vorgias should know the information; however, this is an assumption and we should request comments from his fellow residents and attendings.
    - Further, Dr. Vorgias was encouraged to find an appropriate dosing of a medication using UpToDate by his attending. I observed him search for this on UpToDate but was unable to find the medication dosing information. He then asked me if I had a point of care resource (I believe epocrates) on my phone. I informed him I did not. He then proceeded to ask a fellow resident if they did, in which the resident responded UpToDate is the best source. Dr. Vorgias then requested the resident show him how to look this up because he was unable to find the information, which the resident did.

1

CONFIDENTIAL                    CHCW 000055

- Another relevant observation that falls under multi-tasking was my observation of him interacting with a patient that was just recently admitted. This was a Spanish speaking elderly male who had a difficult time communicating with Dr. Vorgias. There appeared to be a cognitive deficit, either some cognitive impairment or decline. Again, not being familiar with what is expected of residents during the first interaction with a patient admitted, I am not sure if my feedback is relevant. However, Dr. Vorgias asked very few questions to the patient, other than, "how are you feeling; it seems that you are feeling better?" He did also ask a few orienting questions, which demonstrated some cognitive concerns. In total, Dr. Vorgias spent 5-10 minutes during this initial interaction and after leaving the room stated, "okay, I am ready to present this patient with Dr. Moran." I, unfortunately, was not able to observe this presentation.
  - My mind wonders if the interaction was brief due to Dr. Vorgias managing three other patients, two of which were having a number of care coordination issues that Dr. Vorgias was simultaneously overseeing. Again, with being unfamiliar to know what is expected during these interactions, I am unsure if this was even an aberrant behavior.
- By the time I left at 2:45 PM, it appeared that Dr. Vorgias was going to struggle to be at sign-out on time, as he had to present to Dr. Moran, as well as complete a discharge summary and see a patient at Regional.

Overall, I felt like Dr. Vorgias was definitely aware that he was falling behind his other residents. He also appeared to be very hard working. There were moments where his lack of comfortability and competence with the EHR was impacting his efficiency, as well as being unsure of how to locate relevant information in point-of-care resources. As stated previously, I am unable to assess how his behavior matches up to his peers, due to having minimal perspective on expectations of residents on FMS. Thus, I would highly suggest combining my observations with attendings and fellow residents' feedback.

Please let me know if you all have any other questions or concerns!

David Bauman, PsyD
Behavioral Health Education Director
Licensed Psychologist, State of Washington
Behavioral Health Consultant, Faculty
Central Washington Family Medicine Residency Program

CONFIDENTIAL                CHCW 000056

3. Concerns for patient safety & decision making: New concerns from 2nd FMS rotation include great difficulty interviewing patients in a linear manner, without repeating questions, and difficulty asking clarifying questions and addressing patient's secondary diagnoses and co-morbidities. Began a patient on an anti-coagulant without a discussion of the risks and benefits, and without obtaining patient consent. Previous concerns included lack of documentation of after hours call for patient with chest pain, SOB, & palpitations who wanted to drive herself to the ER. Documentation should have included advising her to call 911, rather than drive herself. On FMS 11/2018 evaluation, concern for documenting a physical exam without actually examining the patient, which is fraudulent.

4. Lack of awareness of inappropriate social interactions with female faculty, staff, & peers: No new concerns. Previous concerns included being overly familiar with attendings, calling females "love" and making comments about females physical appearance. Your intention is to be friendly but is perceived to be inappropriate due to lack of personal relationship with those you are addressing as well as the professional setting.

**ACTION PLAN:**

1. I must review and respond to messages, refill requests, labs within 3 business days and documents within 7 business days (PTO excluded).

2. I must arrive on time for clinic, shadowing experiences, required clinic meetings, as well as shifts at hospitals and rotations.

3. I must complete all prior rotation evaluations, didactic attendance logging, CKSA completion, and procedure logging by 2/21/19 and require no more than 1 reminder from advisor or program administrative staff in the future.

4. I understand that in order to ascertain adherence to this action plan, residency staff will provide Dr. Hill and Dr. Powers with a status report of my Allscripts inbox, charts, outstanding documents/refills/labs, timely arrival to rotation duties, as well as rotation performance on 2/21/19.

5. You are expected to arrive to your family medicine clinic at 8am, chart prep the night before clinic, and consistently huddle with your purple team MA. Feedback will be obtained on 2/21/19.

6. You will be shadowed in your family medicine clinic by a faculty member in the next 1 mo, with special attention paid to EMR efficiency, time management, & history and physical exam performance.

CHCW 000073

7. You will receive an evaluation by Washington Physician Health Program, in person, in Seattle, to determine your fitness to practice in residency. You will be released from clinical duties to attend this evaluation and any follow up appts.

8. You have failed your second FMS rotation after your 2nd week in Feb 2019, as well your first FMS month in Nov 2018 and will be required to make up both rotations (8 weeks) prior to graduating from CWFM and this will extend your training by 2 blocks (unless you choose to use your elective time to re-do one of these rotation).

9. You will inform your preceptors that you must have them see all of your patients during your family medicine clinic, as well as precept all patients at the time of the visit. You need to articulate workup for presenting problem (chart prep), give 3 differential diagnoses for new or acute problems, and state guideline and source used to formulate a treatment plan. Confirm plan with attending- ie. Repeat back plan to attending to confirm both parties are on the same page. If unclear, ask questions.

10. You will seek help with the stress of residency by contacting the EAP program for counseling appts, which are free. You must make an appointment with EAP by 2/21/19, and should have your first counseling appointment completed by 2/27/19. You will be excused from clinical duties if needed, in order to attend these appointments, with prior arrangements through the residency coordinator Leticia Fernandez and scheduler Cindi Grunewald.

11. You were offered additional trainings on Cerner EMR at VMM & Astria prior to your next FMS rotation, which you refused.

12. Clinic Learning Plan:

Pick 1 clinical question to answer EVERY night regarding a clinic patient you have seen or are going to see, and read your chosen resource. Examples of resources include UpToDate,

*yes M-F; weekends no*

Write a 1 paragraph email to your advisor and the PD (Caitlin.hill@chcw.org and micahlyn.powers@chcw.org) EVERY NIGHT to tell them your clinical question, and then summarize what you have learned, and cite your source.

13. I understand that probation becomes a permanent and reportable part of my academic record and may interfere with my ability to obtain

**Heidi Martinez**

---

**From:** Caitlin Hill
**Sent:** Wednesday, May 01, 2019 9:34 AM
**To:** Heidi Martinez; Micahlyn Powers
**Subject:** Fwd: feedback on demetrios

Get Outlook for iOS

**From:** Ravneet Dhaliwal
**Sent:** Friday, April 26, 2019 5:35:40 PM
**To:** Caitlin Hill
**Subject:** feedback on demetrios

Feedback for Demetrios this month

Although it seems that he had improved over the course of this month, there were still many areas of concern as follows:

-Being aware of his surroundings and listening to patient management plans. E.g. I went to discuss discharge medication plan with him for his patient and at the time of visit, he spent time texting attendings not aware of the plan which he l to ask again while placing discharge orders.

-He does not know how to triage or prioritize his time. He also is unaware of level of urgency/acuity in patients (I believe this is due to lack of medical knowledge). E.g did not know that ICU patients should be seen FIRST. He also does not know how to prioritize admission vs discharging a patient when they come in at the same time.

-Lacks basic skills such as knowing how to write a script, understanding why pelvic exams are being performed  etc.

-Concern for patient safety with appropriate transfer of care. He at times has mentioned either incorrect information for the night resident and once did not give a complete sign out for a late admission. E.g had admit at 5pm, gave brief sign out at rounds as he had not precepted and did not  provide any further information to dolly (night reisdent) or joel (who was to take care of the patient the following day). Another time at sign out, tess had discussed with him that cardiology did NOT recommend ativan to be given to an agitated patient however at sign out that was the recommendation that was given to night resident. Once tess corrected him, it still seemed to be a challenge for him to relay the accurate plan (and to recall it).

On the contrary,

-We did note some improvement in efficiency in the last week compared to the first week of his rotation. This is difficult to say if this was due to less number of patients or if he had followed recommendations during our one on one time.

-He did take feedback regarding his discharge summaries that I had reviewed. I had given him a copy of a discharge mmary with written feedback that he used to improve the summary the following day and has been using throughout the last week of FMS.

1

CHCW 000085

BARRIERS:

-He has not established his own presentation flow therefore can not adjust/tweak presentations for each attending's ference. (woud recommend that all attendings follow 1 template for him that he can master without having to alter .. so he can build the basic skills)

-I do feel that often will hear conflicting advice (eg how to do discharge summaries, discharge priorities -((had been told to discharge a patient before seeing ICU patient)) therefore being in his position could be very challenging when learning the basics is already so difficult.

I can provide further details and examples if needed. I kept it short as we had discussed some of this in person.

Let me know if there's anything I could help with.  Tess was chief and she may have more details to share.

Thanks,
Ravneet

2

CONFIDENTIAL

**Central Washington Family Medicine Residency Program**  a Service of **Community Health** of Central Washington

Resident Name: Dr. Demetrios Vorgias

The CARED (Committee Addressing Residents Experiencing Difficulty) met on 4/24/19 to discuss your recent progress and form this plan for termination of your residency employment, effective immediately.

You will be given 30 days of salary and benefits.

Probation:
If a resident fails a rotation or does not correct a consequential citation within the specified time, he/she will be placed on probation. Further testing, evaluation by professionals, tutorials or outside therapy/treatment may be required. Expectations for achievement and the timeline for reevaluation will be determined.

Due Process Summary:
On 1/23/2019 the CARED committee convened to form a plan for consequential citation which was reviewed with you on 1/24/2019. On 2/13/2019 the CARED committee met and your consequential citation was escalated to academic probation. You were presented with the probation document on 2/13/2019.
Your progress was reviewed by the CARED Committee again on 2/26/2019 and academic probation was continued. The CARED Committee met on 4/17/2019 to review your progress, which revealed ongoing grave concerns about medical knowledge and consensus was to continue current FMS rotation and seek further feedback on potential progress from FMS faculty and all faculty at scheduled R1 evaluation on 4/24/2019.

Primary Reasons for Termination:

1. Failure to pass your FMS rotations during 10/15/18 block, 2/4/2019 block, and 4/1/2019 block due to medical knowledge deficits and failure to follow the terms of your Individual Learning Plan (FMS reading plan and discussion with attending).

2. Lack of medical knowledge for stage of training: Please see your rotation and "on-the-fly" evaluations in New Innovations for further details.

ACTION PLAN:

1. You are relieved of your duties as of today's date, and will not return to your current FMS rotation.

2. You will meet with Laura McClintock on Friday 5/3/2019 at 8-9 am to answer further questions and turn in your CHCW property (laptop, clinic keys, badges, books).

3. You have an meeting with Laura McClintock on 5/6/2019 at 1pm which can be attending in person or by phone.

Grievance Procedure:
If the resident does not agree with the Program Director/CARED's decision (including dismissal), the resident may submit a grievance in writing to the Program Director/CARED within five (5) days to be sure that due process was followed. If satisfactory resolution is not reached, the resident may within five (5) days submit a written request for review of the due process to the CHCW Chief Executive Officer. The CEO's decision will be final and binding. Please refer to the detailed Grievance and Due Process Policy (http://pandp.chcw.org/page.php?itemID=333) for details.

Resident Acknowledgement:
I have received this document and agree to attend follow up meetings as scheduled with Laura McClintock.

Date:

Resident Signature: _____

Advisor Signature: _____

HR Witness: Laura McClintock

Program Director: m. powell MD.