HONORABLE STANLEY A. BASTIAN

William D. Pickett, WSBA #27867
THE PICKETT LAW FIRM
917 Triple Crown Way, Ste. 100
Yakima, Washington 98908
Tel: 509-972-1825
bill@wpickett-law.com
*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| DEMETRIOS VORGIAS,<br>                 Plaintiff,<br><br>v.<br><br>COMMUNITY HEALTH OF<br>CENTRAL WASHINGTON;<br>                 Defendants. | NO: 1:21-CV-03013-SAB<br><br>**PLAINTIFF'S FRCP 26<br>INITIAL EXPERT WITNESS<br>DISCLOSURE** |

    Plaintiff DEMETRIOS VORGIAS, pursuant to the Court's order accepting stipulation to extend expert disclosure deadlines "ECF 18", and FRCP 26, hereby makes the following initial Expert witness disclosures:

    **A.**    On behalf of Plaintiff, Demetrios Vorgias, and pursuant to FRCP 26(a)(2)(A) the following individual is hereby designated as Plaintiff's expert psychologist and forensic evaluator:

PLAINTIFF'S INITIAL EXPERT WITNESS DISCLOSURES AND
REPORT (1:21-CV-03013-SAB) - 1

The Pickett Law Firm
*Law Office of William D. Pickett*
**917 Triple Crown Way, Suite 100
Yakima, WA. 98908
Tel: 509-972-1825 / Fax: 509-972-1826**

**EX. 8**

**Scott A. Whitmer, Psy.D. – Forensic Evaluator**
**Forensic Mental Health Evaluation**
**Forensic earning capacity Evaluation**
**205 N. 40th Avenue, Ste. 203**
**Yakima, Washington  98908**
**Email:      scott@whitmerandassociates.com**
**Phone:     509-571-1625**
**Fax:        509-571-1626**

B.     Attached hereto and pursuant to FRCP 26(a)(2)(B) is the initial
        written report of Plaintiff's Expert Scott A. Whitmer, Psy.D.,
        Forensic Evaluator.

        Plaintiff expressly reserves the right to supplement this disclosure as any

additional information may become known during the discovery stage of this

matter.

        Dated this 1st day of October, 2021.


                                        s/ William D. Pickett
                                William D. Pickett, WSBA #27867
                                *Attorney for Plaintiff*
                                917 Triple Crown Way, Ste. 100
                                Yakima, Washington  98908
                                Tel: 509-972-1825
                                bill@wdpickett-law.com

PLAINTIFF'S INITIAL EXPERT WITNESS DISCLOSURES AND
REPORT (1:21-CV-03013-SAB) - 2

The Pickett Law Firm
*Law Office of William D. Pickett*
917 Triple Crown Way, Suite 100
Yakima, WA. 98908
Tel: 509-972-1825 / Fax: 509-972-1826

**EX. 8**

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Mr. Luon T. Le, *pro hac vice*
Law Offices of Luan T. Le
1190 S. Bascom Ave, Suite 213
San Jose, CA 95128
Tel: 408-247-4715
Email:     ledowningllp@gmail.com
*Co-counsel for Plaintiff*

Mr. Seth W. Wiener, *pro hac vice*
Law Offices of Seth W. Wiener
609 Karina Court
San Ramon, CA 94582
Tel: 925-487-5607
Email:     seth@sethwienerlaw.com
*Co-counsel for Plaintiff*

Catharine Morisset, WSBA #29682
Scott M. Prange, WSBA #53980
Fisher & Phillips, LLP
1201 Third Avenue, Ste. 2750
Seattle, Washington 98101
Tel: 206-682-2308
Email:     cmorisset@fisherphillips.com
           sprange@fisherphillips.com
*Attorneys for Defendant*

DATED at Yakima, Washington, this 1st day of October, 2021.

By:   s/ William D. Pickett
William D. Pickett, WSBA NO. 27867

PLAINTIFF'S INITIAL EXPERT WITNESS DISCLOSURES AND
REPORT (1:21-CV-03013-SAB) - 3

The Pickett Law Firm
*Law Office of William D. Pickett*
917 Triple Crown Way, Suite 100
Yakima, WA. 98908
Tel: 509-972-1825 / Fax: 509-972-1826

**EX. 8**

## FRCP 26(A) (B) INITIAL DISCLOSURE OF EXPERT WITNESS REPORT

## FORENSIC MENTAL HEALTH EVALUATION

| NAME OF EXAMINEE | Demetrios Vorgias |
| --- | --- |
| SEX | Male |
| SEXUAL ORIENTATION | Heterosexual |
| ADDRESS | 3603 Bridge wood Drive, Jacksonville Florida 32277 |
| DATE OF BIRTH | March 07, 1975 |
| AGE | 46 |
| RACE | Greek American |
| FIRST LANGUAGE | English |
| SECOND LANGUAGE | Greek |
| HANDEDNESS | Right |
| MARITAL STATUS | Married |
| EDUCATION | BS, Graduate School-Medical School |
| EMPLOYMENT-PRESENT | Unemployed |
| EMPLOYMENT-PAST | Medical Resident/Medical Scribe/Tutor |
| DATE OF EVALUATION REPORT | 09/03/21 through 09/30/21 |
| REFERRAL SOURCE | Bill Pickett, Attorney-At-Law |
| FORENSIC EVALUATOR | Scott A. Whitmer, PsyD, LMHC, CRC, ABVE-Diplomate, IPEC |

## QUALIFICATIONS, INCLUDING LIST OF ALL PUBLICATIONS AUTHORED

Attached is a copy of my current C.V., including qualifications.

## METHODOLOGY STATEMENT

Among the forensic mental health evaluation profession, there are sound peer reviewed procedures, peer accepted and clinically based approaches, and reliable and valid empirical methods that are utilized to ensure measurement methods are dependable and findings are authentic.  Quantitative and qualitative peer reviewed methods are designed to rule out confounding variables and/or unwanted influences so that the forensic evaluator has confidence that a reasonable degree of certainty and statistical degree of certainty findings are accurate.  Qualitative and quantitative procedures and methods are listed below that were followed in this evaluation:

1. Utilizing a semi-structured interview method that is deemed valid and reliable among professional peers and supported via peer reviewed literature.

**EX. 8**

2. Triangulation of facts across multiple different sources to determine if there is consistency, continuity, and verifiable facts to support findings.

3. Overall analysis of subjective measures against objective measures that may support or discount the accuracy of facts, behavior, or symptoms considered and measured.

4. Analysis of qualitative measures against quantitative measures to authenticate findings, opinions, and outcomes.

5. Appropriately matching, selecting, and relying upon psychometric measures that are used for forensic evaluation.

6. Relying upon empirically supported psychometric tools based on context, norms of the examinee's demographic, culture, and constructs being measured.

7. Using psychometric measures that have empirical findings that have a known error rate and therefore provide a statistical reliability and validity finding to ensure dependability and authentic measure of symptoms and diagnoses.

8. Comparing and verifying symptom validity testing (SVT) scores against performance validity testing (PVT) within a single measurement instrument.

9. Comparing and verifying SVT scores to PVT scores across different objective measurement instruments.

10. Using known peer reviewed clinical methods in contrast with empirical-scientific measures to enhance and explain divergence or convergence of methodological findings.

11. Evidence-based assessment methods (EBA): The EBA paradigm is a method that enhances fidelity of testing outcomes by linking theory, research, measurement, context, standards of practice, to relevant treatment recommendations. The EBA paradigm ask's the following questions during the use of qualitative and quantitative methods: Is the theory still relevant to measuring human behavior? Does the empirical research support the theory and vise versa? Does the empirical research consider context of culture, age, gender, and individual differences? Does the assessment measure have efficacy among the populations it measures? Does the measure contribute to reasonable and efficacious treatment recommendations for those being tested?

## PRESENTING PROBLEM & FACTS OR DATA CONSIDERED

Demetrios Vorgias was training with Central Washington Family Medicine (CWFM) as a Resident around June 2018 through May 2019 for the purpose of becoming a licensed medical doctor. Sometime in late 2018 through early 2019, his supervisor with CWFM became verbally hostile towards him. According to Dr. Vorgias, his supervisor developed a pattern of hostility with him over a short period of time around issues of his residency performance. Initially, Human Resources of CWFM recommended he get a neuropsychological evaluation to help determine if there were any cognitive deficiencies interfering with his performance. Once a neuropsychological evaluation was ordered and before it was completed, CWFM management terminated Dr. Vorgias from his residency position. Dr. Vorgias asked if he could resign knowing they were intent on terminating

**EX. 8**

him. It was thought a resignation would leave an improved probability placed in residency with a different clinic. CWFM refused Dr. Vorgias offer to allow him to resign. Prior to termination of the residency with Dr. Vorgias, it was known by CWFM that Dr. Vorgias had been diagnosed with ADHD. They were not yet aware that he was diagnosed with Generalized Anxiety Disorder (GAD) which emerged as a result of work hostility. The GAD was interfering with his performance in residency. CWFM prematurely and without reasonable cause, terminated Dr. Vorgias. While initially there was some discussion around accommodation to help him adjust to residency performance standards, considering his diagnoses of ADHD, CWFM did not wait for the neuropsychological evaluation or attempt to intervene on Dr. Vorgias behalf. Instead, CWFM initiated a punitive and hostile campaign retaliatory behavior disguised as a competency evaluation. There were no egregious behaviors, immoral acts, unethical behaviors, or disproportionately incompetent performance from Dr. Vorgias. As a first-year medical resident, there were expectation that some competencies would fall below the average reasonable standard, yet at the same time, a first-year resident would have expected to show improvements through support and adequate training. A residency program such as CWFM is responsible and accountable to bridge the gap of competency through supportive training and understanding a resident's unique challenges, particularly if they have neurocognitive diagnosis and related symptoms. By all accounts, CWFM supervisor and the organizational culture of CWFM demonstrated hostile and retaliatory behavior rather than supportive actions. The evidence supports a pattern of hostile behavior by Dr. Dom Nguyen towards Dr. Vorgias.

Dr. Vorgias had committed his life as well as years of education and training to become a medical doctor. CWFM acted recklessly and in retaliatory fashion disregarding Dr. Vorgias' s ADHD and untreated GAD symptoms. CWFM and Dr. Nguyen overreacted and unfairly judged Dr. Vorgias performance as a first-year resident. The very definition of a resident in training is to expect some incompetence's that are expected to improve through competent supervision. Dr. Vorgias may have demonstrated some incompetence's, but nothing that couldn't be corrected with a well laid out plan of supervisory support and action. The pattern of evidence suggests CWFM did not like him. They acted prematurely by terminating him instead of accommodating him for functional competencies that were considered fixable. Other facts of the file suggest he has knowledge competency as evidenced of his passing medical exams. The presence of a hostile and punitive environment followed by retaliatory actions by CWFM staff resulted in a premature and discriminatory outcome.

## EVALUATION REFERRAL QUESTIONS

1. What if any behavior performance on the part of Dr. Vorgias during academic medical training, or first-year residency performance would suggest he would be terminated?
2. What immoral, unethical, illegal, or egregious actions or behaviors did Dr. Vorgias demonstrate that put patients at risk?

**EX. 8**

3. What immoral, unethical, illegal, or egregious actions or behaviors did Dr. Vorgias demonstrate that put CWFM or other professionals in danger?
4. What actions or behaviors did Dr. Vorgias demonstrate that would suggest he could not correct them to improve if he were given proper mentorship and adequate training?
5. What basis did CWFM use to justify terminating a first-year resident and was it reasonable without attempted accommodation?
6. What if any mentorship and supervision did CWFM implement to help support Dr. Vorgias in overcoming typical incompetence's for a first-year resident?
7. What if any psychological diagnoses and or symptoms interfere with Dr. Vorgias' s functioning as a first-year resident?
8. What actions did CWFM take to help Dr. Vorgias overcome symptomatic mental health and behavior, so that he could function to the minimum acceptable standards as defined in ACGME Program Requirements and Residency Handbook?
9. Would Dr. Vorgias have successfully met minimum competencies if CWFM would have provided well-planned supervisor support during his residency and particularly after the neuropsychological evaluation was completed?
10. Were there any other performance reasons, perceived, suspected, or documented that interfered with Dr. Vorgias' s performance as a first-year medical resident?
11. What losses and damages will occur should Dr. Vorgias be thwarted from getting placed into a new residency based on CWFM discriminatory actions that led to residency termination?

## QUANTITATIVE & QUALITATIVE EVALUATION PROCEDURES

Semi-Structured Interview (SCID) with Demetrios Vorgias.
Millon Clinical Multi-Axial Inventory-IV (MCMI-IV).
Analysis & Interpretation of Psychological Testing.
Review of Academic and Licensing Exam Scores.
Review of Performance Employment Records.
Review of Psychological/Psychiatric Records.
Review of ACGME Program Requirements.
Review of Neuropsychological Evaluation.
Review of CWFM Residency Handbook.
ASEBA-Behavioral Checklist.
Review of Earnings Records.
Review of Medical Records.
Symptoms Checklist.
SCL-90-R.

**EX. 8**

## INDEX OF EXHIBITS & DOCUMENTS REVIEWED

- 10/23/08 & 10/30/08, Psychological Assessment by David Goodman, PhD, and Carol Wintermyer, PhD.
- 07/01/16, ACGME Program Requirements for Graduate Medical Education in Family Medicine.
- 04/10/17, St. George's University Medical Student Performance Evaluation.
- 04/06/15-03/27/18, medical records from Nicholas Delgado, MD.
- 04/15/2018, IRS 1040 Individual Tax Returns/Married Filing Jointly.
- 10/23/18, CARED Meeting case note.
- 07/19/18 to 01/23/19 CWFM Performance Reports.
- 01/29/19, CARED Consequential Citation Report, signed by Dr. Vorgias, program director and Advisory Residency Site Director.
- 02/10/19, Resident Evaluations.
- 02/13/19, email from Dom Nguyen to Leti, Katina & Micahlyn.
- 07/19/18-02/26/19, Performance Reports from Central Washington Family Medicine Residency Program.
- 03/11/19, Charles V. Bulfinch, DO medical records.
- 04/01/19, CWFM Residency Program Resident Handbook.
- 04/10/19, Neuropsychological Assessment by Rehabilitation Institute of Washington, LLC.
- 04/15/2019, IRS 1040 Individual Tax Returns/Married Filing Jointly.
- 05/23/19, Preceptor Shift Card Residency Evaluations.
- 06/05/19, Residency reference letter from Douglas E. Coon, MD.
- 06/06/19, Verification of Graduate Medical Education & Training signed by Residency Program Manager, Micahlyn Powers, MD.
- 06/08/19, Residency reference letter from Ed Prasthofer, MD.
- 06/24/19, Residency reference letter from Mark J. Bauer, MD.
- 07/03/19, Residency reference letter from Judith Harvey, MD.
- 08/06/13 to 12/18/19, United States Medical Licensing Examination Scores for Step 1, Step 2, & Step 3.
- 12/18/19, United States Medical Licensing Examination Step 1-3 Scores
- 04/15/2020, IRS 1040 Individual Tax Returns/Married Filing Jointly.
- 04/23/20, Residency reference letter from Tess Ish-Shalom, DO.
- 07/18/19-07/20/21, behavioral health records from Sagar Vijapura, MD.
- 09/02/21, Referral letter from Pickett Law Firm.
- 09/16/21, CV-Resume of Demetrios Vorgias.
- 09/16/21, Unofficial St. George's Academic Transcripts.
- 09/27/21, Covid Clinic Job Description.

**EX. 8**

## SEMI-STRUCTURED INTERVIEW

**Background Information.** On 09/03/2021, I met with Demetrios Vorgias to complete a structured clinical interview and psychometric testing. Dr. Vorgias is a 46-year-old male who is about 5'8" tall and weighs about 260 lbs. He identifies as Greek American. He is married to Rebecca Ward. They are both trained medical doctors. He has yet to complete his first-year medical residency. Rebecca has completed her medical residency. They both live in Florida where Rebecca practices medicine. They do not have children. He is right-handed. His first language is English and second is Greek. Dr. Vorgias presents on observation with anxious behaviors and ADHD symptoms. He tested to have a high superior Verbal IQ and a FSIQ of 125, over one standard deviation above the norm for his age group. It is difficult for him to slow his speech and he can at times become tangential in his effort to answer my questions. Dr. Vorgias uses humor to defuse anxiety and stress and did so several times during the interview. When he relaxed in the interview, he was able to slow down a bit with his speech and stay on task with questions asked. Essentially, Dr. Vorgias is here today because of a culmination of symptoms that resulted in an unfair training termination by his trainers. The culminated symptoms included uncontrolled anxiety, panic attacks, ADHD symptoms, and depressive symptoms occurred while being evaluated in training during treatment of patients. CWFM staff appeared to be on board with getting a neuropsychological evaluation completed to help identify potential problems and to offer a corrective action plan to help Dr. Vorgias succeed in his medical residency training. However, CWFM did not await the results of the neuropsychological evaluation and chose to terminate his residency instead of attempting an accommodation to support and supervise.

**Developmental History.** Dr. Vorgias was born 03/07/1975, in Redwood City, California. He attended elementary school in San Bruno and San Jose, California. He attended Belair public school from 1st to 3rd grade. He reports math was his strength. English was initially challenging because his parents immigrated to the United States and hadn't mastered the English language well. He and his family moved back to Greece when he was 6-months old. He was raised in Greece until he was the age of five. His parents often spoke Greek in the household. He attended grades 4th through 8th at Harker Academy, a private school. He reported he earned honors grades up through middle school. In later elementary grade and middle school, all academic courses came easy to him. He had a difficult time in physical education courses. He attended high school at Bellerman College Prep, a Jesuit school for boys. He reported he earned mostly A's and B's, except for French and AP Chemistry where he earned C's.

He reported that as a child of Greek Immigrants, the expectation was that he become a doctor, lawyer, or engineer. His mother was a lawyer, and his father was a mechanical engineer. He has a younger brother by the name of George Vorgias. He reported that George has some learning disabilities, stutters, and has hearing loss. George is 36 years-of-age.

**EX. 8**

**Family Medical/Psychiatric History.** His mother has a history of depression and suspected in his paternal grandmother's side of family. His mother also has a history of ADHD, but not diagnosed, hypothyroidism, and osteoarthritis. His father had a history of alcohol abuse, colon cancer, emphysema. His father died in 2015. His brother has a diagnosis of Central Auditory Processing Disorder, and ADHD. He has three cousins and an uncle who also have diagnoses of ADHD.

**Physical & Emotional Abuse.** Dr. Vorgias reported that his father was emotionally, verbally and on occasion physically abusive. He described his father as a very serious man who never laughed and always seemed to be mad. He reported that his father treated his relationships transactional, as though he only had use for the friendship if he both parties were to benefit from some useful skill or exchange. He reported that as a young boy, he feared his father. Harsh and unfair criticism was the norm from his father. Later in high school, he was able to find a more secure footing and confidence through joining and doing well in wrestling. A critical developmental and emotional juncture for Dr. Vorgias as a senior in high school, his father physically pushed him. Dr. Vorgias struck him in return. He stated that his father never physically pushed or hit him again after that incident. Dr. Vorgias reported that he loved his father, but it was a strained relationship until the day his father died in 2015.

His mother often mitigated emotional and verbal abuse delivered by his father. He reported that without his mother's intervention, the abuse would have been a lot worse for him. He reported that his parents moved a lot during his middle school and high school years, which made if difficult at times to be accepted and make new friends. He reported that his parents separated in 1992, when he was a senior in high school. In 1995, his parents tried to reconcile but it did not work out. It is accurate to say that the harsh emotional and verbal abuse from his father in combination with Dr. Vorgias's propensity for academics and awkward verbal style, made him a target during in middle school and high school. As a high school sophomore, he was attacked by a group of boys who tried to take his Halloween candy from him. The attack did not result in serious injury but was described as bullying behavior. Bullying behavior from others during middle school and high school likely felt somewhat expected based on his adaptation of his father's abuse. Asked what his teenage years were like and he stated he was like a tenacious terrier, which I interpreted that he was learned to defend himself as a way of adaptation through his father's abuse and being emotionally-socially different than most throughout high school.

**Religious Beliefs.** His parents practiced Orthodox Greek Christianity. He and his brother attended when his parents did. He reported his parents were somewhat lukewarm with religious practices but likely saw it as a good environment to teach value and morals. He reported that he does not really practice a religion at this time in his life.

**Friends.** Dr. Vorgias reported that he maintains friendships that were created when he was in elementary school, middle school and high school. He and childhood friend Justin

**EX. 8**

became friends when he was about 10 years of age. They speak by phone twice per month on average to this day. Justin is of African American descent. Dr. Vorgias indicated that they hit it off as friends because neither were the typical American child, both different enough that they found common ground in being different. He reported that the few friends he did make, they were friends for life. He describes his wife as his best friend. He also reported that people seem to really like him or don't like him at all, there doesn't seem to be an in between. He confirmed that he has been told that he can come across as loud, verbose, and excitable, with some people being ok with his demeanor, others not so much. He has taken the approach that life is too short to worry too much about what others think of you. When I told him that he likely often uses nervous verbal energy to cope with potential rejection, that some things are missed in the communication exchange, he appeared to want to learn more about his communication style.

**Substance Abuse & Lifestyle.** Dr. Vorgias denies using illicit drugs. When he was age 13 to 20, he abused alcohol to cope with stress. He denies using alcoholic beverages as an adult except on rare occasion during holiday gatherings. He consumes 2 to 3 coffee beverages per week, down from prior use of 2 to 3 per day. During his college years he tried marijuana but didn't like it. His lifestyle can be described by the adage's: "work hard-relax and re-energize", "When we strive to become better than we are, everything around us becomes better too", "Success is no accident" and "Treat others as you wish to be treated". An adaptive approach to standing up for himself when he was younger might have been "defend, preserve, and persevere".

As an adult, he has built a maladaptive approach to unfair harsh criticism, likely out of the experience and combination experiences of past emotional abuse, more recent anxiety and panic disorder. He exhibits symptoms of auditory hypo-sensitivity and auditory hyper-sensitivity and may become confrontational in return.

**Working Relationships.** Dr. Vorgias has developed many friendships in past employment settings and at CWFM. He has many character statements and references that speak of his good character, enthusiasm, and commitment to patients and co-trainees alike. He reported that his most impelling work characteristics are empathy for his patients. He reported that he has a great rapport with his patients. There have been no patient complaints against him. Those co-workers who do not like him or criticize him are likely met with aloofness and non-engagement from Dr. Vorgias. When under great pressure and harsh unfair criticism, Dr. Vorgias subconsciously resorts to a defensive posture and social confrontation. This unfiltered subconscious defensive posture and social confrontation occurred when he perceived his supervisor actively and unfairly seeking harsh criticism against him as opposed to offering constructive criticism and mentoring behavior.

**Marriage.** Dr. Vorgias reported that he feels lucky to have met and married his wife. He and Rebecca met the first day of medical school. They struck up a friendship which soon turned into an intimate and supportive relationship. He described their relationship now

**EX. 8**

as supportive to one another and the safest and most loving relationship he has ever experienced. He described going through medical school together as two starving students, supporting one another, living simple on a tight budget. They traveled together for various medical training opportunities, sometimes in difficult circumstances due to lack of funds and resources.

**Finances.** Dr. Vorgias reported that his spouse currently earns about $140,000.00 per year as a medical doctor. They have been reliant upon her salary since he was terminated from CWFM. He has recently taken a temporary position with a medical clinic in Mississippi, administering Covid Vaccines. He would have been earning a modest salary in medical residency if he were still with CWFM. One salary among the two of them with medical school debt makes it very tight to meet their responsibilities at this time.

**Housing.** He reported that when they moved to Florida, they purchased a modest home. They live in a 1500 square foot, 3-bedroom, 2-bath home. They have a monthly mortgage.

**Medical Status.** Dr. Vorgias denies having any serious physical disorders, diseases, or illness. He had his wisdom teeth pulled at age 25. He was in two motor vehicle collisions, one in 2004 and one in 2006. He sustained broken ribs in one of the MVA's. He reports that he has migraine headaches occasionally, likely associated with stress. He has seasonal allergies which are treated with OTC medication.

**Psychiatric Status.** Dr. Vorgias reported to have been diagnosed with ADHD Combined Type between 2007 and 2008. He was diagnosed with Generalized Anxiety Disorder (GAD) and ADHD Combined on 04/03/2019 by neuropsychologist, Kelly Cornett, PsyD, CBIS. The neuropsychological evaluation was recommended by attending physicians Laura Moss, MD and Charles Bulfinch, DO. CWFM staff agreed to the neuropsychological exam to determine what was interfering with Dr. Vorgias's functioning and to come up with a treatment plan and corrective action. It appears CWFM took inappropriate and hasty action to terminate him instead of waiting for the neuropsychological results and recommendations.

**Activities of Daily Living.** He denies any physical problems with basic functioning instrumental to activities of daily living.

**Interpersonal Functioning & Social Support.** His spouse, mother, and a few friends are his primary social support. He reports that his marriage is very strong. He stated that he and his spouse talk openly. He gets along well with others. He is committed to medicine and treating patients as a medical doctor. His career choice and time committed is a large part of his purpose and identity.

**Educational Training.** His educational background is as follows:

**EX. 8**

- BA from molecular and cell biology, University of California, Berkeley, 2000.
- Master of Art degree in Medical Science, Bostin University School of Medicine, 2009.
- Doctor of Medicine, St. George's University School of Medicine, Grenada, West Indies, 2011-2016.
- Also initiated a Master of Business Administration in Multi-Sector Health Management at St. Georges University.

**Work History & Training.**

| Occupation | Dates | Employer |
|---|---|---|
| First Year Medical Resident-Medical Doctor | June 2018-May 2019 | CWFM |
| Medical Scribe | April 2017-May 2018 | Scribe Solutions & Angel Kids Pediatrics. |
| Chief Laboratory Technician | June 2009-December 2010 | Framingham Heart Study |
| Graduate Student Researcher | March 2008-May 2009 | Boston MA |
| Teaching Assistant & Tutor in Histology. | January 2007-December 2008 | Department of Anatomy and Histology, Boston MA |

**Behavioral Observations.** During our one-on-one, Dr. Vorgias was initially hurried, with pressured speech, somewhat nervous yet confident of what he was communicating. At no point did I witness any behavior or emotion that would suggest that he was unstable. His rapid and tangential speech can be described under the paradigm of auditory hyposensitivity. People with auditory hyposensitivity exhibit loud voice, loud speaking, excessive speaking, difficulty with verbal and social cues, difficulty understanding specific input, tangential and circumstantial speech, talks self through task or explanations, and at times appears oblivious to reciprocal exchange.

## REVIEW OF MEDICAL RECORDS

There are two medical providers, Charles Bulfinch, MD and Nicholas Delgado, MD with records that illustrate the difficulties and problems Dr. Vorgias was struggling with during his first residency at CWFM. A third medical provider, Sagar Vijapura, MD, provided psychiatric treatment and those records are reviewed and summarized here.

Clinical reports by Nicholas Delgado, MD, dated 04/06/2015 through 03/27/2018, convey the following:
- Patient was diagnosed in 2007 with ADHD.
- Ritalin 20 mgs.
- Father with history of diabetes, hypertension, colon cancer, smoker, emphysema.

**EX. 8**

- Mother with history of diabetes, hypertension, hypothyroidism, osteoarthritis, depression.
- He is a medical school graduate, going into family medicine residency in Washington State.

A clinical report by Dr. Bulfinch dated 03/11/2019 conveyed the following:
- Requests a neuropsychological evaluation.
- No side effects of ADHD medication.
- Ongoing medical problems include ADHD, erectile dysfunction, family history of colon cancer, morbid obesity.
- Surgical history, wisdom teeth extracted.
- Medications include Methylphenidate, Ritalin, Sildenafil.
- Substance Use-never; Tobacco Use-Never.

Clinical reports by Sagar Vijapura, MD that span 07/18/2019 through 08/19/2021, convey the following:
- Chief Complaint & History:
    - I was terminated from my medical residency on 05/01/2019.
    - I struggled with in-patient service, I would stutter, repeat myself, miss social cues, these are the only area I would struggle in.
    - The program sent me to Washington Physicians Help Program.
    - As part of their evaluation, I was referred to follow up with a neuropsychological evaluation.
    - I had the neuropsychological evaluation on 04/03/2019, my results came back on 05/08/2019, one week after CWFM terminated me.
    - I was diagnosed with Generalized Anxiety Disorder.
    - Since my termination I have been struggling with depression, anxiety, panic attacks. I am afraid that my career is over, I am scare of the future. I began having suicidal thoughts.
    - Program claimed that he was terminated because of lack of knowledge consistent with level of training.
    - He stated that he has spoken with four lawyers to consider pursuing legal action.
    - He stated he never endangered a patient or did anything unethical.
    - He endorses symptoms difficulty with attention, making careless mistakes, distractibility, organization, procrastination, anhedonia, sleep disturbance, loss of 20 lbs., feelings of worthlessness, and suicidal ideation.
    - He stated he would not suicide because he loves his wife. He stated his marriage is very strong.
- Vitals:
    - Weight 268 lbs.
    - Height 69 inches (5'9")
    - BMI 39.58
- Clinical Assessment:

0014

**EX. 8**

- o Depression NOS w/o psychotic features.
- o GAD
- o History of ADHD, combined type.
- Risk Assessment:
  - o Low imminent suicide/homicide risk.
- Protective Factors:
  - o Help seeking, future oriented, good personal support, no suicide attempts, engages in safety planning, demonstrates practical judgement and impulse control to be able to self-monitor and access crisis care.
- Medications:
  - o Sertraline (Max at 150 mgs)
  - o Methylphenidate (Max at 40 mgs, extended release)
  - o Propranolol (Max at 10 mgs)
- Plan:
  - o Start Sertraline 25 mgs and increase to 50 mgs.
  - o Change ADHD meds to extended release.
  - o Psychoeducation on diagnosis and use of psychotropics.
  - o Follow up in 2 weeks.
  - o Advised on suicidal prevention and resources.
- Continued Subjective:
  - o Presents with wife in some sessions.
  - o Some improved mood with Sertraline.
  - o Propranolol helping to manage anxiety, decreased panic symptoms.
  - o Anxiety results in sweating.
  - o Extended-release methylphenidate improving attention and concentration.
  - o Compliance with CBT at Metropolitan Behavioral.
  - o Sertraline has reduced mental/emotional breakdowns.
  - o Struggling with depression based on the situation, loss of residency.
  - o Working on self-awareness in CBT.
  - o Some sexual side effects from Sertraline.
  - o Extended-release Methylphenidate is less anxiety inducing.
  - o Takes less ADHD medication when not working
  - o He reports exercising and eating better.
- Diagnoses:
  - o F41.1 GAD
  - o F90.2 ADHD Combined Type
  - o F32.9 Major Depressive Disorder, single episode, unspecified.

## REVIEW OF PSYCHOLOGICAL ASSESSMENTS

On 10/23/2008 and 10/30/2008, Carol Wintermyer, PhD, and David Goodman, PhD, completed a psychological assessment with Dr. Vorgias. I have paraphrased and bulleted the scores by T-Score, percentile ranking and qualitative description. The following was assessed and diagnosed:

0015

**EX. 8**

- Wechsler Adult Intelligence Scale-III (WAIS-III)
  - Verbal Intelligence Quotient        125    95%    Superior Range
  - Performance Intelligence Quotient    119    90%    Superior Range
  - Full Scale Intelligence Quotient     125    95%    Superior Range
  - Verbal Comprehension Index           131    98%    Very Superior Range
  - Perceptual Organizational Index      118    88%    High Average
  - Working Memory Index                 115    84%    High Average
  - Processing Speed                     114    82%    Average
- There was no significant discrepancy between VIQ and PIQ, however the VCI scores are significantly higher than the POI, WMI, and PSI scores. The discrepancy between these scores suggests a profound relative strength in verbal comprehension but it also means the discrepancies in lower scores of perceptual, working memory and processing speed likely creates difficulties in cognitive functioning. This likely describes Dr. Vorgias's comment that "its like 4 thoughts going on at once but my thoughts cannot be conveyed quick enough". The emotional and social compensatory strategies to demonstrate his intelligence are to over verbalize, demonstrate his skills through memorization and impulsive conveyance of facts. By over use of these compensatory strategies, he misses other important social and emotional cues when communicating, engaging or listening.
- The cognitive functioning deficiencies show up as lack of concentration and lack of attention as well as recall of information in his short-term memory on visuo-constructional reasoning tasks, digit span and letter-numbering sequencing, and resulting in inconsistent performance on math problems.
- The Brown ADD Scales supported the WAIS-III findings as follows:
  - T-Score of 82        ADHD Highly Probable.
  - T-Score of 91        Impairment with Attention & Concentration.
  - T-Score 84           Impairment with ability to organize and activate.
  - T-Score of 82        Deficits in memory and recall of learned materials.
  - T-Score of 71        Deficits in sustaining cognitive energy.
- Other psychometric measures were administered and supported the deficits in executive functioning in the areas noted while demonstrating a superior IQ.
- Diagnoses:
  - Axis I:        ADHD Combined Type
  - Axis II:       Deferred
  - Axis III:      Moderate seasonal allergies
  - Axis IV:       Academic Difficulties, related discord with father, cumbersome schedule.
  - Axis V:        GAF = 60
- Recommendations:
  - Continue with psychopharmacological assistance and management.
  - Seek additional strategies to improve cognitive functioning and academic functioning.

**EX. 8**

On 04/03/2019, Kelly Cornett, PsyD, of Rehabilitation Institute of Washington, PLLC, completed a neuropsychological assessment with Dr. Vorgias's. The report conveys the following:

- Reason for Referral:
  - Referred by Washington Physician Health Program by attending physician, Charles Bulfinch, MD. And Dr. Moss.
  - Will assess patterns of cognitive strengths and weaknesses, neurobehavioral contributors to presenting concerns and make recommendations.
- Evaluation Procedures:
  - Multiple psychometric tests were utilized to measure multiple areas of functioning as expected by a neuropsychological evaluation.
- History of Injury/Disorder/Social/Developmental/Psychiatric/Medical:
  - Dr. Cornett provided an accurate history of his ADHD and symptom struggles.
  - Work history included Medical Resident, Medical Scribe, Teachers Assistant, and Laboratory Assistant.
  - He has struggled with the electronic medical record system at CWFM.
  - Educational Background noted BA, MA, MD, and MBA ongoing.
- Behavioral Observations:
  - Appropriately groomed and casually dressed.
  - Gait, body and facial features are grossly within normal limits.
  - He arrived 15 minutes late
  - Speech was pressured and at time circumstantial.
  - There were neologisms present.
  - Testing was done with patient on usual medication.
- General Intellectual Functioning:
  - Verbal reasoning (VCI=98th percentile) Very Superior Range.
  - Processing speed (PSI=70th percentile) Average Range.
- Language Functioning:
  - Word knowledge, similarity of words, and defining words fell between superior and very superior (84th to 99.6 percentile) compared to his age group
  - Confrontation naming fell in the average range as did phonemic or letter fluency.
  - Semantic or categorical fluency fell in the high average range.
- Inattention/Memory Problems, Processing Speed, Working Memory, Executive Control, Visuoperceptual, Visuospatial, Visuoconstructional, Memory and Learning, Academic Functions, Sensorimotor/Praxis, Emotional constructs and domains were measured. The results essentially supported the intellectual functioning and ADHD symptoms found in the 2008 psychological assessment. Furthermore it supported the discrepancy between VCI and PSI, which is known to be present with an ADHD diagnosis. Its like have a 500 horsepower engine, but the transmission is impaired to the extent the power becomes diffused or

0017

**EX. 8**

dampened, leading to other performance issues of the engine and car. In Dr. Vorgias's case, he possesses very superior to superior intellectual functioning, but when it comes time to communicating, her processing speed, attentiveness, and reciprocity of communication cause problems conveying what he really truly knows.

- Notable findings in summary and conclusions:
  - o Strengths fall in verbal reasoning, ability to learn, ability to remember highly structured information, visual-memory and learning, writing and problem-solving skills.
  - o His relative weaknesses (average scores), fell among attentional functioning, processing speed, working memory, alternation attention, response inhibition, mathematics, and find motor dexterity.
  - o The deficits or weaknesses to not alone meet criteria for a cognitive disorder.
  - o There was evidence of unawareness of or possibly resistance to self-disclose regarding psychosocial emotional functioning.
  - o He did endorse and exhibit symptoms of anxiety and tendencies toward excitability and turbulence.
- ICD-10 Diagnostic Impressions:
  - o F41.1 Generalized Anxiety Disorder
  - o F90.2 Attention-Deficit/Hyperactivity Disorder, Combined Presentation.
- Implications/Recommendations:
  - o CBT is warranted weekly to include cognitive restructuring to manage anxiety, enhance personal sensitivity and to learn ways to avoid being rebuffed and misunderstood.
  - o Additional supervision during his residency is also recommended to address the concerns regarding relative weakness in the domains of attention and executive control.
  - o Cognitive Speech therapy to improve attentional by implementation of SBIA, SMART, Exercise, Gantt Charts and ABC method of organization and prioritization.
  - o Follow up with psychiatric provider regarding medication management for anxiety and ADHD.

## REVIEW OF ACADEMIC PERFORMANCE & US MEDICAL LICENSING EXAMATION:

**Academic Performance.** His GPA was above a 3.5 with St. George's.

Dr. Vorgias passed Step 1, Step 2, and Step 3 for his United States Medical Licensing Examination on the associated dates:

| Step 1 | Passed | August 6, 2013 |
| Step 2 | Passed | November 10, 2015 |
| Step 3 | Passed | December 18, 2019 |

**EX. 8**

## MEDICAL RESIDENCY PERFORMANCE & TRAINING RECORDS:

**Medical Residency Performance.**

**Training Records/Reference Letters.** There are several letters on file that describe Dr. Vorgias's traits, characteristics, communication style, and sound behavior in context of his potential as a Licensed Medical Doctor.

**Judith Harvey, MD.** Judith Harvey, MD, was employed at CWFM for nineteen years. Here is what she said about Dr. Vorgias:

- I was impressed with his passion for connecting with others.
- He matched our program in June of 2018.
- I supervised him for a year while practicing OP, OB, and hospital medicine.
- Initially his skills and medical knowledge were rusty, however, he recognized his deficits and worked quite hard at building his medical knowledge and efficiency.
- He has some anxiety during patient presentation, I then gave him one-on-one time and put him at ease, he then gave appropriate and thorough presentations and demonstrated an appropriate fund of medical knowledge.
- He consistently improved gaps in his medical knowledge.
- By the end of the first year, he was performing at the level expected for an intern.
- Unfortunately, because of his nervousness, some faculty had already made up their minds and was unable to see the progress he made.
- He went on probation and was sent to Washington Physicians Health Program for evaluation. He was diagnosed with anxiety (GAD) and unfortunately was discharged from the program before he had an opportunity to address his anxiety. Given the opportunity to address it, I would likely not have needed to write this letter.
- He possesses a quality that cannot be taught, and that is a great big heart. He is very protective of his patients and is first and foremost a patient advocate. He is aware of treating the whole patient. He goes the extra mile to work with care coordinators to ensure the best care for patients.
- After his termination meeting, he went to the hospital to sign-out on his patients, even as he was breaking down in front of me. That is the kind of dedication and professionalism that medicine needs. Given the opportunity, this dedication will continue to serve his patients, his team, and his career very well.
- Dr. Vorgias is a warm, motivated, enthusiastic, hard-working, passionate, and dedicated resident.
- He is a team-player who is well loved by his colleagues, staff, and patients.
- He has had the capacity to become an excellent physician who I believe any program would benefit from having him on their team. I highly recommend Dr. Vorgias for your residency program.

**EX. 8**

**Reference Letters.** Other similar letters with similar sentiment were written by Douglas E. Coon, MD, FACEP, Ed Prasthofer, MD, Mark J. Bauer, MD, and Tess Ish-Shalom, DO, MS. Here are some stand out comments made by these physicians about Dr. Vorgias performance:

- I have witnessed his drive and dedication.
- I found his depth of knowledge solid and appropriate for is level of training.
- His ability to communicate with patients was always courteous and professional.
- From my experience his enjoyment and for learning actually made the teaching process a pleasure.
- I know that this challenge has only increased his passion and drive.
- He expressed enthusiasm, ability, and initiative beyond average and had an excellent work ethic.
- He was empathic with patients
- I found him to be attentive and recording in detail my recommendations and he asked inquisitive questions.
- Demetrios was an honors student at graduate of Boston University.
- He coauthored several publications.
- He clearly has the intellectual capability to perform as a physician and in a hospital training program.
- I believe that he is capable of continuing his post graduate medication education in a residency program.
- It is clear that severe anxiety and ADHD impeded his ability at CWFM Residency. Should these conditions be well controlled and properly accommodated, I anticipate he will be much more successful in the future.

**Micahlyn Powers, MD, Residency Program Manager.** I believe it CWFM made a major mistake by terminating Dr. Vorgias from residency based on discriminatory patterns of behavior and actions. The records illustrate a resident doctor who has all the "right stuff" to succeed. He did not have an ethical, moral, or egregious problems or weaknesses. The evidenced by the Program Director's evaluation document dated 06/06/2019, depict the traits and skills Dr. Vorgias has to succeed, yet the evaluation report erroneously gives him low categorical rankings. The records give some in-site into the culture of CWFM Program and a hostile supervisor who missed opportunities to uplift Dr. Vorgias who was primed to excel yet was struggling with some anxiety. The records depict a competent doctor in first-year residency, who if offered intervention to treat the underlying issues and overt symptoms of anxiety, would have succeeded in medical residency. Clearly, there was an under-current of hostility and retaliatory actions taken against Dr. Vorgias for no good reason except that a few people didn't like him and he was an easy target because of his anxiety, ADHD symptoms and notably his openness to criticize himself.

Dr. Powers performance report dated 06/06/2019 was written in context residency performance from 06/25/18 to 05/01/19. It was signed by Residency Program Director, Micahlyn Powers, MD. The report is a good representation of Dr. Vorgias's

0020

**EX. 8**

commitment, dedication and multiple competent attributes that indicate he has what it takes to be a great doctor. It is an unfair and inaccurate representation of his true competency. This report depicts what behaviorally emerged with his anxiety and functioning when emotionally mistreated and disrespected. Under normal distress, his functioning waivered as would be expected by a first-year resident, but with a little encouragement and support, he rallied and went beyond expectations as noted by many supervisors. However, under emotional attack, rife with derogatory attitude and hostility, his anxiety and functioning went to a level of self-doubt and self-criticism that impaired his functioning, which did not actually reflect his true competency as a resident doctor. The narrative evaluation by Dr. Powers illustrates many positive attributes demonstrated by Dr. Vorgias. The evaluation by Dr. Powers is an exercise in contradiction in that her narrative describes a medical doctor that most clinics would be lucky to have, yet the categorical ratings were incongruent with the glowing narrative. In evaluation of performance, it is typically a sound evaluation if the narrative is congruent with the ratings of performance. In this instance, it's as if Dr. Powers is evaluating two different people, providing a glowing narrative yet providing low category ratings. It illustrates how Dr. Powers viewed him as a competent resident as described in her narrative, yet she gave low category competency marks. It may further suggest she reluctantly was drawn into the retaliatory campaign spear headed by Dom Nguyen. It is probable she was pressured to give him low marks to satisfy the retaliation campaign and to protect her position of power. Her report provides an example of CWFM decision and actions to recklessly terminate a resident who had committed his entire life to this vocation, and a callousness to overlook the treatment needs for someone with anxiety.

Dr. Powers marked 13 categories of competency as "Fair", 5 categories of competency as "Good", 2 categories of competency as "Excellent", 0 categories of competency were marked as "Poor", and only 1 category of competency was marked as "Unknown". It's interesting to note that the single category rated as "Unknown" was for procedural competence, yet there were many examples of observation by past supervisors that he did that well.

When reviewing narrative part of the report, Section III, the following terms are used to describe Dr. Vorgias's competencies and functioning: Enthusiastic, caring, team oriented, constantly caring for other residence and nurses, dedicated, driven to improve, loves his patients, builds relationships with patients, loves patient care, gets significant joy from treating the pediatrics populations, diffusing fear of children patients, he gave two great presentations-one on pediatrics and the other on pain, he likes to teach, he is very motivated to succeed in medicine, and was self-disclosing about his distractibility and self-criticism. Dr. Powers did link his anxiety to functioning but did not address that fact that the CWFM program did not accommodate treatment for anxiety to determine a fair course of action before terminating him.

The underlying and unresolved anxiety is connected to developmental trauma from childhood abuse, the untreated factors of ADHD related to emotional-social impact on

**EX. 8**

self-esteem and self-efficacy, and the group of auditory hypo-sensitive and hyper-sensitive symptoms that have an etiology likely from ADHD. He is able to manage these symptoms under positive mentorship and supportive supervision, but he tends to overcompensate with perfectionistic thinking and becomes preoccupied with worrying if he is accepted, leading to being overwhelmed in the moment. This occurs to a level of impaired functioning most prominently when an authority figure is hostile, unfair, and exhibits a derogatory judgement style against him. The anxiety symptoms and ADHD symptoms become a distorted cognitive source of a negative self-fulfilling prophesy. Dr. Vorgias has the intellectual ability, foundational knowledge, skills, abilities, commitment, dedication, work ethic, ethics, morality, personality, and positive attitude to finish training as a medical doctor. He has demonstrated traits and skills with patients, peers, and supervisors to be a competent doctor. Because of these contrasts in functioning, it suggests he has some untreated developmental trauma underlying the anxiety that needs to be treated in order for him perform more consistently. These conditions are highly treatable and the prognosis is very good if treatment is allowed and the employer is on board.

It is ironic that CWFM is accusing Dr. Vorgias for not following procedure, due to anxious behavior, yet the program managers did not follow its own procedure to wait for the neuropsychological evaluation and recommendations for treatment. If one is referred for an evaluation, isn't it imperative for the attending provider to get the evaluation results, and then analyze what interventions or treatment is needed, apply the interventions, and then see the patient through? CWFM did not follow procedure and protocol because they had already made up their minds. This demonstrates an uncaring and callous approach, a reckless and egotistical approach to someone who exhibits symptoms of suffering, that of anxiety. They did not apply empathic judgement. CWFM did not help Dr. Vorgias succeed, rather they took a hardline hostile approach to terminate. They took an uncaring and hostile approach with a resident doctor who by many accounts, was doing good work and correcting issues of functioning despite his anxiety.

## TEST RESULTS

### Symptom Checklist (Beliefs, Values, Thoughts, Emotions, Behavior)

Dr. Vorgias was asked to complete the Symptom Checklist. He checked the following:
- Depressed.
- Feel inferior
- Feel helpless.
- See no future.
- Difficulty falling asleep.
- Waking earlier than intended.
- Anxious.
- Nervous.
- Witnessed or experienced serious trauma.

**EX. 8**

- Witnessed or experienced life-threatening event or serious injury.

**The ASEBA-Behavior Checklist-Adult**

**ASEBA Introduction.** The ASEBA-Behavioral Checklist that measures adaptive and maladaptive functioning. It illustrates symptoms and behavioral domains along several emotional, social, cognitive and behavior scales. The test in taken in the context of post-termination of medical residency training. The ASEBA-Behavioral Checklist is a reliable and valid psychometric measure of adaptability that measure several psychological constructs using standard scales of measurement to determine functioning at normal (normative) or clinical pathological behavior. The primary constructs being measured by the ASEBA are as follows: Adaptive Functioning Scales, Internalizing/Externalizing Syndrome Scale; Substance Use Scale; DSM-Oriented Scales; Attention Deficit Hyperactivity Disorder Scale; Sluggish Cognitive Tempo and Obsessive-Compulsive Problems Scales.

**Validity Interpretation.** The results on the ASEBA-Behavior Checklist should be read and interpreted with caution. There were several response styles and response inconsistencies on this test which may suggest it was not an accurate view of symptoms or that the examinee may have been distracted in his response behavior.

**Adaptive Functioning Scales.** The subscales that determine level of adaptive functioning are defined under Friends, Spouse, Family, Job, Education, and Personal Strengths. These adaptive subscales purport that people turn towards those structures and support systems to adapt and function. When impaired functioning occurs or those structures and support systems are lacking, adaptive thinking and behaving may become impaired.

Among the Adaptive Functioning Subscales, Dr. Vorgias reported that his spouse and family play a significant role in helping him adapt to difficult situations and conditions. He did not respond to Friends and Job domains as adaptive resources, yet in my interview with him, he reported both friends and his career as sources of profound connection and fulfillment. It is likely that currently his behavior is such that he is embarrassed to share his difficulties with friends and does not see the job environment as a supportive and positive energy.

He also reported that he has many personal strengths of which he relies upon to functionally adapt to difficult or changing conditions. The personal strengths he endorsed include good use of time, ability to work long hours, being honest, views some strengths that make him stand out, meets responsibilities, stands up for self, enjoys the company of others, likes to help people, tries to be fair, enjoys experiencing new things and is generally a happy person.

**Internalizing/Externalizing Syndrome Scale.** Dr. Vorgias scored at the 90%, approaching the borderline cutoff score for anxious/depressive symptoms under the

**EX. 8**

internalizing domain of adaptive/maladaptive behavior. He endorsed subdomains of crying, worrying about the future, feeling like others are out to get him, feeling worthless, feeling nervous, lacks self-control, being fearful, suicidal ideation, feeling sad, feeling as though he can't succeed, and excessive worrying.

He endorsed subdomains of representing thought problems to include mind wanders off, experiences physical twitches, has repetitive acts or thinking, and perceives his behavior as strange at times. Two other domains representing aggressive behavior and intrusive behavior, while not in clinical or borderline range, are important to note. Subdomains endorsed in the domain of aggressive behavior is feeling blamed, others being mean, feeling judged by family, experience behavior change, being stubborn, and expressing temper. Subdomains endorsed in the domain of intrusive behavior include showing off, talking too much, and being loud. His intrusive behavior is viewed as a subconscious defense mechanism that most likely surfaces when he feels unfairly judged.

**Substance Use Scale.** Dr. Vorgias's scores on the Substance Use Scales were in the normal range of use. He reported no use of alcohol or substances.

**Critical Test Items.** Critical items on the test are those responses indicate need for follow up for treatment or for further evaluation. Dr. Vorgias reported difficulty with mind wandering off, crying, being mean, feelings of elation and depression, feeling as though his behavior is strange, suicidal ideation and sadness. The endorsed level of critical items scored at the 93%, just at the borderline range of 93-97 percentile.

**DSM-Oriented Scales.** Dr. Vorgias's notable scores on the DSM-Oriented Scale and Subscales did not reach the clinical level of pathology, yet are important to convey especially when comparing symptom validity testing across other measurement instruments that may be more sensitive to interpreting they symptoms associated with anxiety and depression.

| | |
|---|---|
| Depressive Problems | 87% |
| Anxiety Problems | 87% |
| Avoidant Personality | >97% |
| ADHD Inattentive | >97% |
| Antisocial Personality | 93% |

**Attention Deficit Hyperactivity Disorder Scale.** Dr. Vorgias's ADHD Inattentive and Hyperactive/Impulsive scores did not approach the borderline cutoff or clinical range, suggesting this instrument was not sensitive enough to pick up on his patterns of ADHD that have been verified both clinically and with other quantitative instruments. Another explanation may be that he was highly distracted when taking the test or had shifted to a defensive posture about responding to such questions about attentiveness and impulsivity. A third possible explanation is that he has enough atypical ADHD symptoms and a superior IQ that which do not emerge on this type of test.

**EX. 8**

**Sluggish Cognitive Tempo and Obsessive-Compulsive Problems Scales.** Dr. Vorgias's scored > 62% (T-score of 53) for Sluggish Cognitive Tempo, suggesting his thought patterns are not slowed under normal or non-distressing conditions. Under distressful conditions, his cognitive processing or tempo is likely impaired. His OCD scale score was at 92% (T-score of 64), suggesting he has ruminative thinking, excessive worrying. OCD thinking and behavior may also be represented by his procrastination, which really appears to manifest as a combination of perfectionistic thinking and impulsive distractibility. He does not necessarily procrastinate purposely, but instead is highly distracted by perhaps less important tasks or stimuli for which he impulsively attends to. Another way to express this is that he has difficulty prioritizing and organizing thoughts and tasks at hand.

## The Millon Clinical Multiaxial Inventory-IV

The MCMI-IV is a personality evaluation instrument suitable for forensic evaluation and clinical intervention for psychotherapy. The instrument is a reliable and valid measure of test response style (over/under reporting), psychological symptoms of beliefs, thinking, emotions and behavior for accurate diagnosis and treatment. It is also a reliable and valid measure of clinical personality patterns and/or at-risk personality characteristics/traits that may or may not influence current psychological diagnoses, adaptive/maladaptive functioning, and clinical syndromes. The instrument is not a stand-alone instrument nor are its findings meant to be definitive measure without other sources to triangulate accuracy of findings. The report and findings should be interpreted in context of other tests, interviews, clinical observations of a trained mental health clinician, review of historical records, fact patterns and data. The findings of the MCMI-IV have been integrated into the evaluation for Demetrios Vorgias along with other valid measures. The MCMI-IV test findings are congruent and explainable with other test findings and clinical interpretations.

**Base Rate Scores.** Base rate scores are indexed on a scale of 0 – 115. A score of 60 represents the median of a clinical distribution, 75 serving as the cut score for presence of disorder, 85 serving as the cut score for prominence of disorder, and 115 corresponding to the maximum raw score.

**Scoring Scale for MCMI-IV Personality & Psychopathology**

| Normal Functioning Present | Style Present | Type/Features Present | Clinical Disorder Present |
|---|---|---|---|
| 0 – 59 | 60 - 74 | 75 - 84 | 85 - 115 |
| Nonclinical | Tendencies | Traits or Syndrome | Persistence of Clinical Disturbance |

**Validity/Modifying Indices.** There are two scales to detect random response styles, the Validity Scale (V) contains a number of improbable items which may indicate

**EX. 8**

questionable results if endorsed. The Inconsistency Scale (W) detects differences in responses to pairs of items that should be endorsed similarly. The more inconsistent responding on pairs of items, the more confident the examiner can be that the person is responding randomly, as opposed to carefully considering their response to items.

The validity score (V) was within normal limits. Five inconsistency responses on the Inconsistency (W) Scale emerged. Base rate adjustments were made in the anxiety (A) and depression scales (CC). The inconsistency responses represent a man who likely has a higher level of anxiety and depressive symptoms than what he would like to admit to. Another explanation is that he may be unaware of how anxiety and depression emerge or in a hostile environment. In other words, he is more likely to normalize hostile engagement if and when it is directed towards him based on attachment issues and abusive behavior he contended with as a child and young man. His distortion of hostile behavior therefore underlies inconsistent responses to similar questions about anxiety and depression as symptoms relate to hostility.

The modifying indices scale of disclosure was in the average range, representing a examinee who was open to responding in an honest and conscientious manner.

The modifying indices scale of desirability was in the high range (BR-78), suggesting he has a style or tendency of describing himself in an overly positive light. Based on other test results and clinical interview, my interpretation is that his propensity to present himself in an overly positive or elevated desirability is learned behavior out of self-preservation, operating subconsciously as an overcompensated response to feeling inferior or critical of himself. The high validity score for desirability is clinically explainable given other interpretations and the MCMI-IV test results are considered reliable and valid.

The modifying indices scale of debasement was in the average range, suggesting he does not exaggerate his symptoms or elevate the negative problems or conditions occurring within or around him.

The table below represents Dr. Vorgias's underlying beliefs, thoughts, emotions, and behavior, personality patterns, personality pathology, syndromes, and severity level of findings.

| Modifying Indices | BR Score | Qualitative Definition |
|---|---|---|
| Disclosure | 46 | Average Range, Consistent Response, & Valid |
| Desirability | 78 | High Range, overly positive presentation, Explainable and Valid |
| Debasement | 50 | Average Range, Consistent Response, & Valid |
| Clinical Personality Patterns | BR Score | Qualitative Definition |
| Histrionic | 65 | Non-Clinical but stylistic. |

**EX. 8**

| Turbulent | 71 | Non-Clinical but stylistic. |
|---|---|---|
| Narcissistic | 65 | Non-Clinical but stylistic. |
| Compulsive | 67 | Non-Clinical but stylistic. |
| Negativistic | 67 | Non-Clinical but stylistic. |
| **Severe Personality Psychopathology** | **BR Score** | **Qualitative Definition** |
| None | None | None |
| **Psychopathology/ Clinical Syndromes** | **BR Score** | **Qualitative Score** |
| General Anxiety | 75 | Maladaptive Feature or Syndrome by etiology. |
| **Severe Clinical Syndromes** | **BR Score** | **Qualitative Score** |
| Major Depression | 77 | Problems concentrating, dread, hopelessness, worthlessness, guilt, irritability. |

**MCMI-IV Diagnoses Considerations.**
F41.1 Generalized Anxiety Disorder
F90.2 Attention-Deficit/Hyperactivity Disorder, Combined Presentation.

### Symptom Checklist-90-R (SCL-90-R)

Overall, Dr. Vorgias's SCL-90-R symptom profile is not of a magnitude to be considered in the clinical range. However, depressive symptoms and anxiety symptoms approach at stylistic or featured in his adaptive/maladaptive functioning. Also given his tendency to amplify and present himself in overly positive light, I would be inclined to argue that he under-represented his symptoms on this test. I believe he is in the moderate range of symptoms severity for anxiety and depression.

## EARNING CAPACITY EVALUATION & EXHIBITS USED TO SUMMARIZE OR SUPPORT OPINIONS

### Earning Capacity Analysis
To properly assess loss of earning capacity, there are several data sets that help describe Earning Capacity. Several data points and sources are used to define the data sets of Actual Past Earnings, Pre-Termination Earning Capacity, Past Lost Earnings (since the date of termination), Post-Termination Diminished Earning Capacity, and Post-Termination Mitigating Earnings Losses.

**Actual Past Earnings (Pre-Termination) & Past Lost Earnings.** The facts and data on file illustrate Dr. Vorgias's actual earnings while at CWFM was $43,858.30. Would they have kept him on at the clinic for the full year, he would have earned $52,630.00. He therefore lost $8,771.70 in earnings for his first year of medical residency.

0027

**EX. 8**

| Tax Year | Actual Earnings | Estimated Earning Capacity | Past Loss Earnings |
|---|---|---|---|
| 2018 1st year residency | $43,858.30 | $52,630.00/Year ($4,385.83/Month) | -$8,772.00 |

**Estimated Earning Capacity During Medical Residency & Past Lost Earnings.**

| Tax Year | Estimated Earnings Capacity | Past Loss Earnings |
|---|---|---|
| 2019 2nd year residency | $55,080.00 | -$55,080.00 |
| 2020 3rd year residency | $58,450.00 | -$58,450.00 |

**Earning Capacity Post-Medical Residency.**

May 2020 - U.S. NATIONAL (USDOL-BLS) Occupational Employment and Wage Survey for Family Physician (OEWS):
Hourly - 10%ile = $38.28      Weekly - 10%ile = $1,531      Annual - 10%ile = $79,610
Hourly - 25%ile = $71.31      Weekly - 25%ile = $2,852      Annual - 25%ile = $148,320
Hourly - 50%ile = $99.70      Weekly - 50%ile = $3,988      Annual - 50%ile = $207,380
Hourly - 75%ile = No Data     Weekly - 75%ile = No Data     Annual - 75%ile = No Data
Hourly - 90%ile = No Data     Weekly - 90%ile = No Data     Annual - 90%ile = No Data

National Wage Survey Data from Salary.Com for 2020 for Family Physicians-With Sign-On Bonus:

Salary.com: Physician - Family Practice Salary+Bonus by Percentile

| PERCENTILE | SALARY | LOCATION | LAST UPDATED |
|---|---|---|---|
| 10th Percentile Physician - Family Practice Salary + Bonus | $181,260 | WA | September 27, 2021 |
| 25th Percentile Physician - Family Practice Salary + Bonus | $206,399 | WA | September 27, 2021 |
| 50th Percentile Physician - Family Practice Salary + Bonus | $234,012 | WA | September 27, 2021 |
| 75th Percentile Physician - Family Practice Salary + Bonus | $271,366 | WA | September 27, 2021 |
| 90th Percentile Physician - Family Practice Salary + Bonus | $305,376 | WA | September 27, 2021 |

Salary.com: Physician - Family Practice Salary+Bonus by Percentile

| PERCENTILE | SALARY | LOCATION | LAST UPDATED |
|---|---|---|---|
| 10th Percentile Physician - Family Practice Salary + Bonus | $160,860 | Jacksonville,FL | September 27, 2021 |
| 25th Percentile Physician - Family Practice Salary + | $183,170 | Jacksonville,FL | September 27, 2021 |

0028

**EX. 8**

| PERCENTILE | SALARY | LOCATION | LAST UPDATED |
|---|---|---|---|
| Bonus | | | |
| 50th Percentile Physician - Family Practice Salary + Bonus | $207,674 | Jacksonville,FL | September 27, 2021 |
| 75th Percentile Physician - Family Practice Salary + Bonus | $240,825 | Jacksonville,FL | September 27, 2021 |
| 90th Percentile Physician - Family Practice Salary + Bonus | $271,007 | Jacksonville,FL | September 27, 2021 |

Due to Covid virus pandemic and the strain it has put on medical institutions and professionals, there is a high demand and low supply of physicians as well as other medically trained personnel available. This scenario drives up starting salaries. Most institutions are offering sign-on bonuses for newly graduated physicians, physicians without licenses in states where supply is very low, and for those physicians who have some years of experience in the field. I have shown the OEWS statistics for physicians on a national basis and it does not show the 75% or the 90% likely because that is changing rapidly during this Covid pandemic. I also used Salary.com, a private source who publishes wages and salaries for family practice physicians.

The table below depicts salaries starting at the 50% percentile through the 90%. It is my opinion based on salary research, high demand for new physicians, and current low supply of physicians available, that there are a large number of employers who would hire new physicians at the 50% and the 75%, depending on how urgent their need is. Currently the need is high in almost all states.

The USDOL-BLS OEWS data provides a baseline for family physician salaries, however, Salary.com provides a more boots on the ground reality of what family physicians are being paid at completion of their medical residency.

| Location & Data Source | 50% | 75% | 90% |
|---|---|---|---|
| National/OEWS data | $207,380 | NA | NA |
| Washington/Salary.com | $234,012 | $271,366 | $305,376 |
| Florida/Salary.com | $207,674 | $240,825 | $271,007 |
| Average | $216,355 | $256,095 | $288,191 |
| Most probable starting wage: | | $256,095 | |

0029

**EX. 8**

**Diminished Earing Capacity (Salary + Benefits)**

It is estimated that it may take another entire year from today's date before Dr. Vorgias could be matched for a new medical residency clinic.  It is not certain that he will be able to match again based on how CWFM handled the termination of his first-year medical residency.  But assuming he can, there will be diminished earnings losses from 2021 through 2024, at which time Dr. Vorgias would complete his third-year residency.

A 5% cost of living increase is calculated for every year after 2021.  An additional $500 will be added to the benefits value every year after 2021 due to inflation, cost of managed health care increases and production/merit increases.  Additional losses are appropriate to consider if present value calculation and delayed earnings losses are considered.

| Tax Year | Earning Capacity | Benefits 25% | Total Earning Capacity | Expected Earnings | Diminished Earning Capacity |
|---|---|---|---|---|---|
| 2021 | $256,095 | $64,023 | $320,118 | $00.00 | $320,118 |
| 2022 | $282,345 | $64,523 | $346,868 | $55,080 | $291,788 |
| 2023 | $296,462 | $65,023 | $361,485 | $58,450 | $303,035 |
| 2024 | $311,285 | $65,523 | $376,808 | $320,118 | $56,690 |
| 2025 | $326,849 | $66,023 | $392,872 | $346,868 | $46,004 |
| 2026 | $343,191 | $66,523 | $409,714 | $361,485 | $48,229 |
| 2027 | $360,351 | $67,023 | $427,374 | $376,808 | $50,566 |
| Total Diminished Earning Capacity | | | | | **-$1,116,430.00** |

## LOSSES, HARMS, & DAMAGES

Past Lost Wages $122,302.00
Diminished Earning Capacity Loss $1,116,430.00
Pain and Suffering-general damages $ to be determined by jury

Total Losses & Damages: $1,238,732.00 (not including non-economic/general damages as determined by jury)

## ANSWERS TO EVALUATION REFERRAL QUESTIONS

1. What if any behavior performance on the part of Dr. Vorgias during academic medical training, or first-year residency performance would suggest he would be terminated because of inability to be taught?
   a. His GPA with St. George's University for the program of Doctor of Medicine indicates a B+ GPA.

0030

**EX. 8**

    b.   There are many medical doctors who worked with Dr. Vorgias in his first-year medical residency and gave him high marks despite the anxiety that he was having difficulty with.

2.   What immoral, unethical, illegal, or egregious actions or behaviors did Dr. Vorgias demonstrate that put patients at risk?
    a.   There are no immoral, unethical, illegal, or otherwise egregious actions or behaviors Dr. Vorgias was cited for or that contributed to his termination.
    b.   Dr. Vorgias was assessed by many as a well loved doctor by patients and peers and staff.

3.   What immoral, unethical, illegal, or egregious actions or behaviors did Dr. Vorgias demonstrate that put CWFM or other professionals in danger?
    a.   There were no immoral, unethical, or otherwise egregious actions Dr. Vorgias displayed that justified termination.

4.   What actions or behaviors did Dr. Vorgias demonstrate that would suggest he could not correct them to improve if he were given proper mentorship and adequate training?
    a.   There are numerous accounts written by Chief Resident, Senior Resident, and other medical residents stating Dr. Vorgias responded in a positive, corrective, and learned manner when approached about his anxiety.

5.   What basis did CWFM use to justify terminating a first-year resident and was it reasonable without attempted accommodation?
    a.   Based on fact patterns of record, CWFM and his supervisor (Dom Nguyen) did not take the opportunity after the neuropsychological evaluation to implement prescribed treatment to help him adjust.  It also appears that his Dom Nguyen purposely set out to create a hostile and retaliatory approach to terminate him.

6.   What if any mentorship and supervision did CWFM implement to help support Dr. Vorgias in overcoming typical incompetence's for a first-year resident?
    a.   The fact pattern suggests that a lack of supportive supervision and mentorship was lacking from Dom Nguyen.
    b.   There is evidence to suggest that if you are not liked among the in-group, your requests for support would be dismissed.
    c.   Dr. Nguyen's approach of hostility resulted in Dr. Vorgias pushing back when he felt as though Dr. Nguyen was being hostile.  When Dr. Vorgias attempted to appropriately defend himself, Dr. Nguyen became retaliatory as did medical management who ultimately chose to terminate his residency prematurely.

7.   What if any psychological diagnoses and or symptoms interfere with Dr. Vorgias's functioning as a first-year resident?
    a.   Dr. Vorgias had been diagnosed with ADHD since 2007/2008.  He had learned to adjust to academics and work demands by seeking therapy

**EX. 8**

and using prescribed medication. He had continued with such treatment while at CWFM and had adjusted as he went.

    b. However, when a pattern of hostile and retaliatory behavior emerged towards him, his anxiety level amplified to an extent that it interfered with his performance, particularly around Dr. Nguyen. CWFM recommended he pursue a neuropsychological evaluation to assess what problems were interfering with his performance. Unfortunately, CWFM did not await the results, but instead terminated him.

8. What actions did CWFM take to help Dr. Vorgias overcome symptomatic mental health and behavior, so that he could function to the minimum acceptable standards as defined in ACGME Program Requirements and Residency Handbook?

    a. Some staff offered mentorship and appropriate supervision as evidenced by reference letters. As Dr. Vorgias progressed through the medical residency, Nguyen and a few others in management made up their minds prior to the neuropsychological evaluation being completed. They set out to terminate him by harshly and unfairly building competency performance problems against Dr. Vorgias instead of offering support.

9. Would Dr. Vorgias have successfully met minimum competencies if CWFM would have provided well-planned supervisor support during his residency and particularly after the neuropsychological evaluation was completed?

    a. Yes, there is evidence from other physicians who wrote statements on behalf of Dr. Vorgias good performance that when they put him at ease, spent time to mentor him, and offered guidance and support, that he met performance standards.

    b. Yes, his academic grades and licensing exams demonstrate the intellectual and cognitive functioning to excel.

10. Were there any reasonable performance reasons, perceived, suspected, or documented that interfered with Dr. Vorgias's performance as a first-year medical resident?

    a. No, there was no reasonable justification to terminate Dr. Vorgias from his position with CWFM. He was purposely pushed into a hostile environment that lead to a retaliatory environment.

    b. There was a justifiable reason for CWFM to be patient and wait for the neuropsychological evaluation that diagnosed Generalized Anxiety Disorder. Upon further inquiry, CWFM could have offered support in many different ways to help Dr. Vorgias to adjust and continue to succeed.

    c. Furthermore, Dr. Nguyen wrongly accused Dr. Vorgias of not having the knowledge of medicine consistent with his training level. He wrongly evaluated and accused him of not being "teachable". This is highly unlikely if one were to consider the following:

**EX. 8**

     i.   Despite Dr. Vorgias ADHD, he earned a 3.5 + GPA at St. George's University School of Medicine.

    ii.  Dr. Vorgias passed Step 1, Step 2, and Step 3 of his United States Medical Licensing Exams.

   iii.  Many others who worked with Dr. Vorgias gave him high marks for quality traits and fund of knowledge to be a physician.

   iv.  He is in the superior to very superior range of intellectual functioning areas that would suggest he is very capable of learning and maintaining a high level of knowledge for which he committed his life to.

    v.  The fact pattern of record shows that Dr. Vorgias had/has the knowledge, did have some correctable performance issues that were corrected and could be corrected with appropriate support, and was teachable.

   vi.  The fact pattern of record illustrates that Dr. Nguyen along with a few others, made up their minds prematurely to terminate him, acted with haste, hostility, and retaliatory behavior.

11. What losses and damages will occur should Dr. Vorgias be thwarted from getting placed into a new residency based on CWFM discriminatory actions that led to residency termination?

    a.  It is well documented in employment law and forensic vocational evaluation, that in some industries and professions, a termination that purposely or with retaliatory intent, can result in a "black balling" effect of the individual. CWFM would play a part in providing a reference that would hopefully refrain from discrediting Dr. Vorgias in any way. At this time, it is uncertain if CWFM and its staff have acted against Dr. Vorgias to the extent that he would be precluded from getting a new residency match. He has made attempts to match with new clinics and has not been matched to date. If he cannot be matched/placed to finish his residency to realize his vocation as a licensed and trained Physician, the future earning capacity damages would be catastrophic. His losses/damages would run in the millions over his work-life expectancy on a comparison analysis for earnings as a Physician in contrast to a Chief Laboratory Technician.

## OPINIONS AND RECOMMENDATIONS AND THE BASIS AND REASONS

**Psychological Diagnoses:**

F41.1 Generalized Anxiety Disorder

F90.2 Attention-Deficit/Hyperactivity Disorder, Combined Presentation.

F32.4 Major Depressive Disorder, Single Episode (In Partial Remission).

V62.29 (Z56.9) Other Problem Related to Employment-Hostile Work Environment.

**EX. 8**

**Professional Opinions:**

1. Dr. Vorgias is highly functional and capable of finishing out a 3-year medical residency if he is provided normal supportive supervision. If there is a chance to finishing up at CWFM, then a new supportive supervisor should be made available. However, its highly unlikely CWFM will offer him another chance based on how they terminated him. If a new residency site is required, it would be supportive if CWFM were to provide a positive written reference that provides confidence with the next site that Dr. Vorgias is capable but didn't finish with them due to a misunderstood diagnosis or their hasty decision making.

2. Dr. Vorgias is quite capable of improving and learning through psychotherapy and speech therapy to address symptoms associated with a communication style that fits the term "auditory hyposensitivity". I would defer to a speech therapist to determine if there is another diagnosis associated with symptoms of auditory hyposensitivity (AH) or if its related to ADHD. AH symptoms are known to present as core features with some ADHD patients. He certainly has the symptoms associated under AH that include speaking loudly, speaking excessively, difficulty with verbal cues, low self-esteem, insecure relationships, difficulty with remembering what was said particularly under hostile conditions, talks self-through tasks, and misses certain sounds. AH symptoms may also be associated with other facets of sensory related diagnoses. A speech therapist is better trained to detect such problems. Either way, there is a strong prognosis for Dr. Vorgias to make the needed changes and adapt to most any training site.

3. It is clear that Dr. Vorgias has adapted successfully in many ways from childhood developmental trauma and abuse from his father and has compensated adaptively with ADHD challenges. Yet, treating these things together in a dynamic fashion I believe has not been done.

4. I believe that up until his residency and the emergence of GAD, the GAD threw him a curve ball that he did not know how to respond to quickly in the presence of a hostile environment. In addition, it's difficult to adapt quickly to a hostile work environment, threats of termination, and derogatory attitude from your supervisor. If he would have gotten sufficient treatment for GAD and was provided supportive supervision, he likely would have continued in medical residency with CWFM. Unfortunately, CWFM was too hasty and retaliatory in their responses to oust him from residency. Perhaps they took this approach simply because they did not like him or because the clinic culture is one of "sink or swim on your own".

5. He would benefit from cognitive behavioral therapy/behavioral therapy to bridge the gap where deficiencies emerge because of GAD and aggravated ADHD. It will be important to build into therapy modalities to help Dr. Vorgias conceptualize and overcome his developmental trauma residuals, current communication style (auditory hyposensitivity features), ADHD, and GAD. All of these things create a dynamic that can create a maladaptive response style that

0034

**EX. 8**

works against him. He will require treatment so that more adaptive responses on is part will occur even in the face of potential negativistic supervision.

6. It is expected that discrepancies between superior verbal intellectual functioning and average perceptual, organizational, and processing speed as noted in psychological assessment reports will become less cognitive impediment and more of a known and accepted weakness that can then be dealt with using practiced cognitive and behavioral approaches.

7. Psychotherapy is expected to help Dr. Vorgias set goals and reach them in the following context:

- Teach and council Dr. Vorgias the nuances of social-emotional symptoms impact from a life-long diagnosis of ADHD. Most psychotherapists, doctors, and counselors do not address the social-emotional deficits that cause problems because of ADHD. Not treating this side of ADHD will worsen GAD, MDD, and continue to disproportionately put him at risk with hostile behavior.

- Testing and assessment has noted Dr. Vorgias has procrastination problems associated with or in combination with organization and prioritization. Research shows that people with significant procrastination issues finds that upon deeper investigation, procrastination is emotional impulsivity and a low tolerance to defend against distractibility. It's not that Dr. Vorgias procrastinates and avoids getting things done, its that he has not trained himself to reduce emotional impulsivity and from being easily distractible. He therefore gets too easily pulled into other relevant tasks but that are not critical in getting things done on time and in order.

- Research further demonstrates that prioritizing, organizing, and goal setting are not helped that much by stimulant medication. Rather such deficiencies are changed through clear, concise, and practiced behavioral therapy goals. ADHD medication helps improve executive functioning, but without behavioral therapy and clear behavioral goals to change the wanted behavior, medication may in fact increase obsessive compulsive thinking and behavior, and worsen distractibility.

8. Dr. Vorgias is vulnerable to worsening of mental health symptoms associated with GAD and ADHD if he continues to be supervised by someone who openly, unfairly, and harshly judges him, and has hostile intent to cause pain and suffering for the purpose of ousting him from his training environment.

9. On the other hand, he has demonstrated that he adjusts quite well to overcome deficiencies in training when he is being mentored and supervised by someone who takes the time to understand him, provide tools for his unique challenges, is empathetic, and supportive.

10. He is aware of most of these problems, including his style of communication. I believe he has not had a well conceptualized set of methods to help him overcome the problems with GAD, ADHD, and communication style in a manner that releases him from subconscious negativistic and catastrophic beliefs and thinking that underlies these known problems.

0035

**EX. 8**

**Psychological & Medical Treatment Recommendations:**

1. CBT and Behavioral Therapy to restructure cognitive schemas and replace behavioral actions to better adapt to prioritization and organization.
2. Use CBT and Interpersonal Psychotherapy methods to extinguish emotional impulsivity and disruptive distractibility.
3. It may be worth a try to introduce the third tier ADHD medication called Guanfacine. Guanfacine is a nonstimulant and it may provide the executive functioning improvement without subtle OCD symptoms. This might mean reducing or eliminating stimulant medication for awhile to see how it works. Another possibility to consider is Vyvanse.
4. It is recommended Dr. Vorgias get evaluated by a speech therapist for symptoms defined under the paradigm of Auditory Hypo-Sensitivity and Hyper-Sensitivity.
5. If he has more than one sensory input problem upon speech therapy evaluation, it would be productive to consider sensory issue is making it more difficult for him to adjust to using the electronic medical record system and how that may be related to ADHD symptoms. If there are any recommendations to assist him in this realm, they are welcomed.
6. I believe Dr. Vorgias would benefit from psychotherapy weekly for the first few months. Then every two weeks would be sufficient until the desired cognitive, emotional, and behavioral changes are achieved.

## COMPENSATION TO BE PAID FOR EXPERT SERVICES

Attached is a copy of my rate sheet for professional services provided.

## LIST OF ALL CASES TESTIFIED DURING PREVIOUS 4 YEARS, AS EXPERT BY TRIAL OR DEPOSITION

Attached is a list of cases wherein I have previously testified, worked, or provided expert services/opinions.

Sincerely,
Whitmer and Associates, Inc.

Scott A. Whitmer, Psy.D.
Psychotherapist/Forensic Evaluator
Certified Rehabilitation Counselor
American Board of Vocational Experts-Diplomat
International Psychometric Evaluation Certified
Licensed Mental Health Counselor

0036

**EX. 8**



# WHITMER & ASSOCIATES, Inc

Scott A. Whitmer, PsyD, CRC, ABVE/D, IPEC, LMHC
## PROFESSIONAL FEE & SERVICE AGREEMENT

**Evaluation billable activity typically includes case management, research, testing, interviews, report writing and testimony. Here are some following examples but the list is not exhaustive:**

| | | |
|---|---|---|
| Interview(s) of Examinee | Interview of Collateral Source(s) | Labor Market Research |
| Administering Tests | Authoritative Literature Review | Writing Correspondence |
| Communicating by Phone | Communicating by Email | Communicating by other |
| Writing Reports | Review of Documents & Files | Consultation In Person |
| Electronic Consultation | Research of Relevant Data | Scoring, Analysis, Synthesis |
| Reading Correspondence | File Reviews | Any Kind of Testimony |

**Billable Fees for Evaluation and Testimony will be billed hourly, with smallest units billed by 15-minute intervals.**

**HOURLY BILLABLE FEES:**

| | |
|---|---|
| All Evaluation and Case Management Activities | $325.00 per hour |
| All Types of Testimony (Deposition, Live Testimony..) | $425.00 per hour |
| Test Instrument Cost | Cost + 10% administration |
| A file, organization, set-up, admin, consultations, naming fee | 1 hour minimum |
| Travel Time | 50% of billable rate per hour |
| Wait Time | 50% of billable rate per hour |
| Driving Mileage | .55 cents per mile |
| Parking | Reimbursed by receipt |
| Air Line Fees | Reimbursed by receipt |
| Hotel Fees | Reimbursed by receipt |

Fees for expert or non-expert testimony at any level of litigation (depositions, mediation, arbitration, and trial) is billed by incremental hour as noted above. If there is a remaining balance due to Scott A. Whitmer or Whitmer & Associates, Inc., after any retainer funds have been exhausted, the final evaluation report will not be made available to the party (s) signing and paying under this agreement until the invoice for such services are paid in full.

**FEES FOR TESTIMONY:** If I am required to testify, a new retainer fee of $3,500.00 is required prior to testimony. A 4-hour minimum at the testimony rate will be charged against the retainer if I spend less than 4-hours testifying. If I am asked to be available for more than 4-hours for any kind of testimony, the minimum amount due will be $3,500.00 per day. I will schedule testimony time on my calendar, but it must occur no less than two weeks in advance of the date of testimony. Prior payment for scheduled testimony is due at time of scheduling or no later than 3 business days after scheduling. Any testimony cancelled during 2 weeks prior to the testimony date by defense, plaintiff, court, or unrepresented, will be charged accordingly for the amount of time I was expected to testify.

| | |
|---|---|
| **RETAINER SPECIFICS FOR THIS AGREEMENT:** | |
| Retainer Amount Required: | $3,500.00 |
| Payable to: | Whitmer and Associates, Inc or Scott A. Whitmer |
| Address: | 205 N. 40th Avenue, Suite 203, Yakima, WA  98908 |
| FED EIN: | 46-2012523 |

0037

**EX. 8**

## TESTIMONY LOG of SCOTT A. WHITMER, PSYD, LMHC, CRC, ABVE/D, IPEC as of 08/16/2021

Scott A. Whitmer, PsyD, LMHC, CRC, ABVE/D, IPEC

Evaluations, deposition, administrative hearings, arbitrations, mediations, and jury trials.

| Claimant Name | Claim or Case ID | Client/Attorney/Referrer | Client Type | Case Type | Date of Referral | Date of Closure |
|---|---|---|---|---|---|---|
| | | Whitmer & Associates Inc. | | EIN: 2012523 | | |
| Kramer, Joshua | Kramer | Montoya Hinkley | Employment | Employment Law | 06/28/2021 | 07/12/2021 |
| Potter, Shiloh | Potter | True Law Group, PS | Family Law | Family Law | 08/25/2020 | Ongoing as of 08/16/2021 |
| Martinez-Rodriguez, Juan | Martinez-Rodriguez | Qwest Office | Immigration | Immigration Hardship Evaluation | 2019 | 04/21/2021 |
| Shiner, Velma Rae | Shiner | Referred by Daughter | Geriatric | Mental Health Assessment | 04/13/2021 | 04/23/2021 |
| Cabrera, Martha | Cabrera | Church and Page, PLLC | Plaintiff | Personal Injury | 03/10/2021 | 06/21/2021 |
| Angeles Sanchez, Maurilio | Angeles-Sanchez | Qwest Office | Immigration | Immigration Hardship Evaluation | 2019 | 04/13/2021 |
| Nicholson, Patrick | Nicholson | Self-Referred | Defense | Psychosexual/Parental | 03/09/2021 | Ongoing as of 08/16/2021 |
| Acord, Lorraina | Acord | Gierth-Eddy Law Offices | Plaintiff | Personal Injury | 08/28/2020 | 01/04/2021 |
| Brophy, Mike | Brophy | William Pickett, Attorney | Employment | Employment Law | 05/25/2021 | 07/23/2021 |
| Lackey, Kanani | Lackey | Gierth-Eddy Law Offices | Plaintiff | Personal Injury | 08/28/2020 | Ongoing as of 08/16/2021 |
| Rodriguez-Hunter, Cherayl | Rodriguez vs. Rodriguez-Hunter | Yakima Law, PLLC | Parental | Family Law/Parental | 03/25/2021 | 06/15/21 |
| Kienow, Teresa | Kienow | Self-Referred | Parental | Divorce Lit/Parental | 08/20/2020 | 2020 |
| Hibbs, Tom | #BC89874 | Darrell Smart | Plaintiff | Worker Comp | 2020 | 2020 |
| Macias-Martinez, Luis | #BB61914 | Darrell Smart | Plaintiff | Worker Comp | 01/19/2021 | 2021 |
| Buckmiller, John | Buckmiller vs. VA Mason Med Ctr | Shannon Trivett | Plaintiff | Employment Law | 03/12/2020 | 2021 |

0038

**EX. 8**

| Kienow vs. Kienow | Kienow | Self-Referred | Parental | Divorce Lit /Parental | 08/20/2020 | 02/13/2021 |
| Lorena Martin | Martin vs. Mariners | Lasher, et al. | Plaintiff | Discrimination | 09/05/2019 | 09/21/2020 |
| Andrea Goebel | Goebel | Goebel | Plaintiff | Discrimination | 12/15/2019 | 03/20/2020 |
| Jennifer Babione | Babione | Ken Babione | Plaintiff | Competency Evaluation | 11/13/12019 | 02/19/2020 |
| Lorynda Guerrette | Guerrette | Jared Wagner, MD | Plaintiff | Pain Evaluation | 08/15/2019 | 10/15/2019 |
| Seth Calagna | Calagna | S Calagna | Plaintiff | Fit to Parent | 03/21/2019 | 07/01/2019 |
| Maurilio Angela Sanchez | Mas | Paul D. Edmondson | Plaintiff | Immigration | 05/13/2019 | 06/12/2019 |
| Juan Martinez | Jmart | Paul D. Edmondson | Plaintiff | Immigration | 04/26/2019 | 06/06/2019 |
| Jacqueline Howard | Howard | Sonia Rodriquez | Defense | Adoption Child | 03/12/2019 | 05/07/2019 |
| Hull et.al. vs. Heritage et. al. | Hull vs. Heritage | Lasher et. al. | Plaintiff | Discrimination | 01/03/2019 | 04/01/2019 |
| Karisa Usher | Dupont | EAP/Compsych | Employment | Fit to Work | 01/15/2019 | 03/09/2019 |
| Marisa Sagar | Sagar | M. Sagar | Plaintiff | Fit to Parent | 05/14/2018 | 05/23/2018 |
| Taylor Clark | Clark | T. Clark | Plaintiff | Fit to Train US Armed Svs. | 04/01/2018 | 05/10/2018 |
| Samuel Endicott | Endicott | Kim Endicott | Plaintiff | Fit to Work Train | 02/23/2018 | 04/17/2018 |
| Kienow vs. Kienow | Kienow | Self-Referred | Parental | Divorce Lit /Parental | 08/20/2020 | 02/13/2021 |
| Lorena Martin | Martin vs. Mariners | Lasher, et al. | Plaintiff | Discrimination | 09/05/2019 | 09/21/2020 |
| Andrea Goebel | Goebel | Goebel | Plaintiff | Discrimination | 12/15/2019 | 03/20/2020 |
| Jennifer Babione | Babione | Ken Babione | Plaintiff | Competency Evaluation | 11/13/12019 | 02/19/2020 |
| Dodd, Danny | Domestic V. | Danny Dodd | Plaintiff | Domestic Violence Psych Evaluation | 01/08/2019 | 02/15/2019 |
| Hull et al. vs. Heritage University | Discrimination | Shannon Trivett | Plaintiff | Class Action Law Suit Discrimination | 01/02/2019 | 02/04/2019 |
| Clark Taylor Ann | Fit for Duty | Taylor Ann Clark | Plaintiff | Fit for Duty Military | 02/10/2018 | 05/10/2018 |
| Martinez, Carlos | DEA | Carlos Martinez | Plaintiff | Criminal | 01/17/2018 | 4/30/2018 |
| Smith, Ian | SSA/DSHS | Ian Smith | Plaintiff | Disability Neuro-developmental | 12/20/2017 | 03/20/2018 |

0039

**EX. 8**

| Brown, Bruce L. | F28443-A | Johnson & Johnson | Plaintiff | Personal Injury | 09/01/2015 | 09/01/2015 |
|---|---|---|---|---|---|---|
| Poteet, Debra | 14-2-01400-4-A | Hitt, Hiller, Monfils, Williams | Defense | Personal Injury | 03/27/2015 | 03/27/2015 |
| Hinojosa, Martin | PB013015-A | Prezler & Bunch | Plaintiff | MVA | 01/30/2015 | 01/30/2015 |
| Romero, Fred | DLFR090613 | Delore Johnson | Plaintiff | Personal Injury | 09/06/2013 | 10/27/2014 |
| Moore, Richard | MOORE14 | Manny Jacobawitz | Plaintiff | Personal Injury | 03/19/2014 | 03/19/2014 |
| Barrera, Martin | 12-3117-TOR | Brendan W. Monahan | Defense | Discrimination | 11/13/2013 | 03/13/2014 |
| Mitchell, Loren | 12-2-03138-7 | Gierth- Eddy Law Offices | Plaintiff | Personal Injury | 09/03/13 | 02/21/2014 |
| Winkfield, Walter | SE06749 | Smart Connell Childers | Plaintiff | Worker Comp | 12/05/13 | 02/21/2014 |
| SCOTT | ENTERED | DOCTORAL PROGRAM | 2013-2017 | LIMITED TIME | FOR FORENSIC | EVALUATION |
| Campos, Urbano | AH15809 | Michael Connell | Plaintiff | Worker Comp | 06/14/2013 | 09/25/2013 |
| Finney, Rocky | AK62695 | Smart Connell Childers | Plaintiff | Workers Comp | 01/14/2013 | 09/20/2013 |
| Holford, Barbara | SE-43502 | Barbara Holford | Plaintiff | Worker Comp | 03/05/2013 | 09/18/2013 |
| Larsen, Deneise | HKL09182013 | Henning, Keedy & Lee | Plaintiff | Life Care Plan | 09/18/2013 | 09/18/2013 |
| McClellan, Patricia | AH90745 | Smart Connell Childers | Plaintiff | Worker Comp | 04/03/2013 | 08/23/2013 |
| Baumgart v State of Montana | CDV 2011-452 | Ross McLinden | Defense | Worker comp | 09/17/2012 | 07/24/2013 |
| Frisk, Terry | AJ90997 | Smart Connell Childers | Plaintiff | Workers Comp | 12/12/2012 | 03/18/2013 |
| Urbina, Rick | Y881677 | Smart Connell Childers | Plaintiff | Workers Comp | 09/05/2012 | 11/15/2012 |
| Hanses v Hanses | 12-3-00239-1 | Jeffers Danielson | | Divorce | 05/30/2012 | 09/05/2012 |
| Gomez, Jesus | Y922298 | AG Spokane | Defense | Worker Comp | 04/23/2012 | 08/06/2012 |
| Gonzalez, Evarista | AK25929 AH64053 | AG Wenatchee | Defense | Worker Comp | 04/23/2012 | 07/05/2012 |
| Pugh, Eldon | C06166842 | NW Liberty Insurance | Defense | Personal Injury | 01/23/2012 | 04/02/2012 |
| Serrano, Antonia | SMAC | Smart Connell Childers | Plaintiff | Worker Comp | 08/25/2011 | 03/12/2012 |
| Macias, Blanca | MVADELJ-P | Delore-Johnson | Plaintiff | Personal Injury | 09/23/2011 | 03/08/2012 |
| Frisk, Terry | AJ90997 | Smart Connell Childers | Plaintiff | Worker Comp | 04/25/2011 | 01/12/2012 |
| Hille, Janet | 201878 | Delorie Johnson | Plaintiff | Personal Injury | 04/06/2011 | 01/12/2012 |
| Mahoney, Edward | MAHONEYDE | Delorie-Johnson | Plaintiff | Worker Comp | 09/01/2011 | 01/12/2012 |
| Zimmerman, Tamara | ZIMM-TAMAKI | Tamaki Law | Plaintiff | Personal Injury | 01/18/2011 | 01/12/2012 |
| Lott, Lillian | AA31112 | Smart Connell Childers | Plaintiff | Workers Comp | 10/17/2011 | 12/21/2011 |
| Wilson, Stacie | STWILSON-Del | Delorie-Johnson | Plaintiff | Worker Comp | 04/13/2011 | 12/01/2011 |

0040

**EX. 8**

| | | | | | | |
|---|---|---|---|---|---|---|
| Dehaven, Diana | SA76161 | Will Halpin | Plaintiff | Worker Comp | 06/15/2011 | 11/16/2011 |
| Mauldin, Clay | MAULDINSMC | Smart Connell Childers | Plaintiff | Worker Comp | 07/16/2011 | 11/16/2011 |
| Carter, Mary | CARTERJBUR G | VanderMay  Law | Plaintiff | Personal Injury | 05/13/2011 | 10/19/2011 |
| Godoy, Rito | GODOYSMCC | Smart Law | Plaintiff | Worker Comp | 03/21/2011 | 07/31/2011 |
| Crowl, Ralph | JBOWMAN201 1 | John Bowman | Plaintiff | Personal Injury | 04/06/2011 | 07/20/2011 |
| Arslanian, Carolee D | Arslanian-DJ | Delorie-Johnson | Plaintiff | Worker Comp | 06/01/2010 | 05/05/2011 |
| Fox, Bradley | X787304 | Smart Connell Childers | Plaintiff | Worker Comp | 01/10/2011 | 05/05/2011 |
| Wild, Verna | W834211 | Smart Connell Childers | Plaintiff | Workers Comp | 12/29/2010 | 05/05/2011 |
| Canseco, Flor | CANSECO-DJ | Delorie Johnson | Plaintiff | Worker Comp | 07/06/2010 | 04/13/2011 |
| Honsinger, Alissa | HONS_DELJ | Delorie Johnson | Plaintiff | Worker Comp | 07/13/2010 | 04/13/2011 |
| McKinney, Barbara | BMCKN-SMCC | Smart Connell Childers | Plaintiff | Worker Comp | 08/11/2010 | 04/13/2011 |
| Munoz, Javier | DJMUNOZ | Delorie Johnson | Plaintiff | Worker Comp | 09/09/2010 | 04/13/2011 |
| Tilton, Erin | 201723 | Delorie Johnson | Plaintiff | Workers Comp | 05/05/2010 | 04/13/2011 |
| Walker, Karin | WALKER_SM | Smart Connell Childers | Plaintiff | Workers Comp | 06/23/2010 | 04/13/2011 |
| Williams, Roy | RWilms-SMCC | Smart Connell Childers | Plaintiff | Workers Comp | 08/03/2010 | 04/13/2011 |
| Brown, Georgiann | HBB-Brown | Hurst Brumbeck & B | Plaintiff | Worker Comp | 11/08/2010 | 04/07/2011 |
| Guajardo, Lionel | W919467 | Smart Connell Childers | Plaintiff | Worker Comp | 04/12/2010 | 10/06/2010 |
| Crain, Kerry | Y295245 | Colbom & Schwab | Plaintiff | Worker Comp | 09/08/2010 | 09/29/2010 |
| Dixon, Joanna | Dixonverhulp | Smart, Connell, Childers & V | Plaintiff | Personal Injury | 11/16/2009 | 09/29/2010 |
| Gangle, Rory L. | Gangle | Delorie Johnson | Plaintiff | Personal Injury | 02/19/2009 | 08/02/2010 |
| Odom, Scott | X157859 | Smart, Connell, Childers | Plaintiff | Worker Comp | 12/04/2009 | 08/02/2010 |
| Hubbard, Kristi | SA68920 | Smart, Connell, Childers | Plaintiff | Worker Comp | 03/05/2010 | 07/30/2010 |
| Baty, Jeffrey B. | RRB-2167 | Anna Baca | Defense | Railroad Retirement Board | 03/01/2010 | 06/14/2010 |
| Mitchell, Steven G. | RRB-2560 | Anna Baca | Defense | Railroad Retirement Board | 03/11/2010 | 06/14/2010 |
| Garcia, Guillermo | N705874 | Attorney General | Defense | Worker Comp | 08/18/2009 | 04/01/2010 |
| Hernandez, Angelica | Y558800 | Smart, Connell, Childers | Plaintiff | Workers Comp | 09/23/2009 | 04/01/2010 |
| Rogers, Wanda | W594789 | Delorie Johnson | Plaintiff | Worker Comp | 02/12/2010 | 04/01/2010 |
| Sellers, Stanley E. | Gano5174 | Thorner, Kennedy & Gano | Plaintiff | Long Term Disability | 03/02/2010 | 04/01/2010 |
| Seward, Thomas G. | AB48545 | Delorie Johnson | Plaintiff | Personal Injury | 06/18/2009 | 04/01/2010 |

0041

**EX. 8**

| | | | | | | |
|---|---|---|---|---|---|---|
| Habberfield, Dean | W964149 | Smart Connell Childers | Plaintiff | Worker Comp | 1/2/2009 | 03/23/2010 |
| Bain, John | 27583 | Layman, Layman, & Robinson | Plaintiff | Personal Injury | 5/12/09 | 03/15/2010 |
| Pineda, Solidad | X123456 | Prediletto, Halpin | Plaintiff | Workers Comp | 09/23/2009 | 03/01/2010 |
| Para, Maria | W589042 | Sather, Byerly & Holloway | Defense | Workers Comp | 10/19/2009 | 02/01/2010 |
| Benner, Tod | MVA | Delorie Johnson | Plaintiff | MVA | 3/14/09 | 01/29/2010 |
| Deluca, David | Deluca3588 | Delorie Johnson | Plaintiff | Personal Injury | 5/20/09 | 01/29/2010 |
| Miller, Shawn | AC20823 | Delorie Johnson | Plaintiff | MVA | 3/11/2008 | 01/13/2010 |
| Bernal, Ricardo | AE66283 | Timothy Hamill | Plaintiff | Worker Comp | 7/15/09 | 12/23/2009 |
| Corbaley, Stephen | CORBALEY | Walthew Law Firm | Plaintiff | Workers Comp | 06/16/2009 | 12/23/2009 |
| Rowe, Benjamin | TAMAKI | Tamaki Law | Plaintiff | MVA | 5/14/2008 | 12/23/2009 |
| Urbina, Maria | Y881656 | Smart Connell Childers Verhul | Plaintiff | Worker Comp | 5/12/09 | 12/23/2009 |
| Tillotson Sr, Phillip L | AA85982 | Attorney General | Defense | Workers Comp | 08/25/2009 | 10/28/2009 |
| Hay, Jerry | AC42947 | Larson Berg Perkins | Defense | Worker Comp | 5/14/2009 | 10/21/2009 |
| Matthews, Dave | Matthews5497 | Delorie Johnson | Plaintiff | Worker Comp | 4/20/09 | 10/21/09 |
| Shields, Marylu | MVA | Tamaki Law | Plaintiff | MVA | 3/02/2009 | 10/21/2009 |
| Bartz, Robert | NA | Tamaki Law | Plaintiff | MVA | 2/11/2009 | 09/30/2009 |
| Miller, Marjorie | NA | Delorie Johnson | Plaintiff | MVA | 2/19/2009 | 08/18/2009 |
| Mejia, Abigail | Y990893 | Smart Connell Childers Verhulp | Plaintiff | Worker Comp | 4/14/09 | 08/10/2009 |
| Morgan, Randy | Morg9554 | John Pidgeon | Plaintiff | Worker Comp | 5/08/09 | 06/24/2009 |
| Miramontes, Raquel | Y181612 | Smart, Connell, Childers | Plaintiff | Worker Comp | 3/5/09 | 6/8/09 |
| Biorato, Agustin | X210170 | Smart Connell Childers | Plaintiff | Worker Comp | 12/30/2008 | 5/29/09 |
| Zorrozua, Donna | NA | Delorie Johnson | Plaintiff | Personal Injury | 12/19/2008 | 5/29/2009 |
| Ash, Kris | MVA92802 | Tamaki Law | Plaintiff | MVA | 12/05/2008 | 5/12/09 |
| Gabino, Steven | OS4501730 | Tamaki Law | Plaintiff | Personal Injury | 8/15/08 | 5/12/09 |
| Harrell, Mary | NA | Tamaki Law | Plaintiff | MVA | 5/22/2008 | 5/12/2009 |
| Hickman, Darrell | P785189 | Smart Connell Childers | Plaintiff | Worker Comp | 9/24/2008 | 5/12/2009 |
| Travis, Kathleen | Y464477 | Smart Connell Childers | Plaintiff | Worker Comp | 8/12/2008 | 5/12/2009 |
| Jenkins, Robert W. | Y898607 | Smart Connell, Childers | Plaintiff | Workers Comp | 04/16/2009 | 04/21/2009 |
| Copeland, Courtney | AB48651 | Smart, Connell, Childers | Plaintiff | Workers Comp | 03/30/2009 | 04/08/2009 |

0042

**EX. 8**

| | | | | | | |
|---|---|---|---|---|---|---|
| Crawford, Roger | n/a | Tamaki Law | Plaintiff | Personal Injury | 2/11/2009 | 4/08/2009 |
| Trepanier, Byron R | Y278287 | Attorney General | Defense | Workers Comp | 03/18/2009 | 04/08/2009 |
| Bafus, Lisa | Y631305 | Attorney General | Defense | Worker Comp | 2/12/2009 | 3/16/09 |
| Ibarra, Yoland | X578938 | Smart Connell Childers | Plaintiff | Worker Comp | 2/2/2009 | 3/16/09 |
| Ross, Tammy | W127798 | Thorner, Kennedy,Gano | Plaintiff | Worker Comp | 10/03/2008 | 3/10/2009 |
| Howell, Kina | W813511 | Walthew Law Firm | Plaintiff | Worker Comp | 12/31/2008 | 2/20/2009 |
| Benitez, Erika | Y488266 | Smart Connell Childers | Plaintiff | Worker Comp | 11/10/2008 | 2/2/2009 |
| Nelson, Donna | P363013 | Attorney Gen | Defense | Worker Comp | 11/26/2008 | 1/27/2009 |
| Erb, Theodore Sr | AE28116 | Attorney Gen | Defense | Worker Comp | 10/20/2008 | 1/22/2009 |
| Soto, Marisela | AB03964 | Smart Connell Childers | Plaintiff | Worker Comp | 10/15/2008 | 1/06/2009 |
| Godinez, Candelario | K608660 | Prediletto Halpin Scharnikow | Plaintiff | Worker Comp | 9/29/08 | 12/23/2008 |
| Adair, Mary R | Y326158 | Attorney General | Defense | Worker Comp | 9/11/2008 | 11/21/2008 |
| Pastrana, Wanda | W790255 | Smart Connell Childers | Plaintiff | Worker Comp | 8/29/2008 | 11/20/2008 |
| Valencia, Rosalinda | Y741601 | Smart, Connell, Childers | Plaintiff | Workers Comp | 09/02/2008 | 11/04/2008 |
| Odom, Scott W. | X157859 | Smart, Connell, Childers | Plaintiff | Worker Comp | 1/22/08 | 10/23/2008 |
| Ramirez, Rosa | N/A | Tamaki Law | Plaintiff | Worker Comp | 9/2/2008 | 10/23/2008 |
| Villa, Santiago | AE34837 | Smart Connell Childers | Plaintiff | Worker Comp | 3/5/2008 | 10/21/2008 |
| Porras, Adam | NA | Delorie Johnson | Plaintiff | MVA | 6/10/2008 | 10/02/2008 |
| Sears, Byron | Y393311 | Smart Connell Childers | Plaintiff | Worker Comp | 1/23/2007 | 9/22/2008 |
| Renick, Ophelia | AA52189 | Smart Connell Childers | Plaintiff | Worker Comp | 5/4/2007 | 8/07/2008 |
| Robinette, Suzanne | NA | Attorney Gen | Defense | Worker Comp | 1/14/2008 | 8/07/2008 |
| Griffin, Ray | SA70303 | Smart Connell Childers | Plaintiff | Worker Comp | 5/26/08 | 7/30/2008 |
| Kiefel, Palmer | K383842 | Thorner, Kennedy, Gano | Plaintiff | Worker Comp | 5/20/2008 | 7/07/2008 |
| Miranda, Gildardo | N538167 | Smart, Connell, Childers | Plaintiff | Worker Comp | 3/8/07 & 4/15/08 | 6/04/07 & 7/07/08 |
| Butrick, George | Y752340 | Attorney General | Defense | Worker Comp | 5/13/2008 | 6/12/2008 |
| Carter, Phyllis | W758933 | Smart, Connell, Childers | Plaintiff | Worker Comp | 12/4/2007 | 6/03/2008 |
| Davisson, Steph | Y917696 | Attorney Gen | Defense | Worker Comp | 3/25/2008 | 5/21/2008 |
| Page, Janelle | 1571331 | Tamaki Law | Plaintiff | Personal Injury | 3/30/2008 | 5/16/2008 |
| Hutfles, Gladys | Y646716 | Attorney General | Defense | Worker comp | 3/17/2008 | 5/8/2008 |
| Marshal, Gloria | Y081568 | Bothwell & Hamill | Plaintiff | Worker Comp | 2/28/2008 | 4/30/2008 |

0043

**EX. 8**

| | | | | | | |
|---|---|---|---|---|---|---|
| Jahiafendic, Jusuf | W957261 | Smart Connell Childers | Plaintiff | Worker Comp | 3/7/2008 | 4/21/2008 |
| Danielson, James | X306874 | Attorney Gen | Defense | Worker Comp | 3/06/2008 | 4/01/2008 |
| Sperle, Brian | P535810 | Smart, Connell, Childers | Plaintiff | Worker comp | 12/19/07 | 4/1/2008 |
| Forman, Randy | X356506 | Attorney General | Defense | Worker Comp | 3/6/2008 | 3/17/2008 |
| Ash, Kris | MVA92802 | Tamaki Law | Plaintiff | MVA | 6/27/2007 | 3/03/2008 |
| Leaverton, Lajuana | P656825 | Smart, Connell, Childers | Plaintiff | Worker Comp | 12/4/2007 | 2/21/2008 |
| Chairez, Yolanda | W860237 | Smart, Connell, Childers | Plaintiff | Worker comp | 1/18/2008 | 2/19/2008 |
| Martinez-Ramos, Juan | Y224361 | Smart Connell Childers | Plaintiff | Worker Comp | 6/29/2007 | 2/13/2008 |
| Ostrom,  Scott | NA | Meyer, Fluegee, Tenney | Defense | Personal Injury | 9/24/08 | 1/13/2008 |
| Rojas, Elva | X424639 | Thorner, Kennedy,Gano | Plaintiff | Worker Comp | 9/5/2007 | 1/8/2008 |
| Breed, Douglas | Y324509 | Attorney General | Plaintiff | Worker Comp | 3/27/2007 | 12/14/07 |
| Jones, Steve | Y686448 | Prediletto, Halpin | Plaintiff | Worker Comp | 10/1/2007 | 12/13/07 |
| Lee, Carolyn | Y267508 | Thorner, Kennedy Gano | Plaintiff | Worker Comp | 10/15/2007 | 11/26/2007 |
| Wilson, Lloyd | Y646069 | Attorney General | Defense | Worker Comp | 10/22/2007 | 11/26/2007 |
| Ribail, Daniel | Y615750 | Bothwell | Plaintiff | Worker Comp | 8/17/2007 | 11/13/2007 |
| Silver, Melvin | SA33459 SA33486 | Smart Connell Childers | Defense | Worker Comp | 10/26/2007 | 11/9/2007 |
| Rogers, Wanda | W594789 | Smart Connell Childers | Plaintiff | Worker Comp | 3/12/2007 | 10/29/2007 |
| Hefner, Walter | 539562993 | Johnson | Plaintiff | Personal Injury | 4/20/2007 | 10/25/2007 |
| Thompson, Warren | AB12544 | Smart Connell Childers | Plaintiff | Worker Comp | 9/6/07 | 10/22/2007 |
| Beeks, Darcia | Y295108 | Smart Connell Childers | Plaintiff | Worker Comp | 4/4/2007 | 10/19/07 |
| Artiach, Sandra | W775805 | Smart Connell Childers | Plaintiff | Worker Comp | 6/20/2007 | 10/2/07 |
| Buckman, Jimmy | Y402040 | Smart Connell Childers | Plaintiff | Worker Comp | 6/28/07 | 9/13/07 |
| Macias, Gildardo | AA35445 | Gano | Plaintiff | Worker Comp | 5/7/2007 | 8/30/2007 |
| Sutton, Shawn | | Tamaki Law | Plaintiff | Worker Comp | 5/12/2006 1/12/08 | 8/23/2007 6/16/2008 |
| Goulding,Charles | Y965201 | Smart Connell Childers | Plaintiff | Worker Comp | 4/13/07 | 8/03/2007 |
| Torres, Rogelio | N236332 | Smart Connell Childers | Plaintiff | Worker Comp | 4/19/07 | 8/02/2007 |
| Gabino, Steven | OS4501730 | Tamaki Law | Plaintiff | Personal Injury | 1/18/0207 | 8/01/2007 |
| Nelson, Vickie | AA65001 | Ricean & Associates | Plaintiff | Worker Comp | 7/05/2006 | 7/26/2007 |
| Berrones, Nick | 3088-A | Tamaki | Plaintiff | Personal Injury | 10/20/2006 | 6/19/07 |
| Salgado, Maria | X089284 | Smart Connell Childers | Plaintiff | Worker Comp | 3/0620/07 | 6/4/2007 |

0044

**EX. 8**

| Richards, Joel | Y903540 | Tenney | Defense | Personal Injury | 4/12/2007 | 5/15/2007 |
|---|---|---|---|---|---|---|
| Morris, Jack | MFT19031 | Meyer Fluegee Tenney | Plaintiff | Personal Injury | 5/15/2006 & 2/26/2007 | 9/6/2006 & 4/18/2007 |
| Clark, Chester | Y716137 | Prediletto Halpin Scharnikow | Plaintiff | Worker Comp | 2/27/2007 | 4/11/2007 |
| Eric Vargas | 534683697 | Private Attorney | Plaintiff | LTD | 09/06/2006 | 04/11/2007 |
| Nicholson, Allen | P084007 | Scharnikow | Plaintiff | Worker Comp | 2/28/07 | 4/3/07 |
| Gibson, Shirley | Y193459 | Prediletto Halpin Scharnikow | Plaintiff | Worker Comp | 5/26/06 | 3/1/2007 |
| Campos, Gabriela | T436740 | Prediletto Halpin Scharnikow | Plaintiff | Worker Comp | 8/22/2006 | 2/01/2007 |
| Sanchez, Elvira | P196144 | Smart Connell Childers | Plaintiff | Worker Comp | 2/08/2006 | 2/01/2007 |
| Eslinger, Norman | W919325 | Prediletto Halpin Scharnikow | Plaintiff | Worker Comp | 9/6/2006 | 12/19/2006 |
| Gonzales, Jose | X228176 | Smart Connell Childers | Plaintiff | Worker Comp | 3/23/06 | 11/28/2006 |
| Hernandez, Rita | W942801 | Smart Connell Childers | Plaintiff | Worker Comp | 10/31/2006 | 11/28/2006 |
| Brigman, Ralph | W080718 | Craig, Jessup, & Stratton | Plaintiff | Worker Comp | 10/18/2006 | 11/27/06 |
| Lenk, Roger | SCC1235-A | Smart Connell Childers | Plaintiff | Long Term Disa. | 10/26/2006 | 11/16/2006 |
| Beeler, Steve | P392736 | Smart Connell Childers | Plaintiff | Worker Comp | 7/20/2006 | 10/20/2006 |
| Lawhorn, Ester | Y114892 | Smart Connell Childers | Plaintiff | Worker Comp | 3/24/2006 | 10/16/2006 |
| Rosas, Margarita | P745444 | Smart Connell Childers | Plaintiff | Worker Comp | 5/18/2004 | 10/5/2006 |
| Hall, Richard | W412524 | Prediletto Halpin Scharnikow | Plaintiff | Worker Comp | 6/22/2006 | 10/2/2006 |
| Ceja, Silvino | Y950421 | Tamaki Law | Plaintiff | Worker Comp | 6/6/2006 | 9/29/2006 |
| Francis, Rodney | Y367429 | Smart Connell Childers | Plaintiff | Worker Comp | 8/10/2006 | 9/27/2006 |
| Baughn, Corey | W722278 | Craig Jessup Stratton | Defense | Worker Comp | 9/1/2006 | 9/12/2006 |
| Brunelle, Lawrence | 190006 | Meyer Fluegee Tenney | Plaintiff | Personal Injury | 5/3/2006 | 9/8/2006 |
| Lamas, Yurico | TL10974 | Tamaki Law | Plaintiff | Personal Injury | 4/6/2006 | 8/1/2006 |
| Impson, Kevin | R1819578 | Tamaki Law | Plaintiff | Personal Injury | 2/2/2006 | 7/25/2006 |
| Gangle, Rory L. | Djohnson | Delorie Johnson | Plaintiff | Personal Injury | 6/21/2005 | 6/14/2006 |
| Arenas, Alfredo | R1816237 | Tamaki Law | Plaintiff | Personal Injury | 2/2/2006 | 5/9/2006 |
| Davenport, William | P728807 | Attorney Gen | Defense | Worker Comp | 2/08/2006 | 4/13/2006 |
| Jonas, Penny | MVA | Delorie Johnson | Plaintiff | Personal Injury | 5/12/2006 | 4/10/2006 |
| Knight, Terry | Smart | Smart Connell Childers | Plaintiff | Personal Injury | 9/12/2005 | 3/8/2006 |
| Conn, Ryan | P805070 | Smart Connell Childers | Plaintiff | Personal Injury | 9/8/2005 | 3/07/2006 |
| Torres, Rogelio | N236332 | Smart Connell Childers | Plaintiff | Worker Comp | 9/15/2005 | 1/30/2006 |

0045

**EX. 8**

| Vazquez, Elio | W860058 | Smart Connell Childers | Plaintiff | Worker Comp | 12/11/2005 | 1/17/2006 |
|---|---|---|---|---|---|---|
| Guzman, Osvaldo | Smart | Smart Connell Childers | Plaintiff | Personal Injury | 8/24/2005 | 1/10/2006 |
| Navarro, Teresa | Y613603 | Hurst, Brumbeck, Brusic | Plaintiff | Personal Injury | 6/1/2005 | 1/1/2006 |
| Roman, Mirta | Y613690 | Smart Connell Childers | Plaintiff | Worker Comp | 10/2/2005 | 12/30/2005 |
| Sandoval, Refugio | X111166 | Attorney Gen | Defense | Worker Comp | 7/11/2005 | 12/30/2005 |
| Lamb, Bradley | W765060 | Reeve, Shima | Defense | Worker Comp | 2/17/2005 | 11/16/2005 |
| Baugh, Richard | Y424788 | Attorney Gen | Plaintiff | Worker Comp | 2/29/2005 | 10/11/2005 |
| Mendez, Luis | X558058 | Smart, Connell, Childers | Plaintiff | Worker Comp | 7/15/2004 5/16/2005 | 8/26/2005 8/31/2005 |
| Buenaventura, Andr | Y636770 | Smart Connell Childers | Plaintiff | Worker Comp | 6/3/2005 | 8/22/2005 |
| Mejia, Jesus | Y488404 | Attorney General | Defense | Worker Comp | 7/7/2005 | 8/17/2005 |
| Fickel, Kerry | INC1211295 | Tamaki Law | Plaintiff | Personal Injury | 5/26/2005 | 6/20/2005 |
| Massengale, Daniel | Y615637 | Thomas Bothwell | Plaintiff | Worker Comp | 5/16/2005 | 6/6/2005 |
| Rodriguez, Jesus | K413921 | Smart Connell Childers | Plaintiff | Worker Comp | 2/10/2005 | 4/14/2005 |
| Ramos, Petra | N350552 | Hurst, Brumbeck, Brusic | Plaintiff | Worker Comp | 2/10/2005 | 4/07/2005 |
| Mejia, Jesus | Y488404 | Calbom & Schwab | Plaintiff | Worker Comp | 1/2/2003 | 2/25/2005 |
| Gabbard, Jack | 532385629 | Tamaki Law | Plaintiff | Worker Comp | 4/22/2004 | 2/3/2005 |
| Crawford, Jackie | P661912 | Attorney Gen | Plaintiff | Worker Comp | 11/1/2004 | 11/22/2004 |
| Barnhart, Thelma | P861666 | Smart Connell Childers | Plaintiff | Worker Comp | 7/14/2004 | 10/18/2004 |
| Rosas, Margarita | P189955 | Smart Connell Childers | Plaintiff | Worker Comp | 5/18/2004 | 10/5/2004 |
| Glidewell, Eva | P974078 | Smart Connell Childers | Plaintiff | Worker Comp | 8/11/2004 | 8/24/2004 |
| Denton, Carl | 723061 | Smart Connell Childers | Plaintiff | Worker Comp/MVA | 6/11/2004 | 7/30/2004 |
| George, Heidi | T012104 | Tamaki Law | Plaintiff | Personal Injury | 01/21/2004 | 07/30/2004 |
| Andrews, Teresa | T012104 | Tamaki Law | Plaintiff | Personal Injury | 1/21/2004 | 6/25/2004 |
| Cadengo, Linda | X578929 | Smart Connell Childers | Plaintiff | Worker Comp | 1/29/2004 | 2/27/2004 |
| Talbert, Sandy | N748559 | Smart Connell Childers | Plaintiff | Worker Comp | 1/6/2003 | 12/31/2003 |
| Cavazos, Robert | X338248 | Attorney Gen | Defense | Worker Comp | 11/17/2003 | 12/30/2003 |
| Ayala, Estela | Y295871 | Smart Connell Childers | Plaintiff | Worker Comp | 5/23/2003 | 7/2/2003 |
| Masters, Patty | M696478 | Smart, Connell, Childers | Plaintiff | Worker Comp | 12/17/2002 | 2/24/2003 |
| Lyczewski, Les | X574819 | Tamaki Law | Plaintiff | Personal Injury | 9/16/2002 | 2/17/2003 |

0046

**EX. 8**

| Masters, Patty | P661937 | Smart, Connell, Childers | Plaintiff | Worker Comp | 12/17/2002 | 1/24/2003 |
|---|---|---|---|---|---|---|
| Aranda, Leanne | 96-009180 | Tamaki Law | Plaintiff | Personal Injury | 6/24/2002 | 9/18/2002 |
| Damery, Kendra | CA 0683718 | Tamaki Law | Plaintiff | Personal Injury | 12/20/2001 | 6/30/2002 |
| Gonzalez, Sergio | P799448 | Attorney Gen | Defense | Worker Comp | 5/29/2002 | 6/30/2002 |
| Niemeyer, Gary | J199 10136 | Tamaki Law | Plaintiff | Personal Injury | 11/9/2001 | 5/6/2002 |
| Basford, Don | K722891 | Prediletto Halpin Scharnikow | Plaintiff | Worker Comp | 12/28/2001 | 4/24/2002 |
| Judy, Mary | W464074 | WKM | Defense | Worker Comp | 11/18/2001 | 4/8/2002 |
| Puerta, Benjamin | X103237 | Attorney Gen | Defense | Worker Comp | 1/17/2002 | 4/08/2002 |
| Rodriguez, Benito | X376809 | Attorney Gen | Defense | Worker Comp | 11/09/2001 | 4/08/2002 |
| Markle, Loy | P516611 | Attorney Gen | Defense | Worker Comp | 2/08/2000 | 2/25/2002 |
| Benjamin, Larry | P186046 | Attorney Gen | Defense | Worker Comp | 9/10/2001 | 9/25/2001 |
| Campos, Alida | X360054 | Attorney General | Defense | Worker Comp | 5/4/2001 | 5/30/2002 |
| Mitchell, Clifford | N678613 & X087691 | Attorney Gen | Defense | Worker Comp | 8/20/2001 | 10/1/2001 |

**EX. 8**